1   Sasha K. Danna (Cal. Bar No. 244462)
2   sasha.danna@kirkland.com
    KIRKLAND & ELLIS LLP
3   333 South Hope Street
4   Los Angeles, California 90071
    Telephone: (213) 680-8400
5   Facsimile: (213) 680-8500

6
    Michael B. Slade (*pro hac vice application to be filed*)
7   Christopher Esbrook (*pro hac vice application to be filed*)
    KIRKLAND & ELLIS LLP
8   300 North LaSalle
9   Chicago, Illinois 60654
    Telephone: (312) 862-2000
10  Facsimile: (312) 862-2200

11
12  *Attorneys for Plaintiffs*

13                UNITED STATES DISTRICT COURT
14          FOR THE CENTRAL DISTRICT OF CALIFORNIA

15

16  THE BOEING COMPANY and                )   CIVIL CASE NO. CV13-00730 ABC
17  BOEING COMMERCIAL SPACE               )                    (AJWx)
    COMPANY,                              )
18                                        )
                                          )   **COMPLAINT FOR:**
19              Plaintiffs,               )   **(1) BREACH OF CONTRACT -**
                                          )   **CREATION AGREEMENT;**
20         vs.                            )   **(2) BREACH OF CONTRACT -**
                                          )   **CREATION AGREEMENT;**
21  KB YUZHNOYE; PO YUZHNOYE              )   **(3) BREACH OF CONTRACT -**
22  MASHINOSTROITELNY ZAVOD;              )   **GUARANTEE AGREEMENT;**
    S.P. KOROLEV ROCKET AND SPACE         )   **(4) BREACH OF CONTRACT -**
23  CORPORATION, ENERGIA D/B/A            )   **GUARANTEE AGREEMENT.**
    ROCKET AND SPACE                      )
24  CORPORATION ENERGIA AFTER             )
25  S.P. KOROLEV; ENERGIA                 )   **DEMAND FOR JURY TRIAL**
26  OVERSEAS LLC; and ENERGIA             )
    LOGISTICS LTD.,                       )
27                                        )
                                          )
28              Defendants.               )

COPY

**COMPLAINT**

Plaintiffs The Boeing Company ("Boeing") and Boeing Commercial Space Company ("BCSC") (collectively, "Plaintiffs") bring this action against KB Yuzhnoye and PO Yuzhnoye Mashinostroitelny Zavod (collectively, "Yuzhnoye"), S.P. Korolev Rocket and Space Corporation, Energia d/b/a Rocket and Space Corporation Energia After S.P. Korolev ("Energia"), Energia Overseas LLC ("EOL"), and Energia Logistics Ltd. ("EL" and collectively with Yuzhnoye, Energia, and EOL the "Defendants"), and allege as follows:

1.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, which confers upon district courts "original jurisdiction of all civil actions arising under the Constitution, laws, or treatises of the United States." As alleged in more detail below, this action arises under the Foreign Sovereign Immunities Act (the "FSIA"), 28 U.S.C. §§ 1330 and 1605, because it is a civil action against agencies or instrumentalities of a foreign state, and such parties are not entitled to immunity. Title 28 U.S.C. § 1367, which defines the supplemental jurisdiction of district courts, furnishes an additional bases for jurisdiction over the parties and the claims raised in this action.

**PRELIMINARY STATEMENT**

2.    This is a straightforward breach of contract case. In 1995, Boeing and its wholly-owned subsidiary BCSC agreed with three international partners—Norway's Kvaerner Moss Technology, Russia's Energia, and Ukraine's Yuzhnoye—to create a joint venture called Sea Launch, a company based in Long Beach, California, to launch commercial satellites into space. Sea Launch required substantial investments to create, build, and operate. Substantial funding was provided by BCSC directly (through loans to Sea Launch) and Boeing indirectly (through guarantees of third-party loans to Sea Launch). Each of the partners agreed that if the venture failed, they would reimburse BCSC and Boeing for their fair share of the funding, in an amount reflecting their percentage ownership in the venture.

1

1        3.    Sea Launch failed.  It defaulted both on the loans directly made by BCSC

2    and on the loans made by third parties and guaranteed by Boeing.  Boeing and

3    BCSC—which were out of pocket hundreds of millions of dollars on the venture—

4    then asked their joint venture partners to live up to their contractual promises by

5    reimbursing Boeing and BCSC, as they were required to do by unambiguous written

6    agreements, for their respective shares of the risk.  Kvaerner (through its successor

7    Aker Maritime Finance AS ("Aker")) complied with obligations under joint and

8    several guarantees it had signed with Boeing, but Yuzhnoye and Energia refused to

9    contribute at all.  To be sure, neither Yuzhnoye nor Energia have disputed that they

10   are obligated to reimburse Plaintiffs for their share of the loans guaranteed by Boeing

11   and made by BCSC, nor could they do so.  Instead, they simply refuse to pay the over

12   $350 million they are contractually and legally obligated to pay Boeing and BCSC.

13       4.    Yuzhnoye's and Energia's obligations to pay Plaintiffs arises primarily

14   out of two agreements.

15       a.    *First*, the joint venture partners executed a document known as the

16   "Creation Agreement," attached as Exhibit 1, which created the

17   Sea Launch venture in 1995.  Article 9.4.2 of the agreement

18   provided, among other things, that if any parties or their affiliates

19   guaranteed Sea Launch debt, and ultimately had to pay on the

20   guarantees, each partner would reimburse the guarantor a

21   percentage of the debt equal to their ownership percentage in Sea

22   Launch.  Over the years, Boeing, at the request of Sea Launch and

23   based on assurances from each of the partners that they would

24   comply with their obligations under the Creation Agreement,

25   guaranteed almost $450 million in third-party loans to Sea Launch.

26   Boeing had to make good on those guarantees when Sea Launch

27   defaulted; under the Creation Agreement, each of the partners has

28   an unambiguous obligation to reimburse Boeing for their share.

1
2

Neither Yuzhnoye nor Energia has fulfilled its unambiguous obligation to reimburse Boeing.

3     b.     **Second**, BCSC made a loan of approximately $180 million directly
4             to Sea Launch (the "BCSC Loan").  Before it made the loan,
5             BCSC required Yuzhnoye and Energia to each guarantee a portion
6             of it—15% and 25%, respectively—reflecting their ownership
7             interests in Sea Launch.  Yuzhnoye and Energia executed
8             guarantee agreements, attached as Exhibits 2 (the "Yuzhnoye
9             Guarantee") and 3 (the "Energia Guarantee") (collectively, the
10            "Partner Guarantees"), which embody these promises.  Neither
11            Yuzhnoye nor Energia lived up to its promises after Sea Launch
12            defaulted on the BCSC Loan.

