Xanath McKeever (SBN 200646)
xanath.mckeever@kirkland.com
KIRKLAND & ELLIS LLP
333 South Hope Street
Los Angeles, California  90071
Telephone: (213) 680-8400
Facsimile: (213) 680-8500

Michael B. Slade (*Admitted Pro Hac Vice*)
michael.slade@kirkland.com
Christopher Esbrook (*Admitted Pro Hac Vice*)
christopher.esbrook@kirkland.com
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois  60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

*Attorneys for Plaintiffs*
THE BOEING COMPANY and
BOEING COMMERCIAL SPACE COMPANY

## UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE BOEING COMPANY, *et al.*, <br><br> Plaintiffs, <br><br> OLD KVAERNER INVEST AS, <br><br> Intervenor Plaintiff, <br><br> vs. <br><br> KB YUZHNOYE, *et al.*, <br><br> Defendants. | CASE NO. CV13-00730-AB (AJWx) <br><br> **PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT AGAINST ENERGIA AND THE YUZHNOYE DEFENDANTS; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** <br><br> **[PUBLIC VERSION]** <br><br> Complaint Filed:  February 1, 2013 <br><br> Date:        June 29, 2015 <br> Time:       10:00 AM <br> Judge:      Hon. Andre Birotte <br> Place:       Courtroom 680 |

**TO THIS HONORABLE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD, PLEASE TAKE NOTICE** that on June 29, 2015 at 10:00 am, or as soon thereafter as the matter may be heard in the above-referenced court, located at 255 East Temple Street, Los Angeles, CA 90012, Plaintiffs The Boeing Company ("Boeing") and Boeing Commercial Space Company ("BCSC") will, and hereby do, move this Court pursuant to Federal Rule of Civil Procedure 56 for summary judgment on Count I-IV of Plaintiffs' complaint against defendants KB Yuzhnoye and PO Yuzhnoye Mashinostroitelny Zavod ("Yuzhmash" and together with KB Yuzhnoye, "Yuzhnoye") and S.P. Korolev Rocket and Space Company, limited Energia ("Energia"), and on Affirmative Defenses Nos. 1-31 submitted by Energia and Nos. 1-32 submitted by Yuzhnoye.  This motion is supported by the attached Memorandum of Points and Authorities, the Statement of Uncontroverted Facts and Conclusions of Law in Support of Plaintiffs' Motion for Summary Judgment Against Yuzhnoye And Energia, and the Declaration of Xanath O. McKeever.  This motion is made following the conference of counsel, which occurred on February 27, 2015.

A proposed order granting this motion is attached.

DATED:  May 4, 2015

KIRKLAND & ELLIS LLP
Xanath O. McKeever
Michael B. Slade (*Pro Hac Vice*)
Christopher Esbrook (*Pro Hac Vice*)


/s/ *Xanath O. McKeever*
Xanath O. McKeever

*Attorneys for Plaintiffs*
THE BOEING COMPANY and
BOEING COMMERCIAL SPACE
COMPANY

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................................iii

MEMORANDUM OF POINTS AND AUTHORITIES ...............................................1

UNDISPUTED FACTS ...........................................................................................2

I.     Defendants are Leading Commercial Space Companies. ...................................2

II.    Years of Discussions Led to the Creation Agreement. ...................................3

III.   The Partners Sign the Creation Agreement. .....................................................3

      A.     Article 1.1 and Other Terms Re: "Affiliates" ...........................3

      B.     Article 1.7:  "Voting" ..................................................................4

      C.     Article 9.4.2:  "Reimbursement for Guarantee" .......................4

      D.     Article 17:  "Entire Agreement" ...............................................5

IV.   All Partners Participated in Sea Launch Management. .....................................5

V.    All Partners Incurred Development Phase Overruns. ........................................5

VI.   The CIS Partners Approved All Sea Launch Borrowing. ..................................6

VII.  The CIS Partners Approved the BCSC Loan and Guaranteed their Share
of its Repayment. ...............................................................................................7

      A.     The Energia and Yuzhnoye Guarantees ....................................8

      B.     The Amendments to the BCSC Loan ........................................9

VIII. Defendants Repeatedly Reaffirm their Promises. ..........................................10

IX.   The CIS Partners Made Millions from Sea Launch, While Boeing
Incurred Massive Losses. .................................................................................11

X.    Energia and Yuzhnoye Renege on their Promises ...........................................12

i

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

ARGUMENT ................................................................................... 13

I.    Boeing is Entitled to Summary Judgment on Counts I and III (Creation
      Agreement) as a Matter of Law .......................................................... 13

II.   BCSC is Entitled to Summary Judgment on Counts II and IV (Partner
      Loan Guarantees) as a Matter of Law .................................................. 14

III.  Plaintiffs are Entitled to Summary Judgment on the CIS Partners'
      Affirmative Defenses ...................................................................... 15

      A.   Energia's and Yuzhnoye's Procedural Defenses Are Invalid ................. 15

      B.   None of Energia's or Yuzhnoye's "Bar" Defenses Can Stand
           Either ............................................................................... 16

      C.   None of Energia's or Yuzhnoye's Contract Defenses Is Viable ............. 18

      D.   None of Energia's or Yuzhnoye's "Unfairness" Defenses Survive ........ 20

           1.   Undue Influence and Unconscionability ................................. 20

           2.   Unclean Hands, Inequitable Conduct,and Breach of the
                Covenant of Good Faith ................................................. 21

           3.   Unjust Enrichment ....................................................... 22

      E.   None of the Count II/IV-Specific Defenses Survives, Either ................. 22

      F.   Defendants' "Reduce the Damages" Defenses Fail ............................ 24

CONCLUSION .............................................................................. 25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.,*
     477 U.S. 242 (1986) ...........................................................................13

*Celotex Corp. v. Catrett,*
     477 U.S. 317 (1986) ...........................................................................13

*Citizen's Bank of Maryland v. Strumpf,*
     516 U.S. 16 (1995) .............................................................................25

*DePalma v. Westland Software House,*
     225 Cal. App. 3d 1534 (1990). ..........................................................25

*In re Fitness Holdings Int'l Inc.,*
     714 F.3d 1141 (9th Cir. 2013) ...........................................................19

*In re SubMicron Sys. Corp.,*
     432 F.3d 448 (3d Cir. 2006) ..............................................................19

**Rules**

Fed. R. Civ. P. 12(h) .................................................................................16

Fed. R. Civ. Proc. 56(a) ...........................................................................12

1 | **MEMORANDUM OF POINTS AND AUTHORITIES**

2           This is a simple breach of contract case that can be decided now on summary

3 | judgment.  Plaintiffs Boeing Commercial Space Company ("BCSC") and its parent

4 | The Boeing Company ("Boeing") incurred hundreds of millions of dollars of

5 | obligations in the form of direct loans and guarantees of bank loans to develop and

6 | operate Sea Launch, a commercial joint venture formed to launch satellites into space

7 | from an ocean platform.  As partners in the venture, Defendants Energia, Yuzhnoye

8 | and Yuzhmash signed contracts obligating them to pay their proportionate share of

9 | certain losses if the venture failed.  Sea Launch ultimately went into bankruptcy, and

10 | Boeing paid all of the loans and guarantees that came due.  Plaintiffs now seek to

11 | require Defendants to honor their express commitments—set forth in unambiguous,

12 | fully integrated contracts—to pay their share of these losses.  Defendants made these

13 | commitments knowingly, and BCSC and Boeing relied on them in loaning Sea

14 | Launch hundreds of millions of dollars in start-up funds and guaranteeing hundreds of

15 | millions of dollars in other loans.  Yet when Sea Launch declared bankruptcy and

16 | Plaintiffs called upon Defendants to live up to their promises, they refused.  This

17 | motion requests simply that the Court enforce these explicit contractual obligations.

