<table>
<tr><td></td><td>
<strong>FILED</strong><br>
CLERK, U.S. DISTRICT COURT<br><br>
9/28/2015<br><br>
CENTRAL DISTRICT OF CALIFORNIA<br>
BY: _____ CW _____ DEPUTY
</td></tr>
</table>

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE BOEING COMPANY and BOEING COMMERCIAL SPACE COMPANY,<br><br>　　　　Plaintiffs,<br><br>v.<br><br>KB YUZHNOYE; PO YUZHNOYE MASHINOSTROITELNY ZAVOD; S.P. KOROLEV ROCKET AND SPACE CORPORATION, ENERGIA D/B/A ROCKET AND SPACE CORPORATION ENERGIA AFTER S.P. KOROLEV; ENERGIA OVERSEAS LLC; and ENERGIA LOGISTICS LTD.,<br><br>　　　　Defendants. | Case No. CV 13-00730-AB (AJWx)<br><br><br><br><br>**ORDER GRANTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT (DKT. NO. 552)** |

Pending before the Court is Plaintiffs The Boeing Company ("Boeing") and Boeing Commercial Space Company's ("BCSC") (collectively, "Plaintiffs") Motion for Summary Judgment against Defendants S.P. Korolev Rocket and Space Corporation, Energia D/B/A Rocket and Space Corporation Energia After S.P. Korolev ("Energia") and  Defendants KB Yuzhnoye, PO Yuzhmash, and PO Yuzhnoye Mashinostroitelny Zavod (collectively, "Yuzhnoye") on Plaintiffs' breach

of contract claims.  (Dkt. No. 552 ("Motion").)  Energia and Yuzhnoye filed an Opposition, and Plaintiffs filed a Reply.  (Dkt. No. 574 ("Energia Opp."); (Dkt. No. 648 ("Yuzhnoye Opp."); Dkt. No. 623 ("Reply").)  The Court held a hearing on this motion on June 29, 2015.  (Dkt. No. 680.)

Having carefully reviewed the materials submitted by the parties and the arguments presented during oral argument, and for the reasons indicated below, the Court **GRANTS** Plaintiffs' motion.

## I.     BACKGROUND

In February 2013, Plaintiffs filed a complaint against Yuzhnoye and Energia for breach of contract.  (*See* Dkt. No. 1 ("Compl.").)  The cause of action arises out of Sea Launch Co. LLC's ("Sea Launch") bankruptcy.  Sea Launch was a joint venture between BCSC, Energia, Yuzhnoye, and Old Kvaerner Invest AS ("Kvaerner").[1]  Sea Launch is a corporation (based in Long Beach, California) that launches commercial satellites into space from a sea-based platform.  (Dkt. No. 108, ¶ 2.)  Following Sea Launch's bankruptcy, disputes among the Partners and their affiliates resulted in litigation, including the instant lawsuit.  Plaintiffs claim that they loaned a substantial amount of money to fund Sea Launch, and following Sea Launch's bankruptcy, Plaintiffs' loans became due-and-owing.  Yuzhnoye and Energia refuse to fully reimburse Plaintiffs.

Plaintiffs sued Energia and Yuzhnoye for (1) Breach of Contract - Creation Agreement against Yuzhnoye; (2) Breach of Contract - Creation Agreement against Energia; (3) Breach of Contract - Guarantee Agreement against Yuzhnoye; and (4) Breach of Contract - Guarantee Agreement against Energia.[2]  (*See* Compl.)  Plaintiffs

---

[1] In July 2013, Kvaerner intervened in this action, suing Energia and Yuzhnoye on identical theories for breach of contract.  (Dkt. No. 108.)  Kvaerner is not a party to this Motion because it has dismissed its claims against Energia and Yuzhnoye.  (Dkt. Nos. 339; 515.)

[2] Energia and Yuzhnoye asserted four (4) counterclaims against Plaintiffs for breach of fiduciary duty, fraud and intentional deceit, accounting, and enforcement of an arbitration award.  (*See* Dkt.

1  now move for summary judgment on all counts against Energia and Yuzhnoye. (*See*
2  Mot.)

3  **II.   LEGAL STANDARD**

4       "The Court shall grant summary judgment if the movant shows that there is no
5  genuine dispute as to any material fact and the movant is entitled to judgment as a
6  matter of law." Fed. R. Civ. Proc. 56(a). "The very mission of the summary
7  judgment procedure is to pierce the pleadings and to assess the proof in order to see
8  whether there is a genuine issue of fact." *Mende v. Dun & Bradstreet, Inc.*, 670 F.2d
9  129, 132 (9th Cir. 1982) (quoting Advisory Committee Notes to Rule 56). An issue is
10 "disputed" for the purposes of summary judgment so long as "reasonable minds could
11 differ as to the import of the evidence . . . ." *Anderson v. Liberty Lobby, Inc.*, 477
12 U.S. 242, 251 (1986). In determining whether summary judgment is appropriate, the
13 court may not weigh evidence to resolve disputed questions (*Chevron Corp. v.*
14 *Pennzoil, Co.*, 974 F.2d 1156, 1161 (9th Cir. 1992)), and must draw all reasonable
15 inferences in favor of the non-moving party. *United States v. Diebold, Inc.*, 369 U.S.
16 654, 655 (1962). However, the "existence of *some* alleged factual dispute between the
17 parties will not defeat an otherwise properly supported motion for summary judgment;
18 the requirement is that there be no *genuine* issue of *material* fact. *Anderson*, 477 U.S.
19 at 251. "The mere existence of a scintilla of evidence in support of the [opposing
20 party's] position will be insufficient . . . ." *Id*., at 252. To avoid summary judgment
21 "there must be evidence on which the jury could reasonably find for the" party
22 opposing summary judgment in light of the "substantive evidentiary burden"
23 applicable at trial. *Id*., at 252, 254.

24      The party moving for summary judgment bears the initial burden of
25 demonstrating with admissible evidence that there is no disputed issue of material fact

26

27 No. 143, 157.) The Court has since dismissed all of the counterclaims except the claim for
   enforcement of an arbitration award. (*See* Dkt. No. 196, 199.)
28

as to a claim for relief or affirmative defense. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party may meet this burden in one of two ways. In its most traditional form, a party may obtain summary judgment by submitting uncontroverted evidence that affirmatively disproves an essential element of the opposing party's claim or defense. *Adickes v. S.H. Kress & Co.* 398 U.S. 144, 158-60 (1970). This is sometimes referred to as the "tried-and-true" form of summary judgment. Alternatively, the moving party may carry its initial burden by demonstrating that the opposing party lacks sufficient evidence to prove its claim or affirmative defense at trial. Fed. R. Civ. Proc. 56(c)(1)(B); *Celotex*, 477 U.S. at 325. This form of summary judgment is sometimes known as a "no evidence" motion for summary judgment, and summary judgment on that ground will only lie after the opposing party has had an adequate opportunity to conduct discovery. Fed. R. Civ. Proc. 56(d); *Celotex Corp. v. Catrett*, 477 U.S. at 326.

Once the moving party satisfies its initial burden, the burden shifts to the non-moving party to show a triable issue of material fact. At that point, "[t]he non-moving party must make an affirmative showing on all matters placed in issue by the motion as to which it has the burden of proof at trial." *Fed. Ins. Co. v. Burlington N. & Santa Fe Ry. Co.*, 270 F.Supp.2d 1183, 1185 (C.D. Cal. 2003). The party opposing summary judgment may "not rest on his allegations … to get to a jury" and avoid summary judgment. *Anderson*, 477 U.S. at 249. "[I]nstead, the nonmoving party must introduce some 'significant probative evidence tending to support the complaint.'" *Fazio v. City & County of San Francisco*, 125 F.3d 1328, 1331 (9th Cir. 1997) (quoting *Anderson*, 477 U.S. at 249). The question is not whether the non-moving party is able to muster *any* evidence that would support it claim for relief but "whether [the evidence] is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52 Nor can a party oppose summary judgment based on theories of liability or affirmative defenses not set forth in the pleadings because "the issues in the complaint guide the parties during discovery and put the

4.

1  defendant on notice of what evidence is necessary to defend against the allegations."

2  *Ortiz v. Lopez*, 688 F.Supp.2d 1072, 1082 (E.D. Cal. 2010) (citing *Coleman v. Quaker*

3  *Oats Co.*, 232 F.3d 1271, 1292–1293 (9th Cir. 2000).

4  **III.   UNDISPUTED FACTS**

5  The following material facts are largely undisputed and are drawn from the

6  Parties' pleadings and exhibits.[3]

7  Boeing is a leading manufacturer of commercial jetliners and defense, space,

8  and security systems.  (Boeing and BCSC's Statement of Uncontroverted Facts

9  ("BUF"), Dkt. No. 569, ¶ 1.)  BCSC is a wholly owned subsidiary of Boeing.  (BUF ¶

10  2.)  Energia is a Russian company whose largest shareholder is the Russian

11  Federation.  (BUF ¶ 3.)  Yuzhnoye is wholly-owned by the State of Ukraine.  (BUF ¶

12  5.)

13  Between 1992 and 1993, Boeing and Energia began developing their business

14  relationship.  (BUF ¶ 13.)  In March 1993, Boeing and Energia entered into a

15  preliminary agreement that listed seven areas of potential cooperation.  (*Id.*)  Number

16  (6) on the list was "Launch Systems and Services," which included "a sea-based

17  system for medium to large payloads using Russian launch vehicles and an off-shore

18  platform." (*Id.*)  This idea became known as Sea Launch.  (*Id.*)

19  **A.  The Creation Agreement**

20  On May 4, 1995, BCSC, Kvaerner, Energia, and Yuzhnoye signed the

21  Agreement for the Creation of Sea Launch Companies (the "Creation Agreement").

22  (BUF ¶ 19; Xanath McKeever Declaration, Dkt. No. 554-8, Ex. 29 ("Creation

23

24  ───────────

[3] The Court notes that Energia and Yuzhnoye purportedly "dispute" many facts on artificial or
25  highly technical grounds, and/or by raising tangential factual issues.  Thus, to the extent the Court
finds such "disputes" to be non-existent, it will simply treat the fact as undisputed without further
26  explanation.

27  Additionally, the Court has reviewed the Parties' objections to the evidence submitted.  (Dkt. Nos.
577, 636, 647, 668, 669.)  Except as otherwise noted, any objections that are inconsistent with the
28  Court's ruling are **OVERRULED**.  All other objections are **SUSTAINED**.

Agreement").)  Pursuant to that Agreement, BCSC owned 40% of Sea Launch,
Kvaerner owned 20%, Energia owned 25%, and Yuzhnoye owned 15%.  (BUF ¶ 22.)

Authorized representatives of each Party executed the Creation Agreement.
(BUF ¶ 21.)  Energia and Yuzhnoye did not have legal representation present during
the execution of the Creation Agreement.

### 1. Notable Contract Terms

Swedish law governs the Creation Agreement.  (Creation Agreement, p. 49.)
The Creation Agreement specifies the rights and obligations of the Parties and their
"Affiliates."  (BUF ¶ 26.)[4]

#### i. Reimbursement of Guarantees

A notable term is Article 9.4.2, "Reimbursement for Guarantee," which states:

> If any Party or its Affiliate provides a Guarantee to a Third Party in response to a
> request from a Venture Company, then all Venture Companies will be obligated to
> reimburse the Guarantor for any money that the Guarantor has to pay to the Third
> Party.  If the Venture Companies fail to reimburse the Guarantor in full within thirty
> days of receipt of an invoice from the Guarantor, then each Party agrees to pay the
> Guarantor a percent of the amount paid to the Third Party (after subtracting money
> paid by the Venture Companies to the Guarantor) equal to the percent ownership
> identified for that Party in the Venture Companies in Article 1.5.

(BUF ¶ 29; Creation Agreement, p. 49.)

#### ii. Voting Provision

Article 1.7 addresses voting rights.  (Creation Agreement, p. 26.)  The voting
provision mandated a 67% majority vote for adoption and amendment of the bylaws,
approving the borrowing and lending of money, and the issuance of guarantees.
(Creation Agreement, p. 27.)  For these matters, each Sea Launch Partner's vote was
proportionate to their equity interest in Sea Launch, *i.e.*, BCSC's vote equated to 40%,
Kvaerner's vote equated to 20%, Energia's vote equated to 25%, and Yuzhnoye's vote

---

[4] Article 1.1 defines an "Affiliate" as "a Subsidiary of a Party, a legal entity that is the Parent of a
Party or a legal entity that is the Subsidiary of the Parent of a Party."  (BUF ¶ 26.)

equated to 15%.[5]  (BUF ¶ 105.)

### iii.  "Entire Agreement" Provision

Article 17 of the Creation Agreement states:

> The foregoing articles and Exhibit A comprise the entire agreement between the Parties and supersede any prior oral or written agreement, commitments, understandings, or communications with respect to the subject matter of this Agreement.  This Agreement shall not be amended unless agreed to in writing by the Authorized Representatives of each Party.

(Creation Agreement, p. 51.)

### 2.  Governing Body

The Creation Agreement provided that each Sea Launch Partner was represented on the board of directors.  Sea Launch executives regularly reported to the board regarding Sea Launch operations.  (BUF ¶ 102.)  From 1995 to 2009, the board of directors held approximately 45 meetings during Sea Launch's development period.  (BUF ¶ 103.)  All of the Sea Launch Partners were represented at board of director meetings.  (*Id*.)  All other decisions proposed by Sea Launch's management team were subject to a majority vote of the Partners.  (BUF ¶ 107.)  In advance of many board meetings, the Partners held "business" or "working group" meetings at which representatives of the Partner companies (typically, executives junior to those who represented each Partner on the Sea Launch board) would analyze particular issues of concern and prepare materials for the board meeting.  (BUF ¶ 104.)

