1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

THE BOEING COMPANY, *et al.*,

        Plaintiffs,

   vs.

KB YUZHNOYE, *et al.*,

        Defendants.

CASE NO. CV13-00730-AB (AJWx)

**FINAL PRETRIAL CONFERENCE ORDER**

Judge:      Honorable André Birotte Jr.
Trial Date:  November 10, 2015
Time:      8:30 a.m.
Place:     Courtroom 790

# TABLE OF CONTENTS

**Page**

1.   THE PARTIES ................................................................. 1

2.   FEDERAL JURISDICTION AND VENUE ................................ 1

3.   TIME ESTIMATION .......................................................... 2

4.   TRIAL BY JURY ............................................................... 2

5.   ADMITTED FACTS REQUIRING NO PROOF ........................ 3

6.   STIPULATED FACTS WITH EVIDENTIARY OBJECTIONS ....... 3

7.   CLAIMS AND DEFENSES — ELEMENTS AND KEY EVIDENCE ........... 4

8.   ISSUES REMAINING FOR TRIAL ....................................... 28

9.   RULE 26(A)(3) DISCLOSURES .......................................... 30

10.  WITNESS LISTS ............................................................. 30

11.  PENDING OR CONTEMPLATED MOTIONS ........................ 32

12.  NO BIFURCATION .......................................................... 32

13.  ORDER TO SUPERSEDE PLEADINGS ................................ 322

i

Following pretrial proceedings, pursuant to Federal Rule of Civil Procedure 16 and Local Rule 16-7, **IT IS ORDERED**:

1. **THE PARTIES**

The parties are:

**Plaintiffs**

    1)  The Boeing Company ("Boeing"), a Delaware corporation

    2)  Boeing Commercial Space Company ("BCSC"), a Delaware corporation

**Defendants**

    1)  Energia Logistics Ltd. ("Energia Logistics" or "Logistics"), a Delaware corporation

    2)  Energia Overseas LLC ("Energia Overseas" or "Overseas"), a Delaware limited liability company

Both Energia Logistics and Energia Overseas (hereinafter collectively referred to as "Defendants") have been served and have appeared.  Other parties named in the pleadings include:  Intervenor Plaintiff Old Kvaerner Invest AS ("Kvaerner"); defendant S.P. Korolev Rocket and Space Company, Energia ("Energia" or "RSC Energia"); and defendants KB Yuzhnoye and PO Yuzhnoye Mashinostroitelny Zavod (together, "Yuzhnoye").   During the litigation, Kvaerner dismissed all of its claims against Energia and Yuzhnoye with prejudice.   In addition, summary judgment was granted in Plaintiffs' favor on all of Plaintiffs' claims against Energia and Yuzhnoye and on all of Energia and Yuzhnoye's defenses to those claims.

For purposes of trial, the operative pleadings are:  (1) Plaintiffs' Complaint (Dkt. No. 1); and (2) the Second Amended Answer of Energia Overseas LLC and Energia Logistics Ltd. to Plaintiffs' Complaint (Dkt. No. 144).

2. **FEDERAL JURISDICTION AND VENUE**

In its June 3, 2013 Order (Dkt. No. 74), this Court determined that federal jurisdiction exists pursuant to the Foreign Sovereign Immunities Act (the "FSIA"), 28 U.S.C. §§ 1330 and 1605.  Based on its determination that Yuzhnoye is not immune

from suit under FSIA, the Court further determined that FSIA jurisdiction extends over the entire action, *i.e.*, including the issues presently to be tried to the Court.  Dkt. No. 74 at 4 & n.2; *see also* 28 U.S.C. §§ 1330, 1605.

Venue is proper in this District pursuant to 28 U.S.C. § 1391(f)(1) and (f)(3) because a substantial part of the events giving rise to Plaintiffs' claims occurred in this judicial district, and Yuzhnoye is an agency or instrumentality of Ukraine which has been conducting business in this judicial district since 1995.

Venue is also proper in this District pursuant to 28 U.S.C. § 1391 (b)(2) because a substantial part of the events giving rise to Plaintiffs' claims occurred in this judicial district.

Under the Court's determinations regarding FSIA jurisdiction, venue is also proper in this District pursuant to 28 U.S.C. §1391(b)(1) and (c)(2), because at the time Plaintiffs filed suit against Defendants, Defendants had the capacity to sue and be sued, and they have been deemed subject to the Court's personal jurisdiction with respect to this action.

For the purposes of trial, Plaintiffs and Defendants do not dispute either federal jurisdiction or venue.  Defendants recognize the Court's jurisdictional determinations are the law of the case, but expressly preserve, and do not waive, any arguments in connection with any subsequent appeals.

**3.     TIME ESTIMATION**

Each party has 30 minutes to present an opening statement and 45 minutes to present a closing statement.  Each party has 10 hours to present evidence.

**4.     TRIAL BY JURY**

On September 28, 2015, the Court granted Plaintiffs' Motion for Summary Judgment against Energia and Yuzhnoye. (Dkt. No. 750.)  As a consequence, the only claim that remains to be decided by bench trial is Plaintiffs' alter ego claim against Defendants.  As set forth in the Court's February 20, 2014 Order, Plaintiffs' alter ego claim will be tried to the Court.  Dkt. 273 at 3.

Plaintiffs recognize that the Court's decision on this point is law of the case. Nevertheless, Plaintiffs expressly preserve, and do not waive, their arguments that they are entitled to a jury trial on their alter ego claims against Defendants. *See* Dkt 248 at 1, 4; Dkt 249 at 58-59, 62-63, 69.

**5.     ADMITTED FACTS REQUIRING NO PROOF**

The following facts are admitted and require no proof:

1.     The Creation Agreement, which set forth the parameters of the Sea Launch venture, was executed in May 1995.

2.     On June 22, 2009, Sea Launch filed for Chapter 11 bankruptcy protection in the U.S. Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").

3.     During Sea Launch's bankruptcy case, the parties discussed and negotiated the terms of Sea Launch's plan of reorganization (the "Plan") and the order confirming the Plan (the "Confirmation Order").

4.     During Sea Launch's bankruptcy case, RSC Energia and Defendants were represented by the same lawyers, Claude Montgomery and Lee Whidden of the Salans firm (which is now Dentons US LLP).

5.     In the Confirmation Order dated July 30, 2010, the Bankruptcy Court approved the Plan.

6.     Energia Logistics RU is a Russian company that is wholly owned by Energia Overseas RU, a Russian company.

7.     RSC Energia is the ultimate owner of Energia Overseas RU and Energia Logistics RU.

8.     Defendant Energia Overseas LLC is a Delaware limited liability company that is wholly owned by Energia Overseas RU.

9.     RSC Energia is the ultimate owner of Defendants.

**6.     STIPULATED FACTS WITH EVIDENTIARY OBJECTIONS**

The following facts, though stipulated, shall be without prejudice to any evidentiary objection:

1.     The first Delta IV launch, of the Eutelsat W5 satellite, took place in November 2002.  It was the first and only commercial launch performed by Delta IV and was deeply discounted.