13    5.     Yuzhnoye and Energia owe Boeing and BCSC more than $350 million,
14    with interest continuing to accrue daily.  Instead of paying claims to which they have
15    no defense on the merits, Yuzhnoye and Energia have decided to stall and evade,
16    forcing Plaintiffs to chase them around the world to secure payment of debts clearly
17    owed.  Worse still, Energia created EOL and EL (the "Energia Subsidiaries"), and
18    other affiliates in Russia—all of which are alter egos of Energia—with the specific
19    intent of continuing to run Sea Launch in Long Beach, California, while attempting to
20    avoid paying the Plaintiffs.  This must end.  Plaintiffs respectfully request that the
21    Court enter judgment against the Defendants on each count of this Complaint.

22                                    **PARTIES**

23    6.     Boeing is the world's leading aerospace company and the largest
24    manufacturer of commercial jetliners and military aircraft combined.  Additionally,
25    Boeing designs and manufactures rotorcraft, electronic and defense systems, missiles,
26    satellites, launch vehicles and advanced information and communication systems.
27    Boeing employees over 150,000 people in the United States.  Boeing is incorporated
28    in Delaware and has its principal place of business in Illinois.

3

7.     BCSC is a Delaware corporation with its principal place of business in Illinois.  BCSC is a wholly-owned subsidiary of Boeing.

8.     KB Yuzhnoye and PO Yuzhnoye Mashinostroitelny Zavod (collectively, "Yuzhnoye") are Ukrainian aerospace design companies, each of which is wholly-owned by the State of Ukraine.

9.     Energia is a Russian joint-stock company which manufactures spacecraft and space station components.  At least 38% of Energia is directly owned by the Russian Federation.  On information and belief, the overwhelming majority of Energia is directly or indirectly owned by the Russian Federation.

10.    EOL is a Delaware limited liability company with its principal place of business in California.  EOL is indirectly owned by Energia, through certain Russian subsidiaries.

11.    EL is a Delaware corporation with its principal place of business in California.  EL is indirectly owned by Energia, through certain Russian subsidiaries. EL currently holds the license to operate Sea Launch.

12.    As further alleged below, Energia has used both EOL and EL, as well as other affiliates (including EOL's and EL's direct Russian parents), as alter egos to manage and control every aspect of Sea Launch's business, permitting Energia to reap the benefits of Plaintiffs' extensive investments in Sea Launch, while at the same time attempting to hide assets and escape liability for the breaches of contract asserted by Plaintiffs in this action.

## SUBJECT MATTER JURISDICTION

### I.    Jurisdiction Pursuant to the Foreign Sovereign Immunities Act.

13.    This Court has subject matter jurisdiction over this entire action pursuant to 28 U.S.C. § 1331 and the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1330 and 1605.  This is a civil action against a foreign state which is not entitled to immunity from this lawsuit.

4

14.     The FSIA, 28 U.S.C. § 1603, defines a foreign state to include agencies or instrumentalities of a foreign state.  Ukraine is a foreign state, and Yuzhnoye, which is wholly owned by Ukraine, is an agency or instrumentality of Ukraine.

A.     **Yuzhnoye Expressly or Implicitly Waived Sovereign Immunity in the Creation Agreement and in the Yuzhnoye Guarantee.**

15.     Yuzhnoye is not entitled to immunity because it expressly or implicitly waived sovereign immunity in, among other documents, the Creation Agreement.  The Creation Agreement contains the following provision:

> <u>Sovereign Immunity Waiver</u>.  Each Party hereby agrees that its participation this transaction constitutes private and commercial activity and shall not be regarded as a governmental or public act.  Each Party further agrees that its participation in this transaction is activity both in the United States and outside the United States having direct effect within the United States for purposes of waiver of sovereign immunity and exercise of jurisdiction of the courts of the United States pursuant to the Foreign Sovereign Immunities Act of 1976, as amended (28 U.S.C. § 1602 et seq.) and any equivalent law in . . . any other country . . . .

16.     By entering into the Creation Agreement, Yuzhnoye expressly waived sovereign immunity from any action, including the action brought by Plaintiffs here, which arises from the Creation Agreement.

17.     Yuzhnoye also expressly or implicitly waived sovereign immunity in the Yuzhnoye Guarantee.  Section 11(e) of the Yuzhnoye Guarantee provides:

> <u>Judicial Proceedings; Waiver of Jury Trial</u>:  Any judicial proceeding brought against the Guarantor under this Agreement may be brought in any court of competent jurisdiction in the United Kingdom and, by execution and delivery of this

1   Agreement, the Guarantor [] accepts, generally and
2   unconditionally, the nonexclusive jurisdiction of such
3   courts . . . . Nothing herein shall . . . limit the right of the
4   Lender . . . to bring proceedings against the Guarantor in the
5   courts of any other jurisdiction.

6   18.   In the Yuzhnoye Guarantee, the parties contemplated that BCSC may
7   bring an action against Yuzhnoye in any court, including any court in the United
8   States, for breach of the Yuzhnoye Guarantee.  By entering into the Yuzhnoye
9   Guarantee, Yuzhnoye expressly or implicitly waived sovereign immunity from any
10  action, including the action brought by Plaintiffs here, which is based on the
11  Yuzhnoye Guarantee.

12  **B.   Plaintiffs' Breach of Contract Claims Are Based upon Yuzhnoye's**
13  **Commercial Activity in the United States.**

14  19.   In addition, Yuzhnoye is not entitled to immunity because its conduct fits
15  within the "commercial activity" exception of the FSIA, 28 U.S.C. § 1605(a)(2).
16  *First*, this action is based upon commercial activity carried on in the United States by
17  Yuzhnoye.  *Second*, this action is based upon acts performed in the United States in
18  connection with commercial activity of Yuzhnoye elsewhere.  *Third*, this action is
19  based upon acts outside the United States in connection with the commercial activity
20  of Yuzhnoye elsewhere that caused a direct effect in the United States.

21  20.   Yuzhnoye is a Ukrainian aerospace design company that has engaged in
22  commercial activity in the United Sates—particularly, in California—on a continuous
23  and systematic basis since 1995.