18           During the course of the venture, Energia and Yuzhnoye repeatedly reaffirmed

19 | their commitments.  It is only now, when reimbursement is due, that they have tried to

20 | avoid and obscure these straightforward obligations by recklessly pleading a

21 | smokescreen of 63 unfounded affirmative defenses.  Now that discovery is over, these

22 | defenses have been revealed for what they are:  legally irrelevant or factually baseless,

23 | and in most cases, both.  Defendants contend, for example, that they "never intended"

24 | to honor their obligations and that Plaintiffs "promised not to enforce" them.  Not only

25 | are these suggestions incredible on their face, but they are directly contradicted by the

26 | written contracts to which the Defendants agreed and that they repeatedly reaffirmed.

27           Defendants' other defenses are similarly meritless.  They claim that their

28 | commitments were not supported by consideration, notwithstanding the hundreds of

1

millions of dollars Plaintiffs committed in reliance on those promises; that it would be unfair to bind Energia and Yuzhnoye to their agreements, ignoring that they benefitted *directly* from the loans Plaintiffs made and stood behind for the benefit of Sea Launch; and that Plaintiffs are somehow barred from enforcing the agreements as a result of the Sea Launch bankruptcy, even though Energia and Yuzhnoye expressly consented to a full reservation of rights within the Sea Launch bankruptcy

Enough is enough.  Defendants have utterly failed to present a legitimate factual dispute on any issue that would negate their legal obligations.  These obligations were memorialized in formal contracts; they are crystal clear; and they were expressly reaffirmed by Energia and Yuzhnoye in writing multiple times.  Summary judgment should be entered in Plaintiffs' favor on each of the pending claims and defenses.

## UNDISPUTED FACTS

The material, undisputed facts that warrant summary judgment are set forth in Plaintiffs' Statement of Uncontroverted Facts (each a "UF") and Conclusions of Law (each a "CL").  This section summarizes the facts and provides additional context.

## I.   DEFENDANTS ARE LEADING COMMERCIAL SPACE COMPANIES.

Energia, Yuzhnoye, and Yuzhmash (the "CIS Partners")[1] are leading companies in the international space business.  UF 3-8.  Energia, whose largest shareholder is the Russian Federation, was founded in 1946 and "is Russia's largest space integrator."  UF 3.  Energia is the primary contractor for all Russian manned flights and the lead developer of Russia's spacecraft.  UF 3-4.  For decades, Energia has used its "capabilities in space technology and operations to develop commercial programs with organizations and corporations from more 20 different countries."  UF 3.

Yuzhnoye and Yuzhmash are wholly-owned by the State of Ukraine.  UF 5. Yuzhnoye "is one of the most well-known and recognized scientific and design companies in the world in the field of space technology development," having

---

[1] Defendants were called the "CIS Partners" due to their affiliation with the Commonwealth of Independent States, an association of former Soviet Republics.

designed and developed more than 400 satellites and 130 types of engines.  UF 6.
Yuzhmash manufactures spacecraft designed by Yuzhnoye as well as other goods,
such as tractors and aircraft landing gears.  UF 7.  Yuzhmash is the largest aerospace
firm in Ukraine and it "carries out foreign economic activity in 23 countries."  UF 8.

## II.   YEARS OF DISCUSSIONS LED TO THE CREATION AGREEMENT.

After the fall of the Soviet Union, the CIS Partners sought to do business
internationally.  UF 9-11.  On February 27, 1992, Energia's President, Yuri Semenov,
travelled to D.C. and testified before Congress about Energia's desire to partner with
U.S. companies.  UF 9-10.  The CIS Partners pursued this goal aggressively and, by
1995, had negotiated contracts with many Western entities.  UF 11.

Shortly after Dr. Semenov visited Washington, Boeing and Energia began to
discuss collaborating on various initiatives, including the creation of a sea-based
rocket launching system.  UF 13.  By 1993, these discussions included Yuzhnoye and
Kvaerner, a Norwegian maritime company.  UF 14.  For the next two years, the group
developed the technical and business concepts for what became Sea Launch.  UF 15.

## III.   THE PARTNERS SIGN THE CREATION AGREEMENT.

On May 3, 1995, BCSC, Energia, Yuzhnoye, and Kvaerner executed the
Creation Agreement.  UF 19.  BCSC owned 40% of Sea Launch, Energia 25%,
Kvaerner 20%, and Yuzhnoye 15%.  UF 22.  The Creation Agreement contained the
following key terms and conditions:

### A.   Article 1.1 and Other Terms Re: "Affiliates"

The Creation Agreement contained multiple terms specifying the rights and
obligations of "Affiliates," which were defined in Article 1.1 to include the parent and
subsidiaries of each Partner.  UF 26-27.[2]  All Partners were aware when the contract
was signed that Boeing, as the parent of BCSC, was an "Affiliate."  UF 28.

---

[2] Significant terms include:  Article 1.4 obligating the "Parties and their Affiliates" to
cooperate with transfer pricing rules; Article 1.6.2 providing "non-selling Parties or
their Affiliates" rights of first refusal with respect to the sale of ownership interests;
Article 2.1 barring "the Parties or their Affiliates" from participating in other projects

**B.     Article 1.7:  "Voting"**

Article 1.7 of the Creation Agreement addresses Sea Launch's governance. Each partner had one seat on Sea Launch's Board of Directors and a vote equal to its ownership interest.  UF 101, 105.  Article 1.7 required a simple majority for most decisions, but mandated a 67% supermajority for others, including appointing Sea Launch's general manager and his direct reports, or borrowing money.  UF 106. Thus, no single partner could exercise control over the venture.  Indeed, a vote from Yuzhnoye or Energia was needed for any vote requiring a supermajority.  UF 106.

**C.     Article 9.4.2:  "Reimbursement for Guarantee"**

The Partners knew that Sea Launch would need to borrow money to operate. They also understood that, in order to do so, Sea Launch might need a guarantee from one of its Partners (or their Affiliates).  To encourage the extension of such a guarantee, the Partners agreed to include Article 9.4.2, which made all parties to the venture responsible for their pro rata share of payments made by "any Party or its Affiliate" when acting as a guarantor:

> 9.4.2 <u>Reimbursement for Guarantee</u>.  If any Party or its Affiliate provides a Guarantee to a Third Party in response to a request from a Venture Company, then all Venture Companies will be obligated to reimburse the Guarantor for any money that the Guarantor has to pay to the Third Party. If the Venture Companies fail to reimburse the Guarantor in full within thirty days of receipt of an invoice from the Guarantor, ***then each Party agrees to pay the Guarantor a percent of the amount paid to the Third Party (after subtracting money paid by the Venture Companies to the Guarantor) equal to the percent ownership identified for that Party in the Venture Companies in Article 1.5***.  *See* UF 29 (emphasis added).