### B.  Funding Sea Launch

Although Energia and Yuzhnoye provided rocket technology and in-kind contributions, (BUF ¶ 4), Sea Launch's funding was provided through initial equity contributions by the participating companies, as well as by loans from the Sea Launch Partners and third-party loans.  (Dkt. No. 636, p. 108 (Energia's Additional Material Facts ("EAMF")), ¶ 5.)

---

[5] There is no evidence of any Sea Launch Partner having veto power or the power of unilateral action.

### 1. BCSC Financially Supports the Development of Sea Launch

On February 2, 1996, BCSC and Sea Launch entered into a loan agreement in which BCSC loaned Sea Launch approximately $183 million (the "BCSC Loan"). (EAMF ¶ 60.)  Each Partner agreed that Sea Launch should enter into the BCSC Loan. (BUF ¶ 68.)  In connection with the BCSC Loan, Energia and Yuzhnoye each executed a "Guaranty and Security Agreement" which states, in relevant part, "[t]he Guarantor hereby absolutely, unconditionally, and irrevocably guarantees to the Lender, for its benefit and that of its successors and assigns, the full and prompt payment of" their share  (25% for Energia and 15% for Yuzhnoye) "of each and every payment obligation of the Borrower under the Loan Agreement."  (McKeever Decl., Ex. 58, Section 2; Ex. 59, Section 2 (both exhibits are collectively referred to as the "Guaranty Agreements").)

In 1997, the BCSC Loan was first amended to increase the principal amount by approximately $666,667.00.  (BUF ¶ 79.)  The principal was increased for litigation expenses related to a December 1996 lawsuit against Sea Launch and the Sea Launch Partners.[6]  (BUF ¶¶ 79-81); *cf. Commercial Space Management Company Inc. v. The Boeing Company Inc.; Enerm; Boeing Commercial Space Co. Inc.; Sea Launch Company LDC; Kvaerner; RSC Energia; NPO Yuzhnoye*, 96-cv-08568 (C.D. Cal. 1996).  In 2002 and 2005, the BCSC Loan was amended to defer interest payments and reduce the interest rate.  (BUF ¶ 86.)  Each Partner agreed to these amendments in signed Sea Launch board resolutions.  (*Id*.)  Every year from 2001 to 2008, Sea

---

[6] Energia and Yuzhnoye acknowledge that the increase in principal was used for Sea Launch and the Sea Launch Partner's (including Energia and Yuzhnoye) litigation expenses, but they claim that this amendment was not provided to them for approval.  (Dkt. No. 636, p. 44 ¶ 79; Dkt. No. 647, p. 48 ¶ 79.)  However, the amendment derived from a litigation expense funding agreement to which Defendants did sign.  (Mckeever Decl., Ex. 65, p. 27.)

Moreover, in a 1999 letter to the Sea Launch Partners, the Partners proposed another amendment to the BCSC Loan.  (BUF ¶ 82.)  The Amendment pushed out the loan maturity date to January 1, 2010. (*Id*.)  Energia and Yuzhnoye claim that the amendment was preliminary approved but never finalized. (Dkt. No. 636, p. 46 ¶ 83; Dkt. No. 647, p. 50-51 ¶ 83.)

1  Launch's audited financial statements included a note describing the BCSC Loan,

2  setting forth the loan balance, and explaining that the Sea Launch Partners guaranteed

3  the loan.  (BUF ¶ 88.)[7]  Each time a financial statement was audited, Energia and

4  Yuzhnoye never objected.  (*Id.*)

### i.   Notable Terms of the BCSC Loan and the Guaranty Agreements

7  There is no dispute that the BCSC Loan is "governed by the laws of the United

8  Kingdom [("UK")]."  (BUF ¶ 73.)

9  The Guaranty Agreements contain a provision, entitled "Waivers;

10  Amendments."  That provision states:  "(i) Any term, covenant, agreement or

11  condition of this Agreement may be amended or waived, and any departure therefrom

12  may be consented to, if, but only if, such amendment, waiver or consent is in writing

13  and is signed by the Lender and, in the case of an amendment, by the Guarantor."

14  (BUF ¶ 71.)

15  Similar to the Creation Agreement, the Guaranty Agreements also contain a

16  provision, entitled "Entire Agreement," that states:  "[t]his Agreement and the Loan

17  Agreement embody the entire agreement between the Guarantor and the Lender

18  relating to the subject matter hereof and supersede all prior agreements,

19  representations and understandings, if any, relating to such subject matter."  (BUF ¶

20

---

21  [7] (Mckeever Decl., Ex. 71, p. 39 (2001 Financial Audit Statement stating "12. <u>Subordinated Loans from Partners</u> As of December 31, 2001, the balance of subordinated loans from Partners is as

22  follows: <u>BCSC</u> Loan principal $184,000,000"); Ex. 72, p. 42 (2008 Financial Audit Statement

23  stating "14. <u>Subordinated Loans from Partners</u> The balance of subordinated loans from Partners is as follows: As of December 31, 2008 Boeing Loan principal $184,000,000 . . . As of December 31,

24  2007 Boeing Loan Principal $184,000,000 . . . ."); Ex. 74, p. 42 (2002 Financial Audit Statement stating "13. <u>Subordinated Loans from Partners</u> The balance of subordinated loans from Partners is as

25  follows: <u>As of December 31, 2002</u> <u>BCSC</u> Loan principal $184,000,000 . . . <u>As of December 31, 2001</u> <u>BCSC</u> Loan Principal $184,000,000 . . . ."); Ex. 75, p. 43 (2003 Financial Audit Statement

26  stating the same); Ex. 76, p. 45 (2004 Financial Audit Statement stating the same); Ex. 77, p. 13

27  (2005 Financial Audit Statement stating the same); Ex. 78, p. 13 (2006 Financial Audit Statement stating the same); Ex. 79, p. 12 (2007 Financial Audit Statement stating the same).)

28

73.)

## 2. Boeing Guarantees Sea Launch's Additional Funding and Sea Launch Partners Reaffirm Obligations.

During a December 1995 Sea Launch Partners' meeting in Oslo, Norway, Boeing and Kvaerner's associates represented to Energia and Yuzhnoye that commercial bank loans would likely be needed to provide external debt financing to Sea Launch. (EAMF ¶ 36.)  During the same meeting, Boeing and Kvaerner's associates further represented that the banks would likely require Boeing and Kvaerner to fully guarantee these loans. (EAMF ¶ 37.)  Ultimately, the Sea Launch Partners unanimously authorized Sea Launch to "enter into loan agreements with commercial banks up to the amount of $300 million" and requested that Boeing provide loans guarantees. (BUF ¶ 34.)

On June 23, 2004, Sea Launch entered into a $270 million loan agreement with J.P. Morgan Chase Bank.[8]  (BUF ¶ 35.)  With support from all of the Sea Launch Partners, Sea Launch requested Boeing guarantee the J.P. Morgan loan on Sea Launch's behalf. (BUF ¶ 36.)  Each of the Sea Launch Partners agreed to reaffirm their obligation under Article 9.4.2 in connection with Boeing's loan guarantee. (BUF ¶ 38.)

On October 7, 2004, Sea Launch entered into a $31 million loan agreement with Sumitomo Mitsui Banking Corporation. (BUF ¶ 39.)  Sea Launch Partners unanimously approved this loan (the "Sumitomo Facility"). (Id.)  With support from all of the Sea Launch Partners, Sea Launch asked Boeing to guarantee the Sumitomo Facility. (BUF ¶ 40.)  Each Sea Launch Partner agreed to reaffirm their obligation under Article 9.4.2 in connection with Boeing's guarantee of the Sumitomo Facility. (BUF ¶ 42.)  On July 11, 2005, Sea Launch entered into an agreement to issue $100 million worth of senior notes (the "Note Issue."). (BUF ¶ 43.)  And on August 31,

---

[8] This loan was was amended and restated in a $260 million Amended and Restated Credit Agreement with Citicorp USA Inc. (BUF ¶ 35.)

2005, Sea Launch entered into a $100 million loan agreement with Sumitomo.  (*Id.*)
The Note Issue and Second Sumitomo Loan were used to refinance $200 million of
debt that was maturing (the "2005 Refinancing").  (*Id.*)  With support from the Sea
Launch Partners, Sea Launch again asked Boeing to guarantee the 2005 Refinancing.
(BUF ¶ 44.)  Boeing agreed to guarantee the 2005 Refinancing as long as the Sea
Launch Partners reaffirm their obligation pursuant to Article 9.4.2.  (BUF ¶ 45.)  Each
Sea Launch Partner agreed to reaffirm their obligation under Article 9.4.2 in
connection with Boeing's loan guarantee of the 2005 Refinancing.  (BUF ¶ 46.)

In 2009, one of Sea Launch's bank loan's due-and-owing dates was
approaching, and Sea Launch lacked the funds to repay the loan.  (BUF ¶ 55.)  Sea
Launch attempted to refinance the loan.  (*Id.*)  The bank was willing to refinance the
loan, if Boeing guaranteed Sea Launch's obligations.  (*Id.*)  Boeing was willing to
guarantee Sea Launch's obligations if the other Partners reaffirmed Article 9.4.2.
(BUF ¶ 56.)  Thereafter, Yuzhnoye signed a draft board resolution that reaffirmed the
Article 9.4.2 obligation in May and June 2009.  (BUF ¶ 57.)

In sum, Boeing guaranteed around $450 million in third-party loans to Sea
Launch.

## C.  The Development and Eventual Fall of Sea Launch

At its outset, the Sea Launch Partners did not know how much capital was
needed for a project like Sea Launch because a sea-based launch platform was never
built before.  (BUF ¶ 111.)  The first four years were known as the development phase.
(BUF ¶ 109.)  During this phase, each Partner served as a supplier or subcontractor to
Sea Launch by providing components or services necessary to the development of the
venture.  (BUF ¶ 110.)

The project began with building the largest piece of construction for the Sea
Launch project—the Assembly and Command Ship (or "ACS") and modifying the
Launch Platform (or "LP").  (BUF ¶ 112.)  These were the vessels Sea Launch would
use to launch satellites.  (*Id.*)  In a September 1994 letter, Boeing expressed concerns

11.

about the expenses associated with this platform.  (BUF ¶ 113.)  Energia, Yuzhnoye,
and Kvaerner responded to this letter stating that they were "fully confident" that the
platform would "prove technologically and economically feasible."  (BUF ¶ 114.)  As
time went on, more and more money was spent to complete the work on the Sea
Launch subcontracts.  (BUF ¶ 120.)  Ultimately, the Sea Launch project ran
significantly over the budget set forth in the initial 1995 Sea Launch business plan.
(EAMF ¶ 75.)

In 1998, at the end of the development phase and the beginning of the operation
phase, the Sea Launch Partners agreed to revise the current business plan.  (BUF ¶
124.)  The plan expressly contained a total of $1.2 billion in development costs.  (*Id*.)

Sea Launch's operations phase lasted from its first demonstration launch in
March 1999 through its bankruptcy filing in June 22, 2009.  (BUF ¶ 125.)  Yuzhnoye
designed and manufactured Sea Launch's rocket, the Zenit rocket, for the project's
first launch.  (BUF ¶ 127.)  Energia designed and manufactured The Block-DM—the
third stage of the Zenit rocket—for the project's second launch.  (*Id*.)  On multiple
occasions, Sea Launch failed to properly launch these rockets which negatively
impacted Sea Launch's business prospects and made it difficult for Sea Launch to
market its services.  (BUF ¶ 133.)  Due to various reasons, it became evident to the
Partners that Sea Launch was an unsuccessful venture.

### 1. Sea Launch Files for Bankruptcy and Plaintiffs Request Reimbursement for their Guarantees.

In June 2009, Sea Launch filed for bankruptcy.  (BUF ¶ 61.)

Sea Launch's bankruptcy was an event of default under the BCSC Loan.  (BUF
¶ 94.)  By this time, Sea Launch owed approximately $523 million under the BCSC
Loan due to unpaid interest.  (*Id*.)  BCSC sent letters to the other Sea Launch Partners
demanding payment for their respective shares, *i.e.*, 25% for Energia, 15% for
Yuzhnoye, of the outstanding balance under the BCSC Loan, pursuant to the Guaranty
Agreements.  (BUF ¶ 95.)

1    Upon Sea Launch's bankruptcy filing, Boeing was required to pay, and did pay,

2    $449,082,462.84 on account of the guarantees it had given to the Sea Launch

3    companies' third-party lenders.  (BUF ¶ 61.)  After paying off the third- party lenders,

4    Boeing invoiced the Sea Launch for the amount of these payments.  (BUF ¶ 62.)

5    Thirty days after invoicing Sea Launch for the amount paid to the third-party lenders,

6    Boeing requested payment from each Sea Launch Partner which was in the amount

7    equal to what Boeing paid the third-party lenders, multiplied by each Partner's

8    percentage ownership of the Sea Launch companies.  (BUF ¶ 63.)

9    Sea Launch has not paid any principal or interest on the BCSC Loan or

10   Boeing's loan guarantees.  (*Id.*)  Boeing has not received any money on account of the

11   small stake it owns in Sea Launch's bankruptcy reorganization through the creditor

12   trust.[9]  (BUF ¶ 155.)

13   **IV.   ADDITIONAL FACTS**

14   Energia and Yuzhnoye offer these additional facts outlined below.  (EAMF;

15   Dkt. No. 647 (Yuzhnoye Additional Material Facts ("YAMF")).)  Because these facts

16   do not affect the outcome of this motion, *i.e.* these facts are not material for the

17   purposes of summary judgment, the Court assumes them to be true for the sake of

18   argument.

19   **A.  Unsophisticated Parties**

20   As negotiations developed in executing the Creation Agreement, Energia and

21   Yuzhnoye claim that they were unfamiliar with the western business practices and that

22   Plaintiffs took advantage of Defendants' unfamiliarity.  According to Defendants,

23   Plaintiffs were well aware that Energia and Yuzhnoye were not represented by

24   counsel, evincing both Defendants' lack of business acumen.  (EAMF ¶¶ 21-30.)