2.     The EELV program was the primary source of launch vehicles and services used by the Department of Defense to launch U.S. military and intelligence satellites.

3.     Other than the Eutelsat W5 launch, the Delta IV launches performed from 1999 to 2009 were procured as part of the Air Force's EELV program.

4.     The majority of launches performed by the Delta II rocket between 1998 and 2009 were for U.S. government missions.

5.     From approximately November 2001 to November 2003, Boeing Launch Services performed marketing services for Sea Launch as well as Delta.

**7.     CLAIMS AND DEFENSES — ELEMENTS AND KEY EVIDENCE**

**Claims:**

**(a)**     Plaintiffs plan to pursue the following claims against Defendants:

**Alter Ego:**   Plaintiffs contend that Defendants are the alter egos of Energia.  In its February 20, 2014 Order denying Defendants' summary judgment motion (Dkt. No. 273), this Court determined that Plaintiffs' alter ego theory against Defendants does not present a claim for "reverse" veil piercing.  Dkt No. 273 at 3-4.  Plaintiffs contend that the Court's decision on this point is law of the case.

**(b)**     The parties disagree as to the elements required to establish Plaintiffs' alter ego claim.

**Plaintiffs' Position:**

Plaintiffs contend that the elements required to establish alter ego are:

1.     Energia and Defendants have operated as a single economic entity, taking into consideration factors, including, but not limited to, whether:

4

a.     Energia dominated and controlled Defendants and other Energia affiliates' activities;

b.     Defendants and/or Energia were undercapitalized;

c.     Defendants failed to observe corporate formalities;

d.     Defendants failed to pay dividends;

e.     Defendants and/or Energia are insolvent;

f.     Energia and/or its other affiliates siphoned funds from Defendants;

g.     Defendants failed to maintain board minutes or other corporate records and/or failed to hold board meetings; and

h.     Energia used Defendants as a conduit for a single venture or as a mere façade for its own operations.

2.     There would be an overall element of injustice or unfairness if Defendants were treated as separate from Energia, for purposes of the judgment against Energia.

3.     The "injustice" or "unfairness" element in prong (2) can be satisfied by the same factors supporting prong (1) or other factors.

Sources: *Blair v. Infineon Techs. AG*, 720 F. Supp. 2d 462, 471 (D. Del. 2010); *Greenspan v. LADT, LLC*, 191 Cal. App. 4th 486, 513 (2010) (setting forth alter ego factors under California law); *In re Hydroxycut Mktg. & Sales Practices Litig.*, 810 F. Supp. 2d 1100, 1121 n.10 (S.D. Cal. 2011) ("[B]oth Delaware and California examine similar factors in determining whether an individual or corporation is the alter ego of another corporation.").

### Defendants' Position:

Defendants contend that, under Delaware law, which this Court has held is controlling (*see* Dkt. No. 273, p. 2), Plaintiffs cannot pursue an alter ego claim that seeks "reverse" veil-piercing, *i.e.*, to hold a subsidiary liable for the obligations of its corporate parent. (*See* Dkt. No. 758, Defendants' Memorandum of Contentions of Fact and Law,

at 19:18-20:12, and authorities cited therein.)[1]  Defendants further contend that to obtain any equitable relief, including alter ego, Plaintiffs must demonstrate the absence of an adequate remedy at law.  (*See* Dkt No. 758 at 20:14-28 and authorities cited therein.)

Assuming Plaintiffs can pursue an equitable alter ego claim, Defendants contend they must prove two essential and independent elements:

1. That RSC Energia has exercised exclusive domination and control over Defendants to the point that they no longer have legal or independent significance of their own; and

2. Either a fraud or an overall element of injustice or unfairness would result from respecting Defendants' legal separateness from RSC Energia.

In connection with the first element, non-determinative factors the Court may consider include (1) whether the company was adequately capitalized for the undertaking; (2) whether the company was solvent; (3) whether corporate formalities were observed; (4) whether the dominant shareholder siphoned company funds; and (5) whether, in general, the company simply functioned as a facade for the dominant shareholder.

Sources:  *Outokumpu Eng'g Enters. v. Kvaerner Enviropower*, 685 A.2d 724, 729 & n. 2 (Del. Super. Ct. 1996); *Mobil Oil Corp. v. Linear Films, Inc.*, 718 F. Supp. 260, 267 (D. Del. 1989); *MicroStrategy Inc. v. Acacia Research Corp.*, 2010 Del. Ch. LEXIS 254, *46 (Del. Ch. Dec. 30, 2010); *Harco Nat'l Ins. Co. v. Green Farms, Inc.*, 1989 Del. Ch. LEXIS 114, *12 (Del. Ch. Sept. 19, 1989); *Fletcher v. Atex, Inc.*, 68 F.3d 1451,

---

[1] While Judge Collins, in denying Defendants' summary judgment motion, previously found that Defendants "ha[d] not demonstrated that Plaintiffs' claims against them are tantamount to outside reverse veil piercing" (Dkt. No. 273, pp. 3-4), Defendants contend this finding is not binding law of the case.  Defendants' motion for summary judgment was based on a limited evidentiary record directed at whether Plaintiffs could demonstrate a genuine issue of material fact concerning the requisite element of injustice for Plaintiffs' alter ego claim.  See Dkt. No. 209-210.

1461 (2d Cir. 1995) (Delaware law); *Seymour v. Hull & Moreland Eng'g*, 605 F.2d 1105, 1112-1113 (9th Cir. 1979).

(c)     In brief, the key evidence Plaintiffs rely on to establish their alter ego claims consists of the following:

**Background**

1.     Documents produced by the parties and testimony, including from Ira Schey, Randy Simons, Brett Carman, and others, showing that Energia promised to reimburse a percentage of the amounts that BCSC loaned to Sea Launch, and that Boeing paid in guarantees for loans to Sea Launch, equal to Energia's percentage ownership interest in Sea Launch, and that Energia repeatedly reaffirmed these promises during the life of the Sea Launch venture.

2.     Documents produced by the parties and testimony, including from Ira Schey, Randy Simons, Brett Carman, and perhaps others, showing that, in reliance on Energia's promises, considering loans given by BCSC to Sea Launch and payments made by Boeing in guarantees on Sea Launch's behalf, Plaintiffs spent hundreds of millions of dollars to develop and fund the Sea Launch venture, while Energia did not contribute any funds to the venture.

3.     Pleadings filed by Energia in this action, including Energia's Amended Answer and its Opposition to Plaintiffs' Motion for Summary Judgment, showing that, despite Energia's promises to Plaintiffs, Energia did not actually intend to reimburse Plaintiffs its agreed share of the money they invested in Sea Launch, and instead Energia openly lied to Plaintiffs when it reaffirmed, multiple times, that Energia would pay the money that it owed.