24  21.   In the Creation Agreement, Yuzhnoye expressly agreed that its
25  involvement in the Sea Launch venture, including its entrance into the Creation
26  Agreement, constitutes "private and commercial activity . . . both in the United States
27  and outside of the United States having a direct effect within the United States . . . ."

28  22.   Yuzhnoye participated in the establishment of Sea Launch, a Long

1   Beach-based company engaged in the business of launching commercial satellites into

2   space.  As a Sea Launch partner, Yuzhnoye influenced the decisions that affected all

3   aspects of Sea Launch's business, and as a Sea Launch supplier, Yuzhnoye received

4   over $300 million for providing rockets and services to Sea Launch in Long Beach.

5   Yuzhnoye's entrance into the Creation Agreement and its performance of its

6   obligations under the Creation Agreement constitute commercial activity by

7   Yuzhnoye in the United States.

8       23.    Further, as part of its involvement in Sea Launch, Yuzhnoye also entered

9   into the Yuzhnoye Guarantee and agreed to repay a portion of the loan that BCSC

10  gave to Sea Launch, in the event Sea Launch defaulted on that loan.  This agreement

11  with a Delaware corporation (BCSC) to guarantee a loan for the benefit of a Long

12  Beach-based company (Sea Launch) also constitutes commercial activity by

13  Yuzhnoye in the United States.  And BCSC's breach of contract claim against

14  Yuzhnoye arises from the Yuzhnoye Guarantee.

15      24.    Moreover, Plaintiffs' claims for breach of contract against Yuzhnoye are

16  also based on acts by Yuzhnoye taken outside of the United States, which caused

17  direct effects in the United States.

18      25.    Pursuant to the Creation Agreement and the Yuzhnoye Guarantee,

19  Boeing and BCSC sent demand letters to Yuzhnoye in Ukraine requesting payment of

20  the amounts owed by Yuzhnoye under those agreements.  Yuzhnoye's refusal to pay

21  such amounts constitutes a breach, which caused direct and adverse effects on

22  Plaintiffs in the United States.  In particular, Yuzhnoye's refusal to pay has deprived

23  Plaintiffs of over $140 million which rightly belong to Plaintiffs under the Creation

24  Agreement and the Yuzhnoye Guarantee.

25  **II.    Supplemental Jurisdiction Pursuant to 28 U.S.C. § 1367.**

26      26.    In addition to having jurisdiction over the entire action under the FSIA,

27  this Court also has supplemental jurisdiction over Plaintiffs' claims against Energia

28

7

1   and the Energia Subsidiaries pursuant to 28 U.S.C. § 1367.  Plaintiffs' claims against

2   Energia and the Energia Subsidiaries are closely related to Plaintiffs' claims against

3   Yuzhnoye and form part of the same case or controversy.

4        27.    Boeing's claims for breach of contract against Defendants are all closely

5   related because, among other reasons, they arise from the same provision of the

6   Creation Agreement, under which Yuzhnoye and Energia are each obligated to pay

7   their pro rata share of the same $449,082,462.84 that Boeing paid as a guarantor when

8   Sea Launch defaulted on its bank loans.

9        28.    BCSC's claims for breach of contract against Defendants are all closely

10   related because, among other reasons, they arise from agreements (the Yuzhnoye

11   Guarantee and the Energia Guarantee) which formed part of the same transaction and

12   are identical in nearly every respect, and under which Yuzhnoye and Energia are each

13   obligated to pay their agreed share of the same loan provided by BCSC to Sea Launch.

14   **PERSONAL JURISDICTION**

15        29.    Defendants have each acted in one or more ways that establish personal

16   jurisdiction in California, including by conducting business in California and/or acting

17   as alter egos through which other defendants do business in California.

18   **I.   Yuzhnoye and Energia Have Substantial, Continuous, and Systematic**

19        **Contacts in California.**

20        30.    As founding partners in the California-based Sea Launch venture and as

21   key suppliers to Sea Launch, Yuzhnoye and Energia have continuously and

22   systematically done business in California since at least 1995.

23        **A.   Yuzhnoye and Energia Purposefully Chose Long Beach, California**

24             **as Sea Launch's Home-Port.**

25        31.    The business of Sea Launch is to launch commercial satellites into space

26   from a floating modified oil drilling platform anchored in the Pacific Ocean.

27        32.    When Sea Launch was founded in 1995, the Sea Launch partners,

28   including Yuzhnoye and Energia, chose to establish Sea Launch's home port in Long

Beach, California (the "Home Port").  The Sea Launch partners, including Yuzhnoye
and Energia, specifically chose Long Beach because of its port facilities, its proximity
to the major commercial satellite manufacturers in California and to certain Boeing
facilities located in California, and its proximity to the location in the Pacific Ocean
from which Sea Launch completes its launch missions.

33.    Sea Launch's Home Port facilities are located on a 16-acre site in the
Port of Long Beach previously used by the United States Navy.  The Sea Launch
partners decided to convert this site into a headquarters for Sea Launch, including a
state-of-the-art payload processing facility and storage facilities for flight hardware
(including for Yuzhnoye's Zenit-2S rockets and Energia's Block DM-SL rockets),
among other structures.

34.    Sea Launch's Long Beach location also serves as Home Port for the two
sea-going vessels that Sea Launch uses to carry out its marine-based launch
operations, including the assembly and command ship named the "Sea Launch
Commander" (the "ACS") and the self-propelled, semi-submersible launch platform
named the "Odyssey" (the "Launch Platform").

35.    Sea Launch, with the active participation of each of the Defendants,
provides fully integrated launch services out of its Home Port in Long Beach.  After a
satellite is received at Home Port, it is fueled and encapsulated in the payload
processing facility.  The encapsulated satellite is then transferred to the ACS while
docked at the Home Port, for integration with the rocket components that form the
integrated launch vehicle ("ILV").  While still at the Home Port, the ILV is transferred
to the Launch Platform, where it is stored in an environmentally controlled hangar
during transit to the launch site.  Both the ACS and the Launch Platform then sail
from the Home Port to the launch site at the Pacific Ocean equator.

36.    Sea Launch completed its first mission in 1999.  Since then, Sea Launch
has launched or attempted to launch more than 30 satellites; its last attempted launch
took place on January 31, 2013.  Sea Launch's location in Long Beach, and the

Defendants' active participation in the litany of business activities taking place in Long Beach, are all crucial to providing this service.