---

to launch satellites from sea; Article 12.4 specifying the circumstances under which a "Party or its Affiliate" may act on behalf of Sea Launch; and Article 14 authorizing Parties to participate in Sea Launch "through an Affiliate" (UF 27).

### D.     Article 17: "Entire Agreement"

Article 17 of the Creation Agreement, entitled "Entire Agreement," was a standard integration or "merger" clause.  UF 23.  It states:

> The foregoing articles and Exhibit A comprise the entire agreement between the Parties and supersede any prior oral or written agreement, commitments, understandings, or communications with respect to the subject matter of this Agreement.  This Agreement shall not be amended unless agreed to in writing by the Authorized Representatives of each Party.  UF 23-24.

As the Defendants' witnesses understood, this clause meant that the Creation Agreement superseded all other opinions, protocols, and agreements.  UF 25.

## IV.     ALL PARTNERS PARTICIPATED IN SEA LAUNCH MANAGEMENT.

As contemplated in the Creation Agreement, Sea Launch was governed by its Board, which consisted of a representative of each Partner.  UF 101.  Sea Launch's executives reported to the Board and the Partners regularly about the venture, and the Board selected Sea Launch's executives and approved key strategic decisions.  UF 101-102.  Sea Launch held more than 15 board meetings during its "development phase" (1995 through Sea Launch's first launch in 1999) and more than 30 meetings during its operations phase (1999 until Sea Launch's bankruptcy in 2009).  UF 103.

## V.     ALL PARTNERS INCURRED DEVELOPMENT PHASE OVERRUNS.

During the development phase, Sea Launch developed and tested the world's first sea-based launch system.  UF 109, 111.  Each Partner was responsible for developing a major component of the system as a subcontractor to Sea Launch: Kvaerner developed the sea-based platform and command ship; BCSC provided the fairings for the Zenit rocket; and Energia and Yuzhnoye worked to conform the existing Zenit launch vehicle to the new sea-based concept.  UF 112, 127, 148. Because an ocean-based launch system like Sea Launch was highly complex and had never been developed before, no one knew, with certainty, how much the system or its components would cost to design, build or test.  UF 111.

As it turned out, all of the Partners incurred costs during the development phase that exceeded what they were contractually entitled to be paid by Sea Launch.  UF 116-120.  Boeing repeatedly expressed its willingness to absorb its own cost overruns, but the other Partners refused; thus, all of the Partners ultimately requested that Sea Launch reimburse for their development cost overruns out of the venture's profits.  UF 121-122.  Ultimately, because Sea Launch never made a profit, no development cost overruns were ever paid to any of the Partners.  UF 123.[3]

## VI.   THE CIS PARTNERS APPROVED <u>ALL</u> SEA LAUNCH BORROWING.

The Partners understood from the outset that Sea Launch would have to borrow money to finance the project.  UF 65.  Thus, in 1995, all Partners voted to authorize Sea Launch to "enter into loan agreements with commercial banks up to the amount of $300 million" and to request that Boeing provide guarantees of the loans.  UF 34.  Pursuant to this authorization, Sea Launch funded its development phase, in part, through bank loans, guaranteed by Boeing.

The loans taken by Sea Launch during its development phase were set to mature in 2004-05, and Sea Launch did not have the money to pay them.  The Partners all agreed that Sea Launch should refinance its debts with new loans, and it did so. UF 35, 39, 43.  Thus, Sea Launch entered into: (a) a June 23, 2004, $270 million loan with JP Morgan Chase, which was amended and restated in a $260 million agreement with Citicorp; (b) an October 7, 2004, $31 million loan with Sumitomo Banking Corporation; (c) a July 11, 2005, agreement for $100 million of floating senior notes; and (d) an August 31, 2005, $100 million loan with Sumitomo.  UF 35, 39, 43.

Sea Launch could not have borrowed *any* of these funds without Boeing guarantees.  UF 48.  Accordingly, at the express request of the Sea Launch board, Boeing entered into:  (1) a June 23, 2004 Guarantee Agreement with JPM, in which

---

[3] During the development phase, the Partners discussed the fact that Sea Launch was costing far more than originally anticipated.  UF 116-117. █████████████████

Boeing guaranteed Sea Launch's $270 million loan, (UF 36-37); (2) an October 12, 2004 Guarantee Agreement with Sumitomo, in which Boeing guaranteed Sea Launch's $31 million loan, (UF 40-41); (3) a July 11, 2005 Guarantee Agreement with note investors in which Boeing guaranteed $100 million of floating Sea Launch debt, (UF 44-45); and (4) an August 31, 2005 Guarantee Agreement with Sumitomo, in which Boeing guaranteed Sea Launch's $100 million loan UF 44-45.  While Boeing was willing to provide these guarantees, it would only do so subject to Article 9.4.2 of the Creation Agreement, which provided that the other Partners would reimburse their share of any payments Boeing was required to make as a result.  UF 37, 41, 45.  Thus, Boeing demanded, and each Partner agreed, to expressly reaffirm their obligations under Article 9.4.2, in writing, in connection with Boeing's guarantee of each of these loans.  UF 38, 42, 46.

## VII.   THE CIS PARTNERS APPROVED THE BCSC LOAN AND GUARANTEED THEIR SHARE OF ITS REPAYMENT.

In December 1995, the Partners separately authorized Sea Launch to "enter into a loan agreement with BCSC" to borrow funds "at an interest rate of 12% per year. . .." UF 66.  This was memorialized in an amendment to the Creation Agreement specifying that "BCSC and Kvaerner agree to loan [Sea Launch] money on terms that will be set forth in more detail in separate loan agreements." UF 66.  Thus, on February 2, 1996, BCSC and Sea Launch entered into a Loan and Security Agreement, pursuant to which BCSC agreed to loan up to $183,333,334.  UF 66. Kvaerner entered into its own loan agreement.  UF 66.  BCSC's obligation to make a loan to Sea Launch was expressly conditioned on Energia and Yuzhnoye executing separate agreements guaranteeing their shares of the loan.  UF 67.  At the same time, Sea Launch and Kvaerner entered into a separate loan agreement with Sea Launch for approximately $92,000,000, also conditioned on guarantees from Energia and Yuzhnoye.

## A.   The Energia and Yuzhnoye Guarantees

As stated above, before loaning any funds, BCSC insisted that Energia and Yuzhnoye each guarantee a share of the loan reflecting their respective ownership interests in Sea Launch—25% and 15%, respectively.  UF 67, 70.  For weeks, Energia negotiated the terms of its guarantee, in letters and during Sea Launch board meetings.  UF 74-76.  As memorialized in the February 2-3, 1996 board minutes, "[i]t was agreed that all parties recognized that the intent of the Guaranty Agreements is only to require Energia to be responsible for 25% of the loan obligations that Sea Launch does not repay, and that Yuzhnoye and Yuzhmash are only responsible for 15% of the loan obligations that Sea Launch does not repay."  UF 76.