25   With Boeing's lawyers drafting the Creation Agreement and the BCSC Loan

26   Agreement, Energia and Yuzhnoye allege that Boeing controlled the negotiation and

27

28   [9] In September 2009, Kvaerner executed a promissory note to Boeing that satisfied Kvaerner's obligations under Article 9.4.2.  (BUF ¶ 64.)

13.

drafting process from the outset.  (*Id*.)  Defendants claim to have had no negotiating leverage, which according to Energia and Yuzhnoye, left them with no choice but to accept the conditions of the Creation Agreement.  (*Id*.)

## B.  Alleged Oral Representations

According to Defendants, Boeing's representatives told Defendants that Boeing would not seek to enforce Article 9.4.2 against Defendants. (EAMF ¶ 34.)  Moreover, Defendants contend that there was a consistent understanding between the Sea Launch Partners that Plaintiffs would only seek to recover Defendants' pledged share of interest in Sea Launch to satisfy the BCSC loan (rather than Defendants' share under the BCSC loan agreement).  (EAMF ¶ 69.)  Defendants identify the following occasions where Plaintiffs gave Defendants oral assurances of the limited nature of Defendants' reimbursement obligations:

- At a December 1995 Sea Launch board meeting in Oslo, Norway, Boeing's representatives told Energia and Yuzhnoye that Boeing would provide additional capital to Sea Launch in the event that Sea Launch was unable to satisfy its commercial bank loan debt.  "Boeing's representatives also specifically stated that Boeing understood that it was spending its own money in terms of the guarantees of those third-party loans";

   At the same meeting, BCSC's representatives specifically assured Energia and Yuzhnoye that BCSC would not demand monetary repayment for the BCSC Loan.  Instead, BCSC requested security in the form of Energia's pledged share of its interest in the Sea Launch venture, as reflected in the Second Amendment to the Creation Agreement;

- At a 1996 Sea Launch working group meeting in Seattle, Washington, Sea Launch's president Ronald C. Olson (who was on loan from Boeing) told V.M. Filin of Energia and Yuzhnoye that "Boeing, BCSC and Kvaerner were spending their own money in terms of the guarantees of third-party loans";

- At a February 2-3, 1996 Sea Launch board meeting in Moscow, Russia, Dr. Yuri Semenov of Energia made statements (which were omitted from the meeting minutes), regarding the limitations of the Second

Amendment to the Creation Agreement and the assurances from BCSC's representatives in this respect;

- In February 1998, during a splinter meeting from the main Sea Launch Partners' meeting on the Cayman Islands, William Collopy of Boeing conveyed to V.V. Vasiliev and A.G. Derechin of Energia that Boeing had no intention of demanding monetary repayment from Energia under Boeing's guarantees of third-party financial loans;

- During a September 2003 meeting in Moscow, Russia, a Boeing representative told Energia and Yuzhnoye representatives that the re-affirmation of Article 9.4.2 was needed only in connection with an independent audit of Boeing's finances that was being conducted at the time to avoid consolidation of financial statements.

(EAMF ¶¶ 36-39; 40-43; 63-65; 67-68; YAMF 36.)

**C.  Plaintiffs Allegedly Were Responsible for Sea Launch's Cost-Overruns.**

Plaintiffs handled Sea Launch's business planning and financial operations, including projections of Sea Launch's development phase costs.  (EAMF ¶¶ 40-43.) Given their unfamiliarity with western business practices, Energia and Yuzhnoye relied on Plaintiffs to prepare business plans and projections for the successful operation of Sea Launch.  According to both Defendants, Plaintiffs were unable to control the budget estimates during the development phase which resulted in budget excesses and cost overruns of approximately half a billion dollars.  (EAMF ¶¶ 75-83.) By the end of the development phase, Sea Launch had borrowed or financed approximately $1.16 billion in costs, thus incurring approximately $500 million more in costs than anticipated by the Boeing-created Sea Launch business plan.  (*Id.*)  These cost overruns had a negative impact on Sea Launch's business and ultimately led to it going bankrupt.

///

1    **V.    DISCUSSION**

2        Plaintiffs move for Summary Judgment on their breach of contract claims.  (*See*

3    Mot.)  To be entitled to summary judgment these claims, Plaintiffs must show there

4    are no genuine disputes of material fact and establish the elements of their claim as a

5    matter of law.  *T.W. Electric Service, Inc. v. Pacific Elec. Contractors*, 809 F.2d 626,

6    630 (9th Cir. 1987).

7        **A.    The Undisputed Evidence Shows Energia and Yuzhnoye**

8            **Breached the Terms of Article 9.4.2 of the Creation Agreement**

9            **and the BCSC Loan Guaranty Agreements.**

10       Two contracts were signed here—the Creation Agreement and the BCSC Loan.

11   The debt reimbursement obligations—Article 9.4.2 and Guaranty Agreements—

12   flowed from both contracts.

13       First, with respect to Article 9.4.2, the Sea Launch Partners guaranteed Sea

14   Launch's performance under Boeing's various third-party lender bank loan

15   guarantees.  Upon Sea Launch's bankruptcy, Boeing satisfied its financial obligations

16   to the third-party lender bank loan guarantees.  Due to its financial troubles, Sea

17   Launch obviously could not fulfill its guaranty debts under the Creation Agreement,

18   which led to Boeing holding the Sea Launch Partners accountable under Article 9.4.2.

19   Second, as it pertains to the BCSC Loan, this loan became due-and-owing upon Sea

20   Launch's bankruptcy, and BCSC sought performance from the Sea Launch Partners.

21   Kvaerner satisfied its performance due under these agreements.  Energia and

22   Yuzhnoye have not.

23       In sum, the undisputed facts demonstrate that these two Defendants are in

24   breach of Article 9.4.2 of the Creation Agreement and the Guaranty Agreements

25   associated with the BCSC Loan.

26       Plaintiffs, the movants, have met their initial burden of summary judgment.

27   The burden now shifts to Energia and Yuzhnoye, the non-movants, "to show that there

28   is a genuine issue of material fact that must be resolved at trial."  *Burlington N. &*

16.

1  *Santa Fe Ry. Co.*, 270 F.Supp.2d at 1185.  Energia and Yuzhnoye attempt to assert

2  several affirmative defenses demonstrating the existence of triable facts worthy of a

3  jury trial.  (Dkt. No. 143 ("Energia Aff. Def. No.");Dkt. No. 149 ("Yuzhnoye Aff.

4  Def. No.").)  The Court addresses Energia's and Yuzhnoye's affirmative defenses

5  below, but before that discussion, it is necessary to determine the relevant law under

6  the Creation Agreement and the BCSC Loan, pursuant to Federal Rule of Civil

7  Procedure ("Rule") 44.1.[10]

8      **B.      Swedish Law Governs the Creation Agreement and UK Law**

9            **Governs the BCSC Loan.**

10      There is no dispute that the Swedish law governs the Creation Agreement and

11  UK law governs the BCSC Loan guarantee.  (Creation Agreement, Article 13, p. 49;

12  BUF ¶ 73.)  All parties to this motion submitted expert reports that clarify the

13  governing law under these agreements.  *Universe Sales Co., Ltd. v. Silver Castle,*

14  *Ltd.,* 182 F.3d 1036, 1038 (9th Cir.1999) ("Although, pursuant to Rule 44.1, courts

15  may ascertain foreign law through numerous means, expert testimony accompanied by

16  extracts from foreign legal materials has been and will likely continue to be the basic

17  mode of proving foreign law.").  The Court discusses the reports below.

18      **1.      Creation Agreement**

19      The Court must determine how to apply Swedish contract law.  Two expert

20  reports opining on Swedish contract law have been submitted.  (McKeever Decl., Dkt.

21  _____

22  [10] Rule 44.1 states:

24        [a] party who intends to raise an issue concerning the law of a foreign country shall
          give notice by pleadings or other reasonable written notice.  The court, in determining
25        foreign law, may consider any relevant material or source, including testimony,
          whether or not submitted by a party or admissible under the Federal Rules of
26        Evidence. The court's determination shall be treated as a ruling on a question of law.

27  Fed. R. Civ. P. 44.1; *accord Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1361 (9th Cir.
    1988) (en banc) (stating that "questions of foreign law are not beyond the capacity of our courts").

28

No. 554-32, Ex. 133 ("Munck Report"); Rita M. Haeusler Declaration, Dkt. No. 575, Ex. 68 ("M-G Report").)

Plaintiffs' expert, Justice Johan Munck, served as a Swedish Supreme Court Justice for 22 years before retiring.  (Munck Report, ¶ 4.)  He was the Chief Justice of the Supreme Court from 2007 to 2010.  (*Id*.)  In his report, he states that the "general rule" in Sweden is that "a contract only binds the parties to that contract."  (*Id*. at ¶ 11.)  However, if it follows from the text of the agreement, a third party (such as Boeing) may have an independent right under a contract although not directly named as party to that contract.[11]  (*Id*. at ¶ 12.)  Justice Munck continues to opine that "[t]he language of the agreement is the primary and heavily favored means by which Swedish courts infer the intent of the parties."  (*Id*. at ¶ 18 (citing to "Jan Ramberg & Christina Ramberg, Allmän avtalsrätt, 2014, p 144 et sec and Supreme Court cases NJA 2007 s 35 and 2013 s 271").)  The party claiming a different intent than what is stated in the contract's plain language bears a *heavy burden of proof*.  (*Id*. (emphasis added).)

Energia and Yuzhnoye both utilize the same experts, Goran Millqvist and Lars Gorton.  (*See* M-G Report.)  Mr. Millqvist is a civil law professor at Stockholm University and Mr. Gorton is a banking law professor at Lund University.  (M-G Report, p. 1183.)  According to their report, Swedish private international law and contract law govern issues such as a contract's validity, interpretation, performance, the consequences of a breach, and various ways of disclaiming obligations.  (*Id*. at ¶ 37.)

### i.    Modifying a Contract under Swedish Law

Each report opines on the possibility of modifying the Creation Agreement.

---

[11] American law refers to this party as an intended third party beneficiary.  *Far West Fed. Bank, S.B. v. Office of Thrift Supervision–Dir.*, 119 F.3d 1358, 1363 (9th Cir. 1997) ("[A] third party who is an intended beneficiary of a contract may sue to enforce the contract or to obtain an appropriate remedy for breach.") (citation omitted).

1   According to Justice Munck, Article 17 of the Creation Agreement is a valid

2   integration clause that is binding under Swedish contract law.  (Munck Report, p. 12.)

3   "Under Swedish law, written agreements containing this language cannot be

4   'modified' by oral agreements and parties cannot be 'estopped' from enforcing the

5   terms of such written agreements based on prior and subsequent oral statements."

6   (Munck Report, p. 12 (citations omitted).)

7   According to the M-G Report, Swedish law adopts a "liberal view regarding the

8   formation and amendment of contracts."  (M-G Report, ¶ 41.)  "Swedish law allows

9   parties to rely on oral representations made in connection with the conclusion of a

10  written contract, as long as the oral statements are directly relevant to the

11  interpretation of the written contract . . . ."  (*Id*.)  "[T]he general view under Swedish

12  law is that [the] existence of an entire-agreement clause in a written contract does not

13  prevent a party from relying on prior statements for the interpretation of a contract."[12]

14  (*Id*. at ¶ 42.)  In applying Unidroit Contract Principles of Commercial Contracts[13], the

15  report states that

> A contract in writing which contains a clause requiring any modification or
> termination by agreement to be in a particular form may not be otherwise modified or
> terminated.  However, a party may be precluded by its conduct from asserting such a
> clause to the extent that the other party has acted in reliance on that *conduct*.

(*Id*. at ¶ 44 (emphasis added).)  In other words, in a circumstance where a contract

contains a provision barring oral modifications, one could be precluded from

enforcing contractual terms if the other contracting party relied on behavior that

contradicted the terms of the contract.

---

[12] The entire-agreement clause is Article 17, the Creation Agreement's integration clause.

[13] The Unidroit Contract Principles of Commercial Contracts are not binding as a matter of Swedish law, but may be used as a source of guidance which is evident by its use in Swedish case law.  (M-G Report, ¶ 42 n. 5 (citing to "Swedish Supreme Court cases NJA 2009 . . . and NJA 2013 . . . .").)

## 2.      BCSC Loan

Two expert reports provide the Court with an interpretation of UK contract law as it pertains to guaranty contracts (similar to the Guaranty Agreements).

Plaintiffs' expert, David Wolfson, authored the first report.  (McKeever Decl., Dkt. No. 554-34 ("Wolfson Report").)  Mr. Wolfson is a barrister, practicing in the area of commercial law for 23 years.  (Wolfson Report, p. 1.)  He was appointed Queen's Counsel in 2009, and he is also a contributing author to books on arbitration and banking litigation.  (*Id*.)  According to Mr. Wolfson, under UK contract law, guaranty contracts are defined as a type of suretyship contract to which "the guarantor (the surety) promises the creditor that if the principal fails to perform her obligation to the creditor under the principal contract then the guarantor will be responsible for it." (*Id.* at pp. 3-4; p. 4 ("A guarantee is an accessory contract by which the promisor undertakes to be answerable for the debt, default or miscarriage of another person, whose primary liability to the promise must exist or be contemplated." (citing *Halsbury's Laws of England*, Volume 49 (5th ed. 2008)).)

Energia and Yuzhnoye provide a rebuttal expert, Richard Coleman.  (Haeusler Decl., Ex. 70 ("Coleman Report").)  Mr. Coleman has practiced as a barrister in commercial litigation since 1994.  (Coleman Report, p. 1.)  He was appointed to Queen's Counsel in 2012, and he is a joint author on the documentary credits in *Law of Bank Payments*.  (*Id.* (emphasis in original).)  According to Mr. Coleman, the general rule is that a party is ordinarily bound by the terms of the written contract (whether he or she has read or understood the terms).  (*Id.* at p. 3 ¶ 9 (citing *L'Estrange v. Graucob* [1934] 2 KB 394, 403).)