4.     Documents produced by the parties and testimony, including from Alexander Derechin, Ira Schey, and Randy Simons, showing that

Energia profited materially from its participation in the Sea Launch venture while Plaintiffs lost hundreds of millions of dollars.

5. Documents produced by the parties and testimony, including from Ira Schey, Randy Simons, and Dennis Shomko, showing that, before Sea Launch filed for bankruptcy in 2009, it was Energia's desire to gain full control over the supply chain for Sea Launch's rocket hardware.

6. Documents produced by the parties and testimony, including from Ira Schey, Randy Simons, Kjell Karlsen, Dennis Shomko, and perhaps others, showing that, in 2007 to 2008, Energia tried to purchase and gain control over Sea Launch, through a secret "investor," the identity of which Energia did not disclose to the Sea Launch members, and who the Sea Launch members were never personally allowed to meet, but for reasons unclear to the Sea Launch members, the negotiations with the secret investor failed.

7. Documents produced by Katya Peppler and others, and perhaps testimony from Kjell Karlsen, Brett Carman, Ira Schey, Randy Simons, and others, showing that Energia deliberately pushed Sea Launch toward a bankruptcy filing in the face of all other participants' efforts to save it from bankruptcy.

8. Documents produced by the parties and testimony, including from Ira Schey, Randy Simons, and Brett Carman, showing that after Sea Launch filed for bankruptcy, Energia proposed a plan of reorganization pursuant to which it would purchase Sea Launch out of bankruptcy, and take control over Sea Launch's supply chain, on the condition that Plaintiffs released their claims against Energia and the Energia Subsidiaries.

9.     Documents produced by the parties and testimony, including from Ira Schey, Randy Simons, Brett Carman, and perhaps others, showing that Energia refused to vote for any plan other than its own, and because Plaintiffs believed that reorganization was in the best interest of Sea Launch's creditors, Plaintiffs supported Energia's plan, but only on the condition that it expressly preserved any and all of Plaintiffs claims against Energia and its affiliates (including alter ego claims) to recover the amounts owed under the Creation Agreement and the BCSC Loan Guarantee.

10.     Documents produced by the parties and testimony, including from Ira Schey, Randy Simon, Brett Carman, Dennis Shomko, Louis Dudney, and perhaps others, showing that instead of paying the amounts it owed to Plaintiffs, Energia created a complex web of subsidiaries—including the Energia Subsidiaries (Energia Logistics, Ltd. and Energia Overseas, LLC) and their Russian parents Energia Logistics LLC and Energia Overseas Ltd.—to purchase Sea Launch out of bankruptcy, and to control Sea Launch's operations, assets, and supply chain in the United States, while moving the ownership of Sea Launch's assets from the United States (Delaware) to Switzerland.

11.     Documents produced by the parties and testimony, including from Ira Schey, Randy Simon, and Dennis Shomko, that while Plaintiffs paid hundreds of millions of dollars in loans and loan guarantees for the development and funding of Sea Launch, Energia purchased Sea Launch out of bankruptcy for $155 million instead of paying the hundreds of millions of dollars in debt Energia knew that it owed to Plaintiffs.

12.  Documents produced by the parties and testimony, including from Ira Schey, Dennis Shomko, Kjell Karlsen, and others, showing that Energia structured the transactions pursuant to which it purchased Sea Launch out of bankruptcy, so as to hide the fact that the funds came from Energia, and that Energia has consistently refused to disclose to Plaintiffs how the transactions were structured, in violation of the Federal Rules of Civil Procedure and two Orders by Magistrate Judge Wistrich.

13.  Documents produced by the parties and testimony, including from Brett Carman and others, showing that Energia purchased Sea Launch out of bankruptcy through a series of transactions not at arm's-length, by borrowing money from commercial banks at interest rates of 10-15%, and funneling the money through a wholly owned subsidiary (Zao Zem Energia) to the entity used to purchase Sea Launch (Energia Overseas (Russia)), pursuant to loans at interest rates of 4.5%.

14.  Documents produced by Plaintiffs, pleadings filed by Energia, and testimony from witnesses showing that the Russian government has pressed charges against Energia's former President, Vitaly Lopota, for the crime of "abuse of office," and that Mr. Lopota is currently under house arrest, for his role in the transactions to purchase Sea Launch out of bankruptcy, which the Russian government has determined were economically unreasonable and caused harm to Energia.

15.  Documents produced by the parties and testimony, including from Brett Carman and others, showing that the purpose of Energia's complex web of affiliates was to enable Energia to control Sea Launch and its assets in the United States, while attempting to use

10

Sea Launch's Swiss domicile to shield those assets from a judgment on Plaintiffs' claims against Energia.

**Domination and Control**

16. Documents produced by the parties and testimony, including from Brett Carman, Dennis Shomko, and others, showing substantial overlap between Energia's directors, officers, and agents, and the management of Sea Launch, Energia Logistics (Russia), and the Subsidiaries.

17. Documents produced by the Subsidiaries and testimony, including from Brett Carman, Dennis Shomko, and others, showing that— through its directors, officers, and agents—Energia directs the affairs of Sea Launch and Energia Logistics (Russia), and, in turn, Energia, Sea Launch, and Energia Logistics (Russia) direct the affairs of Energia Logistics.

18. Documents produced by the Subsidiaries and testimony, including from Brett Carman and others, showing confusion among employees of Energia and its affiliates as to the difference between Sea Launch, Energia Logistics (Russia), and Energia Logistics, and a belief among such employees that Energia controlled Sea Launch and Energia Logistics.

19. Documents produced by the Subsidiaries and testimony, including from Louis Dudney, showing that Energia Logistics depends for its survival on funds provided by Energia, directly and through Sea Launch, and that no funds are disbursed by Sea Launch or other Energia affiliates to Energia Logistics, absent prior approval from Energia.

20. Documents produced by the Subsidiaries and testimony, including from Louis Dudney, showing that Energia Logistics does not have

11

authority to spend the funds in its possession, but, rather, must obtain prior approval from agents and employees of Energia before spending money.

21. Documents produced by the Subsidiaries and testimony, including from Brett Carman and others, showing that Energia Logistics was not permitted to conduct business with its affiliates on an arm's-length basis, but, rather, was forced to sign contracts with Energia that were not acceptable to Energia Logistics, and was forced to pay invoices to Energia Logistics (Russia) despite the lack of documentation to substantiate the amounts invoiced.

22. Pleadings filed in this action showing that Energia refused to produce documents relating to the Subsidiaries' creation, formation, capitalization, and funding, and Energia's and its various affiliates' financial statements, despite two Court Orders requiring it to do so, among other things, which justifies severe sanctions, as described in Plaintiffs' pending motions for sanctions, and, at a minimum, is circumstantial evidence that the improperly withheld documents would demonstrate that the Subsidiaries were mere shells used by Energia for purposes inconsistent with maintaining corporate separateness.