**B.     Yuzhnoye and Energia Have Participated Extensively and Continuously in Sea Launch's Long Beach Operations.**

37.     As Sea Launch partners and members of the Sea Launch Board of Directors (the "Board"), Yuzhnoye and Energia played a direct and substantial role in making the decisions that shaped nearly all aspects of Sea Launch's business, including its operations in Long Beach. On information and belief, Yuzhnoye and Energia attended over fifty Board meetings, including meetings held in Long Beach.

38.     Moreover, since 1995, Yuzhnoye and Energia have each received hundreds of millions of dollars from supplying goods and services to Sea Launch at its Home Port in Long Beach.

39.     Yuzhnoye has designed and manufactured each of the Zenit-2S rockets that Sea Launch has used to launch its customer's commercial satellites into space. Since 1999, Yuzhnoye has supplied over 30 Zenith-2S rockets to Sea Launch, each of which was delivered to the Home Port in Long Beach for integration on the ACS with other rocket components. On information and belief, Yuzhnoye has received over $10 million for each Zenit-2S rocket that it has provided to Sea Launch in California.

40.     In 1999, in connection with its involvement in Sea Launch's Long Beach operations, Energia registered to do business in California under the name Rocket and Space Corporation Energia After S.P. Korolev. Energia remains actively registered to do business in California under this same name and has continued to do business in California throughout its association with Sea Launch.

41.     Energia has designed and manufactured each of the Block DM-SL rockets that Sea Launch has used to launch its customers' commercial satellites into space. Since 1999, Energia has supplied over 30 Block DM-SL rockets to Sea Launch, each of which was delivered directly to the Home Port in Long Beach for integration on the ACS with other rocket components. On information and belief,

1  Energia received more than $10 million for each Block DM-SL rocket that it sold to
2  Sea Launch in California.

3        42.    In addition to supplying rocket components, Yuzhnoye and Energia have
4  each provided important services to Sea Launch at its Home Port in Long Beach on an
5  ongoing basis since at least 1999.  Among other things, Yuzhnoye and Energia have
6  each provided essential PIMA services for each satellite Sea Launch has attempted to
7  launch.  Among other things, Yuzhnoye and Energia each placed specialists
8  physically present in California to conduct and oversee pre-launch processing and
9  launch operations at the Home Port.

10       43.    Since 1995, Yuzhnoye and Energia have each received over $300 million
11  for supplying rocket components and PIMA services to Sea Launch at its Home Port
12  in Long Beach.  Yuzhnoye considers Sea Launch its single most important customer,
13  and Yuzhnoye provides all of its goods and services to Sea Launch in California.
14  Energia ranks Sea Launch among its top two customers worldwide, and also provides
15  all of its goods and services to Sea Launch in California.

16       44.    Yuzhnoye and Energia have also availed themselves of the court systems
17  in California, including in the actions entitled *Commercial Space Management*
18  *Company, Inc. v. The Boeing Company, Inc., et al.*, United States District Court for
19  the District of California, Case No. 96-8568 JMI (Jgx), and *Commercial Space*
20  *Management Company, Inc. v. The Boeing Company, Inc., et al.*, Superior Court of
21  the State of California for the County of Los Angeles, Case No. BC162947
22  (collectively, the "California Litigation"), both of which related to Yuzhnoye's and
23  Energia's activities at the Home Port in Long Beach.

24       45.    Yuzhnoye and Energia have each extensively publicized their
25  involvement in Sea Launch's Long Beach, California operations and, in turn, have
26  each derived substantial notoriety, publicity, revenues, and additional business as a
27  result of such involvement.

28

11

C.   **A Substantial Relationship Exists Between Plaintiffs' Claims and Yuzhnoye's and Energia's Contacts in California.**

46.   Plaintiffs' claims are substantially related to Yuzhnoye's and Energia's business activities directed at and conducted within California.

47.   Boeing's claims against Yuzhnoye and Energia arise under the Creation Agreement, the same agreement pursuant to which the Sea Launch partners, including Yuzhnoye and Energia, established Sea Launch, and the same agreement pursuant to which Yuzhnoye and Energia have continuously provided rockets and services to Sea Launch at its Home Port in Long Beach since 1995.  Moreover, a substantial portion of the loan money that Boeing guaranteed was used by Sea Launch to fund its Long Beach operations, including the cost of rockets and services provided by Yuzhnoye and Energia at Sea Launch's Home Port.

48.   BCSC's claims against Yuzhnoye and Energia arise under the Partner Guarantees, which Yuzhnoye and Energia each provided to enable Sea Launch to obtain funds (specifically, the BCSC Loan) needed to establish its Long Beach operations.  Additionally, a portion of the BCSC Loan was specifically earmarked to pay the legal fees incurred by Yuzhnoye and Energia in the California Litigation.

II.   **The Energia Subsidiaries Are the Alter Egos, Agents, and/or Successors-at-Interest of Energia.**

49.   The Energia Subsidiaries each maintain their principal place of business at Sea Launch's Long Beach Home Port.

50.   On information and belief, there exists a unity of interest and ownership between Energia and the Energia Subsidiaries, such that the Energia Subsidiaries are each the alter egos of Energia, and no separateness between these entities exists.

51.   On information and belief, Energia and the Energia Subsidiaries share the same equitable ownership, offices, directors, officers, and employees.

52.   On information and belief, Energia has continuously used the Energia Subsidiaries as mere shells, conduits, agents, and/or instrumentalities through which

Energia controls all aspects of Sea Launch's operations in California, and through which Energia continues to sell and deliver tens of millions of dollars worth of Block DM-SL rockets to Sea Launch at its Home Port.

53.    On information and belief, Energia created EOL as a shell to acquire a 95% interest in Sea Launch, and to hold Energia's interests in the subsidiaries through which Energia manages and controls Sea Launch's affairs.

54.    On information and belief, Energia uses EOL and EL as conduits to manage and control all of Sea Launch's Home Port operations and all purchasing required by Sea Launch to conduct those operations.

55.    On information and belief, Energia created and uses the Energia Subsidiaries to exercise control over Sea Launch, permitting Energia to reap the benefits of Plaintiffs' extensive investments in Sea Launch, while attempting to hide its assets and escape from liability to Plaintiffs.

56.    Under the circumstances, treating the Energia Subsidiaries as separate from Energia would permit an abuse of the corporate form and would sanction fraud and promote injustice and bad faith.  Among other injustices, it would permit Energia to exploit EOL, EL, and the corporate fiction by which they exist to deprive Plaintiffs of the substantial amounts of money that they invested in Sea Launch, in good faith, which indisputably belongs to Plaintiffs.