Following this express statement of their understanding, Energia and Yuzhnoye executed the "Partner Loan Guarantees."  UF 70.  In those documents, Energia and Yuzhnoye agreed, in the event of default, to "absolutely, unconditionally, and irrevocably guarantee" the "full and prompt payment" of their share of any amounts owed by Sea Launch under the BCSC Loan.  UF 70.  They further agreed that:

- the Guarantee and BCSC Loan Agreement embodied "the entire agreement between the Guarantor and Lender relating to the subject matter hereof and supersede all prior agreements, representations, and understandings, if any, relating to such subject matter" (UF 72);
- any amendment, waiver, or departure from the terms of the Guarantees would be required in writing and signed by the BCSC (UF 71); and
- "No course of dealing or performance" could "operate as a waiver by it of such right, or the amendment, release or novation of any provision thereof " (UF 71).

***These documents, on their face, create unambiguous, valid contractual obligations***, and there is ***no documentary evidence*** to suggest that any entity or individual involved in any of these transactions understood otherwise.

1

### B.    The Amendments to the BCSC Loan

On December 9, 1996, a U.S. company called Commercial Space Management Co. ("CSMC") filed a lawsuit in the Central District of California against Sea Launch and each of the Partners.  UF 79.  The lawsuit alleged that Energia's President, Dr. Semenov, had contracted in 1994 to grant CSMC exclusive rights to use the Zenit rocket commercially.  UF 79.  Because the Zenit rocket was the core of Sea Launch's planned operations, the lawsuit threatened Sea Launch's very existence.  UF 79.

Energia and Yuzhnoye claimed that they lacked the means to defend against CSMC's lawsuit and requested that Boeing loan Sea Launch money to fund their defense.  UF 80.  Energia and Yuzhnoye memorialized this request in a Litigation Expense Funding Agreement:  "The parties have requested that BCSC and [Kvaerner] make a loan to Sea Launch to enable Sea Launch to fund Energia's CSMC Litigation Expenses (up to $300,000), KB Yuzhnoye's and PO Yuzhnoye's CSMC Litigation Expenses (up to $200,000), and ENERM's [a company managed by Dr. Semenov] CSMC Litigation Expenses (up to $500,000)."  UF 81.

The BCSC Loan was thus amended "for the sole purpose of enabling Sea Launch to fund payment of attorneys' fees and litigation costs and expenses incurred and to be incurred in connection with the defense, respectively, of each of Energia, Yuzhnoye, and ENERM [in the CSMC Litigation]."  UF 79-81.  Energia and Yuzhnoye have never disputed that they not only agreed to, but specifically requested, these additional loan proceeds to fund their legal fees in the CSMC case.

In August 1999, Sea Launch wrote to all Partners, seeking a second amendment to the BCSC Loan to extend the loan's maturity date and defer interest, and attaching "the final form" of the Second Amendment.  UF 82.  Energia responded that it had "no objection in substance" and "approved" the Second Amendment, but wanted to delete the amendment's references to another pending loan then being considered by the parties.  UF 83.  Yuzhnoye replied that it likewise agreed to the amendment, but

9

endorsed Energia's proposed edit to eliminate internal references to the additional loan, and it wanted an invoice for CSMC-related fees to be paid first.  UF 83.

Following adoption of the amendments, the CIS Partners consistently recognized the Guarantees of the loans, as amended, as valid, legally enforceable obligations for the next decade.  In fact, Sea Launch's audited financial statements— which were approved annually by all the parties—confirmed the obligations each year. UF 88.  Likewise, Energia reported its obligations to the Russian Central Bank quarterly for years.  UF 89.  And the CIS Partners proactively sought—and BCSC agreed to—additional changes to the BCSC Loan to further reduce the interest rate. UF 86.  There is no contemporaneous evidence even suggesting that the CIS Partners questioned, much less objected to, the effectiveness of their Guarantees.

## VIII.  DEFENDANTS REPEATEDLY REAFFIRM THEIR PROMISES.

Each Partner consistently held out its Creation Agreement and Loan Guarantee obligations as valid, contractual commitments for over a decade, as confirmed by:

**Correspondence with the Russian Central Bank**.  Energia provided the Russian Central Bank with quarterly reports on the status of the BCSC Loan and its guarantee thereof from 2003 to 2007.  UF 89.  These reports are irreconcilable with Energia's litigation position that it has no obligation to honor its guaranty.

**Repeated Reaffirmations of Article 9.4.2**.  As described above, in 2004 and 2005, the Partners authorized Sea Launch to refinance more than $400 million in bank loans, which could not be done without a guarantee from Boeing.  UF 35-48.  Before agreeing to guarantee the loans, Boeing requested that the Partners expressly reaffirm their obligations under Article 9.4.2 of the Creation Agreement.  UF 37, 41, 45.  At Boeing's request, Energia and Yuzhnoye executed resolutions *four times* in 2004-05 reaffirming their obligations under Article 9.4.2 to pay their share if the guarantees were called.  UF 38, 42, 46.  Indeed, Yuzhnoye reaffirmed its obligations yet again on the eve of Sea Launch's bankruptcy in 2009, only to renege on that reaffirmation weeks later when it came due.  UF 57.

**Contemporaneous Sea Launch Management Presentations**.  On numerous occasions, Sea Launch executives made presentations to the Partners that specifically set forth the amounts each Partner would owe under Article 9.4.2 and the Partner Loan Guarantees in the event of a Sea Launch bankruptcy.  UF 49.  ***There is no report, presentation, memorandum, or any other document suggesting that the obligations under Article 9.4.2 or the Partner Loan Guarantees had been abrogated in any way***.

**Sea Launch Financial Statements**.  Sea Launch's audited financial statements were distributed to the Partners annually.  UF 88.  Each year from 2002 to 2008, these statements recognized the Partner Loan Guarantees, and the CIS Partners never once asserted that the statements detailing their obligations were inaccurate.  UF 88.

**Extensive Other Contemporaneous Documentary Evidence**.  References to these guarantee obligations appear in countless other contemporaneous documents, with no hint in any of these documents that the CIS Partners' guarantee obligations were anything other than valid, contractual commitments.  UF 49.  Equally important, ***no contemporaneous documentary evidence casts doubt upon these commitments***.

## IX.  THE CIS PARTNERS MADE MILLIONS FROM SEA LAUNCH, WHILE BOEING INCURRED MASSIVE LOSSES.

Sea Launch was not a successful venture.  It lost nearly $2 billion prior to its bankruptcy.  While Defendants now seek to blame Boeing, the undisputed facts show that—in addition to the staggering sums involved in this litigation—Boeing performed approximately $400 million of work for Sea Launch *on credit*, for which it was never paid, in an effort to make Sea Launch successful.  UF 139.  Its contributions were simply unable to overcome the true causes of Sea Launch's failure, for which Boeing was not responsible:  dramatically reduced demand for commercial satellite launches, higher than expected development and recurring costs, and highly publicized launch failures in 2000, 2004, and 2007—failures attributed to the CIS Partners.  UF 126-37.

While Boeing accumulated massive losses from its Sea Launch relationship, the CIS Partners made hundreds of millions of dollars from theirs.  UF 97-99, 100.  And

the difference in the Partners' conduct could not have been starker.  When Sea Launch lacked the funds to pay the Partners for their work during the operations phase, Boeing agreed to continue providing Sea Launch goods and services at stable prices and on credit, leading to an "accounts payable" balance to Boeing of over $400 million by 2009.  By contrast, Energia and Yuzhmash substantially increased the price of their hardware and forced Sea Launch to make advance payments by threatening to withhold delivery.  UF 97-99, 142-148.