## C.      Applying Swedish Contract Law to the Undisputed Evidence, Plaintiffs Did Not Modify the Creation Agreement.

The Creation Agreement's general validity is uncontested.  However, the parties disagree as to whether Plaintiffs representations modified the Creation Agreement.  Under Swedish law, the undisputed facts show no modification here.

1       As the Munck Report and the M-G Report opine, written contracts may be

2 modified through oral agreements. (*See* Dkt. No. 554-33 ("Munck Rebuttal"), ¶ 6

3 ("Swedish law allows written contracts to be modified by oral agreements between the

4 parties in the absence of contractual language to the contrary."); M-G Report, ¶ 41

5 ("Swedish law allows parties to rely on oral representations made in connection with

6 the conclusion of a written contract, as long as the oral statements are directly relevant

7 for the interpretation of the written contract.").)[14]  However, there must be evidence of

8 underlying conduct that contradicts the actual terms of the written contract and

9 subsequent reliance on that conduct. (M-G Report, ¶ 44 (citing Unidroit Contract

10 Principles of Commercial Contracts).)  That nexus is missing here.

11       The bulk of Energia and Yuzhnoye's oral modification arguments are largely

12 similar. (Energia Opp., pp. 10-13; Yuzhnoye, pp. 10-12.)  Essentially, Defendants

13 argue that Plaintiffs' oral representations throughout Sea Launch's development and

14 operational phases are the type of representations that modify a contract under

15 Swedish law. (*Id*.)  They also believe that conduct consistent with these oral

16 representations is present here because Plaintiffs never demanded monetary payments

17 in funding the development of the Sea Launch venture. (*Id*.)  Nor did Plaintiff

18 demand monetary payments due under Article 9.4.2 throughout the course of the Sea

19 Launch venture. (*Id*.)

20

21

---

22 [14] Both experts disagree on the overall application of Swedish law to the facts herein. (Munck Rebuttal, ¶ 6 ("the Creation Agreement could not have been amended or supplemented by the oral

23 declarations . . ."); M-G Report, ¶ 46 ("the oral assurances . . . if proven, [could] be viewed as supplementing/amending Article 9.4.2. . .").)  However, these opinions (including their conclusions)

24 are not disputed issues of fact.  Rather, they are simply aids used to assist the Court in determining the approach in determining foreign law.  *See* Fed. R. Civ. P. 44.1 ("In determining foreign law, the

25 Court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence.").  Nor must the Court decide between

26 the two opinions and accept one as true.  *QR Spex, Inc. v. Motorola, Inc.*, No. CV 03-6284-JFW (FMOx), 2004 WL 5642907, at *6 (C.D. Cal. 2004) ("[T]he Court is not required to accept

27 something as true, simply because an expert has said it is so.") (citation omitted).  The Court only uses the expert reports as guideposts in the Court's interpretation of Swedish law.

28

Plaintiffs dispute the facts and arguments these two Defendants assert and argue that Plaintiffs' conduct cannot be construed as an oral modification under Swedish law. (Mot., p. 19; Reply, pp. 6-12.)  First, Plaintiffs point out that the language in Article 9.4.2 is unambiguous and the entities named under such article are obligated to abide by its terms.  (Mot., pp. 13-14.)  Each Sea Launch Partner agreed (and reaffirmed this agreement) to reimburse Boeing for their share of the loan obligations if Boeing was required to pay on the guarantees.  (*Id.*)  Second, Plaintiffs focus on the fact that nothing Plaintiffs said before or after this agreement was signed could be interpreted as an oral modification under Swedish law.  (Reply, pp. 6-12.)  Furthermore, these alleged post-contractual discussions cannot be invoked to amend contracts that expressly provide for amendment only by mutual agreement in writing between the parties, as the Creation Agreement does through its integration clause.  (Creation Agreement, p. 51 (Article 17 states "[t]his [Creation] Agreement shall not be amended unless agreed to in writing by the Authorized Representatives of each Party.").)

Considering these arguments in conjunction with both the undisputed and additional facts, the record is devoid of any facts that meet the oral modification standard under Swedish law.  To reiterate, Article 9.4.2 states "[i]f any Party or its Affiliate provides a Guarantee to a Third Party in response to a request from a Venture Company, then all Venture Companies will be obligated to reimburse the Guarantor for any money that the Guarantor has to pay to the Third Party."[15]  (Creation Agreement, p. 45.)  Once the guarantor satisfies its third-party debt, the Creation Agreement's plain language triggers Sea Launch's obligation to reimburse the

---

[15] Article 1.1 of the Creation Agreement defines "Guarantor" as "a Party or its Affiliate that provides a Guarantee."  (BUF ¶ 30.)  "Guarantee" is defined as a "legal commitment by a Party or its Affiliate [in which it] becomes obligated to make a payment of money to the Third Party if any Venture Company fails to perform obligations that the Venture Company has to that Third Party."  (*Id.*)  At all relevant times, BCSC was, and is, a wholly owned subsidiary of The Boeing Company.  (BUF ¶ 28.)  Boeing is thus an "Affiliate" under the Creation Agreement.  (*Id.*)  Furthermore, it is undisputed that Boeing's third-party guarantees were valid legal commitments that Boeing was obligated to satisfy upon Sea Launch's bankruptcy.

guarantor.  And if Sea Launch cannot satisfy this obligation, the Sea Launch Partners are to satisfy the guarantor's debt by paying their percentage share, *i.e.*, BCSC contributes a 40% share, Kvaerner contributes a 20% share, Energia contributes a 25% share, and Yuzhnoye contributes a 15% share.[16]  (BUF ¶ 22.)  This is a simple third-party beneficiary clause to a guaranty agreement that is recognized in Sweden.[17] (Munck Report, ¶ 14 ("Swedish legal scholarship is completely unanimous in support of the rule that parties can grant rights to non-signatories to an agreement.").)  Energia and Yuzhnoye seek to avoid these obligations, but the holes in their arguments are apparent.

Most problematic with Energia and Yuzhnoye's arguments is the Swedish law requirement that oral representations must be consistent with the overall conduct.  (M-G Report, ¶ 44 ("a party may be precluded by its conduct from asserting such a clause to the extent that the other party has acted in reliance on that *conduct*.") (emphasis added).)  Resolving all doubt in favor of the nonmoving parties, Energia and Yuzhnoye, the Court assumes that the alleged events that occurred during the negotiations over the Creation Agreement, (EAMF ¶ 34), and the alleged events that

---

[16] Article 9.4.2 continues to state:

> If the Venture Companies fail to reimburse the Guarantor in full within thirty days of receipt of an invoice from the Guarantor, then each Party agrees to pay the Guarantor a percent of the amount paid to the Third Party (after subtracting money paid by the Venture Companies to the Guarantor) equal to the percent ownership identified for that Party in the Venture Companies in Article 1.5.

(Creation Agreement, p. 45.)  Thus, Energia owes 25% and Yuzhnoye owed 15% of any third-party loan guarantees that Sea Launch fails to satisfy.

[17] As it relates to third party beneficiaries, Swedish law and American law are essentially the same. *GECCMC, 2005-C1 Plummer Street Office L.P. v. JPMorgan Chase Bank, N.A.*, 671 F.3d 1027, 1033 (9th Cir. 2012) ("One such general principle is that only a party to a contract or an intended third-party beneficiary may sue to enforce the terms of a contract or obtain an appropriate remedy for breach.") (citation omitted); *Hillside Metro Assocs., LLC v. JP Morgan Chase Bank, Nat. Ass'n*, 747 F.3d 44, 49 (2d Cir. 2014) ("Proving third-party beneficiary status requires that the contract terms 'clearly evidence[] an intent to permit enforcement by the third party' in question.'") (citations omitted); *Far West Fed. Bank, S.B.*, 119 F.3d at 1363 (same).

occurred during the Sea Launch board meetings between 1995 and 1998, (EAMF ¶¶ 40-43; 63-65; 67-68), are all true.  Nonetheless, taking these events as true actually validates that the additional facts are immaterial for the purpose of summary judgment because these oral representations still fall short of satisfying the contract modification standard under Swedish law.

The record contains no evidence showing that Boeing engaged in conduct consistent with its alleged oral representations presented in Energia's and Yuzhnoye's briefs.  *Cf.* (M-G Report, ¶ 44.)  Reviewing the factual record (that dates back nearly two decades), the Court highlights Boeing's conduct relative to debt reimbursement in comparison with the alleged oral representations below:

| Oral Representations[18] | Corresponding Conduct |
| --- | --- |
| • December 1995: A meeting in Oslo, Norway, where Boeing told Energia and Yuzhnoye that Boeing would provide capital if Sea Launch was unable to satisfy its third-party lender debt and Boeing also stated that it was "spending its own money in terms of the guarantes of third-party loans." Before the BCSC Loan was executed, BCSC representatives told Defendants that BCSC would not demand repayment from Defendants for the BCSC Loan;<br><br>• 1996: A meeting in Seattle, Washington where Sea Launch's president told Energia and Yuzhnoye that "Boeing, BCSC and Kvaerner were spending their own money in terms of the guarantes of third-party loans"; | • February 1996: BCSC and Sea Launch entered into a loan agreement where BCSC agreed to loan Sea Launch $183 million[19];<br><br>   ○ In connection with this loan, Energia and Yuzhnoye executed the Guaranty Agreements which guaranteed reimbursement for a portion (25% for Energia and 15% for Yuzhnoye) of the BCSC Loan;<br><br>• 1999: the BCSC Loan was amended to continue the maturity date.  Energia and Yuzhnoye preliminarily approved this amendment;<br><br>• 2002 and 2005: the BCSC Loan was amended to defer interest payments and reduce the interest rate.  Energia and Yuzhnoye approved this amendment; |

---

[18] To reiterate, these oral representations are additional facts, not undisputed facts.  These representations are assumed to be true simply for argument's sake.

[19] Although this discussion pertains to orally modifying the Creation Agreement, listing the BCSC Loan as additional conduct supports the obvious—Plaintiffs consistently required Energia and Yuzhnoye to guarantee repayment for the loans they provided.

24.

| | |
|---|---|
| • February 2-3, 1996: A Sea Launch board meeting in Moscow, Russia where Energia made statements regarding the limitations of the second amendment to the Creation Agreement and the assurances from BCSC's representatives in this respect; | • 2001 to 2008: Sea Launch's audited financial statements included notes describing the BCSC Loan and explaining that the Sea Launch Partners guaranteed the loan; |
| • February 1998: A splinter meeting in the Cayman Islands, where Boeing conveyed to Energia that Boeing had no intention of demanding monetary repayment from Energia under Boeing's guarantees of third-party financial loans; | • June 2004: Boeing guarantees J.P. Morgan's $270 million loan on behalf of Sea Launch;<br><br>  o 2004: Sea Launch Partners reaffirm their obligations in connection with J.P. Morgan loan;<br><br>• October 2004: Boeing guarantees Sumitomo Facility's $31 million dollar loan on behalf of Sea Launch; |
| • September 2003: A meeting in Moscow, Russia, where Boeing told Energia and Yuzhnoye that the Article 9.4.2 re-affirmation was needed only in connection with an independent audit of Boeing's finances that was being conducted at the time to avoid consolidation of financial statements. | o 2004: Sea Launch Partners reaffirm their obligations in connection with Sumitomo Facility loan;<br><br>• 2005: Boeing guarantees 2005 refinancing;<br><br>  o 2005: Sea Launch Partners reaffirm their obligations in connection with 2005 refinancing;<br><br>• 2009: Sea Launch files for bankruptcy and Boeing invoices Sea Launch Partners after paying third-party lenders. |

(EAMF ¶¶ 36-39; 40-43; 60; 63-65; 67-68); (YAMF ¶ 36); (BUF ¶¶ 35; 38; 39-42; 44; 46; 62; 83; 86; 88.)  Even assuming that Plaintiffs made a handful of oral representations expressing Plaintiffs' intent not to hold Energia and Yuzhnoye responsible for Article 9.4.2, Energia and Yuzhnoye offer no evidence to suggest that any of those oral representations were supported by the sort of consistent conduct required under Swedish law to give those oral representations any legal force.  (M-G Report, ¶ 44 ("a party may be precluded by its conduct from asserting such a clause to the extent that the other party has acted in reliance on that *conduct*.") (emphasis

added).)  To the contrary, at every significant juncture Plaintiffs required Energia and Yuzhnoye to either reaffirm section 9.4.2 or sign a new agreement that was *wholly inconsistent* with those alleged oral statements.

At oral argument, when pressed about the lack of evidence of conduct consistent with the alleged oral representations, counsel for Energia stated that "every Boeing witness has been very consistent that [] Energia never contributed cash and Boeing never asked it to contribute cash.  And that is extremely consistent with these oral representations."[20]  (Dkt. No. 680, 9:20-23; *see also* 10:22-11:2.)  Energia and Yuzhnoye are apparently arguing that Boeing's willingness to establish Sea Launch without an initial cash investment from Energia or Yuzhnoye is somehow consistent with the alleged oral representations regarding Energia and Yuzhnoye's obligations as guarantors of subsequent loans.  But, capital and in-kind contributions have little to no correlation to guaranty clauses and whether one will perform under such clauses.  *Cf. Federal Election Com'n v. Arlen Specter '96*, 150 F.Supp.2d 797, 802 (E.D. Penn. 2001) (noting that "the term 'anything of value' includes all in-kind contributions . . . " ) (citing 11 C.F .R. § 100.7(a)(1)(iii)(A)); *cf. Hyster Credit Corp. v. O'Neill*, 582 F.Supp. 414, 414 (E.D. Penn. 1983) ("Clauses in guaranty contract providing that guarantor unconditionally guaranteed that debtor would fully and promptly perform, that obligation was independent of obligations of debtor . . . .").  These are two fundamentally separate concepts.  Moreover, these concepts relate to two wholly different time periods.  Article 9.4.2 guaranteed Sea Launch's performance and if Sea Launch could not perform, then the Sea Launch Partners would perform in Sea Launch's place (whenever such performance was due-and-owing).  This provision focused squarely on a *future* event—whether Sea Launch satisfied its debt obligations. (Creation Agreement, p. 49 ("If any Party or its Affiliate provides a Guarantee to a Third Party in response to a request from a Venture Company, then all Venture

---

[20] It is true that Energia and Yuzhnoye did not have to contribute financially, rather they made in-kind contributions to Sea Launch.  (BUF ¶ 4.)