23. Documents and testimony showing that Energia and the Energia Subsidiaries are themselves confused about which employees work for which company, and in fact that counsel for Energia and the Energia Subsidiaries (who previously represented both Energia and the Energia Subsidiaries simultaneously) claimed to bring the same employee to represent both sets of entities at the mediation of this very case.

**Undercapitalization**

24.   Testimony of Brett Carman and Dennis Shomko showing that, though the Energia Subsidiaries were established in February 2010, they had no capital until January 2011, when they were capitalized with $100 against an annual operating budget of around $45 million.

25.   Documents, including pleadings filed by Energia, showing that, considering the hundreds of millions of dollars that Energia owed to Plaintiffs, Energia was also undercapitalized when the Energia Subsidiaries were created, although Energia's benefactors in the Russian government had promised to ensure that Energia has sufficient funds to pay its obligations to Plaintiffs.

**Failure to Observe Corporate Formalities**

26.   Documents located by Plaintiffs (but withheld from production by the Energia Subsidiaries) and perhaps testimony from Brett Carman and others, showing that the State of Delaware revoked Energia Logistics' corporate existence in March 2013 for failure to pay its annual taxes starting in 2011, but Energia Logistics and its attorneys continued to conduct business and defend this lawsuit, in violation of Delaware law, and continued to represent in pleadings and in arguments before the Court that Energia Logistics was a valid Delaware Corporation separate and apart from Energia.

27.   Documents located by Plaintiffs (but withheld from production by the Energia Subsidiaries) and perhaps testimony from Brett Carman and others, showing that Energia Overseas does not do anything, and that the States of Delaware and California revoked its LLC existence and cancelled its corporate charter in June 2014 and February 2015, respectively, for failure to pay its annual taxes, but Energia Overseas and its attorneys continued to defend this lawsuit, in violation of Delaware and California law, and continued to represent in

13

pleadings and in arguments before the Court that Energia Overseas was a valid Delaware Corporation separate and apart from Energia.

28.   Documents produced by the Subsidiaries and perhaps testimony from Brett Carman and others, showing that Energia Logistics misrepresented its corporate status and ownership in filings submitted to the Department of State for purposes related to its registration to hold ITAR licenses.

29.   Testimony of Dennis Shomko showing that Energia Logistics did not hold any board meetings for at least the first two years of its existence, until after Plaintiffs filed this lawsuit alleging abuse of the corporate form.

30.   Documents produced by the Subsidiaries and testimony, including from Brett Carman and others, showing that Energia Logistics did not prepare audited financial statements for any year, and that its accounting was subsumed in consolidated financial statements prepared by Energia.

31.   Documents produced by the Subsidiaries and testimony, including from Brett Carman and others, showing that Energia Logistics performed services and made salary payments, without reimbursement, for other Energia affiliates, including reorganized Sea Launch and Energia Logistics (Russia).

32.   Documents produced by the Subsidiaries and testimony, including of Brett Carman, showing that Energia Logistics, reorganized Sea Launch, and Energia Logistics (Russia) ignored contracts and formal business processes, in favor of transacting business not on an arm's-length basis.

**Nonpayment of Dividends**

33.   Testimony of Brett Carman and Dennis Shomko that neither of the Subsidiaries has paid any dividends to their shareholders.

**Insolvency**

34.   Documents, including pleadings filed by Energia, in which Energia claims that it lacks sufficient funds to pay the amounts it owes to Plaintiffs, although Energia's benefactors in the Russian government have promised to ensure that Energia has sufficient funds to pay Plaintiffs' claims in full.

35.   Documents produced by the Subsidiaries and testimony, including from Brett Carman and others, showing that Energia Logistics and Sea Launch both lack sufficient cash to continue to operate.

**Façade for Energia's Operations**

36.   Documents produced by the parties and testimony, including from Brett Carman, Kjell Karlsen, Louis Dudney, and others, showing that Energia Logistics is merely a link in the closed circuit of companies through which Energia controls Sea Launch's operations, and directs the flow of funds related to those operations, to itself.

37.   Documents produced by the parties and testimony, including from Brett Carman, Kjell Karlsen, Louis Dudney, and others showing that:  Sea Launch uses the funds it receives to buy services from Energia Logistics; Energia Logistics uses the funds it receives from Sea Launch to pay its agent, Energia Logistics (Russia), to buy hardware; Energia Logistics (Russia) uses the funds it receives from Energia Logistics to buy upper stage rockets from Energia; and Energia purchases upper stage rockets from its wholly-owned company (Zao Zem Energia) from which Energia receives dividends.

38.     Documents produced by the parties and testimony, including from Dennis Shomko, Brett Carman, Ira Schey, and others, showing that the Energia Subsidiaries are represented by the same attorneys that represented Energia and the Energia Subsidiaries jointly during the Sea Launch bankruptcy proceedings.

39.     Testimony of Dennis Shomko, Brett Carman, and others, showing that Energia and Energia Logistics use the same offices at Sea Launch's Home Port and that Energia is involved in the day-to-day operations of Energia Logistics' business.

40.     Documents produced by the parties and testimony, including from Brett Carman and/or Igor Komarov or Vladmir Solntsev, that Energia has investigated and considered moving Sea Launch's and/or Energia Logistics' assets abroad, including to Brazil and/or China, in an effort to avoid Plaintiffs' claims.

41.     Testimony, including from Brett Carman and perhaps others, that Energia Logistics possessed a claim against Sea Launch AG for receivables of $100 million, but agreed—without receiving any consideration in return—to allow Sea Launch AG to assign this debt to its parent shell/holding company, Sea Launch SARL, in an effort to shield this receivable from Plaintiffs' claims against the Energia Defendants.

42.     Documents produced by Plaintiffs and testimony, including from Brett Carman, Ira Schey, and perhaps others, regarding the default by Energia Logistics on their post-bankruptcy agreements with Plaintiffs, their multi-million dollar post-bankruptcy debt to Plaintiffs (which they refuse to pay), and their refusal (based on Energia's instructions) to permit Plaintiffs to retrieve their property located at Home Port.

16

**Affirmative Defenses**:

**(a)**      Defendants plan to pursue the following affirmative defenses at trial:

**Affirmative Defense 1:**  Plaintiffs have unclean hands.

**Affirmative Defense 2:**  Plaintiffs consented to the transactions on which their alter ego claims are based.

**Affirmative Defense 3:**  Plaintiffs' alter ego claims are barred by the doctrines of collateral estoppel and/or res judicata.

**Affirmative Defense 4:**  Plaintiffs' alter ego claims are preempted by 11 U.S.C. § 1144 and the Confirmation Order

**(b)**      The parties disagree as to the elements required to establish each of the affirmative defenses asserted by Defendants.