**VENUE**

57.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(f)(1) and (f)(3).  A substantial part of the events giving rise to Plaintiffs' claims occurred in this judicial district, and Yuzhnoye is an agency or instrumentality of Ukraine, which has been conducting business in this judicial district since 1995.

58.    Venue is also proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(1), (b)(2), and (c)(2).  A substantial part of the events giving rise to Plaintiffs' claims occurred in this judicial district, and Defendants are deemed to reside in this judicial district because, due to their contacts in this district, Defendants

13

1    are each subject to personal jurisdiction in this district.

2                        **FACTUAL BACKGROUND**

3         59.    Plaintiffs describe in further detail below:  (i) the history of Sea Launch

4    and its operations; (ii) Yuzhnoye's and Energia's breach of the Creation Agreement;

5    (iii) Yuzhnoye's and Energia's breach of the Partner Guarantees; and (iv) the Energia

6    Subsidiaries' liability as alter egos for the damages caused by Energia's breaches.

7    **I.    The History of Sea Launch.**

8         **A.    The Creation and Business of Sea Launch.**

9         60.    On May 3, 1995, the Sea Launch partners, including BCSC, Kvaerner,

10   Energia, and Yuzhnoye, entered into the Creation Agreement.  The Creation

11   Agreement provided for the creation of Sea Launch and described its ownership

12   structure:  BCSC owned 40%, Kvaerner owned 20%, Energia owned 25%, and

13   Yuzhnoye owned 15%.  The respective shares of ownership corresponded, unless

14   otherwise specifically agreed by the parties, to the pro rata distribution of rights and

15   obligations among the Sea Launch partners in their joint venture.

16        61.    The Sea Launch partners have continuously provided goods and services

17   necessary to Sea Launch's operations.  From the design and construction of the rocket

18   components, to the execution of each launch mission, Sea Launch has drawn on the

19   experience and specialization of the Sea Launch partners to conduct its business.

20        62.    For example, BCSC designs and builds the payload assembly that

21   encapsulates and protects each satellite during the initial ascent of the launch.

22   Yuzhnoye designs and manufactures the Zenit-2S rocket, which comprises the first

23   and second stages of the rocket that Sea Launch uses to launch each satellite.  And

24   Energia designs and manufactures the third or upper stage of the rocket, which

25   provides the final propulsion to place each satellite into geosynchronous orbit.

26        63.    In addition, BCSC, Yuzhnoye, and Energia each provide Sea Launch

27   with services and personnel necessary to launch each particular satellite into orbit.

28

                                        14

64.     The fourth Sea Launch partner, Kvaerner (now Aker), designed, built, and modified the ACS and the Launch Platform, both of which form the infrastructure of Sea Launch's marine-based satellite launch system.

**B.     Sea Launch's Chapter 11 Bankruptcy Proceedings and Reorganization.**

65.     Sea Launch was unable to attain profitability due to a variety of factors, including weakness in the demand for commercial satellite launches, unexpected cost increases, operational losses, mounting debt, increased competition among commercial satellite launch providers, and a launch failure which led to a $53.2 million arbitration award against Sea Launch.

66.     On June 22, 2009, Sea Launch filed for bankruptcy protection under Chapter 11 of the United States Bankruptcy Code.  On July 27, 2010, the United States Bankruptcy Court for the District of Delaware approved a plan of reorganization for Sea Launch (the "Plan of Reorganization"), and Sea Launch completed its Chapter 11 reorganization, effective October 27, 2010.

67.     Pursuant to the Plan of Reorganization, Energia, through a series of subsidiaries that are its alter egos and that were formed purely in an effort to escape liability to Boeing and Kvaerner (now Aker), increased its ownership interest in Sea Launch from 25% to 95%.  All of Boeing's and BCSC's claims against Yuzhnoye and Energia, and all claims raised in this Complaint, were expressly preserved in the Plan confirming Sea Launch's reorganization.

**II.     Yuzhnoye's and Energia's Breach of the Creation Agreement.**

**A.     Yuzhnoye, Energia, Kvaerner, and BCSC Agree to Reimburse Affiliates for Certain Payments Made on Behalf of Sea Launch.**

68.     The Creation Agreement set forth the terms of Sea Launch's formation as well as certain rights and duties of Yuzhnoye, Energia, Kvaerner and BCSC to Sea Launch, each other, and their respective affiliates.  The parties to the Creation Agreement agreed and intended that their affiliates would be third party beneficiaries

1    of the Creation Agreement.

2        69.    The parties to the Creation Agreement recognized that Sea Launch might

3    need to borrow money to operate, and that Sea Launch's efforts to borrow money

4    would be assisted by the willingness of some of the parties, or their affiliates, to

5    guarantee repayment of loans made to Sea Launch.

6        70.    Therefore, the parties to the Creation Agreement agreed that if a party or

7    its affiliate guaranteed a loan made to Sea Launch, and ultimately had to pay on that

8    guarantee, the other parties would reimburse the guarantor.

9        71.    Specifically, under Articles 9.4.1 and 9.4.2 of the Creation Agreement, if

10   Sea Launch failed to pay a third-party lender for a debt, and either a party to the

11   Creation Agreement or its affiliate paid the debt pursuant to a guarantee made at the

12   request of Sea Launch, the other parties must reimburse that party, or its affiliate, for

13   their portion of the payments made on behalf of Sea Launch. *See* Ex. 1 at p. 28.

14        **B.    Sea Launch Borrows Money Guaranteed by Boeing.**

15        72.    On June 23, 2004, at the request of Sea Launch, Boeing entered into a

16   Guarantee Agreement with JPMorgan Chase Bank ("JPM") (the "JPM Guarantee"), in

17   which Boeing, along with Kvaerner, jointly and severally guaranteed a $270 million

18   loan by JPM to Sea Launch (as subsequently amended and restated in a $260 million

19   Amended and Restated Credit Agreement between Sea Launch and Citicorp USA Inc.

20   ("Citicorp"), dated June 19, 2006). A copy of the loan agreement is attached as

21   Exhibit 4, and a copy of the JPM Guarantee is attached as Exhibit 5.

22        73.    On October 12, 2004, at the request of Sea Launch, Boeing entered into a

23   Guarantee Agreement with Sumitomo Mitsui Banking Corporation ("Sumitomo") (the

24   "Sumitomo I Guarantee"), in which Boeing, along with Kvaerner, jointly and

25   severally guaranteed a $31 million loan by Sumitomo to Sea Launch. A copy of the

26   loan agreement is attached as Exhibit 6, and a copy of the Sumitomo I Guarantee is

27   attached as Exhibit 7.