## X.   ENERGIA AND YUZHNOYE RENEGE ON THEIR PROMISES

On June 22, 2009, Sea Launch filed for bankruptcy.  UF 152.  Sea Launch's bankruptcy filing was an event of default under Sea Launch's bank debt as well as under the BCSC Loan.  UF 35, 39, 43, 61, 66, 94.  The banks that had loaned Sea Launch money called on Boeing to satisfy its guarantees and, as those guarantees required, Boeing paid $449,082,462.84 to satisfy Sea Launch's bank debt.   UF 61.

On July 20, 2009, Boeing sent Sea Launch an invoice requesting reimbursement of the $449,082,462.84 that Boeing had paid on its behalf.  UF 62.  After thirty days passed without payment, Boeing sent each Partner a demand under Article 9.4.2 for reimbursement of their share:  25% from Energia ($112,270,615), 20% from Kvaerner ($89,816,493), and 15% from Yuzhnoye ($67,362,369). UF 63.  Kvaerner's successor complied with its obligation, but Energia and Yuzhnoye refused, with no explanation, instead asking Boeing to wait to collect until an unknown date in the future.  UF 64.

On August 5, 2009, BCSC sent Energia and Yuzhnoye invoices requesting payment pursuant to the Partner Loan Guarantees.  UF 95.  Under those agreements, Energia was obligated to pay 25% of the amount due under the BCSC Loan ($130,764,438), and Yuzhnoye was responsible for 15% ($78,438,662).  UF 70.  Again, without contesting their obligations to BCSC or offering any explanation or justification, neither attempted to make payment.  UF 96.

**LEGAL STANDARD**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby*, 477 U.S. 242, 256 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  A dispute is "genuine" only if it can be resolved in favor of either party.  *Anderson*, 477 U.S. at 250-51.

**ARGUMENT**

**I.     BOEING IS ENTITLED TO SUMMARY JUDGMENT ON COUNTS I AND III (CREATION AGREEMENT) AS A MATTER OF LAW**

Swedish law, which governs the Creation Agreement, provides that commercial agreements between business partners shall be enforced according to their clear and unambiguous terms.  McKeever Decl., Ex. 133, Munck Report ¶¶ 12, 19; CL 2-5.  The text of the Creation Agreement is unequivocal:  "If any Party or *its Affiliate* provides a Guarantee to a Third Party in response to a request from a Venture Company" and is called upon to pay on that Guarantee, "each Party agrees to pay the Guarantor a percent of the amount paid to the Third Party" proportionate to the Party's ownership stake.  UF 29.  Energia and Yuzynoye plainly breached the Creation Agreement by failing to reimburse Boeing for their share (25% and 15%, respectively) of the $449,082,462.84 Boeing paid under its guarantees of Sea Launch bank debt.

Nor can there be any suggestions that Energia and Yuzhnoye are somehow relieved of this obligation because Sea Launch's bank loans were guaranteed by Boeing and not BCSC.  The Creation Agreement could not be clearer on this point.  it defined as "Guarantor" as a "Party *or its Affiliate that provides a Guarantee*" and clarifies that an "Affiliate" includes *a legal entity that is the Parent of a Party*."  UF 30 (emphasis added).  Accordingly, as BCSC's parent company, Boeing is an "Affiliate," as defined in the Creation Agreement, and, as a "Guarantor," has the unambiguous right to recover amounts paid to satisfy Sea Launch's third party debt directly.   *See* UF 31; McKeever Decl., Ex. 133, Munck Report at ¶¶20-24; CL 2-5.

Defendants should not be heard to contest these obligations now, after reaffirming them multiple times in 2004-2005, expressly recognizing the applicability of Section 9.4.2 of the Creation Agreement to these particular loan guarantees by Boeing. *See* UF 38, 42, 46. Defendants re-affirmed these obligations fully knowing that Boeing was providing its guarantees in express reliance on those re-affirmations. In sum, the contractual obligation is unambiguous and it was reaffirmed repeatedly by Defendants when Boeing extended the guarantees at issue; no material facts are in dispute. *See* UF 60. Summary judgment is warranted and should be granted.

## II.   BCSC IS ENTITLED TO SUMMARY JUDGMENT ON COUNTS II AND IV (PARTNER LOAN GUARANTEES) AS A MATTER OF LAW

The argument for summary judgment on the Partner Loan Guarantees is equally clear. In them, Energia and Yuzhnoye guaranteed "absolutely, unconditionally, and irrevocably" their share of "each and every payment obligation" under the BCSC Loan. UF 29. Their failure to make those payments when they came due, *see* UF 64, 96, is is plainly a breach. Summary judgment should be entered for that reason alone.

Energia and Yuzhnoye have sought to avoid these unambiguous contractual obligations based on a series of assertions that defy the contract's plain language: that, notwithstanding the parties' execution of formal loan documents, the BCSC Loan was really an "equity investment"; or that, despite the clear terms of the Partner Loan Guarantees, BCSC's recovery is somehow limited to Energia and Yuzhnoye's equity stake in Sea Launch. Even if one puts aside that these allegations have absolutely no documentary support, they are plainly irrelevant under English law, which governs the guarantees. As Plaintiffs' expert David Wolfson states in his expert report, written contracts of guarantee "are treated with the utmost seriousness" by English courts. *See* UF 73, McKeever Decl., Ex. 134, Wolfson Expert Report at ¶¶ 21, 36-37. English law, like U.S. law, enforces the contracts' plain language and does not permit a party to vary their terms based on alleged contradictory oral statements. UF 73; CL 31-38; McKeever Decl., Ex. 134, Wolfson Report at ¶¶ 117-118.

14

As a matter of law, therefore, Energia and Yuzhnoye cannot defeat summary judgment with baseless assertions that are at odds with the unambiguous guarantees that they knowingly signed and held as out as valid for a decade leading up to this dispute.  Nor can they credibly argue that the Partner Loan Guarantees are ambiguous, or that the conditions triggering their obligations under those Guarantees have not occurred.  Accordingly, summary judgment is warranted and should be granted.

### III. PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON THE CIS PARTNERS' AFFIRMATIVE DEFENSES.

In a desperate attempt to avoid their clear contractual obligations, Energia and Yuzhnoye have pled a combined 63 affirmative defenses.  None have any merit.

In denying an early motion to strike these affirmative defenses under Rule 12(f), Judge Collins ruled that she did not need to assess their legal merit at the pleading stage, as (in her view) affirmative defenses need only provide "fair notice" of what was being alleged.  *See* Dkt. No. 198.  But Judge Collins specifically noted her expectation that Energia and Yuzhnoye would not pursue defenses totally devoid of merit.  *Id*.  Unfortunately, Judge Collins' expectation has proven to be misplaced. Defendants have declined to withdraw even one of their 63 affirmative defenses, even though they are untethered from the facts, at war with the record, and unsupported by law.  Summary judgment is appropriate with respect to each and every one of them.