Companies *will be* obligated to reimburse the Guarantor for any money that the Guarantor has to pay to the Third Party.") (emphasis added).)  Article 9.4.2 is not triggered unless this prospective event occurs (*e.g.*, Sea Launch's bankruptcy). However, Energia and Yuzhnoye's in-kind contributions were directly related to the *initial* time equity contributions to Sea Launch.   (*e.g.*, EAMF ¶ 66 ("Energia would be making its Sea Launch equity contribution with technology transfers and in-kind contributions . . . .").)  Nothing in the record suggests that Sea Launch or its Partners guaranteed reimbursement for these contributions.  Nor is there anything in the record indicating that these contributions were related to some *future* event.  These in-kind contributions were simply used to support the Sea Launch project *at that particular time*.  Highlighting these distinctions ultimately show that the time periods, the conduct, and the overall purpose between in-kind contributions and Article 9.4.2 are entirely different.

The Court cannot (and will not) leap to Energia and Yuzhnoye's conclusion—the oral representations were consistent with the overall conduct—especially, when Boeing's conduct made it abundantly clear that it planned to seek reimbursement for these guarantees pursuant to Article 9.4.2.  (BUF ¶¶ 38, 42, 46 (requiring the Sea Launch Partners to reaffirm its Article 9.4.2 obligations three separate occasions before Boeing made its loan guarantees).)  Given that the undisputed facts and additional facts demonstrate a lack of consistency between the oral representations and the underlying conduct, there are no triable issues of material fact as to this affirmative defense, (Energia Aff. Def. No. 19; Yuzhnoye Aff. Def. No. 18), to defeat summary judgment.  There may be a factual dispute regarding whether BCSC or Boeing's representatives made the alleged statements, but, because there is no evidence of consistent conduct, the resolution of that dispute is not material to the outcome of Plaintiffs' claim for breach of contract under Swedish law.

///

**D.      All Equitable Affirmative Defenses Fail as a Matter of Law.** [21]

This discussion focuses on Energia's and Yuzhnoye's attempt to raise triable issues of fact with respect to their equitable defenses.  Plaintiffs' argue that none of these equitable defenses survive under Swedish and UK law.  The law favors Plaintiffs' position.

### i.      Under UK Law, Plaintiffs are Entitled to Judgment as to the Equitable Affirmative Defenses.

Under UK law, it is evident that Defendants' Unclean Hands, Unconscionability, Inequitable Conduct, and Breach of Covenant of Good Faith defenses fail as a matter of law.

According the Wolfson Report, UK law does not recognize a majority of the equitable affirmative defenses at issue.[22]  (*See* Wolfson Report, pp. 43, 45, 47.)

Addressing Defendants' unclean hands defense, UK law applies this defense to "a plaintiff who is seeking equitable relief from the Court."  (Wolfson Report, ¶ 183 (citing Supreme Court of Judicature Act 1873.))  Yet, Plaintiffs' claims seek only monetary relief.  (*See* Compl.)  Plaintiffs' causes of action are for breach of contract which are not equitable claims.  Thus, Defendants' unclean Hands defense fails as a matter of law.

Energia and Yuzhnoye's Undue Influence defense suffers a similar fate.  (*See* Energia Opp., pp. 16-19; Yuzhnoye Opp., pp. 14-17.)  In the UK, "where Person A is in a position of power vis-à-vis Person B and she takes advantage of that position to

---

[21] The equitable defenses are Unclean Hands (Energia Aff. Def. Nos. 9, 11, Yuzhnoye Aff. Def. Nos. 8, 10), Inequitable Conduct (Energia Aff. Def. No. 8, Yuzhnoye Aff. Def. No. 7), Undue Influence (Energia Aff. Def. No. 10, Yuzhnoye Aff. Def. No. 9), Breach of Covenant of Good Faith (Energia Aff. Def. No. 13, Yuzhnoye Aff. Def. No. 12), and Unconscionability (Energia Aff. Def. No. 16, Yuzhnoye Aff. Def. No. 15).

[22] Defendants have not submitted evidence contradicting the Wolfson Report.  The standards articulated in the Wolfson Report are therefore appropriate bases for the Court to analyze Defendants' affirmative defenses, pursuant to Rule 44.1.

1   enter into a contract which is disadvantageous to Person B, the court may set aside

2   that contract ." (Wolfson Report, ¶ 187.)  "The key to establishing undue influence is

3   to show that the plaintiff and defendant were in a relationship of trust and confidence.

4   Classic examples of such a relationship include parent/child, solicitor/client and

5   doctor/patient." (*Id*. at ¶ 189.)  This affirmative defense is wholly without merit.  The

6   record is devoid of any facts that implicate a relationship of trust and confidence

7   between Plaintiffs, Energia, and Yuzhnoye.  The undisputed facts make it evident that

8   these three parties were close to strangers prior to the negotiations associated with the

9   Sea Launch project, making it nearly impossible to claim that this relationship reflects

10  trust and confidence.  None of the undisputed facts suggest that Plaintiffs, Energia,

11  and Yuzhnoye were in a parent and child relationship or a solicitor and client

12  relationship when they executed the Creation Agreement.  The Parties' relationship

13  developed to create the Sea Launch venture.  Notably, Energia and Yuzhnoye have

14  not set forth any UK law arguments in support of their undue influence defense.

15  Based on uncontested facts, this defense fails as a matter of UK law.

16       The remaining affirmative defenses—unconscionability[23], inequitable conduct,

17  and breach of covenant of good faith—are similarly without merit because these

18  defenses are not recognized defenses under UK law.  (Wolfson Report, ¶ 191 ("There

19  is no general [defense] of 'unconscionability' or 'inequitable conduct' in English

20  contract law."); ¶ 198 ("English law does not [recognize] a universal good faith or fair

21  dealing obligation and there is no [recognizable] English law [defense] based on these

22  concepts.").)  Energia and Yuzhnoye have not submitted any evidence that refutes

23

---

24  [23] To clarify, an unconscionability defense is not recognized but an unconscionable conduct defense
25  is available in limited circumstances.  (Wolfson Report, ¶¶ 191-92.)  To have a valid unconscionable
    conduct defense, an aggrieved party must show that he or she was subject to "morally reprehensible"
26  behavior "which affect[ed] [the victim's] conscience . . . The classic example of an unconscionable
    bargain is where advantage has been taken of a young, inexperienced or ignorant person to introduce
27  a term which no sensible, well-advised . . . person would have accepted." (*Id*. at ¶ 192 (citing *Chitty
    on Contracts* (31st ed, 2012), 7-136).)  This sort of egregious conduct is not present here; therefore,
28  such a defense is inapplicable.

these UK law principles.  Because these defenses are not acknowledged in UK jurisprudence, thy fail as a matter of law.

In sum, as a matter of UK law, none of the affirmative defenses contesting the Guaranty Agreements survive to establish a triable issue of fact.

### ii.    Section 36 of the Swedish Contracts Act Covers the Remaining Equitable Affirmative Defenses.

The remaining equitable affirmative defenses contest Plaintiffs' breach claims with respect to Article 9.4.2 of the Creation Agreement.  (Unclean Hands, Energia Aff. Def. No. 9, Yuzhnoye Aff. Def. No. 8; Inequitable Conduct, Energia Aff. Def. No. 8, Yuzhnoye Aff. Def. No. 7; Undue Influence, Energia Aff. Def. No. 10, Yuzhnoye Aff. Def. No. 9; Breach of Covenant of Good Faith, Energia Aff. Def. No. 13, Yuzhnoye Aff. Def. No. 12; and Unconscionability, Energia Aff. Def. No. 16, Yuzhnoye Aff. Def. No. 15.)  There is no dispute that Swedish law governs the Creation Agreement.  (Creation Agreement, p. 49.)

These affirmative defenses are recognized under Section 36 of the Swedish Contracts Act.[24]  (Munck Report, p. 10.)  Section 36 provides that "[a] contract term or condition may be modified or set aside if such term or condition is unconscionable having regard to the contents of the agreement, the circumstances prevailing at the time the agreement was entered into, subsequent circumstances, and circumstances in

---

[24] According to the M-G Report, Section 33 also governs inequity defenses.  (M-G Report, ¶¶ 53-56.)  Section 33 states "[a] legal act which would otherwise be deemed valid may not be relied upon where the circumstances in which it arose were such that, having knowledge of such circumstances, it would be contrary to faith and honor to enforce the legal act, and where the party in respect of whom such legal act was performed must be presumed to have had such knowledge."  (*Id.* at ¶ 54.)  While it is true that Section 33 covered this area of Swedish law, Section 36 has essentially superseded Section 33.  (Munck Rebuttal, ¶ 13.)  "Since 1975 when Section 36 was introduced into the Contracts Act, Section 33 has been the subject of only two publish[ed] [Swedish] Supreme Court cases (NJA 1986 s 748 and NJA 1989 s 505)."  (*Id.*)  Energia also acknowledges Section 33's seldom use.  (Energia Opp., p. 17 n. 21 (arguing that Section 33 is not obsolete while noting that "Section 36 has general application and has reduced the use of Section 33").)

Because Section 33's rare use and Section 36's broad scope, Section 33 does not apply here.

1  general." (M-G Report, ¶ 58.)  Swedish law allows courts to assess the surrounding

2  circumstances to determine, under Section 36, if it is appropriate to modify or set

3  aside a contractual term, *i.e.*, Article 9.4.2.  (Haeusler Decl., Ex. 69 ("M-G Rebuttal

4  Report"), ¶ 20 ("There are no limitations as to what circumstances may be relevant in

5  assessing whether a certain contractual clause is unconscionable.").)

6  The M-G Report opines,

> [a]s a general observation it should be noted that in most cases a finding of
> unconscionability is based on a comparison between the wording and
> content of the actual contract clause . . . If such a comparison shows that
> the actual clause is much more burdensome of the weaker party . . . and
> this is not balanced or motivated elsewhere in the contract, the clause may
> be deemed unconscionable.

(M-G Report, ¶ 60.)  As an equitable provision, Section 36 is primarily used to protect

consumers who may hold an inferior bargaining position.  (*Id.* at ¶ 59.)  The Munck

Report states that "if Section 36 is applied, it is only applied where one of the parties

to a contract is in an especially inferior position as compared to the other" which is

more appropriate in the consumer to business relationship.  (Munck Report, p. 10

(citing "Jan and Christina Ramberg, Allmän avtalsrätt, 8 edition p. 175 et sec with

references").)  The M-G Report somewhat agrees with this position.  (M-G Report, ¶

59 ("Section 36 is of general application.  It has been applied by courts to set aside or

to modify commercial contracts, albeit not as frequently as in relation to business-to-

consumer contracts.").)

The Court has found several cases that provided insight into Section 36's

infrequent application in commercial business contracts.  In NJA 1984 s 229

(Swed.),[25] the Swedish Supreme Court assessed an arbitration clause between

"traders."  Nytt Juridiskt Arkvi [NJA] [Supreme Court Reports] 1984 p. 229 (Swed.),

---

[25] The Court notes that none of the Swedish case law translations are being relied upon as undisputed facts or evidence.  Rather, the Swedish case law is used as context in determining Section 36's application to the undisputed facts, pursuant to Rule 44.1.

https://lagen.nu/dom/nja/1984s229.  There, a self-employed business owner and an insurance company were two "traders" to an insurance contract containing an arbitration clause that demanded the parties bear arbitration costs.  *Id*.  The business owner moved to have the term disregarded under Section 36.  The Court agreed because arbitration clauses in contracts with market traders may lead to the economically weaker party having difficulty establishing its rights against economically stronger businesses like the insurance company.  *Id*.  However, the Court made a point to note its reluctance to apply Section 36 in pure business conditions.  *Id*.; *see also* (Munck Report, p. 10 ("The [Swedish] Supreme Court has expressly stated that particular restrictiveness shall be observed in application of Section 36 to commercial relationships."  (citing NJA 1984 s 229).)  Another notable case analyzing Section 36 is NJA 1989 s 346.  Nytt Juridiskt Arkvi [NJA] [Supreme Court Reports] 1989 p. 346 (Swed.), https://lagen.nu/dom/nja/1989s346.

In another similar case, two corporations, a fur company and an insurance company, were parties to an insurance policy that provided coverage to theft-related damage.  *Id*.  After the insurance company denied the fur company's theft claim, the fur company filed suit.  *Id*.  The action was eventually before the Swedish Court to determine whether the policy covered a burglary that involved an unauthorized key entry (rather than a forced entry).  *Id*.  The fur company asked the court to apply Section 36 because there was evidence that the fur company was robbed by an employee of a security business that the fur company recently hired based on the insurance company recommendation.  *Id*.; (Munck Rebuttal, p. 5) (citing NJA 1989 s 346.)  The Swedish Court agreed in part because under circumstances, the policy was unreasonable because it allowed "the large insurance company to withhold reimbursement from the [fur company]" even though the insurance company recommended the security company that played a role in the robbery.  (Munck Rebuttal, p. 5) (citing NJA 1989 s 346.)

These cases illustrate Swedish law's unwillingness to interfere with business-to-business relations, and when Section 36 is applicable, the circumstances normally reflect an inferior bargaining position or unreasonable terms.

### iii.   Under Swedish Law, Plaintiffs are Entitled to Judgment as to the Equitable Affirmative Defenses.

Under Swedish contract law, none of the parties are inferior here nor is Article 9.4.2 an unreasonable term under these undisputed and additional facts.