**Affirmative Defense 1:  Elements of Unclean Hands**

**Defendants' Position:**

Defendants contend that, under Delaware law, unclean hands is a discretionary equitable defense that is not amenable to a particular checklist of elements.  It bars claims for equitable relief, irrespective of their merits, where:

1.      The plaintiff engaged in inequitable conduct;

2.      The plaintiff's inequitable conduct has a direct and immediate relation to the plaintiff's claim, meaning it in some measure affects the equitable relations between the parties in respect of something brought before the Court for adjudication; and

3.      No stronger public policy supports deciding the plaintiff's claim on its merits.

Sources:  *France Telecom S.A. v. Novell, Inc.,* 2002 WL 31355255, at *3 (D. Del. Oct. 17, 2002); *Kousi v. Sugahara*, 1991 WL 248408, at *2-3 (Del. Ch. Nov. 21, 1991); *Nakahara v. NS 1991 Am. Tr.*, 718 A.2d 518, 523 (Del. Ch. 1998).

**Plaintiffs' Position:**

Defendants' recitation of the elements of unclean hands misstates the law in several ways, particularly with respect to the required nexus that must exist between the plaintiff's alleged inequitable conduct and the transaction concerning which the complaint is made.  Plaintiffs contend that the elements of unclean hands, correctly stated under Delaware law, are the following:

1.  The plaintiff engaged in inequitable conduct so offensive as to shock the moral sensibilities of the Court;

2.  The plaintiff's inequitable conduct relates directly and immediately to Energia's creation and use of Energia Logistics, Ltd. and Energia Overseas LLC to purchase and control Sea Launch, while seeking to shield assets from Plaintiffs' claims.

Sources:  *E.g., Portnoy v. Cryo-Cell Int'l,  Inc.,* 940 A.2d 43, 80-81 (Del. Ch. 2008); *Haft v. Dart Group Corp.*, 841 F. Supp. 549, 577 (D. Del. 1993); *Pom Wonderful LLC v. Welch Foods, Inc.*, 737 F. Supp. 2d 1105, 1110-13 (C.D. Cal. 2010); *Cal-Agrex, Inc. v. Tassell*, 408 F. App'x 58, 61 (9th Cir. 2011) ("actions unrelated to the contract [upon which the plaintiff's claim was based] could not serve as a factual predicate for application of the unclean hands defense"); *Republic Molding Corp. v. B.W. Photo Utils.*, 319 F.2d 347, 349 (9th Cir. 1963) ("[M]isconduct in the abstract, unrelated to the claim to which it is asserted as a defense, does not constitute unclean hands."); *see also E. States Petroleum Co. v. Universal Oil Prods. Co.*, 8 A.2d 80, 82 (Del. 1939) ("[C]ourts of equity . . . do not close their doors because of plaintiff's misconduct, whatever its character, that has no relation to anything involved in the suit.").

### Affirmative Defense 2:  Elements of Consent

**Defendants' Position:**

Defendants contend that, in Delaware, the equitable defense of consent is known as acquiescence.  It can be applied to bar equitable relief where the plaintiff:

1.   Has full knowledge of a transaction;

2.   Accepts the benefits of the transaction or acknowledges its legitimacy, by either word or deed; and

3.   Thereafter attacks the same transaction.

Sources:  *Continental Ins. Co. v. Rutledge & Co., Inc.*, 750 A.2d 1219, 1240 (Del. Ch. 2000); *Clements v. Rogers*, 790 A.2d 1222, 1238 n.46 (Del. Ch. 2001); *Iseman v. Liquid Air Corp.*, 1993 Del. Ch. LEXIS 24, *6 (Del. Ch. Feb. 11, 1993).

**Plaintiffs' Position:**

Plaintiffs believe that Defendants are estopped from raising an acquiescence defense because the Court Order on which the defense is purportedly based expressly preserves Plaintiffs' ability to pursue their alter ego claims.  But even assuming that Defendants can raise the defense, Defendants do not accurately state its elements under Delaware law.  Accurately stated, the elements of acquiescence under Delaware law are the following:

1.   Plaintiffs had full knowledge of their rights and all material facts;

2.   Plaintiffs freely did what amounted to recognition of a complained of act, or acted in a manner inconsistent with the subsequent repudiation; and

3.   Plaintiffs' actions led Defendants to believe that Plaintiffs had approved the complained acts or transactions in their entirety.

Sources:  *Klaassen v. Allegro Dev. Corp.*, 106 A.3d 1035, 1047 (Del. 2014)); *Brevan Howard Credit Catalyst Master Fund Limited, et al. v. Spanish Broadcasting Sys., Inc.*, No. 9209–VCG, 2015 WL 2400712, at *4 n.18 (Del. Ch. May, 19, 2015); *Cancan Development, LLC, et. al. v. Sandra Manno et al.*, No. 6429–VCL, 2015 WL 3400789, at *23 (Del. Ch. Mar. 30, 2015).

**Affirmative Defense 3:   Elements of Collateral Estoppel / Res Judicata**

**Defendants' Position:**

19

Defendants contend that collateral estoppel is an equitable doctrine that bars a party from litigating an issue that was previously decided in another proceeding when:

1.    the issue previously decided is identical to the one in the instant case;

2.    a final judgment on the merits was reached on the previous issue;

3.    the party to be collaterally estopped is the same party from the prior adjudication, or is in privity with the prior party; and

4.    the party to be collaterally estopped had a full and fair opportunity to litigate the issue in the prior action.

Sources:  *VIII - Hotel II P Loan Portfolio Holdings, LLC v. Zimmerman*, 2013 Del. Super. LEXIS 446, *9 (Del. Super. Ct. Sept. 19, 2013); *TR Investors, LLC v. Genger*, 2013 WL 603164, at *15 n. 146 (Del. Ch. Feb. 18, 2013).

Defendants contend the doctrine of res judicata bars a party from litigating a claim or issues that were decided in another action when:

1.    the original court had jurisdiction over the subject matter and the parties;

2.    the parties to the original action were the same as, or in privity with, the parties in the instant action;

3.    the original cause of action or issues decided were the same as in the instant action;

4.    the issues in the prior action were decided adversely to the plaintiff in the instant action; and

5.    the decree in the prior action was a final decree.

Sources:  *LaPoint v. AmerisourceBergen Corp.*, 970 A.2d 185, 192 (Del. 2009); *Dover Historical Society, Inc. v. City of Dover Planning Comm'n*, 902 A.2d 1084, 1092 (Del. 2006).

**Plaintiffs' Position:**

Defendants recite what they contend are the elements of collateral estoppel under Delaware law, but "[w]here a federal court has decided the earlier case, federal law controls the collateral estoppel analysis." *McQuillion v. Schwarzenegger*, 369 F.3d 1091, 1096 (9th Cir. 2004). Under federal law, the elements of collateral estoppel are:

    1.   the issue at stake must be identical to the one alleged in the prior litigation;

    2.   the issue must have been actually litigated by the party against whom preclusion is asserted in the prior litigation; and

    3.   the determination of the issue in the prior litigation must have been a critical and necessary part of the judgment in the earlier action.

Under federal law, the elements of *res judicata* — otherwise known as claim preclusion — are the following:

    1.   an identity of claims;

    2.   the previous action must have resulted in a final judgment on the merits; and

    3.   the present action must involve the same parties or persons in privity of interest.