28

74. On July 11, 2005, at the request of Sea Launch, Boeing entered into a Guarantee Agreement (the "Note Issue Guarantee"), in which Boeing, along with Kvaerner, jointly and severally guaranteed a $100 million aggregate principal amount issue of floating rate senior notes due July 11, 2015 (the "Note Issue") to certain note investors (the "Note Issue Investors"). A copy of the Note Issue is attached as Exhibit 8, and a copy of the Note Issue Guarantee is attached as Exhibit 9.

75. On August 31, 2005, at the request of Sea Launch, Boeing entered into another Guarantee Agreement with Sumitomo, in which Boeing, along with Kvaerner, jointly and severally guaranteed a $100 million loan to Sea Launch (the "Sumitomo II Guarantee"). A copy of the loan agreement is attached as Exhibit 10, and a copy of the Sumitomo II Guarantee is attached as Exhibit 11.

76. The guarantees described above were made with the full knowledge and acceptance of each of the parties to the Creation Agreement. Indeed, at the time the guarantees were made, Energia and Yuzhnoye expressly understood and agreed that, in the event Sea Launch could not repay the loans and Boeing was forced to pay on the guarantees, they would reimburse Boeing for their fair share of the obligations, in the percentages described in the Creation Agreement.

77. Indeed, on three separate occasions, Yuzhnoye and Energia specifically and in writing "reaffirm[ed] their obligation established in Article 9.4.2 of the [Creation Agreement]" to pay their pro rata share of any guarantee payments made by a party or an affiliate on Sea Launch's behalf. *See* Exhibits 12, 13, and 14. Yuzhnoye and Energia intended that Boeing rely on these representations, and Boeing did rely on these representations.

C. **Sea Launch Defaults on its Loans, and Boeing Pays Sea Launch's Debt.**

78. When Sea Launch filed for Chapter 11 bankruptcy protection on June 22, 2009, this event constituted a default under each of the JPM/Citicorp, Sumitomo I, and Sumitomo II facilities and the Note Issue.

17

79.     Citicorp, Sumitomo, and the Note Issue Investors called on Boeing and Aker (as Kvaerner's successor in interest) to satisfy the JPM Guarantee, the Sumitomo I Guarantee, the Sumitomo II Guarantee, and the Note Issue Guarantee (collectively, the "Bank Guarantees").

80.     Pursuant to the calls received on the Bank Guarantees, Boeing paid out a sum of $449,082,462.84 on July 1, 2009.

**D.     Sea Launch Fails to Reimburse Boeing for Payments Related to the Bank Guarantees.**

81.     Pursuant to Article 9.4.2 of the Creation Agreement, Boeing sent to Sea Launch an invoice requesting reimbursement for the $449,082,462.84 Boeing paid on Sea Launch's behalf.  Thirty days passed without payment of the invoice by Sea Launch.

82.     Pursuant to Article 9.4.2 of the Creation Agreement, in the event that Sea Launch failed to fully reimburse Boeing (as Guarantor) within thirty days of an invoice from Boeing, then each of the Sea Launch partners must reimburse Boeing for the money it paid to satisfy Sea Launch's debt, in an amount representing their percentage ownership of Sea Launch.

**E.     Yuzhnoye and Energia Fail to Reimburse Boeing.**

83.     Yuzhnoye and Energia are each obligated under Article 9.4.2 of the Creation Agreement to reimburse Boeing for the portion of the $ 449,082,462.84 that Boeing paid under the Bank Guarantees equal to their percentage ownership interest in Sea Launch.

84.     On August 21, 2009, Boeing sent Yuzhnoye and Energia each an invoice for their share of the $449,082,462.84 for which they are obligated to reimburse Boeing.

85.     Yuzhnoye and Energia have refused to pay anything, despite their obligation to reimburse Boeing under Article 9.4.2 of the Creation Agreement.

86.     Yuzhnoye's and Energia's failure to reimburse Boeing for their

1  percentage share of the $449,082,462.84 that Boeing paid under the Bank Guarantees

2  constitutes a breach of Article 9.4.2 of the Creation Agreement.

3        **F.**    **Plaintiffs Initiate An Arbitration Proceeding against Yuzhnoye and**
4             **Energia, But the Tribunal Determines It Lacks Jurisdiction.**

5        87.    Plaintiffs commenced an arbitration proceeding against Yuzhnoye and

6  Energia in Sweden (the "Swedish Arbitration"), seeking to recover the amounts owed

7  by Yuzhnoye and Energia to Boeing under the Creation Agreement.

8        88.    Throughout the Swedish Arbitration, Yuzhnoye and Energia took the

9  position that the Swedish arbitration tribunal (the "Tribunal") lacked jurisdiction over

10  the claims asserted by Plaintiffs, and that the claims needed to be asserted in court.

11  On October 11, 2011, the Tribunal dismissed the Swedish Arbitration for lack of

12  subject matter jurisdiction, without ruling on and expressly preserving Plaintiffs'

13  claims on the merits.

14        89.    Plaintiffs appealed the jurisdictional decision of the Tribunal to the

15  Swedish Court of Appeal (the "Swedish Appeal"), but Yuzhnoye and Energia have

16  gone to great lengths to prevent the Swedish Appeal from going forward.  For

17  example, for over a year, Energia purposely evaded service of the appeal documents

18  necessary for the Swedish Court of Appeal to obtain jurisdiction over the appeal.  The

19  Swedish Appeal has been pending for fifteen months and currently remains

20  unresolved.

21        90.    Neither Yuhznoye nor Energia has ever claimed to have a defense on the

22  merits to Boeing's or BCSC's claims, and indeed they have no defense on the merits.

23  **III.**    **Yuzhnoye's and Energia's Breach of the Partner Guarantees.**

24        **A.**    **Sea Launch Borrows Money from BCSC.**

25        91.    The parties to the Creation Agreement recognized that Sea Launch may

26  not be able to borrow the full amount it needed in capital from third parties, and that

27  Sea Launch may thus need to borrow money directly from one or more of the Sea

28

Launch partners. Article 2 of the Creation Agreement provided that two-thirds of money loaned by the Sea Launch partners to Sea Launch would come from BCSC, and one-third would come from Kvaerner.