#### A. Energia's and Yuzhnoye's Procedural Defenses Are Invalid.

Energia and Yuzhnoye have put forth a series of procedural defenses they refuse to withdraw despite repeated requests and prior Court orders.  For the reasons set forth below, summary judgment is plainly warranted with respect to each of them.[4]

***First***, Defendants argue that Plaintiffs lack standing.[5]  This theory is frivolous. Plaintiffs clearly have standing to enforce promises that the CIS Partners made and

---

[4] Energia and Yuzhnoye both plead "failure to state a claim" as Aff. Defense No. 1. For the reasons described above, it is obvious that Plaintiffs state a claim.
[5] Energia Aff. Defense No. 2; Yuzhnoye Aff. Defense No. 2.

reaffirmed repeatedly in writing.  Defendants do not dispute the conclusion of former Chief Justice of the Swedish Supreme Court Johan Munck that Article 9.4.2 of the Creation Agreement "is an obvious third party beneficiary agreement."  Under Swedish law, "a third party may have an independent right under a contract even though it is not a party to that contract if it follows from the text of the agreement or if the parties to the agreement so intended."  McKeever Decl., Ex. 133, Munck Report ¶¶ 13-19 (citing Swedish Supreme Court authorities); CL 2-5.  The contract expressly anticipates Affiliates (like Boeing) suing in this precise circumstance.  UF 29-31.

*Second*, Defendants contend that Plaintiffs must exhaust arbitral remedies before seeking relief here.[6]  This argument defies Swedish law (CL 9) and has already been rejected.  Dkt. 74 at 5; Dkt. 122 at 5.  As this Court held, Defendants cannot evade their obligations by arguing that Plaintiffs must exhaust arbitral remedies that they successfully persuaded the arbitrator he lacked jurisdiction to provide.

*Third*, Defendants claim that the Swedish Arbitral Award is preclusive.[7]  Again, this Court has already considered and rejected this precise argument because "the scope of the [Arbitral] Award is manifestly clear:  it concerned only jurisdiction," which of course has no preclusive effect on the merits.  *See* Dkt. No. 171 at 3; CL 12.

*Fourth*, Defendants assert that venue is improper.[8]  This defense was waived because it was not raised in the Defendants' motions to dismiss.  *See* Fed. R. Civ. P. 12(h).  In any event, it is baseless.  The Court has already found that California is "the proper forum for this litigation," and Plaintiffs surely have a right to bring suit in the forum in which Sea Launch's Home Port was based.  Dkt. No. 74, at 5; CL 10.

**B.    None of Energia's or Yuzhnoye's "Bar" Defenses Can Stand Either**

Energia and Yuzhnoye contend for a variety of reasons that Plaintiffs are barred from asserting their claims.  Again, none of these defenses has any merit.

---

[6] Energia Aff. Defense No. 3; Yuzhnoye Aff. Defense No. 3.
[7] Energia Aff. Defense No. 5; Yuzhnoye Aff. Defense No. 5.
[8] Energia Aff. Defense No. 7; Yuzhnoye Aff Defense No. 6.

***First***, they assert that Plaintiffs' claims are barred by the statute of limitations, an argument that is difficult even to comprehend.[9]  Plaintiffs' claims could not have possibly accrued before June 22, 2009, when Sea Launch's bankruptcy filing caused a default on its bank loans and the BCSC Loan and triggered Defendants' contractual obligations to Boeing.  UF 61, 94.  Plaintiffs filed this complaint on February 1, 2013, well within any conceivable statute of limitations.  And the Swedish statute of limitations clearly does not bar Plaintiffs' claims because, under Swedish law, the 10-year limitations period "re-set" numerous times every year during Sea Launch's operations.  *See* McKeever Decl., Ex. 133, Munck Report 12-13; CL 20-22.

***Second***, Defendants claim that Plaintiffs' claims were released in Sea Launch's bankruptcy.[10]  But this Court already found to the contrary: "Section 38 of the Confirmation Order, entitled 'Exception to Releases,' specifically preserves claims of Boeing and BCSC 'against entities other than the Debtors' with 'Debtors' referring to the six legal entities that constituted the original Sea Launch enterprise."  Dkt. No. 74, 6/3/13 Order at 6; UF 156-57.  No more is required for summary judgment.

***Third***, Defendants claim that Boeing is "estopped" from raising these claims.  These assertions make no sense as a matter of Swedish law, English law, or logic.  *See* McKeever Decl., Ex. 133, Munck Report at 12, Ex. 134, Wolfson Report ¶¶ 170-175.  The gist of the "estoppel"[11] argument is that Plaintiffs told Energia and Yuzhnoye that *reaffirming* their obligations was only needed for audit purposes.  Even assuming that were true, it could not constitute estoppel.  Rather, Boeing's requests for reaffirmation of guarantees show that Plaintiffs and their auditors were <u>relying</u> on them for financial reporting, and that Boeing (and its auditors) expected each Partner to honor its promises.  It defies logic to contend that by repeatedly requesting that the Defendants reaffirm their payment obligations, Boeing became estopped from enforcing them.

[9] Energia Aff. Defense No. 17; Yuzhnoye Aff. Defense No. 16.
[10] Energia Aff. Defense No. 31; Yuzhnoye Aff. Defense No. 30-32.
[11] Energia Aff. Defense No. 4, 15; Yuzhnoye Aff. Defense No. 6, 14.

**Fourth**, Energia and Yuzhnoye raise a "laches" defense, arguing that BCSC's failure to perfect its security interest in Sea Launch before the Sea Launch bankruptcy constitutes an "unreasonable delay" that purportedly prejudiced Defendants.[12]  Again, Defendants' argument does not make sense.  The guarantee obligations of Energia and Yuzhnoye do not hinge in any way upon BCSC perfecting a security interest in Sea Launch, and the fact that BCSC did not perfect its security interest prior to Sea Launch's bankruptcy cannot possibly have created any "unreasonable delay" in BCSC asserting claims against Energia or Yuzhnoye.  Nor could these circumstances have possibly prejudiced Energia or Yuzhnoye (in fact, it benefitted them).  There are no facts here that plausibly support a "laches" defense.

## C.    None of Energia's or Yuzhnoye's Contract Defenses Is Viable

Energia and Yuzhnoye plead two traditional contract defenses, neither of which can survive summary judgment.

**First**, Defendants argue that there was no consideration for the promises made.[13]  This argument ignores that consideration is not required under Swedish law, a finding Defendants' experts do not contest.  *See* CL 25-36; McKeever Decl., Ex. 133, Munck Report 13.  Moreover, the argument is fatally flawed.  Relying on the Partner Loan Guarantees, BCSC lent $184 million to Sea Launch to create a venture from which the CIS Partners massively benefitted.  UF 97-99.  Likewise, pursuant to the Creation Agreement and Defendants' reaffirmations, Boeing agreed to guarantee hundreds of millions of Sea Launch debt in reliance on Energia's and Yuzhnoye's agreements to pay their share should Boeing incur losses as a result.  UF 31-32.  BCSC's loans to Sea Launch, and Boeing's agreement to guarantee Sea Launch's third-party loans, clearly constitute consideration, under any applicable law.  *See* McKeever Decl., Ex. 134, Wolfson Report ¶¶210-213; CL 25-26, 79-81[14]

---

[12] Energia Aff. Defense No. 27; Yuzhnoye Aff. Defense No. 26.

[13] Energia Aff. Defense No. 20-21, 24; Yuzhnoye Aff. Defense No. 19-20, 23.