Plaintiffs rely on a straightforward argument—the equitable defenses "do not apply at all because the underlying obligations are governed by . . . Swedish law." (Mot. No. 2, p. 23.)  Energia and Yuzhnoye collectively contend that Plaintiffs' underlying conduct during the course of the Sea Launch venture necessitates the application of Section 36.  (Energia Opp., pp. 15-22; Yuzhnoye, pp. 14-19.)

Energia and Yuzhnoye's arguments are centered on Boeing's alleged misconduct before and during the life of Sea Launch.  Focusing on the events before Sea Launch's inception, Energia and Yuzhnoye claim to be unsophisticated parties that were ultimately taken advantage of during the Creation Agreement's execution.  (Energia Opp., pp. 15-22; Yuzhnoye, pp. 14-19.)  Both Defendants claim that Boeing was the primary contract drafter, they were unrepresented by counsel, and they were inexperienced in Western negotiations, which put them in an inferior bargaining position.  (*Id.*)  As for the conduct during Sea Launch's development, they claim that Plaintiffs (as the largest percentage holder) were in *de facto* control over Sea Launch's development, which led to Plaintiffs over-charging Sea Launch for goods and services, not keeping the budget costs under control, and diverting corporate opportunities[26]

---

[26] Without a citation or pincite, Energia urges the Court to refer to Defendants Energia Logistics, Ltd.'s and Energia Overseas, LLC's (collectively, the "Energia Subsidiaries") Opposition filed against Plaintiffs' second summary judgment motion.  (Energia Opp., pp. 9 n. 9, 19 n. 23, 20 n. 24.)  Energia may cite to evidence attached to a separate summary judgment opposition.  *Fair Housing Council of Riverside County, Inc. v. Riverside Two*, 249 F.3d 1132, 1135-36 (9th Cir. 2001) (noting on cross-motions for summary judgment, district court is required to review evidence filed in support of another motion so long as that evidence is "specifically identified in [the] moving

from Sea Launch.  (Energia Opp., pp. 15-22; Yuzhnoye, pp. 14-19.)  Given these circumstances, Plaintiffs effectively caused Sea Launch to file for bankruptcy.  (*Id*.)

Simply put, Defendants are claiming that Plaintiffs intentionally ran Sea Launch into financial ruin in order to obtain this right to reimbursement that they now enforce.  But these circumstances bear no resemblance to the Swedish cases discussed above.  Again, Swedish law is very cautious in applying Section 36 in business-to-business contracts.  (M-G Rebuttal, ¶ 21 ("Section 36 . . . has been used reasonably cautiously in [business-to-business] relations . . . .").)  A genuine issue of whether Section 36 is applicable would only exist if the business-to-business relationship concerned an economically weaker party compared to the other party to the contract.  That is not the case here.

First, these facts do not suggest that any party was inferior.  Nor do these facts cast Energia and Yuzhnoye as small consumers bargaining with the large corporate strong-arm known as Boeing.  (Munck Report, p. 10 ("Section 36 is primarily applied in disputes between consumers and companies.").)  All the parties to this Creation Agreement are premiere corporations in their respective industries.  Energia and Yuzhnoye were (at the time the Creation Agreement was executed) and still are leading companies in the space industry.  (BUF ¶ 3 ("[Energia] was founded in 1946 and has been a leader in the international space industry since the 1950s.); BUF ¶ 8 ("[Yuzhnoye] is the largest aerospace firm in Ukraine and carries out foreign economic activity in 23 countries.").)  And Boeing is obviously another conglomerate in its own right.   (BUF ¶ 1 ("[Boeing] is a leading aerospace company and manufacturer of commercial jetliners and defense, space, and security systems.")  Moreover, to the extent both Defendants claim to be unsophisticated parties because they did not have legal representation when the Creation Agreement was signed, such

---

papers.").  But a party (here, Energia) that wishes to have the court consider evidence cited in a separate opposition for summary judgment must actually *cite* the evidence *in its opposition briefs*. *Id.*

1    an argument is also unpersuasive.  There is no evidence in the record that Energia or

2    Yuzhnoye were "unsophisticated parties" during the execution of the Creation

3    Agreement.  Energia even conceded during the June 29, 2015 hearing that it had a

4    legal department.  (Dkt. No. 680, 32:6-10 ("[Energia] had a small legal department

5    that dealt with Russian contracts.").)  Whether the legal department was well-versed in

6    commercial negotiations misses the mark.  The point is that in having a legal

7    department, one presumes that Energia was aware of the risk in going into a

8    negotiation without legal representation.  For Energia and Yuzhnoye to make an

9    argument that during business negotiations, Boeing was under a duty to "recommend

10   to [Energia and Yuzhnoye] that it retain legal counsel to protect its rights," is as

11   ineffective as it is unsubstantiated under Swedish law.  (Energia Opp., p. 16;

12   Yuzhnoye Opp., p. 15.)  Energia and Yuzhnoye do not point the Court to any

13   substantive law that supports this proposition.  Simply put, there is no inferiority here.

14   Rather, the uncontested facts suggest that Plaintiffs, Energia, and Yuzhnoye were

15   three commercial businesses conducting pure business-to-business dealings to which

16   Section 36 rarely applied.  (Munck Report, p. 10 ¶ 4 ("Section 36 is . . . very seldom

17   applied.  Indeed, if Section 36 is applied, it is only applied where one of the parties to

18   a contract is in an especially inferior position as compared to the other."); ("(M-G

19   Report, ¶ 59 ("Section 36 is of general application.  It has been applied by courts to set

20   aside or to modify commercial contracts, albeit not as frequently as in relation to

21   business-to-consumer contracts.").)

22        Second, considering Plaintiffs' conduct vis-à-vis their alleged control over Sea

23   Launch, the undisputed and additional facts do not merit Section 36's application.

24   Faulting only Plaintiffs for an unsuccessful commercial venture, when the Sea Launch

25   Partners collectively participated and approved each stage of Sea Launch's

26   development, does not align with Section 36's purpose of modifying contractual

27   terms.  Mattias Garrido, *Unfair Contract Terms in European Contract Law*, Uppsala

28   Universitet (2014) ("Section 36 of the Contracts Act plays a key role in protecting

consumers against unfair contract terms and in upholding the balance between contracting parties.").  The same conclusion is drawn from Defendants' assertion that Plaintiffs diverted corporate opportunities, such as U.S. government launch business, from Sea Launch: there is no evidence to suggest that these corporate opportunities would have protected Sea Launch from this financial collapse.  Whether Plaintiffs diverted corporate opportunities is irrelevant because these additional facts simply create doubt as to whether Sea Launch would have entered into bankruptcy had not Plaintiffs diverted these corporate opportunities.   This argument is inherently speculative and ultimately immaterial to this motion.  Moreover, the Court questions how this speculation supports the proposition that Energia and Yuzhnoye are inferior parties or that Article 9.4.2 was unreasonable amidst the circumstances.  Section 36 is not a legal mechanism used for scenarios that are based on pure conjecture.  It is a provision that upholds balance in unreasonable (not speculative) circumstances and that concern a party in an inferior position, similar to NJA 1984 s 229 where a self-employed trader was held accountable for an overly burdensome arbitration clause or NJA 1989 s 346 where an insurance company was trying to exempt itself from liability based on arbitrary terms in an insurance policy.  *See*, *supra*, NJA 1984 p. 229 (Swed.); *see also* NJA 1989 s 346 (Swed.).  Nothing in the record is akin to these Swedish cases, and the undisputed facts show no genuine issue of material fact as to the application of Section 36.

It is also necessary to shed light on the contractual term at issue, Article 9.4.2. Energia and Yuzhnoye argue that the Creation Agreement (which Boeing drafted) contained onerously one-sided terms that were in Plaintiffs' favor.  For example, according to Energia, its personnel working at Sea Launch "received extremely low hourly rates in comparison to Boeing, while Boeing included a profit mark-up on employees it loaned to Sea Launch."  (Energia Opp., p. 16.)  Yuzhnoye claims that Boeing structured Sea Launch to put BCSC "in *de facto* control, while relegating the [other Sea Launch] Partners to minority positions."  (Yuzhnoye Opp., p. 15.)

According to both Defendants, Article 9.4.2 should be disregarded under Swedish law based on the arguments above.  These contentions point at every term but Article 9.4.2.

Article 9.4.2 is a risk-bearing provision that related to all the Sea Launch Partners.  The four Sea Launch Partners—BCSC, Kvaerner, Energia, and Yuzhnoye—are all commercial corporations that invested in the Sea Launch venture.  Based on those investments, equity was allocated amongst the partners and the parties also bore a risk that reflected such equity, *i.e.*, 40% for BCSC, 20% for Kvaerner, 25% for Energia, and 15% for Yuzhnoye.[27]  (BUF ¶ 22.)  As Plaintiffs point out, the terms "allocate[d] the financial consequences of Sea Launch's failure among the partners in accordance their percentages of ownership in the venture."  (Mot., p. 21.)  Article 9.4.2 simply holds the Sea Launch Partners responsible for their percentage share of the benefit and risk of Sea Launch.  Swedish law requires much more evidence of overly burdensome terms to assert Section 36's implementation.  (Munck Rebuttal, p. 5 (discussing NJA 1994 s 359 where a municipality and property owner agreed that it "would be unconscionable for the exemption from fees to apply for all eternity").)  Moreover, the Court questions the overall request—disregarding Article 9.4.2.  As stated, this provision allocates risk amongst the Sea Launch Partners.  The provision is not in place to squarely hold Energia and Yuzhnoye accountable for the debt reimbursement.  Each Sea Launch Partner took on some level of financial responsibility.  Disregarding Article 9.4.2 (as Energia and Yuzhnoye request) is inequitable in its own right because Plaintiffs and Kvaerner would be the only Sea Launch Partners that carried Sea Launch's financial burden following its bankruptcy.  That clearly was not Article 9.4.2's intention.  And Section 36 should not be used to

---

[27] BCSC being the largest stakeholder in Sea Launch does not in and of itself mean that the remaining partners were weaker.  Nor does BCSC's equity share equate to *de facto* control over Sea Launch.  The voting provision mandated a 67% majority vote for adoption and amendment of the bylaws, approving the borrowing and lending of money, and the issuance of guarantees.  (Creation Agreement, p. 27.)  BCSC did not possess unilateral power to make these decisions.  Nor was there any evidence of BCSC having veto power.  The equity share simply illustrates that BCSC contributed more capital than its fellow Sea Launch Partners.

modify Article 9.4.2's original intent.  The undisputed facts validate that there is nothing unconscionable about the Creation Agreement terms and the surrounding circumstances that occurred during the course of the Sea Launch venture.  Section 36 is therefore inapplicable.

Accordingly, Energia and Yuzhnoye's equitable affirmative defenses cannot, as a matter of law, establish a triable issue of fact worthy of defeating summary judgment.

### E.   Defendants' Remaining Affirmative Defenses Are Without Merit.

Energia and Yuzhnoye assert numerous defenses in an effort to extinguish their contractual obligations.[28]  The above-mentioned expert reports also opined on several of these defenses.  The Court finds their opinions useful for this discussion.

### 1.   Misrepresentation and Rectification Defenses are not Properly Pleaded.

There are two affirmative defenses—Misrepresentation and Rectification—that Energia and Yuzhnoye improperly assert in their Oppositions.[29]

---

[28] Energia and Yuzhnoye have collectively asserted over 60 affirmative defenses in their answers and have since withdrawn several defenses.  (Dkt. Nos. 143, 149); *cf.* (Haeusler Decl., ¶ 2; Rudolph V. Pino Declaration, Dkt. No. 583, ¶ 2.)  Yet, in opposing summary judgment, they fail to utilize a majority of these defenses in their briefs.  *Cf.* (Dkt. Nos. 143, 149.)  Moreover, several defenses mentioned in their table of contents are not substantively discussed in their Oppositions.  (*See, e.g.,* Energia Opp., p. i (table of contents mentioning failure of consideration and intervening cause); *see also* Yuzhnoye Opp., p. ii (same).)  Consequently, the Court only addresses the affirmative defenses that Defendants discuss in their Oppositions.  *Cf. U.S. v. George*, 291 Fed. App'x. 803, 805 (9th Cir. 2008) (holding that a party's "failure to adequately develop these arguments in his brief operates as a waiver"); *Moreno Roofing Co., Inc. v. Nagle*, 99 F.3d 340, 343 (9th Cir. 1996) ("[w]e are not required to consider an argument that was not properly presented to the district court . . .").

[29] Yuzhnoye also inexplicably asserts an unenforceability defense under Ukrainian law, claiming that the Guaranty Agreements are unenforceable because Yuzhnoye is a state enterprise under Ukrainian law.  (Yuzhnoye Opp., pp. 23-24.)  Yuzhnoye attaches an expert report noting that Articles 23 and 24 of the Ukrainian Soviet Socialist Republic's Civil Code set limitations on commercial activity involving state enterprises, such as Yuzhnoye.  (*See* Pino Decl., Ex. 25.)  Yuzhnoye argues that because Yuzhnoye is a state enterprise, Article 24 of the Law of Ukraine "On enterprises in Ukraine", it is prohibited from acting as a guarantor with respect to bank loans provided for entrepreneurial or commercial activity.  (Yuzhnoye Opp., pp. 23-24.)

"The key to determining the sufficiency of pleading an affirmative defense is whether it gives plaintiff fair notice of the defense." *Wyshak v. City Nat'l Bank*, 607 F.2d 824, 827 (9th Cir. 1979). "Although Rule 8 requires affirmative defenses to be included in responsive pleadings, absent prejudice to the plaintiff, the district court has discretion to allow a defendant to plead an affirmative defense in a subsequent motion." *Simmons v. Navajo County, Ariz.*, 609 F.3d 1011, 1023 (9th Cir. 2010).