Sources: *McQuillion v. Schwarzenegger*, 369 F.3d 1091, 1096 (9th Cir. 2004); *Town of N. Bonneville v. Callaway*, 10 F.3d 1505, 1508 (9th Cir. 1993); *Schoenleber v. Harrah's Laughlin, Inc.*, 423 F. Supp. 2d 1109, 1111-12 (D. Nev. 2006); *Technology Licensing Corp. v. Thomson, Inc.*, 738 F. Supp. 2d 1096, 1100 (E.D. Cal. 2010).

**Affirmative Defense 3:   Elements of Preemption (11 U.S.C. § 1144)**

**Defendants' Position:**

To the extent that Plaintiffs assert that the formation of Defendants and the release of the Sea Launch debtor companies and their assets was in furtherance of fraud or injustice, Defendants contend that preemption is a legal defense arising under the U.S. Bankruptcy Code. It prohibits a party of interest to a Chapter 11 bankruptcy

21

reorganization proceeding from pursuing any state law claims that would interfere with the rights or duties established by the Confirmation Order approving the debtor's reorganization plan.  Under 11 U.S.C. § 1144, the Confirmation Order only can be set aside if a party (1) requests that the Bankruptcy Court revoke the Confirmation Order within 180 days of its entry; and (2) after notice and a hearing, the Bankruptcy Court determines the Confirmation Order was procured by fraud.

Sources:  11 U.S.C. § 1144; *Dale C. Eckert Corp. v. Orange Tree Assocs., Ltd. (In Orange Tree Assocs., Ltd.)*, 961 F.2d 1445, 1447 (9th Cir. 1992); *MSR Exploration, Ltd. v. Meridian Oil, Inc.*, 74 F.3d 910, 913-916 (9th Cir. 1996); *Jacobson v. AEG Capital Corp.*, 50 F.3d 1493, 1501-1502 (9th Cir. 1995).

**Plaintiffs' Position:**

Plaintiffs contend that preemption under 11 U.S.C. § 1144 has no applicability here, and Defendants' vague effort to invoke broader principles of preemption under the United States Bankruptcy Code is not supported by the cases they cite or any other authority Plaintiffs have been able to locate.  The elements of a defense under 11 U.S.C. § 1144, if it applied, would be:

1.  Plaintiffs would be requesting that the Bankruptcy Court revoke the Confirmation Order entered in the Sea Launch bankruptcy proceeding; and

2.  Plaintiffs would not make this request within 180 days after the Confirmation Order was entered.

Here, Plaintiffs are not asking the Court to set aside the Confirmation Order, so Section 1144 cannot apply by its terms.  Moreover, as Paragraph 38 of the Confirmation Order expressly says, and this Court has already found, the Confirmation Order expressly preserves Plaintiffs' ability to bring their alter ego claims.  *See* Dkt. 74 at 6-7 ("the Confirmation Order has no impact on the claims raised by Plaintiffs against the Energia Subsidiaries").  Thus, it is unclear to Plaintiffs how Defendants can assert that Plaintiffs' claims interfere with the operation of the Confirmation Order, or are

preempted by the Confirmation Order, when the Confirmation Order explicitly preserves Plaintiffs ability to pursue these claims.

Plaintiffs disagree with Defendants' characterization of the standard for the Bankruptcy Code potentially preempting state law claims.  Defendants do not say if they are arguing express or implied preemption, as they merely cite 11 U.S.C. 1114.  But, to establish any sort of preemption, Defendants would have to prove that Plaintiffs' alter ego claims are expressly or implied preempted by the Bankruptcy Code by identifying a specific part of the Bankruptcy Code that actually preempts and overcomes Plaintiffs' alter ego claims, such that (for example) Plaintiffs' alter ego claims would be "self-consciously and entirely [claims] which seek damages for a claim filed and pursued in the bankruptcy court," as in one of the cases Defendants cite.

Source:  11 U.S.C. § 1144 ("On request of a party in interest at any time before 180 days after the date of the entry of the order of confirmation, and after notice and a hearing, the court may revoke such order if and only if such an order was procured by fraud."); *In re Thorpe Insulation Co.*, 677 F.3d 869 (9th Cir. 2012) (generally setting forth the elements of preemption); *MSR Exploration Ltd. v. Meridian Oil Inc.*, 74 F.3d 910, 912 (9th Cir. 1996) (cited by Defendants).

**(c)**     In brief, the key evidence on which Defendants rely for each affirmative defense is:

Defendants incorporate by reference the key facts and evidence set forth in their Memorandum of Contentions of Fact and Law.  (Dkt. No. 758.)  A brief summary of that key evidence, as it applies to each affirmative defense, is as follows:

**(1)     Unclean Hands**

**(a)     Inequitable Conduct**

Defendants will rely on evidence showing that Plaintiffs engaged in various forms of inequitable conduct that contributed to Sea Launch's bankruptcy and the very situation for which Plaintiffs now seek equitable relief, including:

► inducing the minority Sea Launch partners to join and contribute to the venture through representations that Sea Launch would be profitable and could perform launches for the U.S. government;

► acquiring the competing Delta rocket launching program shortly after Sea Launch was formed;

► losing interest in Sea Launch, and considering withdrawing from the venture or allowing it to perish, in light of Boeing's acquisition of Delta;

► misusing Plaintiffs' position of management and control over Sea Launch to unfairly advance the competing Delta program;

► disregarding acknowledged conflicts of interest between Delta and Sea Launch and failing to implement promised firewalls between the two programs;

► placing the head of the Delta program above Sea Launch executives and having employees of Plaintiffs work on the Sea Launch project;

► promoting the Delta program as superior to Sea Launch, despite significant failures in the Delta program;

► jointly marketing both Sea Launch and Delta for the same commercial satellite launches through the same Boeing subsidiary, Boeing Launch Services ("BLS");

► allowing BLS employees working on the Delta program to access confidential Sea Launch bid price information;

► misappropriating and misusing Sea Launch's confidential pricing information to Delta's advantage;

► favoring and promoting Boeing's competing Delta program at Sea Launch's expense;

► hampering Sea Launch's ability to compete for commercial launches, including through anticompetitive behavior and bid-rigging;

► overcharging Sea Launch for goods and services at inflated prices;

► refusing to market Sea Launch for U.S. government contracts or to

24

facilitate such contracts for Sea Launch, despite knowing Sea Launch could not survive without them, and despite Sea Launch's ability to provide significantly lower per-launch costs to the government;

► refusing to pursue or facilitate the available waivers, exemptions, and/or exceptions that would have enabled Sea Launch to perform lucrative U.S. government satellite launches, including for NASA and the Air Force's Evolved Expendable Launch Vehicle ("EELV") program;

► excluding Sea Launch from the U.S. government launch market in furtherance of Plaintiffs' motive, intent, and plan to corner that market for Boeing, as evidenced by Boeing's similar and contemporaneous misconduct towards Lockheed Martin ("Lockheed"), the only other serious competitor for EELV launches besides Sea Launch and Delta;

► forming the separate United Launch Alliance ("ULA") joint venture between Boeing and Lockheed, and agreeing with Lockheed to limit Sea Launch to the commercial launch market and to not allow Sea Launch to compete for U.S. government contracts;

► entirely blocking Sea Launch from U.S. government launches in favor of Boeing's competing Delta and ULA programs, when obtaining even a few such launches for Sea Launch would have enabled the venture to avoid bankruptcy altogether; and

► facilitating the transfer of the federally required licenses to Energia Logistics Ltd. ("Logistics"), including the necessary government approvals, in furtherance of the Sea Launch reorganization effort, even though the license transfer would have violated federal law if, as Plaintiffs now claim, Logistics was not a separate person from RSC Energia, a Russian entity.