92. Pursuant to this provision, BCSC and Sea Launch entered into a Loan and Security Agreement (as subsequently amended in a First Amendment to Loan and Security Agreement and a Second Amendment to Loan and Security Agreement, both of which, on information and belief, were beneficial to and consented to by Yuzhnoye and Energia) (the "BCSC Loan Agreement") pursuant to which BCSC provided draw loans to Sea Launch in the aggregate principal amount of $184,000,000.01. A copy of the BCSC Loan Agreement is attached hereto as Exhibit 15.

**B.   Yuzhnoye and Energia Guarantee the BCSC Loan.**

93. As a condition to entering into the BCSC Loan Agreement, BCSC required Yuzhnoye and Energia to guarantee the repayment of a percentage of any amount that BCSC loaned to Sea Launch, equal to their percentage ownership of Sea Launch.

94. In February 1996, Yuzhnoye entered into the Yuzhnoye Guarantee, promising to pay BCSC 15% of all amounts payable by Sea Launch under the BCSC Loan Agreement, in the event Sea Launch defaulted on the loan.

95. In February 1996, Energia entered into the Energia Guarantee, promising to pay BCSC 25% of all amounts payable by Sea Launch under the BCSC Loan Agreement, in the event Sea Launch defaulted on the loan.

**C.   Sea Launch Fails to Repay the BCSC Loan, and Yuzhnoye and Energia Fail to Pay BCSC Amounts Owed Under the Partner Guarantees.**

96. As in the case of the Bank Loans, when Sea Launch filed for Chapter 11 bankruptcy protection on June 22, 2009, this event constituted a default under the Partner Guarantees.

97. Pursuant to Section 5 of the Partner Guarantees, in the event of default by

1  Sea Launch on the BCSC Loan, BCSC is entitled to proceed directly against

2  Yuzhnoye and Energia, as guarantors, to recover the portions of the BCSC Loan they

3  agreed to repay, without the need to proceed against Sea Launch.

4       98.   Currently, the entire principal amount of the BCSC Loan remains

5  outstanding.  In addition, interest has accrued on the BCSC Loan.  Accordingly, as of

6  Sea Launch's bankruptcy filing, a total of over $500 million was owed to BCSC under

7  the BCSC Loan Agreement.

8       99.   Under the Partner Guarantees, Yuzhnoye and Energia are each obligated

9  to pay their agreed percentage of all amounts owed to BCSC under the BCSC Loan

10  Agreement.  In particular, under Section 2 of the Yuzhnoye Guarantee, Yuzhnoye is

11  obligated to pay BCSC 15% of all amounts owed.  And under Section 2 of the Energia

12  Guarantee, Energia is obligated to pay BCSC 25% of all amounts owed.  The total

13  combined amount owed by Yuzhnoye and Energia under the Partner Guarantees

14  exceeds $200 million.

15       100.   Pursuant to Section 5 of the Partner Guarantees, BCSC sent Yuzhnoye

16  and Energia each a written notice specifying Sea Launch's default under the BCSC

17  Loan Agreement and that Sea Launch lacked sufficient cash flow to pay the amounts

18  owed under that agreement.  Yuzhnoye and Energia refused to pay.

19       101.   Yuzhnoye's and Energia's failure to pay to BCSC their agreed

20  percentage of the over $200 million that is due under the BCSC Loan Agreement

21  constitutes a breach of Section 2 of the Partner Guarantees.

22       102.   In addition, pursuant to Section 6 of the Partner Guarantees, Yuzhnoye

23  and Energia each must pay "all costs, including attorney's fees and disbursements, of

24  [BCSC] in enforcing or attempting to enforce [the Partner] Agreement[s]," including

25  the costs and attorneys' fees incurred by Plaintiffs in this action.

26

27

28

IV.   **The Energia Subsidiaries, as Energia's Alter Egos, Agents, and/or Successors-at-Interest, Are Liable for the Damages Caused by Energia's Breaches.**

103.   On information and belief, there exists a unity of interest and ownership between Energia and the Energia Subsidiaries, such that the Energia Subsidiaries are each alter egos of Energia, and no separateness between these entities exists.

104.   On information and belief, Energia created the Energia Subsidiaries and uses those entities as mere shells, conduits, agents, and/or instrumentalities to manage and control all aspects of Sea Launch's business, permitting Energia to reap the benefits of Plaintiffs' extensive investments in Sea Launch, while at the same time attempting to hide its assets and escaping from liability in the United States for its breaches of the Creation Agreement and the Energia Guarantee.  The Energia Subsidiaries were created as part of Energia's plan to take control over Sea Launch while seeking to avoid Energia's otherwise unavoidable liability to Boeing and BCSC under the Creation Agreement and the Partner Guarantees.

105.   Under the circumstances, the Energia Subsidiaries are liable for the damages caused by Energia's breach of the Creation Agreement and the Energia Guarantee to the same extent as Energia.  Treating the Energia Subsidiaries as separate from Energia would permit an abuse of the corporate form, would sanction fraud, and would promote injustice and bad faith.  Among other injustices, it would permit Energia to exploit EOL, EL, and the corporate fiction by which they exist to deprive Plaintiffs of the substantial amounts of money that they invested in Sea Launch, in good faith, which indisputably belongs to Plaintiffs.

### FIRST CAUSE OF ACTION

**(Claim by Boeing for Breach of the Creation Agreement against Yuzhnoye)**

106.   Plaintiffs incorporate by reference all of the allegations set forth in Paragraphs 1-105 above as though fully set forth and re-alleged herein.

107.   The Sea Launch partners, including Yuzhnoye, each entered into a valid

and enforceable Creation Agreement for the purpose of establishing Sea Launch and setting forth the respective rights and obligations of the parties and their affiliates. The Sea Launch partners, including Yuzhnoye and Energia, deliberately intended that affiliates of parties to the Creation Agreement, such as Boeing, be third-party beneficiaries of the Creation Agreement, and Boeing is an intended third-party beneficiary of the Creation Agreement.

108.   Pursuant to the Creation Agreement, the Sea Launch partners mutually agreed that if an affiliate of a party guaranteed a loan to Sea Launch at the request of Sea Launch, and Sea Launch failed to repay that loan (thereby prompting the lender to demand payment under the guarantee), the remaining parties would indemnify the affiliate by paying to the affiliate a portion of the loan equal to their percentage ownership of Sea Launch.

109.   In reliance on the Creation Agreement, and at the request of Sea Launch, Boeing, as an affiliate of BCSC, agreed to guarantee a number of loans made by third-party banks to Sea Launch.