[14] Part of the "no consideration" argument appears to be a suggestion that the BCSC Loan was really an equity contribution into Sea Launch, not a loan.  This appears to be

***Second***, both Defendants claim that the Creation Agreements and BCSC Loan were "modified" by "oral agreements" in which they claim Plaintiffs promised either not to enforce the obligations at all, or alternatively, only to enforce them against the Partners' equity interests in Sea Launch.[15]  As a factual matter, these claims are not only unsupported by the contemporaneous record, but affirmatively refuted by it.  At the same time Defendants contend Plaintiffs gave them these alleged assurances, their signed agreements and contemporaneous documents, including Sea Launch Board minutes, make clear that they understood the extent of their potential liability.

Regardless, however, both the Creation Agreement and the Partner Loan Guarantees include provisions ***forbidding*** any modification except in a writing signed by all parties.  UF 24.  Specifically, the Creation Agreement provides: "This Agreement may not be amended ***unless agreed to in writing by the Authorized Representatives of each Party***."  UF 24.  Likewise, the Partner Loan Guarantees state that they may be amended or waived "***only if, such amendment, waiver or consent is in writing*** and is signed by the Lender," and "***[n]o course of dealing or performance by the Lender, including any*** delay or ***forbearance by it in exercising any right*** under this Agreement ***shall operate as a waiver by it of such right*** . . .."  UF 71.

As a matter of law, these provisions—valid and binding under Swedish and English law —prohibit the CIS Partners from arguing that oral statements (even if they occurred) modified or waived Plaintiffs' rights.  *See* McKeever Decl., Ex. 134, Wolfson Report ¶¶ 117-118; Ex. 133, Munck Report at 13; CL 23-24, 31-38, 76-79. Energia and Yuzhnoye signed unambiguous contracts that they cannot now disavow.

---

an effort to invoke the doctrine of "recharacterization" in bankruptcy law, where loans in some cases can be treated as equity contributions for purposes of priority among creditors.  *E.g., In re SubMicron Sys. Corp.*, 432 F.3d 448 (3d Cir. 2006); *In re Fitness Holdings Int'l, Inc.,* 714 F.3d 1141 (9th Cir. 2013).  This argument is irrelevant. Energia and Yuzhnoye signed written agreements to pay 25% and 15% of sums due thereunder if Sea Launch did not pay.  These obligations are binding and enforceable, whatever the proper characterization of the loans under bankruptcy law.  None of the "recharacterization" cases suggests that they would relieve third parties, like Energia and Yuzhnoye, from contractual obligations to lenders or guarantors.
[15] Energia Aff. Defense No. 19; Yuzhnoye Aff. Defense No. 18.

19

### D.   None of Energia's or Yuzhnoye's "Unfairness" Defenses Survive

Energia and Yuzhnoye also raise several defenses based on the premise that it would not be "fair" to hold them to their agreements.  There is no factual or legal basis for this ludicrous assertion.  The provisions at issue merely make Energia and Yuzhnoye responsible for their equitable share of some of the amounts BCSC and Boeing lost in support of Sea Launch.  BCSC and Boeing provided a benefit to Sea Launch, in the form of loans and loan guarantees, only because Energia and Yuzhnoye promised that they would reimburse their shares of any amounts Boeing lost as a result.  There is nothing remotely "unfair" about requiring Energia and Yuzhnoye to live up to those obligations now.  This is particularly true given that ███████████ ████████████████████████████████████████ while Boeing lost over $1 billion.  (Yuzhnoye refuses to even say how much it made (UF 99-100)).

#### 1.   Undue Influence and Unconscionability[16]

Any claim of undue influence or unconscionability fails as a matter of law. Under Swedish and English law, these defenses are not available to set aside contract obligations made by commercial companies at arms-length.  *See* CL 13-14, 64-68; McKeever Dec., Ex. 133, Munck Report 10; Ex. 134, Wolfson Report at ¶190 ("[Undue influence] cannot be applied to a commercial relationship between two commercial entities or businesses, even if one of those entities or businesses was unfamiliar with the market in which the contract operated.").

Moreover, the undisputed facts refute the notion that Plaintiffs took "unfair advantage" of Defendants' purported lack of sophistication.  Energia and Yuzhnoye are leading companies in the international space industry and engage in complex commercial aerospace projects around the world.  UF 3-4, 6, 8.  While they claim they had a "poor understanding of Western business models" in 1995, the reality is that, before the Creation Agreement, they had negotiated and contracted with several

---

[16] Energia Aff. Defense No. 10, 16; Yuzhnoye Aff. Defense No. 9, 15.

Western entities.  UF 11.  Moreover, Energia and Yuzhnoye engaged in extensive negotiations with Boeing and Kvaerner before entering into the contracts at issue here. UF 13-15.  Defendants' conduct in the negotiations themselves, and their internal discussions about whether to proceed with the deal, belies their litigation position that they lacked even a basic level of understanding of what they were agreeing to.

Lastly, the provisions Plaintiffs seek to enforce are not one-sided terms that cannot be explained apart from the Defendants' alleged lack of sophistication; they simply allocate the financial consequences of Sea Launch's failure among the partners in accordance their percentages of ownership in the venture.  These terms benefitted all parties; they provided an incentive for one party to take on financial risks that would benefit the rest of the partners, as Boeing did.  What would be 'unconscionable' is for the Defendants to reap the benefits of Boeing's loans to Sea Launch, and loan guarantees on Sea Launch's behalf, but to walk away from their obligations to reimburse Boeing for their share of those amounts once the venture failed.

### 2.   Unclean Hands, Inequitable Conduct, and Breach of the Covenant of Good Faith[17]

The unclean hands and "bad faith" defenses are also meritless as a matter of law.  *See, e.g.,* McKeever Decl., Ex. 134, Wolfson Report ¶186 ("There is no legal basis [under English law] for applying the maxim [of unclean hands] to a plaintiff who is seeking to enforce her legal rights under a contract.  That is not a claim in equity but an action at law.").  Indeed, even if the CIS Partners' allegations were true, their unclean hands defense would fail as a matter of law.  *See* McKeever Decl., Ex. 133, Munck Report at 10: Ex. 134, Wolfson Report ¶¶183-186; CL 17, 60-61.

In all events, the undisputed evidence refutes the allegations underlying Defendants' unclean hands defense.  Contrary to Defendants' claim, the evidence shows that Boeing's contribution to cost escalation during the development phase was

---

[17] Energia Aff. Defense No. 8, 9, 11, 13; Yuzhnoye Aff. Defense No. 7, 8, 10, 12.

insignificant, and even more importantly, that BCSC—not Sea Launch—bore the consequences: Sea Launch never paid BCSC for its excess development costs.  By definition, therefore, BCSC's cost overruns could not have contributed to Sea launch's failure.  UF 120-123.  In fact, BCSC repeatedly provided goods and services to Sea Launch without payment; and ultimately lost more than $1 billion from participation in the Sea Launch venture (including over $400 million in unpaid goods and services). UF 138-39.  This stands in contrast to the CIS Partners—they made a substantial profit from their dealings with Sea Launch.  UF 97-98.

In sum, unclean hands, inequitable conduct and "bad faith" are neither legally viable as defenses nor factually supportable in light of the evidentiary record.