According to Energia and Yuzhnoye, BCSC representatives gave pre-contractual assurances to them that its liability under the BCSC loan would be limited to Yuzhnoye and Energia's "pledged share[] of its interest in the Sea Launch venture." (Energia Opp., p. 13; *see also* Yuzhnoye Opp., p. 12.) In other words, Plaintiffs are only entitled to Energia and Yuzhnoye's equity stake in Sea Launch (which the Court presumes is of little to no value in light of Sea Launch's bankruptcy). Both Defendants again use the purported oral representations made at the Board of Director meetings as a foundation to assert a misrepresentation defense under UK law. (Energia Opp., pp. 13-14; Yuzhnoye Opp., pp. 12-13.) Misrepresentation is a concept under UK law that prevents enforcing contractual terms if a party was induced into entering a contract through misrepresentation of the counterparty to that contract. (Coleman Report, ¶ 9.) Yuzhnoye and Energia contend that these oral

---

This defense is equally puzzling as it is unconvincing. Not only was this defense not pleaded in Yuzhnoye's answer, (*see generally* Yuzhnoye Aff. Defs.), but it also seeks to assert a defense under Ukrainian law when there is no dispute that UK law governs the BCSC Loan and the Guaranty Agreements. (BUF ¶ 73.) Moreover, Yuzhnoye explicitly affirmed that it was in compliance with its country's laws when it signed the Guaranty Agreement. (Guaranty Agreements, p. 3 (Section 7 "Representations and Warranties of Guarantor" of the Guaranty Agreements included subsections— "(c) Compliance with Laws and Contracts."; "(d) Governmental Approvals."—confirming the Guarantor's compliance with foreign governments.)

To now assert a defense that is not pleaded in Yuzhnoye's answer and claims that the Guaranty Agreements are unenforceable under a law that does not govern these agreements is quite an opportune (and ultimately unconvincing) position to take amidst the circumstances. Such a defense has not highlighted any triable issues of fact and does not warrant any further substantive attention within this discussion.

misrepresentations regarding the BCSC loan terms induced them into entering into the BCSC loan guaranty which (according to them) is entirely reasonable as they lacked familiarity with Western negotiations.  (*Id.*)  Defendants also assert a rectification defense under UK law.  (Energia Opp., pp. 14-15; Yuzhnoye Opp., pp. 13-14.)  Rectification is a UK remedy that conforms an agreement to reflect what the parties actually agreed to, rather than what is said in the agreement.[30]  (Coleman Report, ¶ 25.)  Thus, if the Guaranty Agreements are enforced, then Energia and Yuzhnoye urge the Court to conform the agreements and enforce them in accordance to the reimbursement obligations they orally agreed to.  (Energia Opp., pp. 14-15; Yuzhnoye Opp., pp. 13-14.)

These defenses were not pleaded in either Energia's or Yuzhnoye's answers. (*See generally* Dkt. Nos. 143, 149.)  During the hearing, counsel for Energia assured the Court that these defenses were pleaded under affirmative defenses 19 and 20. (Dkt. No. 680, 36:21-24 ("[L]ook at Affirmative Defenses 19 and 20 . . . to see the basis for where those types of arguments are set out in the pleadings.").)  Reviewing Energia's answer, affirmative defense No. 19 is modification by oral agreement and affirmative defense No. 20 is failure of consideration.[31]  (Dkt. No. 143, pp. 40-42.)  To the extent that Energia claims misrepresentation and rectification fall within the ambit of these two defenses, the Court is not persuaded.   Rectification is a defense that focuses on the parties' *pre-contractual* intent, and modifies the terms of the contract to reflect that original intent.  Modification by oral agreement concerns a *post-contractual* amendment to the language of an already existing contract.  In other

_____

[30] "'[T]he remedy of rectification is one permitted by the Court, not for the purpose of altering the terms of an agreement entered into between two or more parties, but for that of correcting a written instrument which, by a mistake in verbal expression, does not accurately reflect their true agreement.'"  (Coleman Report, ¶ 25 (emphasis in original) (citing *Agip SpA v. Navigazione Alta Italia SpA* [1984] 1 Lloyd's Rep. 353, 359).)

[31] Yuzhnoye's answer lists failure of consideration for affirmative defense No. 19 and lack of consideration as affirmative defense No. 20.  (Dkt. No. 149, pp. 37-38.)

1    words, rectification and misrepresentation defenses are simply different defenses than

2    those pleaded in their answer.[32]  Whenever it became apparent that these new

3    affirmative defenses were going to be utilized, both Defendants should have sought to

4    amend their answer.  Waiting until the summary judgment stage to assert new

5    affirmative defenses is inappropriate because it unfairly surprised Plaintiffs as they

6    formulated their litigation strategy.  *Cf. Navajo Cnty.*, 609 F.3d at 1023 ("[A]bsent

7    *prejudice to the plaintiff*, the district court has discretion to allow a defendant to plead

8    an affirmative defense in a subsequent motion.") (emphasis added); *Lowerison v.*

9    *Yavno*, 26 Fed.Appx. 720, 722 (9th Cir. 2002) ("Affirmative defenses are not waived

10   even if they are first raised in pretrial dispositive motions, if *the plaintiff is not*

11   *unfairly surprised or prejudiced*." (citing *Camarillo v. McCarthy*, 998 F.2d 638, 639

12   (9th Cir. 1993)) (emphasis added).

---

15   [32] Even assuming *arguendo* such defenses were properly pleaded, they still fail as a matter of law.

16
17   Rectification rarely (if ever) applies to guaranty contracts.  (Wolfson Decl., ¶ 8 ("there is no English case in which rectification has been ordered for a contract of guarantee.").)

18   Misrepresentation generally (but not always) applies to exceptional circumstances involving a
19   consumer.  (Coleman Report, ¶ 14 ("The cases of which I am aware in which the Misrepresentation Principle has arisen have involved one party's standard form contract or standard terms and
20   conditions, and typically one party is a consumer.").)  For example, the Coleman report cites to
     *Lloyds Bank Plc v Waterhouse* [1993] 2 F.L.R. 97 which is a case involving an illiterate man that
21   "signed a written guarantee in respect of a loan that had been made by the bank to his son." (*Id*. at ¶
     11.)  The UK court allowed the man to avoid satisfying the guarantee based on (1) that he suffered
22   from a disability (illiteracy); (2) the document he signed was "*fundamentally different*" or "*radically
     different*" than the document he thought he was signing; and (3) that he was not careless.  (Wolfson
23   Decl., ¶ 5 (emphasis in original).  This case does not have a hint of resemblance to the undisputed
     facts.  Energia and Yuzhnoye do not suffer from any disabilities, there is no fundamental or radical
24   difference present, and both Defendants certainly were careless in not taking precautions to ascertain
     the significance of the Guaranty Agreements.  (*Id*.)
25

26   Thus, even if these affirmative defenses were considered, they contain little to no merit under UK
     law because whether someone has read or understood the contract terms, the general rule is that a
27   party is ordinarily bound by the terms of the written contract.  (Coleman Report, ¶ 9 (citing
     *L'Estrange v. Graucob* [1934] 2 KB 394, 403).)

28

Plaintiffs were obviously unprepared to address such defenses in their initial motion.  (*See generally* Mot.; Wolfson Report; Wolfson Rebuttal (providing an opinion on all the applicable affirmative defenses except misrepresentation and rectification.).)  This prompted Plaintiffs to submit a supplementary declaration (beyond the discovery cut-off) in order to rebut these new arguments.  *Cf.* (Reply, p. 13 n. 8; McKeever Decl., Dkt. No. 624 Ex. 140 ("Wolfson Declaration"), ¶¶ 1-10 (opining on misrepresentation and rectification defenses.)  "Blind sid[ing] [Plaintiffs] . . . with a new legal issue after the bulk of discovery ha[d] [] been completed" is not consistent with the procedural tents of this circuit.  *Ortiz*, 688 F.Supp.2d at 1082; *see also*, *e.g.*, *Pickern v. Pier 1 Imports (U.S.), Inc.*, 457 F.3d 963, 968–69 (9th Cir. 2006) (refusing to allow the plaintiff to advance new theories "presented for the first time in [the plaintiff's] opposition to summary judgment"); *Wasco Prods., Inc. v. Southwall Techs., Inc.*, 435 F.3d 989, 992 (9th Cir. 2006) ("Simply put, summary judgment is not a procedural second chance to flesh out inadequate pleadings.") (internal quotations and citations omitted).  The Court will not allow Energia and Yuzhnoye to unexpectedly assert new affirmative defenses at the summary judgment stage.  *See Klein v. Boeing Co.*, 847 F.Supp. 838, 844 (W.D. Wash. 1994) ("Klein never asserted this claim prior to his opposition to Boeing's motion for summary judgment, nor has he moved to amend his complaint to add such a claim. Thus, this claim is not properly before the court."); *see also Rodriguez v. Countrywide Homes*, 668 F.Supp.2d 1239, 1246 (E.D. Cal. 2009) ("There is no indication that Plaintiffs relied on this agency theory during discovery or communicated the theory to Countrywide in any way.  Accordingly, Plaintiffs' agency argument is not properly before the Court.").  Because these affirmative defenses were omitted in both Defendants' answers, and the answers were not subsequently amended when they knew such defenses were going to be relied upon, the misrepresentation and rectification defenses are not properly before the Court.  *Quaker Oats Co.*, *supra*, 232 F.3d at 1292–1293 (holding that when a plaintiff fails to include a legal theory in the

complaint and did not identify the theory at any time prior to summary judgment, the plaintiff could not rely on that theory for the first time at summary judgment); *accord Benson v. Ocwen Loan Servicing, LLC*, 562 Fed.App'x 567, 570 (9th Cir. 2014) (holding plaintiff "waived" a theory of liability "because he raised it for the first time in his opposition to the defendants' summary judgment motion").

Accordingly, such defenses fail to highlight triable issues of material fact preventing the entry of summary judgment.

### 2. Unjust Enrichment Defense is Not Recognized as a Defense Under Swedish Law or UK Law.  (Energia Aff. Def. Nos. 12, 25; Yuzhnoye Aff. Def. Nos. 11, 24.)

Energia and Yuzhnoye assert an unjust enrichment defense.  According to Yuzhnoye, Kvaerner executed a promissory note to Plaintiffs to satisfy the debts owed under the Creation Agreement and the BCSC Loan.  (Yuzhnoye, p. 22.)  They believe that Kvaerner overpaid Plaintiffs, meaning Kvaerner paid a portion of the funds Energia and Yuzhnoye owe to Plaintiffs.  (*Id*.)  Yuzhnoye claims that Plaintiffs' proposed order does not account for the excess payment Kvaerner made, and if they were required to reimburse Plaintiffs, such an award would unjustly enrich Plaintiffs.  (*Id*.)  According to Energia, "[i]f [] Energia were to make payment to Boeing, Russian law would consider this to be unjust enrichment to Boeing."  (Energia Opp., p. 23.)

Both Defendants gloss over the fact that unjust enrichment is not recognized as a defense under Swedish law or UK law.   (Munck Report, p. 10 ("While several foreign legal systems have adopted the principal of unjust enrichment, Swedish [ ] law has traditionally shown skepticism toward treating the principal as a general rule of law.); Wolfson Report, ¶ 194 ("Unjust enrichment is not a defen[s]e; it is a freestanding cause of action which one party may bring against another." (citing *Halsbury's Laws of England*, Volume 88 (5th ed. 2012)).).  Notably, neither of these two Defendants' experts mentions anything with regard to unjust enrichment.  . (*See generally* M-G Report; *see also generally* Coleman Report.)  And Energia even goes

as far as to rely on Russian law, even though Russian Law has no bearing on this action.[33]  (Energia Opp., p. 23.)  This glaring hole is fatal to this affirmative defense's application.[34]

Seeing how this defense is not recognized as an affirmative defense under the law governing both agreements, Energia's and Yuzhnoye's unjust enrichment defense has not demonstrated that there exists a triable dispute of fact worthy to present to a jury.

### 3.  Failure to Mitigate Defense is Without Merit.  (Energia Aff. Def. No. 26.)

Although both Defendants pleaded a failure to mitigate defense, (*See generally* Dkt. Nos. 143, 149), only Energia gives this defense substantive attention, albeit in a footnote.  (Energia Opp., p. 21 n. 28.)  According to Energia, "[p]er Swedish law, if the allegedly injured party does not take reasonable measures to mitigate his damages, he shall bear a corresponding share of the loss."  (*Id*.)  Furthermore, "the fact that BCSC failed to perfect its security interest under the BCSC Loan . . . increased the risk of not collecting payment under the loan and therefore constituted a failure to

---

[33] Energia relies on Russian law under Section 11.3 of the Creation Agreement.  Section 11.3 states that "[t]he Parties warrant and represent that this Agreement and its performance does not violate any law, regulation or policy of its government.  The Parties shall be relieved of their obligations to perform under this Agreement to the extent such performance would violate any law of the government of that Party's country."  (Creation Agreement, p. 58.)

The Court questions why Energia uses a provision which effectively states that Energia affirmed its compliance with Russian law when it signed the Creation Agreement.  Now, Energia is apparently contending that the Creation Agreement is not compliant with Russian law.   Because this argument appears to contradict Energia's earlier representations under Section 11.3, this argument is disregarded.

[34] Although Kvaerner may have overpaid Boeing such that Boeing would be unjustly enriched by Energia and Yuzhnoye's proportionate payments, it is Kvaerner who would have the claim for unjust enrichment, not Defendants.  Plaintiffs are not demanding that Energia and Yuzhnoye pay anything more than their proportionate share.  Even assuming *arguendo* that unjust enrichment were an affirmative defense under UK or Swedish law, Energia and Yuzhnoye would likely lack standing to assert it based on *Kvaerner's* overpayment.

mitigate damages under the framework of the Creation Agreement, which is governed by Swedish law."  (*Id*.)

Under Swedish Law, "[t]he injured party shall take reasonable measures to mitigate his damage.  If he neglects to do so, he shall bear a corresponding share of the loss."  (M-G Report, ¶ 66.)[35]  Under UK law, "[i]f a guarantee only gives rise to a damages claim, then the creditor is under a duty to mitigate her losses, and if she has failed to do so, then her damages may be reduced accordingly.  However, the creditor only has to take steps which appear reasonable to her, with regard to her own interests." (Coleman Report, ¶ 25 (citing Tettenborn, *The Law of Damages* (2nd ed., 2010).)