**(b)   Relation to Plaintiffs' Alter Ego Claim**

Defendants will rely on evidence showing that Plaintiffs' inequitable conduct, as summarized above, relates to Plaintiffs' alter ego claim because:

► The alter ego claim seeks to recover debts that arose from the Sea Launch bankruptcy;

► Plaintiffs' inequitable conduct caused or contributed to Sea Launch's bankruptcy;

► obtaining relatively few U.S. government launch contracts for Sea Launch would have allowed the venture to avoid bankruptcy;

► Defendants were formed as a result of and in connection with the Sea Launch bankruptcy reorganization; and

► the formation of Defendants was an essential component to the Sea Launch reorganization effort, including forming and structuring Logistics as a U.S. person so it could hold the federally required licenses.

### (c)   Public Policy

Particularly in light of the longstanding reluctance of Delaware courts to engage in "reverse" veil-piercing, Defendants are aware of no public policy that supports deciding Plaintiffs' alter ego claim on its alleged merits.

### (2)   Consent

Defendants will rely on evidence showing that Plaintiffs knew of, approved, facilitated, and accepted the benefits of the same transactions they now contends were "fraudulent" or "unfair," including that Plaintiffs:

► obtained full knowledge of the Sea Launch reorganization Plan and the related transactions, including the creation of Defendants, their relationship to RSC Energia, and the new investment to be provided by a Russian affiliate of RSC Energia;

► accepted the benefits of the reorganization Plan and the related transactions, including the secured Debtor in Possession ("DIP") financing, avoidance of creditor claims, and continued business relationship with the reorganized Sea Launch;

► acknowledged and advanced the transactions' legitimacy to obtain the benefits described above, including by expressly consenting to the Plan and the

Confirmation Order's findings, by facilitating the transition of the federally required license to Logistics, and by not seeking to revoke the Confirmation Order based on allegations that the Plan or DIP financing were part of a fraud or a sham, either before the Bankruptcy Court's entry of the Confirmation Order or within 180 days thereafter, as required by 11 U.S.C. § 1144; and

► now seek to attack, through their equitable alter ego claim, the same transactions they knew about, approved, facilitated and benefitted from.

### (3) Collateral Estoppel / Res Judicata

Defendants will rely on evidence showing that Plaintiffs actively litigated the same issues that were finally determined by the Bankruptcy Court in the Sea Launch reorganization proceedings, and that Plaintiffs therefore cannot dispute those determinations through their alter ego claim, including:

► In the Confirmation Order and in the order approving the DIP financing, the Bankruptcy Court determined that the transactions contemplated in the Sea Launch reorganization Plan were made in "good faith" and at "arm's length," and were not a "fraudulent conveyance";

► The Confirmation Order and the DIP Financing Order represented final determinations or decree on those issues;

► Plaintiffs did not timely seek to revoke the Confirmation Order within 180 days of its entry, as required by 11 U.S.C. § 1144;

► Before entering the Confirmation Order, the Bankruptcy Court comprehensively evaluated the proposed Plan and the request for DIP financing;

► Plaintiffs actively participated in the proceedings in the Bankruptcy Court leading up to the Confirmation Order;

► Plaintiffs actually litigated, and had a full and fair opportunity to litigate, the issues decided in the Confirmation Order ;

► Because Plaintiffs, in their alter ego claim, now contend that the transactions at issue were "unfair" or "fraudulent," the findings and conclusions in the

Confirmation Order were decided adversely to Plaintiffs; and

►      The Bankruptcy Court had jurisdiction over the Sea Launch reorganization proceedings and over Plaintiffs.

**(4)    Preemption**

Defendants will rely on evidence showing that Plaintiffs' alter ego claim is preempted, as an impermissible attempt to reach Sea Launch assets that were discharged in bankruptcy, and/or inequitable attempt to harass the reorganized Sea Launch, including:

►      under the terms of the Confirmation Order, any assets of the reorganized Sea Launch company were discharged and released;

►      Plaintiffs did not timely seek to revoke the Confirmation Order;

►      Sea Launch assets released in the bankruptcy were transferred to Logistics pursuant to the Plan;

►      as Plaintiffs are aware, Defendants lack sufficient assets to satisfy Plaintiffs' judgment against RSC Energia;

►      as Plaintiffs are aware, Logistics plays an essential role in the business operations of the reorganized Sea Launch;

►      Plaintiffs' lawsuit has caused serious harm to Logistics' and the reorganized Sea Launch's business reputation and finances.

**8.    ISSUES REMAINING FOR TRIAL**

In view of the admitted facts and the elements required to establish the claims and affirmative defenses, the following issues remain to be tried:

1.    Whether Plaintiffs can satisfy the elements of their alter ego claim.

a.    Plaintiffs view the ultimate issues relating to this broader issue as:

1.    whether Energia and Defendants have operated as a single economic entity; and

　　　　　　　　　2.　　　whether there would be an overall element of injustice or unfairness if Defendants were treated as separate from Energia, for purposes of the judgment against Energia.

　　　　　b.　　Defendants view the ultimate issues relating to this broader issue as:

　　　　　　　　　1.　　　Whether RSC Energia has exercised exclusive domination and control over Defendants to the point that they no longer have legal or independent significance of their own; and

　　　　　　　　　2.　　　Whether a fraud or an overall element of injustice or unfairness would result from respecting Defendants' legal separateness from RSC Energia.

　　2.　　Whether Defendants have established their affirmative defense that Plaintiffs' alter ego claim is barred by the doctrine of unclean hands.

　　3.　　Whether Defendants have established their affirmative defense that Plaintiffs' alter ego claim is barred by the doctrine of consent/acquiescence.

　　4.　　Whether Defendants have established their affirmative defense that Plaintiffs alter ego claim is barred by the doctrine(s) of collateral estoppel and/or res judicata.

　　5.　　Whether Defendants have established their affirmative defense that Plaintiffs alter ego claim is preempted by the Bankruptcy Code and the Confirmation Order.