110.   Yuzhnoye specifically requested that Boeing guarantee the loans made by third-party banks to Sea Launch based on a promise that Yuzhnoye would pay its fair share upon any default, and Yuzhnoye specifically reaffirmed its obligation to reimburse Boeing on at least three separate occasions, in writing.

111.   Yuzhnoye breached the terms of the Creation Agreement by failing to reimburse Boeing for its 15% pro rata share of the $449,082,462.84 that Boeing was required to pay under the Bank Guarantees.

112.   As a result of Yuzhnoye's breach of the Creation Agreement, Boeing has suffered damages in an amount not less than $55,439,230.01 to be proven at trial. Boeing seeks damages, prejudgment interest, costs, and attorney's fees.

1

## SECOND CAUSE OF ACTION

2

### (Claim by Boeing for Breach of the Creation Agreement

3

### against Energia and the Energia Subsidiaries)

4      113.   Plaintiffs incorporate by reference all of the allegations set forth in

5   Paragraphs 1-112 above as though fully set forth and re-alleged herein.

6      114.   Energia specifically requested that Boeing guarantee the loans made by

7   third party-banks to Sea Launch based on promises that Energia would pay its fair

8   share upon any default.  Energia also specifically reaffirmed its obligation to

9   reimburse Boeing on at least three separate occasions, in writing.

10      115.   Energia breached the terms of the Creation Agreement by failing to

11   reimburse Boeing for its 25% pro rata share of the $449,082,462.84 that Boeing was

12   required to pay under the Bank Guarantees.

13      116.   On information and belief, the Energia Subsidiaries are each the alter

14   egos, agents, or successors of Energia, and are thus each liable for the damages caused

15   by Energia's breach of the Creation Agreement to the same extent as Energia.

16      117.   As a result of Energia's breach of the Creation Agreement, Boeing has

17   suffered damages in an amount not less than $92,398,716.69 to be proven at trial.

18   Boeing seeks damages, prejudgment interest, costs, and attorneys' fees.

19

## THIRD CAUSE OF ACTION

20

### (Claim by BCSC for Breach of the Yuzhnoye Guarantee against Yuzhnoye)

21      118.   BCSC incorporates by reference all of the allegations set forth in

22   Paragraphs 1-117 above as though fully set forth and re-alleged herein.

23      119.   BCSC and Yuzhnoye entered into a valid and enforceable agreement in

24   which Yuzhnoye agreed to pay to BCSC 15% of all amounts owed by Sea Launch

25   under the BCSC Loan Agreement, in the event Sea Launch defaulted on that

26   agreement.

27      120.   The Yuzhnoye Guarantee was supported by consideration in the form of

28   mutual promises, assurances, and obligations set forth in the BCSC Loan Agreement

24

1 | and the Yuzhnoye Guarantee.

2 |     121.  BCSC has performed all of the material obligations required on its part in

3 | accordance with the terms and conditions of the Yuzhnoye Agreement.

4 |     122.  Yuzhnoye breached the Yuzhnoye Guarantee by failing to pay BCSC the

5 | agreed percentage of the over $500 million due under the BCSC Loan Agreement.

6 |     123.  As a result of Yuzhnoye's breach of the Yuzhnoye Guarantee, BCSC has

7 | suffered damages in an amount not less than $78 million to be proven at trial.  BCSC

8 | seeks damages, prejudgment interest, costs, and attorneys' fees.

9 | **FOURTH CAUSE OF ACTION**

10 | **(Claim by BCSC for Breach of the Energia Guarantee**

11 | **against Energia and the Energia Subsidiaries)**

12 |     124.  BCSC incorporates by reference all of the allegations set forth in

13 | paragraphs 1-123 above as though fully set forth and re-alleged herein.

14 |     125.  BCSC and Energia entered into a valid and enforceable agreement in

15 | which Energia agreed to pay to BCSC 25% of all amounts owed by Sea Launch under

16 | the BCSC Loan Agreement, in the event Sea Launch defaulted on that agreement.

17 |     126.  The Energia Guarantee was supported by consideration in the form of

18 | mutual promises, assurances, and obligations set forth in the BCSC Loan Agreement

19 | and the Energia Guarantee.

20 |     127.  BCSC has performed all of the material obligations required on its part in

21 | accordance with the terms and conditions of the Energia Guarantee.

22 |     128.  Energia breached the terms of the Energia Guarantee by failing to pay

23 | BCSC the agreed percentage of the over $500 million that is due under the BCSC

24 | Loan Agreement.

25 |     129.  On information and belief, the Energia Subsidiaries are each the alter

26 | egos, agents, or successors of Energia, and are thus each liable for the damages caused

27 | by Energia's breach of the Energia Guarantee to the same extent as Energia.

28 |     130.  As a result of Energia's breach of the Energia Guarantee, BCSC has

1    suffered damages in an amount not less than $130 million to be proven at trial.  BCSC

2    seeks damages, prejudgment interest, costs, and attorneys' fees.

3                                    **PRAYER FOR RELIEF**

4          131.   Therefore, Plaintiffs demand judgment against Defendants as follows:

5                 a.     On the First Cause of Action, damages in an amount not less than

6                        $55 million to be determined at trial, for Yuzhnoye's breach of the

7                        Creation Agreement;

8                 b.     On the Second Cause of Action, damages in an amount not less

9                        than $92 million to be determined at trial, for Energia's breach of

10                       the Creation Agreement;

11                c.     On the Third Cause of Action, damages in an amount not less than

12                       $78 million to be determined at trial, for Yuzhnoye's breach of the

13                       Yuzhnoye Guarantee;

14                d.     On the Fourth Cause of Action, damages in an amount not less

15                       than $130 million to be determined at trial, for Energia's breach of

16                       the Energia Guarantee;

17                e.     Prejudgment interest;

18                f.     Attorneys' fees and costs; and

19                g.     For such other and further relief as this Court may deem just and

20                       proper.

21

22   DATED: February 1, 2013                    Respectfully submitted,

23                                               KIRKLAND & ELLIS LLP

24

25

26                                               Sasha K. Danna

27

28                                               *Attorneys for Plaintiffs*

                                        26

1

## **JURY DEMAND**

2        Plaintiffs demand a jury trial of all claims asserted herein to the extent such

3  claims are so triable.

4

5  DATED:  February 1, 2013                    Respectfully submitted,

6                                              KIRKLAND & ELLIS LLP

7

8

9                                              _____
                                               Sasha K. Danna

10

11                                             *Attorneys for Plaintiffs*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28