### 3.    Unjust Enrichment[18]

Defendants cannot credibly claim that Plaintiffs would be unjustly enriched by a verdict in their favor.  Boeing is merely seeking reimbursement of Energia and Yuzhnoye's pro-rata shares of amounts that *it has paid* for the benefit of Sea Launch. Far from unjustly enriching Boeing, this recovery is required by contracts Defendants signed to make Boeing whole—and which served as the basis for BCSC's loan to Sea Launch and Boeing's willingness to guarantee Sea Launch's debt.  UF 67-70.

### E.    None of the Count II/IV-Specific Defenses Survives, Either

Energia and Yuzhnoye also raise defenses specific to the Partner Loan claims (Counts II and IV).  These defenses have different names—failure to disclose, failure to state a claim, lack of acceptance, or "prevention from performance"[19]—but they all boil down to the contention that Defendants are free from their guaranty obligations because: (1) they were supposedly told that the obligations would not be enforced; and (2) they did not approve two amendments to the BCSC Loan.  These arguments defy the express language of the Partner Loan Guarantees, the factual record, or both.

---

[18] Energia Aff. Defense No. 12 ,25; Yuzhnoye Aff. Defense No. 11, 24.
[19] Energia Aff. Defense No. 14, 18, 22, 23; Yuzhnoye Aff. Defense No. 13, 17, 21, 22.

With respect to supposed "promises" that Defendants' obligations would not be enforced, the Partner Loan Guarantees provide expressly that (i) they supersede all prior understandings or agreements (Art. 11(b)) and (ii) they can only be altered by signed, written agreements (Art. 11(g)). UF 71-72. Under English law, these Articles are valid and binding, *see* McKeever Decl., Ex. 134, Wolfson Report, ¶¶ 203-206, and Defendants' obligations under the Guarantees would remain even if BCSC had for some inexplicable reason "promised" not to enforce them. *Id*. In sum, nothing Boeing could have said before (or after) the Guarantees were signed could extinguish Defendants' obligations under the plain text of those Guarantees. CL 30-38.

Energia's and Yuzhnoye's alleged non-consent to the BCSC Loan amendments is similarly meritless. The undisputed facts establish consent—express or implied. *See* UF 79-85. Indeed, Energia and Yuzhnoye indisputably approved the effect of, and enjoyed the benefit of, both amendments. Energia and Yuzhnoye repeatedly represented for years after the amendments—to Plaintiffs, Sea Launch, and others (including the Russian Central Bank)—that they considered the Guarantees effective. *See* UF 89. As Energia and Yuzhnoye well knew, Plaintiffs relied on these repeated representations and assurances (from Yuzhnoye, Energia, and from Energia's parent the Russian government) in continuing to participate in, and guarantee the debt of, Sea Launch—to the CIS Partners' massive benefit.  As a result, under English law, even if one could show that the Defendants did not approve the amendments, they would be estopped by their conduct from denying that the Guarantees are enforceable. *See* McKeever Decl., Ex. 134, Wolfson Report ¶¶ 158-164; CL 30-38.

This defense also finds no support in the factual record. The first amendment increased the amount of the loan to fund Energia's and Yuzhnoye's defense of the CSMC lawsuit; BCSC did this *at Energia's and Yuzhnoye's request*. UF 81. Their contention—sixteen years later—that they did not approve the amendment to include these amounts is mind-boggling and disingenuous in the extreme. Likewise, the second amendment modified the time when Sea Launch would be required to start

making loan payments, and extended the maturity date. UF 82. This modification worked solely to Sea Launch's (and Defendants') benefit. Defendants' claims to the contrary defy the overwhelming evidence showing that everyone involved, including Energia and Yuzhnoye, was aware of and approved of the revision to the terms of the loan and treated the Partner Loan Guarantees as enforceable and valid contractual obligations long after execution of the BCSC Loan amendments.

### F.   Defendants' "Reduce the Damages" Defenses Fail

Finally, Energia and Yuzhnoye assert several defenses aimed at reducing the hundreds of millions of dollars that they owe.

*First*, they assert as an "intervening cause"[20] events in 2008 and 2009 beyond the CIS Partners' control, which they claim led to Sea Launch's bankruptcy. But even if it were true, this is no defense to their clear contractual obligations. Further, the only "cause" they identify was a 2007 launch failure *caused by Yuzhnoye* (UF 132) that led to a customer having to move its launch and successfully suing Sea Launch for $52 million (UF 134-135). The CIS Partners cite no evidence of anything Plaintiffs could have done in 2008-09 that would have averted Sea Launch's demise.

*Second*, they claim that Plaintiffs "failed to mitigate"[21] because they did not sue Energia or Yuzhnoye before the obligations were even due, and because they entered into a settlement agreement during Sea Launch's bankruptcy that explicitly preserved the ability to bring the claims here. UF 156. Neither Energia nor Yuzhnoye explains how suing them earlier could be "mitigation," nor do they explain how Plaintiffs could have obtained even $1 in the settlement they criticize. *See* UF 157. No facts exist that could give rise to a "mitigation" defense here.

*Finally*, they claim that they are entitled to "setoff"[22] various items against the hundreds of millions of dollars they owe. These items include: (a) sums they claim

---

[20] Energia Aff. Defense No. 28; Yuzhnoye Aff. Defense No. 27.
[21] Energia Aff. Defense No. 26; Yuzhnoye Aff. Defense No. 25.
[22] Energia Aff. Defense No. 29; Yuzhnoye Aff. Defense No. 28.

Plaintiffs improperly received from Sea Launch; (b) tax write-offs from Sea Launch losses; and (c) sums they claim Plaintiffs received in the bankruptcy settlement. These arguments misunderstand the concept of "setoff." "Setoff" would only apply if Energia or Yuzhnoye had claims against Plaintiffs (or "mutual debts") to set off.[23] They do not. Defendants' counterclaims making these allegations were dismissed. *See* Dkt. Nos. 196, 199.[24] Plaintiffs' tax write-offs are not subject to setoff as a matter of law,[25] nor are they claims of Energia or Yuzhnoye that could be "set off" against Plaintiffs. Finally, even if the bankruptcy settlement were relevant to setoff (it is not), Plaintiffs did not receive any money from that settlement. UF 154-156. Thus, other than potentially the cost award from the arbitration (which is on appeal in the Swedish courts), there is nothing to "set off" against the amounts owed by Defendants here.

## CONCLUSION

For the foregoing reasons, the Court should grant summary judgment in favor of Plaintiffs on Counts I-IV and on Energia and Yuzhnoye's affirmative defenses.

DATED:  May 4, 2015

KIRKLAND & ELLIS LLP
Xanath O. McKeever
Michael B. Slade *(Pro Hac Vice)*
Christopher Esbrook *(Pro Hac Vice)*

*/s/ Xanath O. McKeever*
Xanath O. McKeever

*Attorneys for Plaintiffs*
THE BOEING COMPANY and
BOEING COMMERCIAL SPACE
COMPANY

---

[23] *Citizen's Bank of Maryland v. Strumpf*, 516 U.S. 16, 18 (1995).
[24] The only counterclaim that survived was Energia and Yuzhnoye's claim to recover costs incurred by them in the arbitration that was dismissed for lack of jurisdiction. *See* Dkt. Nos. 196, 199.
[25] *DePalma v. Westland Software House*, 225 Cal. App. 3d 1534, 1546-47 (1990).