Energia argues that, because Plaintiffs did not attempt to collect payment from the Sea Launch Partners sooner under the Creation Agreement and the BCSC Loan, Plaintiffs have failed to mitigate the damages owed herein.  However, Energia fails to explain how Plaintiffs could have partially mitigated its collection of payment due under the Creation Agreement and the BCSC Loan.  Such payments were not due-and-owing until *after* Sea Launch filed for bankruptcy.  Sea Launch's bankruptcy caused it to default under the BCSC Loan and BCSC sent letters to the Sea Launch Partners demanding payment.  (BUF ¶ 95.)  The same chain of events occurred when the payments due under Article 9.4.2 materialized.  (BUF ¶¶ 61, 62 (Sea Launch files for bankruptcy, Boeing pays close to $450 million in guarantees to third-party lenders, and then Boeing invoices the Sea Launch Partners).)  Sea Launch's bankruptcy reorganization followed.  There, as the Honorable Audrey B. Collins noted, Plaintiffs were able to preserve their claims under these guarantees under Section 38 of the Confirmation Order.  (Dkt. No. 74, p. 6 ("Confirmation Order, specifically preserves

---

[35] The M-G Report relies upon a provision located in the "Swedish Sales of Goods Act" to articulate this standard of law.  (M-G Report, ¶ 66.)  The M-G Report states that "[t]his provision is applicable by analogy to other contractual relations than sales . . . It is a principle of general application in contract law."  (*Id*. at ¶ 66.)  The Munck Report does not dispute this provision's application, and there is nothing in the record that contradicts this legal standard.  Thus, the provision is deemed appropriate for this discussion.

claims of Boeing and BCSC 'against entities other than the Debtors' with 'Debtors' referring to the six legal entities that constituted the original Sea launch enterprise." (citation omitted).)  Afterwards, when it became apparent that Energia and Yuzhnoye were not going to satisfy their debts, Plaintiffs initiated this action.  There is no evidence of Plaintiffs prolonging this lawsuit, and Energia does not explain or highlight any undisputed facts that show what could have been done earlier to mitigate damages.[36]

Accordingly, Energia's failure to mitigate defense fails as a matter of law.

### 4.     Release Defense Fails as a Matter of Law.  (Energia Aff. Def. Nos. 31-32; Yuzhnoye Aff. Def. Nos. 30-32.)

Energia and Yuzhnoye claim that Plaintiffs' breach of contract claims were released when Sea Launch's plan of reorganization was confirmed.  (Energia Opp., pp. 22-23; Yuzhnoye Opp., pp. 20-21.)  According to Energia and Yuzhnoye, "Boeing and BCSC received an equity interest in the post-reorganization Sea Launch Creditor Trust in exchange for relinquishing . . . their claims for reimbursement on the Partner loans and third-party loans."  (Energia Opp., p. 23; Yuzhnoye Opp., p. 20.)  Given the bankruptcy proceedings, both Defendants contend that claims for breaching the Creation Agreement were released and are unenforceable under Ukrainian and Russian law.  (*Id.*)

---

[36] This failure to mitigate analysis is analogous to the analysis used in American law.  *Central Coast Pipe Lining, Inc. v. Pipe Shield USA, Inc.*, No. 2:13–cv–00639–ODW(Ex), 2013 WL 6442603, at *7 (C.D. Cal. 2013) (applying California law to a breach of contract claim, the Court states "[a] party's failure to take reasonable steps to mitigate damages bars recovery of only the *avoidable* portion of the damages—not all damages.") (emphasis added) (citation and quotations omitted); *The Aspect Group v. Movietickets.com, Inc.*, No. CV 05-3125 SFEX, 2006 WL 5894608, at *10 (C.D. Cal. 2006) (applying Florida law to a breach of contract claim, the Court notes "[a] duty to mitigate cannot arise, however, *until* a contract has been breached.") (emphasis added).  No matter the jurisprudence, it is quite evident that a party asserting this defense must identify what damages could have been avoided after the breach occurs.  Energia falls short in this respect.

Again, as mentioned throughout this order, the governing law under Plaintiffs' breach of contract claims is Swedish and UK law.  This uncontested fact is enough on its own to reject this affirmative defense which attempts to apply Ukrainian and Russian law.  Furthermore, Judge Collins has already addressed this contention in her June 3, 2013 Order on the Energia Subsidiaries' Motion to Dismiss.  (Dkt. No. 74, pp. 6-7.)  There, Judge Collins noted that Section 38 of the Confirmation Order, the bankruptcy order formulated during Sea Launch's reorganization, "specifically preserves claims of Boeing and BCSC 'against entities other than the Debtors' with 'Debtors' referring to the six legal entities that constituted the original Sea Launch enterprise."  (Dkt. No. 74, pp. 6-7.)  Energia and Yuzhnoye have not pointed to any undisputed facts that contest Judge Collins's conclusion.

Accordingly, this affirmative defense does not defeat Plaintiffs' Summary Judgment Motion.

### 5. Statute of Limitations Defense  is Without Merit.  (Energia Aff. Def. No. 16, Yuzhnoye Aff. Def. No. 17.)

Energia and Yuzhnoye assert a Statute of Limitations defense because they believe that Plaintiffs' Article 9.4.2 claims are precluded under Swedish law's 10-year limitations period.  (Energia Opp., pp. 23-24; Yuzhnoye, pp. 21-22.)

"Under Section 2 of the Swedish Limitations Act, the applicable statute of limitations is ten years from the date the claim accrued."  (Munck Report, p. 11); (M-G Report, ¶ 79 n. 18 ("No claim may be brought after ten years from its accrual, unless the period of limitation is interrupted prior thereto.") (citing Swedish Statute of Limitations, Section 2).)   The ten year limitations period is interrupted and begins anew when:

1. the debtor offers payment, makes payment of interest or principal, or otherwise acknowledges the claim of the creditor;

2. the debtor receives from the creditor a demand in writing or other written reminder regarding the debt; or,

3.   the creditor commences legal proceedings or otherwise pleads the claim against the debtor in any court, before the Debt Enforcement Authority, or in arbitration proceedings, bankruptcy, or insolvent liquidation proceedings, or in negotiations regarding judicial composition.

(Munck Report, p. 11.)

Here, in accordance with Swedish law, the day the Creation Agreement was executed—May 4, 1995—is the day of accrual, making May 4, 2005 the expiration date for Plaintiffs' Article 9.4.2 claims.[37]  (Munck Report, p. 11.)  Plaintiffs filed this lawsuit in February 2013.  (*See* Compl.)  Thus, there must be evidence of an interruption as late as February 2003 in order to reset the 10-year limitations period.  (M-G Report, ¶ 79 n. 18.)  Plaintiffs contend that the various reaffirmations by these two Defendants interrupted the Statute of Limitations.  (Mot., p. 17.)  Energia and Yuzhnoye claim that the Article 9.4.2 reaffirmations were only applicable to BCSC, not Boeing (the party seeking reimbursement under Article 9.4.2).  (Energia Opp., pp. 23-24; Yuzhnoye, pp. 21-22.)   Essentially, both Defendants are claiming that when they reaffirmed their obligations under Article 9.4.2, such reaffirmations only acknowledge liability to their fellow Sea Launch Partners, not to Boeing.

The undisputed facts and the law do not support Energia and Yuzhnoye's proposition.  Simply put, each time the Sea Launch Partners reaffirmed (twice in 2004 and once in 2005) their obligations, they acknowledged their obligation to perform under Article 9.4.2 in the event Sea Launch is unable to satisfy its debt owed to Boeing.  Recognizing and acknowledging this debt obligation therefore interrupts the

---

[37] On this point, there is a fundamental difference between Swedish law and American law.  Swedish law's accrual date begins the date a contract is executed, limiting the life of a contract to ten years unless interrupted.  (M-G Report, ¶ 79 ("Article 9.4.2 in the Creation Agreement, was made at the same time as the agreement itself, 3 May 1995, and according to Swedish law this date is the starting point for the independent limitation period for any claim . . .."); Munck Report, p. 11.)  While under American law, the statute of limitation usually accrues on the date the claim actually materializes.  *Ancala Holdings, LLC v. Price*, 220 Fed.Appx. 569, 2007 WL 387591, at *3 (9th Cir. 2007) (unpublished) (applying Arizona law, the Court stated "a cause of action accrues each time a defendant fails to perform as required under the contract") (citations omitted); *Johnson v. Columbia Properties Anchorage, LP*, 437 F.3d 894, 900 (9th Cir. 2006) (applying Alaska law, the Court noted "a cause of action for breach of contract accrues, thereby triggering this three-year period, when the breaching party becomes obligated to perform") (citation omitted).

10-year limitations period which means this limitation was reset as to both Plaintiffs as early as 2004 (a year prior to the original expiration date).  (Munck Report, p. 11 ("The ten year limitations period begins anew when . . . the debtor . . . otherwise *acknowledges* the claim of the creditor . . . .") (emphasis added).)

Accordingly, in light of the reaffirmations resetting the limitations period, Plaintiffs (including Boeing) filed this lawsuit within the 10-year limitations period under Swedish law.  The undisputed facts demonstrate that this affirmative defense (Energia No. 16, Yuzhnoye No. 17) does not raise a triable issue of fact that precludes summary judgment.

### 6. Set-off Defenses Fail as a Matter of Law (Energia Aff. Def. Nos. 29-30; Yuzhnoye Aff. Def. Nos. 28-29.)

Defendants assert a set-off defense.  Generally speaking, this defense is used to recoup or set-off certain sums against the amount Plaintiffs would receive if they were to be held liable for the breach of contract claims.

Under Swedish Law, a set-off or recoupment defense is not considered an affirmative defense but rather a claim for damages or a counterclaim.  (Munck Report, pp. 12-13; Munck Rebuttal, p. 8; M-G Report, ¶ 94 ("If Boeing would be judged to be liable towards [] Energia for a specific amount, [] Energia could use this claim for set-off . . . ."); M-G Rebuttal Report, ¶ 33 ("[T]here are two parties who both have claims against each other and each party would be compensated for its respective claim by setting off its alleged liability, due to the fact that both claims are money which are due and payable.").)  This set-off principal is only applicable to the extent that Defendants have a relevant damages claim or counter-claim against Plaintiffs.

Energia and Yuzhnoye contend that Plaintiffs' actions in mismanaging Sea Launch constitute a breach of the duty of loyalty entitling Energia and Yuzhnoye to set off its damages against Plaintiffs.  (Energia Opp., pp. 20-21; Yuzhnoye Opp., 18-19.)  According to Energia, "each party has alleged claims or defenses with monetary value against the other, each party's liability should be set off against the other per

1    Swedish law." (Energia Opp., p. 21.)  Plaintiffs respond by highlighting the fact

2    neither Energia nor Yuzhnoye have counterclaims here because Judge Collins

3    previously dismissed all the counterclaims in this matter.  (Reply, pp. 18-19 (citing

4    Dkt. Nos. 196, 199); Mot. No. 2, pp. 22-23.)

5           Swedish law does not support Defendants' position.  In September 2013,

6    Energia and Yuzhnoye countersued Plaintiffs for breach of fiduciary duty, fraud and

7    intentional deceit, accounting, and enforcement of an arbitration award.  (Dkt. Nos.,

8    143, 149.)  Plaintiffs subsequently moved to dismiss such counterclaims, (Dkt. Nos.,

9    157, 164), and Judge Collins granted Plaintiffs' motion as to the relevant counterclaim

10   at issue here—breach of fiduciary duty.   (*See* Dkt. No. 196, 199.)  In her order, Judge

11   Collins noted that Energia and Yuzhnoye lacked standing to bring their claim for

12   breach of fiduciary duty because the harm these two Defendants were claiming to

13   suffer was "first caused to Sea Launch (the partnership), and then [allegedly] flowed

14   to . . ." other aggrieved Sea Launch Partners.  (Dkt. No. 196, p. 7.)  Now, Energia and

15   Yuzhnoye seek to revive this breach of fiduciary counterclaim by disguising it as a

16   setoff defense pursuant to a breach of loyalty claim. *Cf.* (Dkt. No. 575-5 ("Goran

17   Millqvist Declaration"), ¶ 28 (Under Swedish law, "a claim for damages based on a

18   breach of the duty of loyalty need not be raised as a counterclaim, but could instead be

19   asserted as a set-off claim . . . [which] is a defense and, if successful, only serves to

20   eliminate or reduce the main claim.").)  But Energia and Yuzhnoye do not provide any

21   substantive support under Swedish law that permits such a tactic—asserting a setoff

22   defense that is based on a claim that has already been dismissed.  Defendants will not

23   be allowed to re-litigate their counterclaims for the purpose of asserting a set-off

24   claim, especially in light of Judge Collins's previous ruling.

25           This affirmative defense therefore fails as a matter of law.

26

27   ///

28   ///

## VI.    CONCLUSION

For the reasons stated in this Order, Plaintiffs have successfully established their breach of contract claims as a matter of law.  All of Energia and Yuzhnoye's affirmative defenses fall short of raising a genuine issue of material fact sufficient to defeat a motion for summary judgment.

Accordingly, Plaintiffs' Motion for Summary Judgment, (Dkt. No. 552), is **GRANTED**.  Plaintiffs shall file and lodge a proposed judgment within ten (10) days of the issuance of this Order.  Defendants have seven (7) days to object to Plaintiffs' proposed judgment.

In light of the Court's ruling, a jury trial is no longer necessary.  The Court will proceed with its bench trial set for **November 10, 2015**.  The Pretrial Conference still remains on calendar for **November 2, 2015**.  The Court expects all trial materials to be filed in accordance with the rules and procedures set forth in this Court's Standing Order.

**IT IS SO ORDERED.**

Dated:  September 28, 2015    _____

HONORABLE ANDRÉ BIROTTE JR.
UNITED STATES DISTRICT JUDGE