　　Additionally, Defendants maintain that there are two legal issues for the Court to decide in connection with Plaintiffs' alter ego claim, namely:

　　6.　　Whether Plaintiffs' alter ego claim is for "reverse" veil-piercing and, if so, whether it is legally viable under Delaware law; and

　　7.　　Whether Plaintiffs can demonstrate the absence of an adequate remedy at law.

The parties note that various motions are pending before the Court (identified in Section 12 below) that, in Plaintiffs' view, may affect the scope of trial.  The parties therefore reserve the right to amend or supplement this section accordingly.

## 9.     RULE 26(A)(3) DISCLOSURES

All disclosures under F. R. Civ. P. 26(a)(3) have been made.

In addition, the parties' Joint Exhibit List has been filed under separate cover, as required by Local Rule 16-6.1.  Dkt. No. 769.  The parties anticipate filing a Revised Joint Exhibit List by no later than **November 6, 2015**.  Unless all parties agree that an exhibit shall be withdrawn, exhibits identified in the parties' Joint Exhibit List will be admitted without objection at trial, except those exhibits listed below:

## 10.     WITNESS LISTS

Witness lists of the parties have been filed with the Court.  Dkt. Nos. 759, 761.  Only the witnesses identified in the lists will be permitted to testify (other than solely for impeachment).  Defendants have amended their witness list to specifically add Robert Peckham.  (Dkt. No. 825.)  The Parties intend on filing a joint witness list by no later than **November 6, 2015**.

Each party intending to present evidence by way of deposition testimony will mark such depositions in accordance with Local Rule 16-2.7.  For this purpose, the following depositions shall be lodged with the Clerk as required by Local Rule 32-1:

**Plaintiff's Designated Deposition Transcripts:**

1.     Brett Carman - November 7, 2014

2.     Brett Carman (Rule 30(b)(6) dep. of the Energia Subsidiaries) - January 30, 2015

3.     Kjell Karlsen - November 6, 2014

4.     Dennis Shomko - November 18, 2014

5.     Alexander Derechin - January 26-27, 2015

6.     Tatiana Fedorova (Rule 30(b)(6) dep. of Energia) - January 21, 2015

7.     Vyacheslav Vasiliev (Rule 30(b)(6) dep. of Energia) - January 19-20, 2015

8.      Dmitry Nikon (Rule 30(b)(6) dep. of Yuzhmash) - January 23, 2015

9.      Denys Vedeneyev (Rule 30(b)(6) dep. of Yuzhnoye) - January 22, 2015

**Defendants' Designated Deposition Transcripts:**

1.      Albaugh, James - December 22, 2014

2.      Cooke, Douglas - May 14, 2015

3.      Enyeart, Patrick - November 12, 2014

4.      McKinney, Richard - May 12, 2015

5.      Shomko, Dennis - November 18, 2014

6.      Sloane, Peter D. - January 16, 2015

7.      Vasiliev, Vyacheslav - January 19-20, 2015

8.      Verbeck, Robert - December 10, 2014

9.      Ira M. Schey - October 30, 2013

Plaintiffs object to the presentation of testimony by deposition of the following witnesses:  Plaintiffs object to Defendants presenting any testimony by deposition for any witness affiliated with Defendants, including, but not limited to Vyacheslav Vasiliev.  In addition, Plaintiffs object to Defendants presenting any testimony by deposition for any witness available to testify live at trial.  Plaintiffs further object to Defendants presenting any testimony by deposition for any witness designated by Plaintiffs to testify only as a rebuttal expert, including, but not limited to, Douglas Cooke and Richard McKinney.  Finally, Plaintiffs object to Defendants presenting any testimony by deposition that is taken out of context and/or which concerns far-flung defense theories irrelevant to Plaintiffs' alter ego claims.  Plaintiffs reserve the right to amend or supplement this section following the disposition of Plaintiffs' pending motions referenced in the section immediately below.

Defendants object to the presentation of testimony by deposition of the following witnesses:  Defendants object to Plaintiffs presenting any testimony by deposition for any witness available to testify live at trial, including but not limited to Brett Carman

and Kjell Karlsen.  Defendants reserve the right to amend or supplement this section based on future developments.

**11.    PENDING OR CONTEMPLATED MOTIONS**

The Parties contemplate the following law and motion matters:

**Plaintiffs' Additional Contemplated Motions**:

Plaintiffs may seek evidentiary and monetary sanctions against Defendants and their counsel on the ground that they withheld from Plaintiffs information and documents concerning the revocation of the Subsidiaries' corporate charters, while pursuing massive amounts of burdensome and irrelevant discovery from Plaintiffs knowing or having reason to know Defendants were legally prohibited from participating in such litigation activities.  Plaintiffs also contemplate bringing a motion to recover attorneys' fees and costs from Energia and the Yuzhnoye defendants. Plaintiffs reserve the right to bring additional motions as may be appropriate depending on the resolution of Plaintiffs' pending motions against the Energia Subsidiaries.

**Defendants' Additional Contemplated Motions**:

Defendants reserve the right to file a motion to recover attorneys' fees and costs from Plaintiffs, including but not limited to on the ground that, if Defendants prevail on the alter ego claim, Plaintiffs will be obligated to pay Defendants' fees and costs by virtue of the same theories on which Plaintiffs are seeking their attorneys' fees and costs from RSC Energia and/or Defendants.  Defendants also reserve the right to seek their attorneys' fees and costs as sanctions under F. R. Civ. P. 11 based on Plaintiffs' frivolous and unwarranted litigation positions.  Defendants reserve the right to bring any other motions as may be appropriate based on further developments.

**12.    NO BIFURCATION**

Bifurcation of the following issues for trial is ordered:  None.

**13.    ORDER TO SUPERSEDE PLEADINGS**

The foregoing admissions having been made by the parties, and the parties having specified the foregoing issues remaining to be litigated, this Final Pretrial

Conference Order shall supersede the pleadings and govern the course of the trial of this cause, unless modified to prevent manifest injustice.

**IT IS SO ORDERED.**

DATED:  November 6, 2015.


_____

Honorable André Birotte Jr.

UNITED STATES DISTRICT COURT JUDGE


Approved as to form and content.

1

Respectfully Submitted,

2  DATED:  October 20, 2015

DENTONS U.S. LLP
Steven A. Velkei
DAVID SIMONTON

3

4

*/s/ Steven A. Velkei*

5

Steven A. Velkei

6

*Attorneys for Defendants*
ENERGIA OVERSEAS LLC and
ENERGIA LOGISTICS LTD.

7

8

9

10  DATED:  October 20, 2015

KIRKLAND & ELLIS LLP
Michael Baumann
Xanath O. McKeever
Sasha K. Danna
Michael B. Slade (*Pro Hac Vice*)

11

12

13

*/s/ Xanath McKeever*

14

Xanath O. McKeever

15

*Attorneys for Plaintiffs*

16

THE BOEING COMPANY and
BOEING COMMERCIAL SPACE
COMPANY

17

18

19

20

21

22

23

24

25

26

27

28