1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE BOEING COMPANY and BOEING COMMERCIAL SPACE COMPANY, <br><br> Plaintiffs, <br><br> v. <br><br> KB YUZHNOYE; PO YUZHNOYE MASHINOSTROITELNY ZAVOD; S.P. KOROLEV ROCKET AND SPACE CORPORATION, ENERGIA D/B/A ROCKET AND SPACE CORPORATION ENERGIA AFTER S.P. KOROLEV; ENERGIA OVERSEAS LLC; and ENERGIA LOGISTICS LTD., <br><br> Defendants. | Case No. CV 13-00730-AB (AJWx) <br><br><br><br> **FINDINGS OF FACT AND CONCLUSIONS OF LAW (Fed. R. Civ. P. 52(a)(1))** <br><br> **REDACTED** |

Following the bench trial of the above-captioned matter that started on November 10, 2015 and ended on November 23, 2015, the Court makes the following Findings of Fact and Conclusions of Law[1]:

**I.      FINDINGS OF FACT**

**A.      The Parties**

1.      The Boeing Company is a leading manufacturer of commercial jetliners and defense, space, and security systems.  *See, e.g.,* Defendants' Exhibit ("DX") 2203-0074.

2.      Boeing Commercial Space Company ("BCSC") is a wholly owned subsidiary of Boeing (collectively, Boeing and BCSC are referred to as "Plaintiffs"). *See, e.g.,* Dkt. No. 868[2], Ira Schey[3] 10/30/2013 Deposition ("Schey 10/30/2013 Depo."), 42:14-15.

3.      S.P. Korolev Rocket and Space Corporation, Energia (referred to as "Energia" or "RSC Energia") is a Russian company.  Vasiliev Vyacheslav[4] 1/19/2015 Deposition ("Vasiliev 1/19/2015 Depo."), 22:6-23.  The Russian Federation is Energia's largest shareholder.  *See* DX2272-0006.

4.      Energia owns Defendants Energia Logistics Ltd. (referred to "ELUS" or "Logistics") and Energia Overseas LLC (referred to as "Energia Overseas" or

---

[1] On December 17, 2015, Defendants Energia Logistics Ltd. and Energia Overseas LLC submitted numerous objections regarding Plaintiffs The Boeing Company's and Boeing Commercial Space Company's  Proposed Findings of Fact and Conclusions of Law based on, *inter alia,* improperly argumentative, vague, and conclusory grounds.  Dkt. No. 890.  The Court has taken these objections into account while generating this Order.  Objections inconsistent with this Order are **OVERRULED** and the remaining objections are **SUSTAINED**.

[2] All deposition transcripts cited in this Order have been lodged in Docket Entry 868.

[3] Ira Schey is a retired a former Boeing employee.  Dkt. No. 870, p. 10.

[4] Vasiliev Vyacheslav is an RSC Energia employee.  Vasiliev 1/19/2015 Depo., 15:18-20 ("Q: What is your current title at RSC Energia? A: I'm head of international contract and agreement directorate.").

1 "Overseas") (together, the "Energia Subsidiaries" or the "Subsidiaries").  *See* Dkt.

2 No. 836 ("Final Pretrial Conference Order"), Admitted Fact No. 9, p. 3.

3      5.    ELUS is a Delaware corporation that was formed in February 2010 in

4 connection with the reorganization of Sea Launch Company LLC.  DX2430-1; Trial

5 Transcript ("Tr.") 664:8-16 (Brett Carman[5] ("Carman")).

6      6.    Energia Overseas LLC is a non-operating Delaware limited liability

7 company that was formed in January 2010, also in connection with the

8 reorganization of Sea Launch Company LLC.  Plaintiffs' Exhibit ("PX") 1244

9 (Overseas's State of Delaware Renewal and Revival of Charter Application), pp. 1-

10 2.

11      7.    There are also three other noteworthy Energia subsidiaries:  Energia

12 Logistics LLC RU ("ELRF"), a Russian company which owns Logistics; LLC

13 Energia Overseas Russia ("EORu"), a Russian Federation Limited Liability

14 Company which serves as the parent company of Energia Overseas; Razvitiye, a

15 Russian company, that is the 99.95% owner of EORu.  Dennis Shomko[6] 11/18/2014

16 Deposition ("Shomko 11/18/2014 Depo.") 57:9-20; DX2681-207 ("Proposed

17 Ownership Structure of Sea Launch").

18      8.    RSC Energia ultimately owns Razvitiye which explains its overall

19 ownership of the Energia Subsidiaries.  *See* Proposed Ownership Structure of Sea

20 Launch.

21

22 *///*

23 *///*

24

---

25 [5] Mr. Carman is the acting Chief Executive Officer of Logistics and it's Chief Financial Officer.
Dkt. No. 870, p. 20.  Prior to and during the reorganization of Sea Launch, he was Sea Launch's
26 controller and Chief Financial Officer.  *Id*.

27 [6] Mr. Shomko was heavily involved in the formation of the Energia Subsidiaries during Sea
28 Launch's post-bankruptcy restructure.  Dkt. No. 870, p. 16.

B.     **Procedural History**

9.     Because both Parties are familiar with this case's procedural posture, there is no need to extensively detail this action's procedural history.   But there are several relevant procedural events to note.

10.     The trial's principal issue focuses on enforcing the contractual terms of the Creation Agreement—a 1995 agreement that created Sea Launch.  Dkt. No. 1, ¶ 4(a).

11.     Plaintiffs filed this suit on February 1, 2013.  Dkt. No. 1.  Plaintiffs alleged that Energia and KB Yuzhnoye and PO Yuzhnoye Mashinostroitelny Zavod (together, "Yuzhnoye") who were also owners of the Sea Launch[7] venture breached: (a) the Creation Agreement; and (b) two separate Partner Loan Guaranties.  *See id.* at ¶¶ 4, 68-86, 91-102.

12.     As a result of these breaches, Plaintiffs alleged that Energia and Yuzhnoye owed Plaintiffs over $350 million.  *Id.* at ¶ 5.  Plaintiffs also alleged that the Energia Subsidiaries were alter ego corporations of Energia.  *Id.* at ¶¶ 12, 49-55, 103-105.

13.     Each defendant filed a motion to dismiss.  The Energia Subsidiaries made two substantive arguments in their motion.  *See* Dkt. Nos. 24-25.  *First*, they argued that they were created as a result of Sea Launch's bankruptcy proceedings, and Plaintiffs were precluded from bringing alter ego claims against them.  Dkt. No. 24, pp. 9-10.  *Second*, they argued that Plaintiffs had not pleaded (and could not plead) an alter ego claim against them because doing so was a form of "reverse veil

---

[7] Plaintiffs owned a 40% interest in Sea Launch, RSC Energia owned a 25% interest, Yuzhnoye owned a 15% interest, and the fourth partner in the Sea Launch venture, Kvaerner Moss Technology AS ("Kvaerner") owned a 20% interest in Sea Launch.  *See* Dkt. No. 750, p. 6.  These parties herein are defined as the Sea Launch partners.

piercing" which they contended was prohibited under both Delaware and California law. *Id.* at pp. 14-15.

14.     This Court denied Defendants' motions to dismiss.  Dkt. No. 74. With respect to the Subsidiaries' bankruptcy-related defenses, the Court held that "the fact that the Energia Subsidiaries were created as a result of Sea Launch's bankruptcy does not preclude Plaintiffs from bringing their claims against them" and confirmed that "the Confirmation Order [in Sea Launch's bankruptcy] has no impact on the claims raised by Plaintiffs against the Energia Subsidiaries." *Id.* at pp. 6-7.  The Court stated that "nothing in the Confirmation Order collaterally estops Plaintiffs' claims because the same issues were not previously litigated in the Bankruptcy Court." *Id.* at p. 7.  Lastly, the Court confirmed that Plaintiffs had "sufficiently alleged alter ego liability against the Energia Subsidiaries." *Id.*

15.     The Subsidiaries also filed a motion for summary judgment.  Dkt. No. 209.  The Subsidiaries made two primary arguments in this motion.  *First*, the Subsidiaries claimed that Plaintiffs could not show a "fraud" or "injustice" because Plaintiffs had benefitted from Sea Launch's reorganization.  Dkt. No. 209, p. 16. *Second*, the Subsidiaries again claimed that Plaintiffs' claims were "reverse veil piercing" claims that were not permitted under Delaware and California law.  Dkt. No. 209 at 22.

16.     This Court denied the Subsidiaries' summary judgment motion.  The Court held that the testimony of Plaintiffs' Rule 30(b)(6) witness did not decide the issue of "injustice," *see* Dkt. No. 273, p. 3, noting the lack of discovery from the Energia Subsidiaries and Energia at that point in the case.  The Court also held that "**Plaintiffs' Alter Ego Theory is Not Tantamount to Reverse Veil Piercing**." Dkt. No. 273, p. 3 (emphasis in original).  Rather, the Court noted that Plaintiffs' claim against the Energia Subsidiaries "appears to be a conventional application of the alter ego doctrine." *Id.* at p. 4.

1      17.     After discovery, Plaintiffs moved for summary judgment against

2  Energia and Yuzhnoye under their breach of contract claims.  Dkt. No. 552.  In their

3  Oppositions, Energia and Yuzhnoye argued that, *inter alia*, their obligation to repay

4  the Sea Launch loan debt and the BCSC loan guaranty was relieved based on

5  Plaintiffs' oral modifications.[8]  *E.g.,* Dkt. No. 574 ("Energia MSJ Opp."), pp. 10-13;

6  Dkt. No. 648 ("Yuzhnoye MSJ Opp."), pp. 10-12; Dkt. No. 143, Energia Am.

7  Answer, Affirmative Defenses, and Counterclaims, ¶ 179.

8      18.     The Court rejected Energia's and Yuzhnoye's arguments and granted

9  Plaintiffs' motion for summary judgment on their claims against Energia and

10  Yuzhnoye.  Dkt. No. 750.  The Court found that BCSC had lent Sea Launch more

11  than $183 million and that Energia and Yuzhnoye had guaranteed 25% and 15%,

12  respectively, of all amounts outstanding under that loan.  *Id.* at pp. 8-9.  The Court

13  also found that "Boeing guaranteed around $450 million in third party loans to Sea

14  Launch," subject to provisions in the Creation Agreement calling for Energia to

15  reimburse Boeing for 25%, and Yuzhnoye 15%, of all sums Boeing paid.  *Id.* at pp.

16  6, 11, 13.

17      19.     In the Summary Judgment Order, the Court also addressed the

18  Defendants' contention that the Confirmation Order (that was finalized in Sea

19  Launch's bankruptcy) barred Plaintiffs' claims.  *Id.* at pp. 47-48.  Reaffirming the

20  Court's prior decision denying the motions to dismiss, the Court again held that Sea

21  Launch's bankruptcy did not have an impact on Plaintiffs' claims, given that

22  "Section 38 of the Confirmation Order, the bankruptcy order formulated during Sea

23  

_____

24  [8] Energia took that position despite a letter in which Energia's Russian Government affiliate, the
Russian Space Agency, Rosaviacosmos, ensured that Energia would have the funds to pay the

25  obligations under the Creation Agreement.  *See* DX2035-0002 (2003 Boeing letter to Energia
requesting for information that Energia had the financial capability to pay the obligations under

26  the Creation Agreement); *cf.* DX2037-0003-04 (███████████████████████████████████████

27  ████████████████████████████████████████████████████████████████████████████████████

28  ████████████).

Launch's reorganization, specifically preserves claims of Boeing and BCSC 'against entities other than the Debtors' with 'Debtors referring to the six legal entities that constituted the original Sea Launch enterprise.'" *Id.* at p. 47 (citing Dkt. No. 74, pp. 6-7).

20.     Plaintiffs also moved for summary judgment on the Subsidiaries' nearly 50 affirmative defenses.  Dkt. No. 559.  Prior to the Court's summary judgment decision, the Subsidiaries' decided not to use forty-four affirmative defenses, and pursued only four defenses at the alter-ego bench trial.[9]  Dkt. No. 763. With respect to the four remaining defenses, the Court determined that "the more practical approach is to resolve the disputes at trial."  Dkt. No. 831, p. 4.

21.     Beginning on November 10, 2015, the Court held a bench trial on whether the Energia Subsidiaries are alter ego corporations of Energia and, if so, whether the Subsidiaries can avoid the consequences of such a finding through one of their four remaining affirmative defenses.[10]  The Court limited each side to ten hours to present evidence.  *See* Final Pretrial Conference Order, p. 2.

22.     Following trial, the Court ordered the Plaintiffs and the Energia Subsidiaries to provide proposed findings of fact and conclusions of law within fourteen days following closing arguments to which the Parties timely complied. *See* Dkt. Nos. 869, 886, 889.

---

[9] The Energia Subsidiaries originally pleaded forty-six affirmative defenses: fourteen of their own and thirty-one affirmative defenses "incorporated by reference" from Energia's Amended Answer. Dkt. No. 144.  After the Court granted summary judgment to Plaintiffs' breach claims against Energia, *see* Dkt. No. 750, the Court ordered the Energia Subsidiaries to show cause as to why their contract-related defenses should not be stricken under Federal Rule of Civil Procedure ("Rule") 12(f).  *See* Dkt. No. 751.  In response, the Energia Subsidiaries withdrew all affirmative defenses except for the "unclean hands," "consent," "res judicata/collateral estoppel," and "preemption" defenses.  Dkt. No. 763.  Pursuant to Rule 12(f), the Court struck the remaining defenses (that the Subsidiaries withdrew).  *See* Dkt. No. 831, p. 2.

[10] The Court previously ruled that the most efficient way to resolve Plaintiffs' alter ego claims was through a bench trial.  *See* Dkt. No. 273, p. 3.

23.     For the reasons described in the findings of fact and conclusions of law below, the Court holds that the Energia Subsidiaries are the alter ego corporations of Energia and that the remaining affirmative defenses do not prevail.

## II.     FINDINGS OF FACT REGARDING ALTER EGO LIABILITY

24.     This case is about whether the Energia Subsidiaries are the alter ego corporations of Energia.

25.     On May 3, 1995, BCSC, Energia, Yuzhnoye and Kvaerner, entered into the Creation Agreement which set forth the parameters of the Sea Launch venture. *See* Final Pretrial Conference Order, Admitted Fact No. 1, p. 3.

26.     Sea Launch is a complex launching system that cost over $1 billion to construct. *See, e.g.,* PX130-0007 (May 1998 Sea Launch Business Plan that included "1998 Financial Projections" stating "Total estimated venture Development Phase cost is $1.2bn [billion]."); *cf.* PX132 (May 27, 1998 Resolution approving business plan including financial projections). Sea Launch was in the business of launching satellites into space from a sea-based platform using the Zenit rocket hardware and technology (which Yuzhnoye manufactured) and using the third "Block DM" stage rocket (which Energia manufactured). Tr. 73:18-20 (Randy Simons[11] ("Simons") ("Q: Can you describe Sea Launch's supply chain[?] A: [B]ascially, the [Sea Launch] partners were the supply chain for the most part . . . Yuzhnoye produced the Zenit. . . ."); Tr. 78:3-5 (Simons) ("Q: And the Block DM . . . who was responsible for that? A: That was [] Energia."); Shomko 11/18/2014 Depo., 17:12-17 ("Sea Launch is a company which uses self-propelled oceangoing platform and converted oil rig to launch commercial satellites."); Dkt. No. 108, ¶ 2.

27.     The Boeing Company held the federally required licenses for Sea Launch's technology, including under the U.S. International Trade in Arms Regulations ("ITAR"). Tr. 629:10-14 (Carman) ("A: Boeing held all the [ITAR]

---

[11] Mr. Simons is a retired a former Boeing employee. Dkt. No. 870, p. 1.

1  licenses when we were Sea Launch Company LLC and these licenses were being

2  transferred to the new U.S. entity Energia Logistics U.S.").

3       28.    Over the course of the Sea Launch venture, Boeing guaranteed loans to

4  Sea Launch totaling over $490 million. *E.g.,* PX0002 (Jan. 2004 Resolution

5  referring to a $270 million loan which Boeing guaranteed); PX0003 (Aug. 2004

6  Resolution referring to a loan Boeing guaranteed); PX0004 (Feb. 2005 Resolution)

7  (referring to a $200 million loan that Boeing guaranteed); PX0005 (June 2, 2004

8  Letter from Kjell Karlsen[12] to Sea Launch partners listing Boeing's $547 million

9  loan and performance guarantees given to Sea Launch).

10       29.    In 2004 and 2005, Energia and Yuzhnoye reaffirmed their obligations

11  under Article 9.4.2 of the Creation Agreement[13] several times.  Three reaffirmations

12  were in the form of Sea Launch board resolutions signed in connection with

13  transactions in which Boeing agreed to guarantee loans to Sea Launch on the

14  condition that Energia and Yuzhnoye reaffirm Article 9.4.2 of the Creation

15  Agreement.  *See* PX0002 (Jan. 2004 Resolution); PX0003 (Aug. 2004 Resolution);

16  PX0004 (Feb. 2005 Resolution).  A fourth reaffirmation was signed as a condition

17  of Boeing's agreement to guarantee Sea Launch's obligations to a launch customer.

18  PX0005 (June 2, 2004 Letter).

19       30.    BCSC also lent Sea Launch more than $184 million in loan guaranty

20  agreements.  Before disbursing this loan, Energia and Yuzhnoye agreed to pay their

21  pro rata share (of any amount Sea Launch did not repay) to BCSC.  *See* PX0028

22  (Jan. 27-28, 2009 Presentation), p. 87 (showing $184 million loan balance as of Dec.

23  31, 2008 and portion of guaranteed liability applicable to each partner).

---

24
25  [12] "Mr. Karlsen is a former member of the Board of Directors of Logistics, and the former
President and member of the Board of Directors of Sea Launch S.A."  Dkt. No. 838, pp. 5-6.

26
27  [13] Article 9.4.2 of the Creation Agreement provided that if any partner or its affiliate guaranteed a
loan to Sea Launch, and the guarantor had to pay on the guarantee, each owner would reimburse
the guarantor for a percentage of the payment equal to its ownership percentage in the venture.
28  *See, e.g.,* PX0003-0002; PX0004-0002.

31.     On June 22, 2009, Sea Launch filed for bankruptcy.  *See* Final Pretrial
Conference Order, Admitted Fact No. 2, p. 3.  The bankruptcy was an event of
default under Sea Launch's third-party loans.  As such, Boeing was required to pay
$449,082,462.84 to Sea Launch's third-party lenders.

32.     Boeing invoiced Energia and Yuzhnoye for their portions of the debt
due under Article 9.4.2, but Energia and Yuzhnoye did not reimburse Boeing.  *See*
Dkt. No. 859 ("Notice Of Lodging Written Discovery Extracts To Be Used During
Trial"), Energia's response to Plaintiffs' Requests for Admissions ("RFA") Nos. 54,
55.

33.     Sea Launch never repaid the BCSC loan.  Upon Sea Launch's
bankruptcy filing, BCSC invoiced Energia and Yuzhnoye for the amounts due under
their Partner Loan Guaranties, but Energia and Yuzhnoye did not reimburse BCSC.
*See* Notice Of Lodging Written Discovery Extracts To Be Used During Trial,
Energia's response to Plaintiffs' RFA Nos. 62, 63.

34.     As a result of failing to pay the amounts due under Article 9.4.2 and the
BCSC loan guaranty agreements, Energia (and Yuzhnoye) owe Plaintiffs a
judgment debt.  *See* Dkt. Nos. 750, 960.

**A.     <u>Sea Launch's Initial Restructure Negotiations</u>**

35.     In 2008, Energia President Vitaly Lopota told the Sea Launch partners
that an investor, an unknown Russian national, was interested in buying Sea Launch.
PX0028-0004 (Jan. 27-28, 2009 Presentation summarizing the investor negotiations,
specifically noting ███████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████).
This investor never met the Sea Launch partners or any individual that attended the
bankruptcy meetings.  Tr. 79:11-22 (Simons) ("Q: Who brought this potential new
investor to the table? A: Mr. Lopota. Q: Did you ever meet the investor? A: I did

1  not, no.").  Instead, the Sea Launch partners negotiated with the investor's

2  representatives, Vyacheslav Sheyanov[14] and Dennis Shomko, until Energia

3  eventually told the Sea Launch partners that the investor subsequently withdrew

4  from the negotiations.  Tr. 81:24-82:8 (Simons) ("Q: How did you find out that the

5  alleged investor went away? A: Ultimately, from Mr. Lopota. We negotiated the

6  final agreement, gave our final terms to the potential investor, sent him off, and

7  basically it went quiet. We were not able to reach Mr. Sheyanov, Mr. Shomko to

8  find out what the status was.  And then two or three months later, Mr. Lopota

9  informed the board that the investor was no longer interested.").

10       36.     Mr. Sheyanov and Mr. Shomko also served as directors and officers of

11  ELUS and Energia Overseas.[15]  PX0074-0002 (appointing Sheyanov as the ELUS

12  President and Shomko as the ELUS Secretary); DX2602-0001 (appointing

13  Sheyanov as the Energia Overseas President and Shomko as the Energia Overseas

14  Secretary); Tr. 331:24-332:1 (Carman) (noting that Shomko was on ELUS's Board

15  of Directors); Tr. 337:17-24 (Carman) (noting that Sheyanov was on ELUS's and

16  Energia Overseas's Board of Directors); Tr. 415:13-16 (Carman) ("I know

17  [Sheyanov] was on the Board of Directors of ELUS.  I believe there's a resolution

18  adding him as president . . . ."); Tr. 494:1-4 (Christopher Picone[16] ("Picone"))

19

20

---

21  [14] During this period when he represented the purported "investor," Vyacheslav Sheyanov
22  functioned as an advisor to Lopota.  *See* PX0076-0003 (█████████████████████████
23  ████████); Tr. 337:17-24 (Carman) ("I understood [Mr. Sheyanov] to be a consultant to the
    president of RSC Energia."); *cf.* Shomko 11/18/2014 Depo., 74:11-22 ("Q: Did Mr. Sheyanov
24  serve as an adviser to Mr. Lopota from a business perspective? . . . A: That would be speculation
    on my side, but I would say yes.").
25
26  [15] Mr. Sheyanov also held an EORu officer position.  Shomko 11/18/2014 Depo., 150:7-9 (stating
    that Sheyanov was EORu's Director General).
27
28  [16] Mr. Picone is Sea Launch's former Chief Restructuring Officer which was a bankruptcy court-
    approved position.  Dkt. No. 870, p. 18.

(Sheyanov and Shomko were investment bankers representing Energia and its affiliates in Sea Launch bankruptcy).

### B.  Energia's Proposed Bankruptcy Plan

37.    Sea Launch retained an investment banker, Jefferies & Co. to assist Sea Launch in finding alternative sources of equity and debt financing.  Tr. 450:17-451:2 (Picone) ("Jefferies was the financial advisor for the debtor [Sea Launch] in the Chapter 11."); *see also* DX2008 ("April 2010 Jefferies Presentation").

38.    Jefferies & Co. received and evaluated proposals from three investors who were interested in buying Sea Launch out of bankruptcy: Energia Overseas LLC, Space Launch Services, and PlanetSpace.  *See* April 2010 Jefferies Presentation, at 0008-12.

39.    To successfully reorganize, Sea Launch had to resolve its supply chain problems.  *See* April 2010 Jefferies Presentation, p. 4 ("While management has been successful in obtaining customer support, such support is explicitly (and in most cases contractually) conditioned on customers' confidence in the supply chain"); *see also* Tr. 73:25-74:17 (Simons) ("Q: Did Sea Launch have supply chain issues? A: Yes. When I came on board, one of the first things I got involved with was discussions among the partners about committing to prices for the hardware, committing to delivery dates for the hardware because there had been continued price increases, continued delivery days that were impacting customer launches.").

40.    Energia did not support Space Launch Services or PlanetSpace in addressing Sea Launch's supply chain problems because according to the April 2010 Jefferies Presentation, Energia was better suited to be the prime integrator of Sea Launch's supply chain.[17]  April 2010 Jefferies Presentation (PlanetSpace and

---

[17] In 2009, there were discussions to have Energia take over Sea Launch's supply chain.  *Cf.* Shomko 11/18/2014 Depo., 130:1-9 ("Q: During the two years that you were involved with Sea Launch, prior to the restructuring of Sea Launch, did [RSC] Energia ever express any interest in taking over the management of the supply chain to fix these issues we have discussed? A: There

SLS have "not obtained support from proposed prime contractor"); Tr. 95:12-23 (Simons) ("Q: One of the solutions to the supply chain issue was to make RSC Energia the prime integrators. Isn't that true, sir? A:"That was a potential solution that was discussed at the time."); Tr. 96:16-20 (Simons) (noting that Energia did assume the role as the prime integrator of Sea Launch's rockets).

41.     As a result, Jefferies & Co. determined that the only viable reorganization plan for Sea Launch was to have Energia buy Sea Launch out of bankruptcy.  DX2008-0013 (April 2010 Jefferies Presentation) (PlanetSpace "not a viable option primarily due to inability to resolve supply chain issues"); Tr. 97:22-98:1 (Simons); Tr. 494:22-495:2 (Picone) ("Q: You agree that nobody would have wanted to buy Sea Launch without Energia's approval; right? A: Correct. Q: And the reason is that Energia was a very important part of the supply chain; true? A: Correct.").

42.     While Plaintiffs believed that Energia heading the supply chain would help Sea Launch, Plaintiffs were not willing to release Energia from its obligations. *See* PX1232.[18]

43.     Plaintiffs believed that reorganization was in the best interest of Sea Launch's creditors because as a Sea Launch creditor, Plaintiffs had a fiduciary duty to act in the creditors' best interest, *i.e.* its own interest.  Schey 10/30/2013 Depo., 86:9-22.

---

were discussions to appoint [RSC] Energia as the brand contractor.").

[18] This exhibit is a December 16, 2009 letter (regarding Sea Launch's restructure proposal) from Mr. Simons to Mr. Lopota stating, *inter alia*, "███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████."

44.     Plaintiffs eventually voted to permit the plan to be sent to creditors for voting, provided that it did not release or discharge any of Plaintiffs' claims against Energia or any of its affiliates.  PX981 (the "April 2010 Resolution") (Section 4.5.9 states "[t]he Bankruptcy Court shall authorize and direct the release of all claims (excluding all Boeing arbitration claims) . . . ."); Tr. 89:10-14, 90:1-91:23 (Simons) (testifying that Boeing did not release any claims against Energia and its affiliates).

45.     Thus, the releases in Sea Launch's reorganization made exceptions that allowed Boeing and BCSC to pursue their claims against Energia and its affiliates. *See* April 2010 Resolution (Section 4.5.9); PX522-69 (Exception to Releases hereinafter "Section 38"); DX2019-0044 (Section 10.5 (of the Sea Launch's Reorganization Plan) entitled "Exception to Releases"); DX2023-0005 (Section C (of the Global Settlement Agreement) entitled "Reservation of Rights").

46.     Ultimately, Energia would be allowed to buy Sea Launch out of bankruptcy, and Plaintiffs preserved their right to sue Energia and all affiliates.  *See* April 2010 Resolution (Section 4.5.9); PX522-69 (Section 38) (noting claims against "entities other than the Debtors" will not be released or discharged); DX2019-0044 (Exception to Releases) (same); DX2023-0005 (Reservation of Rights) (stating "Boeing, BCSC, and Aker do not waive and expressly preserve their rights to pursue the other Sea Launch Partners and their affiliates"); *accord* Tr. 89:10-14, 90:1-91:23 (Simons) (clarifying that Boeing was not willing to release its claims); Shomko 11/18/2014 Depo., 120:10-121:3 ("Q: So were you aware at the time that the reorganization plan was confirmed that Boeing had not released its claims against Energia or any of its subsidiaries? A: Of course I was.").

### C.     Sea Launch's Bankruptcy Plan

47.     The Bankruptcy Court[19] appointed a Chief Restructuring Officer, Christopher Picone, to work with the parties as they negotiated Sea Launch's

---

[19] Delaware Bankruptcy Court presided over the bankruptcy proceedings.  *See* Plan.

1   bankruptcy reorganization.  DX2691 (profile stating that "Mr. Picone was the Chief

2   Restructuring Officer . . . in the Sea Launch Company Chapter 11 proceeding"); Tr.

3   436:18-438:6 (Picone).

4        48.    Mr. Picone's responsibilities included ensuring there was

5   communication between all the parties and all the constituencies and ensuring that

6   the process was transparent and moved in accordance with the Bankruptcy Court's

7   direction.  Tr. 436:18-438:6 (Picone) ("Q: Now, what does a Chief Restructuring

8   Officer do? A: Basically helps guide the company through the reorganization

9   process.").

10        49.    In an Order dated July 30, 2010, the Bankruptcy Court approved the

11   Second Amended Plan of Reorganization for Sea Launch (referred to as the "Plan"

12   or "Confirmation Order").  *See* PX522 (the "Plan" or "Confirmation Order").

13        50.    The Confirmation Order included Findings of Fact and Conclusions of

14   Law that held that the transactions underlying the Plan were in good faith and were

15   the "product of extensive arm's length negotiations."  Confirmation Order, Page 38.

16        51.    Primarily, Energia was to purchase Sea Launch out of bankruptcy for

17   $155 million and provide a $200 million dollar "Revolving Credit" (which was

18   entitled "New Investment" in the Plan).  *See* Plan, p. 13 (The Debtors' Second

19   Amended Plan of Reorganization, *i.e.* the Plan); *cf.* Shomko 11/18/2014 Depo.,

20   101:8-15 ("Q: How much money did [Energia] have to pay? A: $155 million, plus a

21   revolver credit facility . . . .").  This acquisition gave Energia control of Sea Launch

22   and its technology.

23        52.    Mr. Picone testified that he "[a]bsolutely" still considered the

24   reorganization to be in the best interests of the Sea Launch stakeholders.  Tr.

25   479:23-25 (Picone).

26

27   ///

28

1        **D.**      **The Energia Subsidiaries' Formation**

2        53.     ELUS and Energia Overseas were formed for purposes of facilitating

3 the Sea Launch reorganization.

4        54.     Under ITAR and other federal licensing requirements applicable to the

5 Sea Launch's vessel and rocket technology, a U.S. company (or person) had to hold

6 and manage the licenses necessary for Sea Launch to do business.  Shomko

7 11/18/2014 Depo., 35:10-15.

8        55.     Although Boeing held the ITAR licenses, a condition to the

9 reorganization was that the operational import and export licenses be transferred

10 from BCSC to a U.S. entity under the control of the foreign equity investor.  Schey

11 10/30/2013 Depo., 210:22-211:14 ("Q: . . . if Logistics didn't get those licenses, the

12 reorganization would not happen; correct? A: That would be correct.") (emphasis

13 omitted).

14        56.     This required the creation of a U.S. company that could hold the ITAR

15 licenses that were necessary for Sea Launch's satellite launching operations which

16 included foreign customer communications and U.S. technical and regulatory

17 compliance responsibilities.  Shomko 11/18/2014 Depo., 31:3-9 ("But it would have

18 been difficult to operate foreign assets from within the U.S. which had ITAR

19 restrictions. So therefore, we obviously had to create a structure which, on the one

20 hand, would allow tax optimization; on the other hand, we would still be able to

21 operate from U.S. waters."); DX2440-13 (defining ELUS's Permits and Licenses

22 within Article 9 of the ELUS/Sea Launch Propriety Information); DX2488-11

23 (describing ELUS's Permits and Licenses within Article 6 of the Launch Services

24 Agreement between ELUS and SARL).

25        57.     Subsequently, Energia set up the post-bankruptcy corporate structure

26 that allowed the Subsidiaries to be formed.  Shomko 11/18/2014 Depo., 27:2-13

27 (agreeing that Shomko designed the corporate structure).

28

1    **1.    ELUS**

2    58.    ELUS was first created to serve the function of holding the ITAR

3    licenses.  Tr. 623:5-7 (Carman) (explaining that ELUS holds the U.S. (or ITAR)

4    licenses to operate and perform launch missions).

5    59.    The transition of the ITAR import licenses from BCSC to Logistics

6    could not have been effected unless Logistics was deemed a U.S. person that is

7    legally separate from any foreign person, such as Energia.  Shomko 11/18/2014

8    Depo., 40:24-41:8 ("[B]ecause we moved the physical assets to -- the ownership to

9    Switzerland, we still had to have an entity which would operate on U.S. soil, due to

10   ITAR regulations. And that's where Energia Logistics came in . . . ."); Schey

11   10/30/2013 Depo., 210:22-211:14 (stating that in order for this reorganization to be

12   occur successfully, the ITAR licenses had to be given to Logistics).

13   60.    As described in the Agreement between Energia, Energia Overseas,

14   ELUS, and others, and the U.S. Department of Justice, U.S. Department of

15   Homeland Security, and the U.S. Department of Defense, the Plan was "to transfer

16   most of the operation functions of Sea Launch to Energia Logistics and certain

17   contract and marketing functions to Sea Launch Corp., a Swiss company."

18   DX2600-0002 (the "Mitigation Agreement").  In other words, ELUS was to conduct

19   Sea Launch AG's ("SLAG") functions in the United States, with only marketing

20   moving to Switzerland. *Id.*; DX2510 (June 21, 2010 Letter addressed to the

21   Committee on Foreign Investment in the United States ("CFIUS")) (same).

22   61.    Currently, ELUS receives money from SLAG to buy hardware which

23   ELUS uses to conduct launches for SLAG customers.  PX0056-0002-3

24   ("Organizational Chart").

25   62.    SLAG pays ELUS's costs for launch services. *See* DX2440-0007, Art.

26   3.1 (ELUS and SLAG reimbursement agreement stating that "Energia Logistics will

27   receive reimbursement of its actual Reimbursable Costs and will receive a fee on

28

certain Reimbursable Costs as further specified herein."); *see also* Tr. 311:21-312:9 (Carman) ("Q: Now, the contract between Sea Launch AG and ELUS covers all of ELUS's costs[,] correct? A: There has been different contracts over the years. Currently, we have a Services Agreement that covers all of ELUS's costs, yes."); Rule 30(b)(6) (ELUS)[20] 01/30/2015 Depo., 35:5-36:2 (same).

63.     In comparing ELUS's and SLAG's agreement with ELUS's financial statements, it appears that ELUS has very little upside or downside in its business (*i.e.*, basically no net profit and no net loss) because SLAG pays for ELUS's launch costs and ELUS's launch costs are equal to its launch revenues.  DX2478-0002 (ELUS 2011 Financial Statements) ("launch revenue" exactly equals "launch costs"); DX2479-0002 (ELUS 2012 Financial Statements) (same); DX2480-0002 (ELUS 2013 Financial Statements) (same).

64.     ELUS, in turn, reimburses ELRF for its costs in procuring launch hardware.  Tr. 315:12-14 (Carman) ("Q: ELUS would pass all the costs of the ELRF costs and markup to Sea Launch AG[?] A: That's correct."), 313:19-314:2 (Carman) (same).

65.     As much as $900 million has passed through ELUS between the bankruptcy reorganization and the present, but almost no money has remained with ELUS.  Tr. 726:16-727:6 (Carman) ("Q: Okay. And so $900 million between those two entities[, ELUS and SLAG]. A: Has flown through the entities, that's correct."), 724:18-725:2 (Carman) (same); *accord* Tr. 126:1-22 (Dudney) ("And you'll see that I had information that was produced in the case for the years 2010 through 2013; and during that time period, there was $599 million of cash that came to . . . ELUS from SLAG"); PX1252-0008 (chart detailing approximately $600 million in ELUS's funding requests to SLAG).

///

---

[20] ELUS's Rule 30(b)(6) witness is Brett Carman.

## 2.   Energia Overseas

66.   Energia Overseas was initially created as a potential alternative entity to own ELUS's shares because of the concerns that an immediately foreign-owned company would have greater difficulty in obtaining the necessary ITAR licenses. Shomko 11/18/2014 Depo., 96:9-17 ("Q: Why did you create Energia Overseas LLC? A: Because at some point, there was an issue with who will end up owning Sea Launch AG. . . . We, I believe, had issues with the company being owned by a Russian company. So that's why we created this, Energia Overseas as an [Special Purpose Vehicle]. But yes, it was for [Committee on Foreign Investment in the United States] purposes."); DX2028-20 (articulating that Energia Overseas would likely be the U.S. registrant).

67.   Initially, Energia Overseas was going to serve as the SLAG owner. DX2028-0015 ("Proposed Ownership Structure" of SLAG). The Plan of Reorganization defined the "New Investor" (that would own the reorganized Sea Launch) as *both* Energia Overseas (Russia) and Energia Overseas US[21], and the Plan also stated that the "New Investor" would own 85% of the "Reorganized Sea Launch," *i.e.* SLAG. DX2019 (Plan of Reorganization), §§ 1.53, 1.77, 1.78, 1.79; Tr. 493:2-16 (Picone) (defining "New Investor" in the Plan).

68.   Yet, once the federal government approved direct foreign ownership of Logistics, there was no need to use that additional corporate entity. Shomko 11/18/2014 Depo., 96:19-23 ("[I]t ended up that the U.S. government approved the ownership as it was presented to them. Q: And you said [Energia Overseas] was a dormant company? A: Correct.").

69.   Energia Overseas had no involvement in the reorganization, never conducted any business operations, and has remained an inactive Delaware

---

[21] Also, the Confirmation Order stated that "[t]he New Investor has made the necessary filings to establish itself as a Delaware Limited Liability Company," confirming for all creditors that Energia Overseas US would be the "New Investor," *i.e.*, the Sea Launch owner. *See* DX0522-0014.

company. Shomko 11/18/2014 Depo., 172:11-17 (describing Energia Overseas as a dormant company); Tr. 469:10-20 (Picone).

70.     Energia Overseas was eventually turned into a dormant company, *i.e.* a shell corporation.     Shomko 11/18/2014 Depo., 98:21-24 ("Q: [D]id you ever attend any board meetings for Energia Overseas LLC? A: No, because the company was dormant."); *cf.* Tr. 290:20-23 (Carman) ("Q:[Y]our understanding is that this -- the defendant, Energia Overseas LLC, has no assets; is that true? A: Yes.").

### 3.   SARL and SLAG

71.     The reorganized Sea Launch Company LLC migrated to Luxembourg and became the entity known as Sea Launch SARL.  DX2488 (the launch services agreement that was initially prepared during the reorganization or soon thereafter between Sea Launch SARL, the Luxembourg company that was formed prior to Sea Launch AG).

72.     Thereafter, SLAG was formed as a Swiss company headquartered in Bern, Switzerland.  Shomko 11/18/2014 Depo., 30:10-12 ("Q: And Sea Launch AG is a company organized under the laws of what country? A:  Switzerland, Bern."); *cf.* Tr. 622:23-623:4 (Carman) ("Q: And what is the business of Sea Launch AG? A: Sea Launch AG is the contracting and marketing arm of the business and they go out and find customers and sign them up for launch missions. Q: And it's located where? A: In Switzerland.  It's now in Geneva, used to be in Bern.").

73.     In December 2010, SLAG absorbed substantially all of Sea Launch's assets not contributed to Logistics, along with most of Sea Launch's post-Chapter 11 liabilities.  Tr. 699:2-15 (Carman) ("They were trying to get organized, they were trying to get the customers in line, they were trying to get the contracts done, and they were transferring all the assets, including the liquid assets, the cash, from Sea Launch SARL to Sea Launch AG.").

**E.      ELUS's ITAR License Ownership**

74.     ELUS holds the ITAR licenses necessary to function as a sea going satellite launch company and retains sole responsibility for compliance with such licenses.  Tr. 518:5-519:16 (Maria Akalovsky-Martinez[22] ("Akalovsky-Martinez")) (explaining the compliance responsibilities); Tr. 624:11-20 (Carman) (elaborating that the ITAR licenses are necessary to operate vessels and that the ITAR licenses have "restrictions that we are required to follow.").

75.     Boeing "support[ed]" Energia's efforts to obtain approval of the reorganization transaction, but that "[t]he principal responsibility for accomplishing this process lies with the potential acquirer and with Sea Launch management, not with Boeing."  DX2026 (Mar. 26, 2010 Letter. from Simons to Lopota); Shomko 11/18/2014 Depo., 226:21-25 ("Q: And did Boeing participate in developing a strategy to resolve ITAR licensing issues? A: I -- to the best of my knowledge, they were pretty much passive observers.").

76.     Boeing made clear to the other Sea Launch partners that it would not be willing to hold the ITAR licenses needed to operate Sea Launch after reorganization because it would not have any visibility into whether Energia or an Energia affiliate complied with ITAR regulations.  Tr. 501:3-10 (Picone) ("Q: And because of that, Boeing would just not have sufficient visibility into what was going on to be able to monitor compliance with the ITAR regulations; right?  A: Correct.  Q: And that's why Boeing needed either to transfer licenses to somebody else or to close them out; right? A: Correct.").

77.     As a Chief Compliance Officer that supervised the compliance of the ITAR licenses, Ms. Akalovsky-Martinez confirmed that her position had little to do

---

[22] Maria Akalovsky-Martinez serves as ELUS's Chief Compliance Officer and Director of Security.  Tr. 506:17-20 (Akalovsky-Martinez) ("I work for Energia Logistics Ltd., the U.S. company, and I serve as the Chief Compliance Officer . . . I'm also serving as the Director of Security.").

with the overall corporate structure, corporate control, corporate financing, corporate contracts, corporate capitalization, or any other corporate procedures affecting ELUS's corporate form.  Tr. 535:6-14 (Akalovsky-Martinez) ("Q: You understand that RSC Energia is the ultimate owner of Energia Logistics US; right? It's the top-level entity in the corporate structure? A: It's on the org[anization] structure but who's the ultimate owner, that's not my area of expertise. I'm responsible for export-import compliance."); 539:3-9 ("Q: So ELUS can do its business and comply with all the export laws and regulations you enforce even though it is, in fact, owned by a Russian company; right? A: As long as there is no technical data that was provided: A, without license; B, without DTSA monitoring; C, without recordkeeping and so forth. But if all the rules are followed, then yes."); 543:16-20 (ultimate ownership of ELUS not relevant to export compliance); 538:5-20 (business issues such as contracts not relevant to export compliance); 541:21-542:8 ("money transfer" and "verification of any financials" are not relevant to export compliance); 542:9-18 (ELRF loans obtained on behalf of ELUS are not relevant to her expertise); 543:21-25 (having only one customer is not relevant to export compliance); 544:1-4 (having only one supplier is not relevant to export compliance); 544:5-12 (undercapitalization and financial dependency on affiliates are not relevant to export compliance); 544:13-19 (power of Russian person in Switzerland to approve or deny ELUS's monthly funding requests is not relevant to export compliance).

78.     During the process of seeking approval for the reorganization transactions, Energia informed the U.S. Government that Energia would have "ultimate control" over Sea Launch following the transactions.  *See* DX2510-0005 (June 21, 2010 Letter) ("ultimate parent"); DX2510-0006 ("RSC Energia, and in turn its shareholders, will have ultimate control over Sea Launch.").  Energia also informed the U.S. Government that the Russian Federation is the "single largest

1  shareholder" of Energia, that the majority of Energia's directors are Russian
2  government officials, and "[t]he Russian Federation thus has 'effective control' over
3  RSC Energia."  DX2510-0006.

4       **F.**   **"Single Economic Entity" Considerations**

5           **1.**   **Ownership**

6       79.    Energia is the ultimate owner of ELUS and Energia Overseas US.  *See*
7  Final Pretrial Conference Order, Admitted Fact No. 9, p. 3.  Energia's ownership of
8  the Energia Subsidiaries is essentially 100%.  *See* Organizational Chart.

9       80.    ELUS's immediate parent is ELRF.  *See* Organizational Chart; *cf.*
10  PX159 (Feb. 22, 2011 Agency Contract between ELRF and RSCE).  Sea Launch's
11  Bankruptcy Reorganization defined ELRF and ELUS as one and the same entity.
12  DX2019, §1.54 ("Energia Logistics means Energia Logistics Limited Russia and
13  Energia Logistics Ltd. (US).") (emphasis in original).

14       81.    Although ELRF has very few employees, it functions as Energia's
15  "agent" for selling rocket hardware to ELUS.  PX0223 (Apr. 8, 2011 R. Werth email
16  stating "ELRF … has only one real employee (Konopelkin).  The balance are
17  consultant(s) and loaned labor from Mr. Sheyanov's company and Energia."); PX75
18  (Feb. 17, 2011 Shomko email stating that ELRF "do[es]n't have offices, or people
19  on the payroll for that matter"); PX357 (Jan. 18, 2011 Shomko email noting that
20  "[t]here are no people working for ELRF today at least legally. There are two
21  persons acting on behalf of ELRF, Kamantsev and Konopelkin, all others are RSCE
22  employees"); Tr. 330:18-331:11 (Carman) ("I believe that ELRF employees were
23  also employees of Energia, RSC Energia"); DX2494-0002 (ELUS-ELRF
24  Agreement), ¶ F ("RSC Energia … instructed Contractor (the Agent) [or ELRF] to
25  enter into this Basic Ordering Agreement on behalf of its own name but on the
26  commission of [RSC Energia].").

27

28

82.     Less than a year after the reorganization, ELRF's "manager" announced via email that he would "withdraw from Sea Launch project" and "transfer all … functions" to an "RSC [Energia] representative."  PX0224 (Sept. 26, 2011 P. Kamantsev email: "Hereby please be advised that from October 10, 2011, the present team of Energia-Logistics LLC is going to withdraw from Sea Launch project and transfer all its functions to RSCE representative D.A. Kakhno and his team.").

### 2.     Corporate Formalities

83.     On March 1, 2013, the Delaware Secretary of State suspended Logistics as an operative corporation, and its Delaware corporate charter was repealed for non-payment of franchise taxes in Delaware.  *See* PX1235 (Delaware Certificate concerning ELUS Corporate Status); Tr. 239:22-240:1 (Carman) (acknowledging that he became aware of ELUS corporate status suspension).

84.     On June 1, 2014, the Delaware Secretary of State also suspended Energia Overseas for failing to pay franchise taxes.  DX1241-142 (Delaware Certificate that recognizing the 2014 Cancelled Limited Liability Companies and naming Energia Overseas LLC).

85.     With regard to ELUS, the unpaid taxes amounted to a small amount of money which is likely because ELUS does not actually conduct business in Delaware. Tr. 1005:1-1005:10 (Cunningham[23]).

86.     On October 20, 2015, the Delaware Secretary of State certified that Logistics "is in good standing and has a legal corporate existence."  Dkt. No. 880, Ex. C.[24]

---

[23] Professor Lawrence Cunningham is the Energia Subsidiaries' corporate governance expert. Dkt. No. 809, Ex. 8, p. 5.

[24] Pursuant to Federal Rule of Evidence 201, the Court takes judicial notice of the Delaware Secretary of State records.  *Big Screen Entertainment Group Inc. v. Davis*,  No. CV 06-3800 AHM (AJWx), 2009 WL 2410729, at *1 (C.D. Cal. 2009) (taking judicial notice of records from the Nevada Secretary of State).

87.     On October 20, 2015, the Delaware Secretary of State certified that Energia Overseas "is in good standing and has a legal existence" after the required balance of $1,793 was paid.  Dkt. No. 880, Ex. D[25]; Tr. 240:2-8 (Carman) ("Q: Did you direct Ms. Ronnau to take the steps to reinstate Energia Overseas LLC's charter? A: Yes.")

88.     To reinstate their corporate status, an officer submitted the corporate status paperwork for the Subsidiaries but ELUS's board of directors did not authorize this officer to do so, despite Delaware requiring that this filing be board authorized.  PX1258-0002 (ELUS's State of Delaware Renewal and Revival of Charter Application which Brett Carman signs as "Authorized Officer"); Tr. 750:5-24 (Carman) ("Q: Who on the board of directors, if anybody, authorized you to [renew ELUS's corporate charter]? A: I didn't get specific authorization to do that from the board of directors."); *cf.* 8 Del. Code Ann. Tit. 8, § 312(d)(6) ("the certificate of renewal or revival is filed by authority of those who were directors or members of the governing body of the corporation . . .").

89.     Energia Overseas also filed papers to reinstate its corporate status. PX1244 (Energia Overseas Application for Reinstatement).

90.     Without preauthorization or instruction, Mr. Carman directed Ms. Ronnau, an ELUS employee, to file reinstatement paperwork for Energia Overseas. Tr. 241:10-22 (Carman) (stating that he did not obtain authorization to have Energia Overseas's charter reinstated); Tr. 243:2-15 (Carman) (same); Tr. 240:6-8 (Carman) (stating that he directed Ms. Ronnau to reinstate Energia Overseas's charter); Tr. 241:6-9 (Carman) (same); *cf.* PX1244-0002 (Ms. Ronnau signs Energia Overseas's Reinstatement Application as "Authorized Officer").

---

[25] Pursuant to Federal Rule of Evidence 201, the Court takes judicial notice of the Delaware Secretary of State records.  *See supra*, n. 20.

91.     Ms. Ronnau's certification to the Delaware Secretary of State was inaccurate because she is not an Energia Overseas' officer as stated on the Restatement Application.  Tr. 238:24-239:4 (Carman) (noting that Ms. Ronnau is not a ELUS officer); Tr. 244:19-23 (Carman) (same); *cf.* PX1244-0002 (Ms. Ronnau signs Energia Overseas's Reinstatement Application as "Authorized Officer").

92.     No evidence was produced to suggest that Mr. Carman obtained authority from anyone to have Energia Overseas's charter reinstated nor was there evidence indicating that the board of directors authorized this individual to reinstate Energia Overseas.

93.     ELUS's legal counsel also represents Energia Overseas in this lawsuit. ELUS is paying all legal fees for counsel representing both Defendants.  Tr. 248:18-23, 249:4-14 (Carman).  The only connection between the two Defendants is their common ownership to Energia.

94.     Moreover, Energia and EORu's counsel of record in the Sea Launch bankruptcy are now counsel for the Energia Subsidiaries in this case.  *See* Final Pretrial Conference Order, Stipulated Fact No. 4, pp. 3-4; Rule 30(b)(6) (Energia) 01/21/2015 Depo., 59:14-19, 21-25; 60:8-12.

95.     No evidence has been produced to demonstrate that Energia Overseas authorized the hiring any counsel to represent it in this lawsuit.

### 3.     Board Meetings

96.     Although ELUS was incorporated in February 2010, it held no board meetings until May 7, 2012, despite its bylaws requiring annual meetings.  *See* DX2433 (May 7, 2012 Board Meeting Minutes); Shomko 11/18/2014 Depo., 47:3-21 ("Q: Were any Energia Logistics board meetings held during the, approximately, two years that you served on the Energia Logistics board? A: No."); *cf.* DX2498 (ELUS Bylaws), at Art. 2, §1, Art. 3, §3.

97.   Since then, board meetings were held on October 31, 2012, February 19, 2013, and December 24, 2014.  DX2434 (October 31, 2014 Board Meeting Minutes); DX2437 (February 19, 2013Board Meeting Minutes); DX2438[26] (redacted December 23, 2014 Board Meeting Minutes).

### 4.   Related Party Contracts

98.   Over a period of seven months (commencing at the Effective Date of the Plan), Plaintiffs entered into several separate post-bankruptcy contracts with Logistics with respect to providing payload fairings for launches and providing payload integration services and other support.  Tr. 669:20-679:23 (Carman); DX2011-2016; DX2495.

99.   Another contract ELUS entered into is with an Energia-controlled entity, ELRF.  ELUS entered into contracts with ELRF whereby ELUS made ELRF its agent for procuring rocket hardware from Russia and Ukraine.  ELRF is the sole supplier of rocket hardware to ELUS. As such, ELRF is responsible for procuring rocket hardware accounting for 75% of ELUS's launch costs.  *See* Tr. 314:12-16; 393:20-22 (Carman).

100.   Under this contract, ELUS made ELRF its "agent" in buying hardware from Energia and paid ELRF the cost of such hardware, plus a 1% fee.  These terms are questionable because ELRF also serves as Energia's agent for selling rocket hardware to ELUS.  ELUS managers' recognized this conflict and believed that this pricing arrangement would incentivize ELRF to purchase hardware at higher prices.  *See* PX75 (Feb. 17, 2011 email chain) (R. Werth: 1% fee is "bad business practice"); PX222 (Oct. 7, 2010 email chain) (R. Werth: "A percent[age] fee as they propose is a disincentive for them to achieve low pricing for us … I have an extraordinarily bad feeling about all of this but am trying to keep an open mind and

---

[26] This 2014 board meeting was to approve a transaction where ELUS would transfer SLAG's debt (that was owed to ELUS) to SARL in exchange for "absolutely nothing."  Rule 30(b)(6) (ELUS) 01/30/2015 Depo., 50:19-52:4.

steer things towards the most professional outcome for all parties."); Tr. 313:16-18, 314:3-6, 316:18-317:24 (Carman); Rule 30(b)(6) (ELUS) 01/30/2015 Depo., 66:7-13.  Simply put, this "contract" allows Energia to determine what it will be paid, without input from SLAG or ELUS.  Tr. 313:16-18, 314:3-6, 315:4-7, 316:18-317:24, 352:5-23 (Carman); Rule 30(b)(6) (ELUS) 01/30/2015 Depo., 66:7-13. Energia's President Vitaly Lopota and ELRF "negotiated" price increases without input from ELUS.  PX1246 (documenting the "extraordinary action" of forcing ELUS to accept terms).  With ELRF's dual roles in the purchasing and selling hardware, it is unclear how ELUS benefitted from this intercompany agency relationship.

101.   ELUS also signed a contract with Energia to purchase upper stage rockets, even though ELUS's managers believed the rockets were in embarrassing condition at the time the contract was signed.  *See* PX85 (Dec. 2, 2010 email chain) (R. Werth: "I have asked Andy to sign the RSC[] [Energia] BOA today, despite the fact that it is in embarrassing condition."); PX86-0002 (Dec. 3, 2010 email confirming the execution of the Block DM Basic Ordering Agreement) (Andy Syrengelas: "As per direction of our management, we have executed this Agreement . . . .").

102.   There is another example of ELUS entering into a very questionable agreement with SLAG.  By late 2014, SLAG had accumulated a large accounts payable balance owed to ELUS, and when SLAG determined that it needed to reduce its debts to comply with Swiss law, ELUS agreed to SLAG's transfer of those payables to its parent company, SARL, for "absolutely nothing."  Tr. 144:12-147:3 (Dudney) (there "was absolutely nothing that ELUS got as a result of that [SARL] transfer and that was consistent with my review of the documents.")[27];

---

[27] As Plaintiffs' forensic accountant expert, Mr. Louis Dudney testified, he had no opinion as to whether any of the intercompany transactions he identified were "improper," except to the extent that the first category of such transactions, involving Logistics' reliance on monthly sustaining payments from SLAG, supported his opinion that Logistics was "undercapitalized."  Tr. 131:18-

1   PX1252-0020-22 PX1252-0019-22 (detailing SLAG's debt transfer agreement with

2   SARL); Rule 30(b)(6) (ELUS) 01/30/2015 Depo., 50:19-51:4 (verifying that SLAG

3   got "absolutely nothing" in return from SARL within the debt transfer agreement).

4        103.   Additionally, although ELUS has entered into contracts with Energia

5   related parties, there is a question as to whether ELUS actually asserts its rights

6   under these contracts.  Specifically, SLAG funds ELUS's monthly operating

7   expenses pursuant to a contract, and SLAG is required to provide funding to ELUS

8   within 14 days of an approved request.  *See* DX2440-0011 (ELUS-SLAG Services

9   Agreement), § 5.5.  However, SLAG has made these payments more than a year

10  late, and ELUS has not attempted to assert its rights under the contract.  *See* Tr.

11  131:22-133:19 (Dudney) (analyzing certain instances where SLAG was late on its

12  payments and ELUS not enforcing the contract terms); PX1252-0011 (detailing

13  ELUS's payment delays); Tr. 388:22-389:21 (Carman) (explaining the difficulties in

14  acquiring the SLAG payments); Tr. 426:18-427:4 (Carman) (noting that SLAG did

15  not have enough money to make payments to ELUS); *cf.* PX0242 (2012 email

16  regarding SLAG's financial troubles).  While these late payments appear to

17  occasionally occur, there is no evidence of ELUS asserting its rights under this

18  contract.

19       104.   Through Mr. Sheyanov, an Energia affiliate, Mr. Shomko has required

20  SLAG and ELUS to make payments to ELRF even when the invoiced amounts did

21  not match the amounts due ELRF under its contracts.  *See* PX0087 (Jan. 26, 2011

22  email from Mr. Shomko to Mr. Carman directing ELUS pay ELRF); PX0088 (Mar.

23  29, 2011 email chain where Mr. Shomko directs Mr. Carman to make payments

24  despite discrepancies in the amounts); Shomko 11/18/2014 Depo., 168:16-169:12

25  ─────────────────────────────────────────────

26  21, 136:22-137:1, 147:4-14, 175:17-176:9, 199:4-7, 199:10-24 (Dudney).  Moreover, Mr. Dudney
    agreed that his review of the company's financial records showed an increased reliance on
27  intercompany transactions and loan activity following Plaintiffs' 2013 lawsuit.  Tr. 176:8-21
    (Dudney).

28

1  ("Because basically when I receive an email from my boss saying, 'pay,' all I can do

2  is I can advise my co-workers to pay. Q: And your boss was Mr. Sheyanov[,] right?

3  A: Correct.").

4        105.    An Energia subsidiary, ELRF, also required SLAG and ELUS to

5  deviate from the payment processes in the contracts between the Energia entities.

6  *See* PX300-0002 (July 8, 2011 email chain) (R. Werth: "███████████████████

7  ██████████████████████████████████████████████████████████████████

8  ██████████████████████████████████████████████████████████████████

9  ██████████████████████████████████████████████████████████████████

10 ██████████████████████████████████████████████████████████████████

11 ████████████████████████████████████████."); Tr.

12 380:7-18 (Carman) (confirming the veracity of the July 8, 2011 email chain); Tr.

13 381:1-5 (Carman) (noting that Mr. Shomko informed him that this is the process in

14 which ELUS will follow).

15       106.    Through Mr. Shomko's advisement, ELUS entered into a contract with

16 Energia containing "problems, errors, and omissions."  PX0387 (Nov. 21, 2010

17 email to Mr. Werth where Mr. Shomko based his instruction on the fact that "[he]

18 do[es]n't believe that once papers are signed, Russians or Ukrainians are 'locked in',

19 as [he is] sure [that Mr. Werth has] had a chance to see over the last few years.").

20       107.    Although there is evidence that ELUS's managers were frustrated with

21 their company's dependency on and control by Energia and its affiliates, and even

22 protested this dependency occasionally, there is no evidence that ELUS ever

23 prevailed in a disagreement with Energia or its affiliates.  Tr. 724:3-17 (Carman);

24 PX350 (May 18, 2012 email chain) (Carman: "As I've been asking unsuccessfully

25 for over a year, SLAG should just give ELUS $10MM a quarter for each launch and

26 stay the hell out of the way. …  That's my beef of the day. Now back to work."  R.

27 Werth: "I'm feeling your pain brother.  Vasiliev calls me about once a week to

28

1  inquire of things.  Nothing I do is ever right in his eyes and everything could always
2  be done better.  So it appears to our managers in Moscow who think they are the
3  masters of the universe, but don't really know how a business is run in the western
4  world.").

5              **5.    Record Keeping**

6       108.   At the end of each year, ELUS performs a reconciliation of its general
7  ledger to determine if there are any inconsistencies with the consolidated Sea
8  Launch Enterprise statements.  Tr. 769:24-770:15 (Carman).

9       109.   ELUS's controller, Elizabeth Ronnau, and her accounting staff
10 annually prepare separate financial statements for ELUS showing its assets and
11 liabilities in each year.  Tr. 626:1-2, 653:17-19, 656:23-25, 659:21-23, 661:9-13
12 (Carman); DX2477-2480.

13      110.   Ms. Ronnau and Logistics' accounting staff also prepare and maintain
14 separate general ledgers and financial receipt records for ELUS showing all
15 payments that are made in and out of the company, all income and expense accruals,
16 and all assets and liabilities and related transactions.  Tr. 637:14-638:18, 644:6-19,
17 646:8-10, 647:7-11, 648:7-10, 649:1-3, 649:16-650:7, 730:25-731:7, 769:24-770:15
18 (Carman); DX2481-2483; DX2589; DX2590.

19      111.   Although ELUS maintains accounting records, its financial statements
20 are not audited.  Tr. 654:8-22, 657:1-18 (Carman); Rule 30(b)(6) (ELUS)
21 01/30/2015 Depo., 54:9-14.

22      112.   Shortly after the present lawsuit was filed, Brett Carman and his
23 accounting staff "clean[ed] up" intercompany transactions between ELUS and the
24 other entities Energia created to own and operate Sea Launch.  PX251 (Mar. 2, 2013
25 email chain) ("Going forward, we are trying very hard to maintain our entities on a
26 stand-alone, third-party, arms-length transaction basis and each Company should be
27 covering their own revenue, expenses, liabilities, and taxes.").

28

113.    Nevertheless, ELUS's general ledger still shows significant payments to related entities and employees of other entities.  DX2481-2483; DX2589; DX2590 (ELUS General Ledgers)[28]; Tr. 737:5-20 (Carman) (ELUS paid Carman's and Karlsen's health insurance while both were employees of Sea Launch Services); Tr. 739:6-10; 740:7-741:13 (Carman) (confirming that Ms. Ronnau every transaction in the general ledger including ELUS paying taxes and registration fees on behalf of Energia Overseas).

114.    ELUS's computer system contains "enterprise" level information for six Energia-controlled entities involved in owning and operating the Sea Launch business and often consolidated reports are prepared to provide "an enterprise view."  Tr. 652:6-18 (Carman) ("So a lot of times we prepare presentation materials or cash flowcharts or any ad hoc requests based on the enterprise picture versus one individual company."); 731:3-7 (Carman) ("Q: But [each Energia affiliate] kept [their ledgers] in the same financial system, same computer setup that produced the printout that you gave us of the general ledger; isn't that true? A: Yes. It's the same software company. Different companies can exist in the same program.").

---

[28] (1) DX2482 (ELUS 2010 General Ledger ("GL")), p. 11 (payments for Energia Overseas's tax registration fees);

(2) DX2483 (ELUS 2011 GL), pp. 70, 218, 378, 412, 409, 418, 436, 440 (all various payments to Carman and Karlsen for items such as health insurance, cell phone, traveling and lodging expenses while they both worked for Sea Launch Services), 84 (payments for Energia Overseas's tax registration fees);

(3) DX2481 (ELUS 2012 GL), pp. 4, 81-84, 86, 90-91, 112-17, 119-20, 122 128-29, 132-33, 139-40, 148, 151, 160, 168, 172-73, 181, 184, 202-03, 216, 220-21, 231, 237, 249, 254, 264, 268, 282-83, 299, 300, 311, 316, 460-62, 511, 525, 535, 529, 530 (all various payments to Carman and Karlsen for items such as credit card membership, golf, life insurance and business lunch and dinner expenses while they worked for Sea Launch services), 95 (payments to Energia Overseas (which is a dormant company);

(4) DX2589 (ELUS 2013 GL), pp. 61, 70, 78, 80-83, 85, 86, 88, 92, 110, 158, 163, 166, 172, 187, 200, 203 (various payments to Carman and Karlsen while they worked for Sea Launch Services);

(5) DX2590 (ELUS 2014 GL), pp. 65, 90 (payments to Energia Overseas).

1

###### 6.    Corporate Functions

2       115.  Currently, ELUS does not have a Chief Executive Officer ("CEO").

3 Rather, Brett Carman has served as "acting" CEO for approximately one year.  Tr.

4 284:21-285:4 (Carman).

5       116.  The head of the "human resources" group is Mr. Carman.  *See*

6 DX2694.

7       117.  No evidence was presented to suggest that ELUS has a legal

8 department or a General Counsel.

9       118.  Because it's a dormant company, Energia Overseas US has no officers

10 of its own.  Tr. 239:2-4 (Carman).

11

###### 7.    Dividends

12      119.  Neither ELUS nor Energia Overseas has paid any dividends to its

13 shareholders.  Shomko 11/18/2014 Depo., 172:4-17  ("Since we didn't have

14 meetings, I don't think we approved, as directors, any dividends.").

15

###### 8.    Undercapitalization And Insolvency

16      120.  ELUS was capitalized with $100, contributed from Dennis Shomko's

17 credit card.  Shomko 11/18/2014 Depo., 36:13-37:24 (claiming that he started ELUS

18 through using his credit card); Tr. 253:17-21 (Carman) (stating that ELUS's initial

19 capitalization was $100); Tr. 127:5-9 (Dudney) (same); PX1252-0008 (same);

20 PX217 (same).

21      121.  As mentioned, the Plan stated that EORu would provide a $200 million

22 revolving line of credit to ELUS.  *See* Confirmation Order, at 0013 ("The Exit

23 Financing Credit Agreement forms an integral component of the Plan … and is vital

24 to the effectuation and implementation of the Debtors' plan."); DX2391-0005

25 (Disclosure Statement) (referring to "exit financing agreement in the amount of

26 $200 million").

27

28

122.   This promised line of credit was "vital" to the plan of reorganization. *See* Tr. 489:17-490:8, 491:19-21 (Picone) (disclosure statement is "very important" and creditors rely on it); Tr. 420:6-10 (Carman) ("The need [for the revolving credit] was to cover funding necessary to go out and procure all the launch vehicle hardware that we needed.").

123.   Energia never provided this line of credit.

124.   Shortly after the reorganization, ELUS director Dennis Shomko admitted in an email to ELUS director Vyacheslav Sheyanov that " ███████████ ██████████████████████████ " and that he " █████████████████████████████████████████████████ " PX232-0003 (Mar. 1, 2011 email chain); Tr. 406:10-15; 408:13-16; 413:9-14 (Carman) ("The funding of that loan was never received."); 414:3-8; 427:16-19 (Carman).

125.   The Subsidiaries have offered no reasonable alternative explanation for what Shomko meant when he admitted the Directors of ELUS "made this promise knowing that it was not so" and that Shomko " ████████████████████ ████████████████████████████████ "

126.   Without the $200 million revolver (*i.e.* independent source of financing to conduct business on its own), Energia (and other Energia-related companies) funds ELUS through continual emergency financings.  Tr. 227:21-228:4 (Dudney).

127.   ELUS owes a significant amount of money to its suppliers and must juggle payments to survive from month to month.  PX244-0004 (Feb. 7, 2014 Carman email chain stating that "ELUS has been surviving month to month on reduced cash and forced to juggle payments between suppliers regularly.").  This is ELUS's constant problem.  Tr. 391:7-20 (Carman) (2012 financial difficulties; Tr. 754:1-4 (Carman) (2013 financial difficulties).

///

1    128.   Because satellite launching is a capital-intensive business, Tr. 178:2-16

2  (Dudney), ELUS's lack of capital is inadequate for the business of launching

3  satellites into space from a floating sea launch pad.  Tr. 136:22-137:1 (Dudney).

4    129.   After realizing the revolver had not been funded, Sea Launch

5  management decided it was too late to take further action against Energia.  Tr.

6  478:12-479:22 (Picone) ("The deal was done. The egg had been scrambled. It would

7  literally be next to impossible to pull all the money back and retransfer

8  everything.").

9    **G.**    **The Energia Subsidiaries' Structure**

10         **1.**    **Finances**

11              **a.**    **ELUS**

12    130.   ELUS has not been able to borrow money and does not have a

13  corporate credit card.  PX229-0002 (Nov. 13, 2013 Carman email stating that

14  "ELUS still isn't able to get a company credit card unless we keep a full limit

15  balance on account with the bank.  Asking for a few million dollars might not be

16  that realistic."); Rule 30(b)(6) (ELUS) 01/30/15 Depo., 121:25-122:21 (noting that

17  ELUS has not obtained any third party loans and it would "highly unlikely" for

18  ELUS to obtain a loan); Tr. 382:6-383:7 (Carman) (same).

19    131.   No evidence suggests that ELUS has retained any of the money that

20  flows through it in the course of conducting satellite launches.

21              **b.**    **SLAG Monthly Payments**

22    132.   ELUS's services are performed only for SLAG.  Tr. 310:23-311:3

23  (Carman) (confirming that SLAG is ELUS's only customer), 624:24-625:2

24  (Carman) (same).  SLAG, in turn, has no launch providers other than ELUS.

25  Shomko 11/18/2014 Depo., 41:10-18 ("Q: And during the time you served on the

26  Energia Logistics U.S. board, did Sea Launch have any other provider of launch

27  services aside from Energia Logistics U.S.? A: No."), 42:12-43:3 (same).

28

133.    ELUS receives more than 99% of its funding from SLAG. Tr. 126:1-127:22 (Dudney) ("That [ELUS] was financially dependent upon SLAG because of that lack of capitalization and the way the agreements were structured between the two entities"); PX1252-0008 (chart explaining ELUS's funding requests to SLAG).

134.    SLAG, in turn, receives financial support from SARL, another Energia subsidiary.  Shomko 11/18/2014 Depo, 100:11-16 (Energia owned 94.8% of SARL).  For example, SARL agreed to assume approximately $40 million of SLAG's debt which was a debt SLAG owed to another Energia's subsidiary, Zao Zem.  Tr. 144:12-145:15 (Dudney) ("SLAG had too much debt on its books for the Swiss authorities and it had to move it off of its books and put it onto SARL's books."); PX1252-0019 (chart explaining debt transfer between SLAG and SARL); Rule 30(b)(6) (Energia) 01/21/2015 Depo., 115:16-20 ("Zao Zem is a fully owned subsidiary of RSC Energia.").

135.    SLAG's board chairman, Lopota (who also serves as Energia's President), must approve all of ELUS's monthly payment requests.  Rule 30(b)(6) (ELUS) 01/30/2015 Depo., 196:2-8 ("Q: Now, does Dr. Lopota need to approve the monthly sustaining costs paid from SLAG to ELUS every month? A: He approves the funding requests before they're paid. Q: Every month? A: Yes."); Tr. 488:23-489:10 (Picone) (noting that Lopota was SLAG's board chairman and Energia's President); Tr. 347:19-348:16 (Carman) (stating that Mr. Lopota had to approve any expenditure over $5,000), Tr. 364:14-21 (Carman) (same); 389:22-390:8 (stating that while heading Energia, Mr. Lopota was approving ELUS's payment requests); PX248 (Mar. 27, 2013 payment request with signature line for Vitaly Lopota).

### c.    **ELRF Hardware Financing**

136.    ELRF takes out loans on ELUS's behalf in order to finance ELUS's hardware production.  Tr. 166:6-167:4 (Dudney) (noting that ELRF took out loans on ELUS's behalf).  However, ELUS often lacks funds to make those payments, so

ELRF obtains financing itself.  PX70 (Mar. 14, 2012 Letter from Mr. Kakhno to Eugene Pruss[29] stating "be informed that due to lack of financing provided by Energia Logistics Ltd (ELUS) in the first quarter of 2012, LLC Energia-Logistics (ELRF) was forced to organize additional loan from Russian bank (RIABANK) in order not to jeopardize the Project . . . .").

137.   Since 2012, ELRF has taken out $80 million in loans to finance hardware costs.  Even though ELUS had no role in loan negotiations, ELUS agreed to pay interest and other costs associated with these loans.  PX238 (June 13, 2013 email) (chart summarizing ELRF's loans); PX233 (Mar. 1, 2012 email chain) (R. Werth: "RSCE intends to provide a short term loan to ELRF to cover the $6M shortfall for engine payments. ELUS will be expected to repay the loan by May with interest."); PX363 (May 16, 2012 email chain) (Dmitry Kakhno: "ELRF succeeded to receive a short-term loan from RSC Energia to cover its urgent need for repayment of loan from RIAbank . . .  At the same time we once again expect that the interest rate will be covered by ELUS in the future."); Rule 30(b)(6) (ELUS) 01/30/2015 Depo., 163:13-165:1 (noting that ELUS covers all ELRF's loan fees).

138.   Similarly, ELUS agreed to reimburse ELRF for the interest and other costs associated with these loans because "ELUS really didn't have a good way to get loans to get any money for working capital either here in the United States or abroad, but ELRF did through its connection with RSC Energia."  Rule 30(b)(6) (ELUS) 01/30/2015 Depo., 146:2-18.

139.   Energia paid for the interest and costs on Energia's loans to finance hardware because neither ELRF nor ELUS had their own money.  PX236 (Apr. 12, 2012 email chain) (Eugene Pruss stating "RKK Energia, our owner, is providing ELUS with $3 millions [sic] loan with 11% interest. In the end of the day who is

---

[29] Eugene Pruss is ELUS's former CEO.  Notice Of Lodging Written Discovery Extracts To Be Used During Trial, p. 74.

going to pay the interest to RKK Energia? The answer is - RKK Energia.")[30]; Rule 30(b)(6) (ELUS) 01/30/2015 154:20-155:20 ("Mr. Pruss is looking at the entire corporate structure, entire venture. And if Energia is loaning money to one of its subsidiaries, and they're paying it back to them with interest, he's trying to make the point that you're really just taking money from one pocket and putting it in the other."); PX370 (Sept. 25, 2013 email chain) (ELUS's Deputy Director General, Andrey Sedov, stating that "[i]t is clear that RSCE uses received cash directly or indirectly for SL project, so any cash received basically will not go out the project. As you properly said money goes from one pocket to another."); Tr. 385:6-16 (Carman) ("[i]f RSC Energia is loaning money or providing money on behalf of the company and they're paying it back to themsel[ves]"); *accord* Tr. 167:5-173:5 (Dudney) (explaining ELUS and ELRF financing); PX1252-0043-52 (Dudney's Organizational Charts explaining ELUS and ELRF financing).

### d. Expense Process

140.    Through ELRF, Energia advises ELUS to make payments for rocket hardware even when ELUS's managers believe that other expenses are more urgent and should be paid first.  PX383-0002 (May 4, 2011 email chain) (P. Kamantsev: "The payments from Sea Launch AG and ELUS shall be made tomorrow.  So ELUS in its turn shall make the payment to [ELRF] on Friday.  This is mandatory instruction of Mr. Sheyanov."); PX220 (June 14, 2011 email chain) (Carman: "we are constantly under pressure from ELRF and Mr. Sheyanov . . . to reply to their requests immediately and without question . . . Multiple reminders and demands are sent until they receive these payments . . . When we recommended a delay in payment to discuss, they transferred the funds themselves without our

---

[30] Rule 30(b)(6) (ELUS) 01/30/2015 Depo., 154:3-6 ("Q: Now, RKK Energia is the same as RSC Energia right A: It is.  The Russians often write it RKK.").

involvement."); *cf.* PX239 (Feb. 27, 2013 email chain) (E. Pruss: "ELRF is the part of our company and if they are going down, we will follow them.").[31]

141.   ELUS could not incur expenses greater than $5,000 without the approval of Energia's President, Vitaly Lopota, and Vyacheslav Sheyanov, an advisor to Energia and an officer and director of ELUS.  PX84 (Apr. 21, 2011 email chain) (R. Werth: "With regard to the increased limit (currently $5K), I would say that this is a severe handicap for us here."); PX291 (Jan. 14, 2011 email chain) (D. Shomko: "This is a bad start: How do you want us to manage the company when there's no operational control over the company's funds???"); PX350 (May 18, 2012 email chain) (B. Carman: "What a tremendous waste of time it is for us to collect all these invoices, copy and bill them to SLAG, then have them reviewed and approved by Mr. Lopota, and have to answer these questions on simple launch services invoices.  All this effort over minor stuff and misc invoices while we have the CIS contractors charging ridiculous prices and fees left and right with no controls in place to stop it."); Shomko 11/18/2014 Depo., 140:23-141:12, 142:1-14, 145:9-14 (using PX84); 148:22-150:22 ("Q: In your experience, how common is it for the Director general of a shareholder of a company with a 45 million plus annual budget to require approvals on expenditures over $5,000? A: I would say that it is very unusual, at least in the West.  But I could again only speculate.  Maybe it is a common practice in Russia.").

## 2.   ELUS Executives and Personnel

142.   At its formation, instead of having a CEO, President, Chief Financial Officer ("CFO"), or other senior executives,  ELUS had only a Chief Operating

---

[31] Around this time, in a June 27, 2011 email chain, Mr. Carman emailed Kjell Karlsen to inform him that "███████████████" and Karlsen responded and said "███████████████████" PX219 (June 27, 2011 email chain).  Mr. Carman proceeded to state that "███████████████████████████████████████████████████████████████████████." *Id.*

1  Officer ("COO"), Kirk Pysher.[32]  *See* PX0077 (Organizational chart outlining

2  ELUS's personnel).

3      143.   ELUS's current CEO and CFO, Brett Carman[33], Chief Compliance

4  Officer, Maria Akalovsky-Martinez, controller, Elizabeth Ronnau, and most of

5  ELUS's other thirty-one current employees are located in the United States.

6  DX2694 (ELUS Organizational Chart).

7      144.   ELUS's board of directors (past and current) consists of Valery Aliev

8  (beginning from December 2011 to present, Vyacheslav Sheyanov (until December

9  2011), Dennis Shomko (until December 2011), Sergey Gugkaev (beginning from

10 December 2012 to present), Kjell Karlson (until March 2014), Eugene Pruss (until

11 December 2011), and Dmitry Kakhno.  *See* Notice Of Lodging Written Discovery

12 Extracts To Be Used During Trial, p. 74 (Energia's response to Plaintiffs'

13 Interrogatory No. 17 listing ELUS's board members); Tr. 662:1-6 (Carman)

14 (naming Valery Aliev, Sergey Gugkaev, and Dmitry Kahno as the current ELUS

15 board members); Rule 30(b)(6) (ELUS) 01/30/2015 Depo., 131:9-11 ("Q: Mr.

16 Sheyanov and Mr. Shomko were Board members of Energia Logistics US as of

17 March 2011? A: To my knowledge.").

18      145.   There are several overlaps between the Energia Subsidiaries' directors,

19 agents, and advisors on the one hand, and Energia's (and other Energia entities')

20 _____

21 [32] Mr. Pysher reported to Shomko and Kjell Karlsen, neither of whom were employees of ELUS,
22 and Shomko, in turn, reported to Sheyanov, who reported to Mr. Lopota, Energia's President.
   Shomko 11/18/2014 Depo., 85:22-87:22.

23 [33] Prior to taking these ELUS's positions, Brett Carman and Kjell Karlsen, a ELUS director from
24 2011 to 2014, were both employees of an entity called Sea Launch Services—an entity that
   Vyacheslav Sheyanov and Dennis Shomko owned at a 50-50 split.  Tr. 727:24-728:18 (Carman)
25 ("Q: And Sea Launch AG paid your salary and benefits? A: I was paid by Sea Launch Services. I
   was actually employee of Sea Launch Services but supporting Sea Launch AG, yes."); 728:23-
26 729:18 ("Q: Okay. Mr. Karlsen also worked for Sea Launch AG? A: Mr. Karlsen also worked for
   Sea Launch Services, performing his role for Sea Launch AG."); *cf.* Shomko 11/18/2014 Depo.,
27 85:6-18 ("Q: And who owned Sea Launch Services? A: At that time, 50 percent belonged to Mr.
28 Sheyanov; 50 percent belonged to me.").

directors, managers, agents, and advisors on the other hand.  *See generally* Notice Of Lodging Written Discovery Extracts To Be Used During Trial, pp. 68-79 (Energia's response to Plaintiffs' Interrogatory No. 17 listing overlapping directors and officers within all Energia entities).

146.   The overlaps in positions between Energia Subsidiaries and Energia (and other Energia entities) are the following:

- While serving on ELUS board of directors, Mr. Aliev is an Energia employee. Derechin 01/26/2015 Depo., 257:2-23 (Aliev is a dual employee of Energia and ELUS).

- While serving on ELUS board of directors, Mr. Gugkaev is also SLAG's CEO and a SLAG board member.  Tr. 387:23-388:6 (Carman); *See* Notice Of Lodging Written Discovery Extracts To Be Used During Trial, p. 78.

- While serving on ELUS board of directors, Mr. Kakhno is also a ELRF director.  Tr. 748:3-4 (Carman); *see also* Notice Of Lodging Written Discovery Extracts To Be Used During Trial, p. 79.  Previously, Mr. Kakhno was an Energia employee, and while he does not use it officially, Mr. Kahkno's Energia position title is still reserved for him.  Derechin 01/26/2015 Depo., 286:7-287:1.

- At various times while serving as a board member of ELUS, Energia Overseas, and SARL, Vyacheslav Sheyanov served as President of Energia Overseas, EORu's Director General, an Energia advisor, and a ELRF board member.  DX2602-0001 (appointing Sheyanov as the President of Energia Overseas); Shomko 11/18/2014 Depo., 150:7-9 (stating that Sheyanov was EORu's Director General); Notice Of Lodging Written Discovery Extracts To Be Used During Trial, p. 79; Tr. 337:17-24 (Carman) ("I understood [Mr. Sheyanov] to be a consultant to the president of RSC Energia."); Tr. 358:1-4 (Carman) (noting that Sheyanov was ELUS director and consultant to RSC

Energia);; Tr. 370:21-24 (Carman) (noting that Mr. Sheyanov was involved with ELRF); Shomko 11/18/2014 Depo., 63:20-22 ("Q: Mr. Sheyanov was also on the board of Energia Logistics Russia? A: I believe so, yes.").

- Dennis Shomko served as Energia Overseas Secretary and was a board member for ELUS, Energia Overseas, and SARL.  DX2602-0001 (appointing Shomko as the Energia Overseas Secretary); Notice Of Lodging Written Discovery Extracts To Be Used During Trial, pp. 74-77 (listing Shomko's Energia-related positions).

- Former ELUS CEO, Eugene Pruss, held ELUS and Energia Overseas board member positions until 2011.  *Id.* at pp. 74-75 (listing Pruss's Energia-related positions).

- While he served as SLAG President, Kjell Karlsen was a ELUS board member position until 2014.  *Id.* at pp. 74-78 (listing Karlsen's Energia-related positions).

- While serving as SLAG's CEO, Aiaz Bakasov was an Energia Overseas board member until 2011.  *Id.* at pp. 75-78 (listing Bakasov's Energia-related positions).

### 3.   <u>Uncompensated Work Among Related Entities</u>

147.   ELUS paid expenses for other Energia related entities.  *See* PX223 (Apr. 8, 2011 email chain) (E. Ronnau: ELUS has been paying a consultant to ELRF "every month based on Shomko's direction" and in response, Rob Werth: "For my part, I could care less whether we [ELUS] pay [the consultant] or ELRF does.  The money seems to come from the same place either way.").

148.   There was no contract for ELUS to cover these expenses for other Energia related entities.  *Id.* (Rob Werth: "if Dennis [Shomko] directs us [ELUS] to pay then I will create a contract or an amendment to a contract between ELUS and ELRF to cover these services . . . .").

149.   ELUS paid the fees for the reinstatement of Energia Overseas US's corporate charter.  Tr. 247:9-13 (Carman) (agreeing that ELUS would pay for the reinstatement of Energia Overseas's corporate charter reinstatement).  And ELUS is paying the fees of counsel representing Energia Overseas US in this lawsuit.  Tr. 248:18-23 (Carman) (recognizing that ELUS currently pays Energia Overseas's legal fees).

150.   Without being compensated, Energia delivered Block DM rocket, worth $12-14 million, to ELUS's home port facility sometime in 2014.  Derechin 01/27/2015 Depo., 253:19-23 ("Q: What services does RSC Energia provide to Energia without service? A: We didn't receive payment for Block DM delivered to Sea Launch and we didn't receive payment for our staff working for Sea Launch now; 254:1-17 (recognizing that the Block DM is worth $12-14 million).

151.   More than 100 RSC Energia employees have worked on Sea Launch and ELUS launches without being paid.  Derechin 01/27/2015 Depo., 254:19-24 ("Q: What other goods or services has RSC Energia provided to Sea Launch without being paid? A: Our staff working for Sea Launch.").  Instead, RSC Energia was covering those costs.  Derechin 01/27/2015 Depo., 254:25-255:5 ("Q: And those people are being paid by RSC Energia for their work for Sea Launch?  A: Yes. They -- they receive their salary, but Energia should pay instead of Sea Launch.").

**H.**   **December 22, 2010 and March 4, 2011 Email Chains**

152.   ELUS's current President and CFO, Brett Carman, wrote to ELUS Controller Elizabeth Ronnau that Energia had created " ███████████████ ███████████████████████████."  PX0253 (Dec. 22, 2010 email chain) (Carman: "that takes a lot of planning and setting up accounts all over the World with ██████████████████████████████████.  Hey . . . wait a minute . . . kind of like what we have set up here . . . ."); *see also* PX300 (July 8, 2011 email chain) (Carman: "██████████████████████████████████████

42

1 ████████████████████████████████████████████████

2 ██████████████████████████████████████████████████

3 ██████████████████ ").

4       153.   Ms. Ronnau responds to Carman's email stating "███████████" and

5 Carman responds, " ████████ "  PX253 (Dec. 22, 2010 email chain).

6       154.   When asked by defense counsel about his relationship with Ms.

7 Ronnau—the individual that received his "████████████████" email—Carman

8 said that he sometimes exchanges jokes with Ronnau.  Tr. 697:12-17 (Carman)

9 (affirming that Carman has a close relationship with Ms. Ronnau and that they both

10 exchange jokes with one another).

11       155.   When asked to explain the "circumstances" in which he used the phrase

12 "███████████████" Mr. Carman stated:

13
14    A: I do [remember the circumstances in which I used the phrase fictitious
      companies].

15
16    Q: Would you please explain to the Court the context and reference that you
      were making at the time?

17
18    A: We were -- if you read through the document, you see that we were being
      asked to make a transfer, based on an e-mail from iAiaz Bakasov who was
19    the chairman of Sea Launch AG at the time, of $38 million.  It was on
      December 22nd.  It was in the -- late in the afternoon, and there was some
20    urgency to making this $38 million transfer from the Sea Launch SARL
      account that held the assets at the time to a new bank, to a new bank account,
21    *without what I considered the proper documentation* that we needed to make
22    that entry.  This was a transaction that was being done kind of basically over
      e-mail.  I think I iterated by displeasure with it to my boss Mr. Karlsen at the
23    time.  I think he said he passed along my displeasure to some individuals that
      were involved in the transaction needing to be done; and *in the end, basically*
24    *it was Elizabeth and I were told we needed to make that transfer*. . . [in order
25    to] transfer[] all the assets, including the liquid assets, the cash, from Sea
26    Launch SARL to Sea Launch AG.

27
Tr. 698:3-699:11 (Carman) (emphasis added).
28

156. Carman did not testify that he meant the phrase " ███████████████ " as a joke.

157. During a March 4, 2011 email chain, ELUS director Dennis Shomko stated " ██████████████████████████████████████████████████████████████████████████████████████████████████████████████████ " PX252 (Mar. 4, 2011 email chain).

158. The Subsidiaries provide no alternative explanation as to the meaning of Mr. Shomko's statement.

## III.   CONCLUSIONS OF LAW REGARDING ALTER EGO LIABILITY

1. Per the Honorable Audrey C. Collins's previous ruling, Delaware law—the statutory law in which the U.S. Subsidiaries were organized—governs Plaintiffs' alter ego claim.   Dkt. No. 273, p. 2; *cf. Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938) (holding that Federal courts sitting in diversity must apply the law of the state in which they sit).

### A.   Delaware's Alter Ego Law

2. "A court can pierce the corporate veil of an entity where there is fraud or where a subsidiary is in fact a mere instrumentality or alter ego of its owner." *Trs. of Vill. of Arden v. Unity Constr. Co.*, No. 15025, 2000 WL 130627, at *3 (Del. Ch. Jan. 2000) (citing *Geyer v. Ingersoll,* Del. Ch., 621 A.2d 784, 793 (1992)); *Mabon, Nugent & Co. v. Tex. Am. Energy Corp.*, No. 8578, 1990 WL 44267, at *838 (Del. Ch. Apr. 12, 1990) ("[C]orporate veil may be pierced where there is fraud . . . [but] the Delaware courts have also stated...the corporate veil may be pierced where a subsidiary is in fact a mere instrumentality or alter ego of its parent . . . [and] where equitable considerations require it.").

3. Under Delaware law, "[c]ourts are reluctant to disregard the separate existence of related corporations by piercing the corporate veil, and have

consistently given substantial weight to the presumption of separateness." *McKesson HBOC, Inc. v. New York State Common Ret. Fund, Inc.*, 339 F.3d 1087, 1094 (9th Cir. 2003) (noting the "very limited circumstances in which Delaware law countenances veil piercing"); *see also ALT Hotel, LLC v. Diamondrock Allerton Owner, LLC*, 479 B.R. 781, 802 (Bankr. N.D. Ill. 2012) ("Delaware has an exceptionally strong policy of respecting the corporate form."); *Wallace ex rel. Cencom Cable Income Partners II, Inc., LP v. Wood*, 752 A.2d 1175, 1183 (Del. Ch. 1999) ("Persuading a Delaware court to disregard the corporate entity is a difficult task.").  At least one Delaware court noted that it would not disregard the corporate form absent "compelling cause."  *Midland Interiors, Inc. v. Burleigh*, No. Civ.A. 18544, 2006 WL 3783476, at *3 (Del. Ch. Dec. 19, 2006). Federal courts applying Delaware law have noted that Delaware requires a strong case to pierce the corporate veil and that there is a high burden on a party seeking to disregard the corporate form.  *Alberto v. Diversified Group, Inc.*, 55 F.3d 201, 205–07 (5th Cir. 1995); *TransUnion LLC v. Credit Research, Inc.*, No. 00 C 3885, 2001 WL 648953, at *8 (N.D. Ill. June 4, 2001).  Thus, "[t]he presumption of legal separateness may be disregarded only when "equitable considerations require such action."  *Harper v. Del. Valley Broads., Inc.*, 743 F. Supp. 1076, 1086 (D. Del. 1990), *aff'd* 932 F.2d 959 (3d Cir. 1991).

4.      According to Delaware law, the following elements are required to establish alter ego:  (1) a parent and subsidiary operated as a single economic entity; and (2) an overall element of injustice or unfairness is present.  *Harper*, 743 F. Supp. at 1085; *see also NetJets Aviation, Inc. v. LHC Commc'ns, LLC*, 537 F.3d 168, 177 (2d Cir. 2008) (applying Delaware law and citing cases).

5.      Applying alter ego theory is quite complex because often times there is no universal standard to determine when it is proper to disregard limited liability and pierce the corporate veil.  Michael J Gaertner, *Reverse Piercing the Corporate*

1   *Veil: Should Corporation Owners Have it Both Ways?*, 30 WM. & MARY L. REV.

2   667, 678 (1989).  In conducting an alter-ego analysis, Delaware courts consider

3   many factors in evaluating whether entities operate as a single economic entity,

4   including: "whether the corporation was adequately capitalized for the corporate

5   undertaking; whether the corporation was solvent; whether dividends were paid,

6   corporate records kept, officers and directors functions properly, and other corporate

7   formalities were observed; whether the dominant shareholder siphoned corporate

8   funds; and whether, in general, the corporation simply functioned as a façade for the

9   dominant shareholder."  *U.S. v. Golden Acres, Inc.*, 702 F. Supp. 1097, 1104 (D.

10  Del. 1988), *aff'd* 879 F.2d 860 (3d Cir. 1989).  This test is very fact-intensive.

11         6.     According to the Subsidiaries' proffered expert, Professor Lawrence

12  Cunningham, undercapitalization, insolvency, the siphoning of assets, parent

13  officials directing a subsidiary's activities or the hiring and firing of subsidiary

14  officials, and the absence of corporate formalities, are relevant to the separateness

15  between affiliates.  Tr. 1007:12-1008:10 (Cunningham); *see Blair v. Infineon Techs.*

16  *AG*, 720 F. Supp. 2d 462, 470-71 (D. Del. 2010) (applying these factors); *Albert v.*

17  *Alex. Brown Mgmt. Servs., Inc.*, No. Civ. A. 762-N, 2005 WL 2130607, at *8-10

18  (Del. Ch. Aug. 26, 2005) (same).  And in response to the Court's inquiries,

19  Professor Cunningham testified that in looking for alter ego evidence, he would look

20  at the corporate records to see if there were "things that don't make sense, things

21  that depart from commercial practices of reasonableness, dubious transactions" or,

22  as he characterized it, "prestidigitation" to "suck out cash."  Tr. 993:6-19

23  (Cunningham).

24         7.     "A decision to disregard the corporate entity generally results not from

25  a single factor, but rather some combination of them[.]"  *MicroStrategy Inc. v.*

26  *Acacia Research Corp.*, Civil Action No. 5735–VCP, 2010 WL 5550455, at *11

27  (Del. Ch. Dec. 30, 2010); *see also Mason*, 2005 Del. Ch. LEXIS 99, at *10 ("no

28

single factor is dominant"); *Harco*, 1989 Del. Ch. LEXIS 114, at *12 ("[N]o single factor could justify a decision to disregard the corporate entity, but that some combination of them was required[.]").  As Chancellor Allen observed, "[t]he legal test for determining when a corporate form should be ignored in equity cannot be reduced to a single formula that is neither over- nor under-inclusive." *Irwin & Leighton, Inc. v. W.M. Anderson Co.*, 532 A.2d 983, 989 (Del. Ch. 1987); *see generally* Stephen B. Presser, PIERCING THE CORPORATE VEIL § 2.8, p. 197-99 (2015).

8.      Even if a combination of factors are established, the final alter ego element "of injustice or unfairness must always be present . . . .'" *Microstrategy*, 2010 WL 5550455, at *11 (citation omitted).

9.      Delaware law requires a showing of "fraud or similar injustice," *Outokumpu*, 685 A.2d at 729, as well as an "overall element of injustice or unfairness" to impose alter ego liability. *MicroStrategy*, 2010 WL 5550455, at *11.

10.     "Piercing the corporate veil under the alter ego theory requires that the corporate structure cause fraud or similar injustice.  Effectively, the corporation must be a sham and exist for no other purpose than as a vehicle for fraud." *Base Optics Inc. v. Yaping Liu*, 2015 Del. Ch. LEXIS 155, at *87 n.166 (Del. Ch. May 29, 2015) (quoting *Wallace*, 752 A.2d at 1184).

11.     The court will disregard the corporate entity if *the defendants' use of the corporate form* caused fraud, injustice, or inequity.  *Blair*, 720 F. Supp. 2d at 473 ("The fraud or injustice that must be demonstrated in order to pierce a corporate veil must be found in the defendants' use of the corporate form."); *Marnavi S.p.A. v. Keehan*, 900 F. Supp. 2d 377, 392 (D. Del. 2012) (the corporate entity will be disregarded if the plaintiff "show[s] some fraud, injustice, or inequity in the use of the corporate form."); *Doberstein v. G-P Indus., Inc.*, No. CV 9995-VCP, 2015 WL 6606484, at *4 (Del. Ch. Oct. 30, 2015) (the fraud or injustice "must be tied to the

1  manipulation of the corporate form in order to make veil-piercing justifiable on
2  grounds of equity"); *MicroStrategy*, 2010 WL 5550455, at *11 (same).

3      12.   Because Delaware law looks to the "overall" existence of injustice or
4  unfairness, this Court (sitting in equity) can consider all the relevant evidence
5  bearing on whether their claimed injuries are attributable to any fraud or injustice
6  arising from the U.S. Subsidiaries' separate business structures. *See Godwin v.*
7  *Collins*, 9 Del. 28, 38 (Del. Super. 1869) (courts of equity "will inquire into and
8  consider all the facts and circumstances connected with the case presented");
9  *Monaco v. Liberty Life Assur. Co.*, 2007 U.S. Dist. LEXIS 31298, *13 (N.D. Cal.
10 Apr. 2007) ("[A] court must examine all the circumstances to determine whether to
11 apply the [alter ego] doctrine."); *Garcia v. Wachovia Mortgage Corp.*, 676 F. Supp.
12 2d 895, 903 n.5 (C.D. Cal. 2009) (court may "tak[e] into consideration all the
13 circumstances" in making decision "within the court's equitable discretion").

14     13.   Professor Cunningham stated that proof of fraud or criminal conduct is
15 not required—the defendant's conduct need only be "reproachful" to justify an alter
16 ego finding. Tr. 980:17-981:1 (Cunningham) (describing "reproachful" conduct).
17 Professor Cunningham testified that to find alter ego evidence, one should look,
18 *inter alia*, for evidence of fraud perpetrated on the Bankruptcy Court or CFIUS. Tr.
19 1011:6-1112:2 (Cunningham). More generally, he agreed that a finding of alter ego
20 would be supported by "[f]raud, deception, inequitable conduct or unfair behavior
21 on the part of Logistics, Overseas, RSC Energia, or others involved." Tr. 1025:11-
22 20 (Cunningham).

23     14.   Delaware cases and related commentary support Professor
24 Cunningham's testimony; although, the case law does not require fraud or
25 criminality, rather an overall element of injustice must be present. *See, e.g., Blair*,
26 720 F. Supp. 2d at 473 ("If plaintiffs' allegations are true—that [parent] misdirected
27 funds, exercised crippling control, and purposefully siphoned profits from the []
28

[s]ubsidiaries in favor of propping up [parent]—then plaintiffs have sufficiently alleged that the [parent] may have perpetuated an element of fraud or injustice in their use of the corporate form under both the federal alter ego standard (element of fraud or injustice) and the state alter ego standard (something similar to fraud or injustice)."); *NetJets*, 537 F.3d at 176 ("To prevail under the alter-ego theory of piercing the veil, a plaintiff need not prove that there was actual fraud but must show a mingling of the operations of the entity and its owner plus an 'overall element of injustice or unfairness.'").

15.   It is worthy to note that the presence of multiple alter ego factors may suffice to show the requisite "inequity" or injustice. *See Golden Acres*, 702 F. Supp. at 1106 ("As the *Pisani* court noted, the presence of a number of these [alter ego] factors may be itself be sufficient evidence of injustice or unfairness" (citing *U.S. v. Pisani*, 646 F.2d 83, 88 (3d Cir. 1981) (emphasis in original).

### B.   Plaintiffs' Alter Ego Theory

16.   Here, Plaintiffs have established that Energia dominates and controls the Energia Subsidiaries.

17.   As one Delaware court explained, "[o]bservation of appropriate formalities by those controlling a corporation is typically regarded as an important consideration because it demonstrates that those in control of a corporation treated the corporation as a distinct entity and had a reasonable expectation that the conventional attributes of corporateness, including limited liability, would be accorded to it." *Irwin*, 532 A.2d at 989.

18.   Energia's domination and control has taken various forms, including control of ELUS's financial managements.  Although the Plan stated that ELUS had a $200 million budget in revolving credit, an Energia representative still had to approve all payments that exceeded $5,000.  *See supra* at Findings of Fact Regarding Alter Ego Liability Nos. 121-123, 141.  Moreover, Energia directs and

controls the critical components of ELUS's business.  *See supra* at Findings of Fact Regarding Alter Ego Liability Nos. 80-82, 92-95, 99-107.  ELUS is merely a "pass through" entity that allows Energia to operate SLAG while ensuring that funds only pass through ELUS before being passed up the chain to Energia.  *Id.* at No. 65.  And Energia Overseas is merely a shell in the overall structure of Energia companies. *See supra* at Findings of Fact Nos. Regarding Alter Ego Liability 70.  It was created to be the SLAG owner, but eventually, Energia Overseas turned into a dormant company.  Shomko 11/18/2014 Depo., 98:21-24 ("Q: [D]id you ever attend any board meetings for Energia Overseas LLC? A: No, because the company was dormant."); *cf.* Tr. 290:20-23 (Carman) ("Q:[Y]our understanding is that this -- the defendant, Energia Overseas LLC, has no assets; is that true? A: Yes.").

19.     The facts also demonstrate other alter ego factors proving that Energia and the Energia Subsidiaries operate as a single economic entity.

20.     *First*, ELUS is wholly undercapitalized, and Energia Overseas US has no capital at all.  *See supra* at Findings of Fact Regarding Alter Ego Liability Nos. 70, 120; *see also, e.g., Golden Acres*, 702 F. Supp. at 1104-05 ("the obligation to provide sufficient capitalization is an ongoing one, which begins at the time of incorporation and continues throughout the corporation's existence"); *In re Autobacs Strauss, Inc.*, 473 B.R. 525, 552 (Bankr. D. Del. 2012) ("Undercapitalization and insolvency are the most relevant factors in determining 'whether the corporation was established to defraud its creditors or [some] other improper purpose such as avoiding the risks known to be attendant to a type of business.'"); *accord Bridas S.A.P.I.C. v. Gov't of Turkmenistan*, 447 F. 3d 411, 420 (5th Cir. 2006) ("Undercapitalization is often critical in alter ego analysis." (citing *Gardemal v. Westin Hotel Co.*, 186 F.3d 588, 594 (5th Cir. 1999))); *Minton v. Cavaney*, 364 P.2d 473, 475 (Cal. 1961) (stating that the shareholders must actively participate in the conduct of corporate affairs for undercapitalization to be relevant).

1  The corporate form was used here to keep money out of the United States, even

2  though a torrent of cash was required to flow through the United States to operate

3  Sea Launch.  The Energia Subsidiaries are in a business that requires a huge amount

4  of capital; yet, they have no capital except that which Energia gives them.  Thus, the

5  Energia Subsidiaries' undercapitalization is directly related to their lack of

6  separateness from Energia. This evinces alter ego.  *Golden Acres*, 702 F. Supp. at

7  1104; *see generally* 1 W.M. Fletcher, *Cyclopedia of Corporations*, § 41.33 (Sept.

8  2015) (hereinafter "Fletcher Cyclopedia") ("A corporation's capitalization has been

9  deemed to be a major consideration in deciding whether a legitimate separate

10  corporate entity was maintained.").

11      21.    *Second*, the Energia Subsidiaries have failed, at times, to satisfy

12  corporate formalities.  Indeed, the Energia Subsidiaries allowed their corporate

13  charters to lapse for several years while this alter ego lawsuit was pending.  *See*

14  *supra* at Findings of Fact Regarding Alter Ego Liability Nos. 83-95.

15      22.    The failure to pay corporate taxes is non-determinative for an alter ego

16  finding, and the Court recognizes that the Subsidiaries' addressed their failure to

17  update their corporate charters in October 2015.  *See supra* at Findings of Fact

18  Regarding Alter Ego Liability Nos. 86-87.  The U.S. Subsidiaries are now in good

19  standing with the Delaware Secretary of State.  *Id.*  As Mr. Cunningham testified,

20  "[i]t's really a revenue thing" that "has no bearing on the question of corporate

21  separateness."  Tr. 1005:17-20 (Cunningham).

22      23.    While this alone would not be sufficient to disregard the corporate

23  form, Ninth Circuit precedent makes clear that the loss of a corporate charter due to

24  a failure to pay state taxes is still relevant evidence supporting an alter ego finding.

25  *See U.S. v. Standard Beauty Supply Stores, Inc.*, 561 F.2d 774, 777 (9th Cir. 1977)

26  ("a corporation's failure to pay its franchise tax may be evidence that the

27  shareholders do not view the corporation as having a separate existence and that the

28

51

corporation should possibly be regarded as the alter ego of its shareholders" and "this failure must be treated and weighed like any other failure to observe the normal requirements for a corporation").  In applying California law, *Standard Beauty* court further "emphasized that, while section 23301 suspends the corporation'' powers, the corporation continues to exist," such that any "[a]ctions that would have been considered those of the corporation before the suspension should ordinarily continue to be viewed as actions of the corporations." *Id.* at 777.  Accordingly, "[i]f the corporation acts, it is the corporation, not its agents, officers, or shareholders, who should be held privately responsible for such actions." *Id.*

24.     While this lapse in formality may be minor, the Energia Subsidiaries violated Delaware law in their efforts to address the problem. *See supra* at Findings of Fact Regarding Alter Ego Liability Nos. 88-92.

25.     For example, to reinstate Energia Overseas's corporate status, Mr. Carman directed Ms. Ronnau, an ELUS employee, to file reinstatement paperwork for Energia Overseas. *Id.*  Neither ELUS nor Energia Overseas's directors authorized the reinstatement filings as required under Delaware law. *Cf.* 8 Del. Code Ann. Tit. 8, § 312(d)(6) ("the certificate of renewal or revival is filed by authority of those who were directors or members of the governing body of the corporation . . .").  Thus, having Ms. Ronnau sign these reinstatement applications as an Overseas's officer or director (when in fact she was not) demonstrates that she deceived Delaware authorities. *Id.* at Nos. 91-92.

26.     Alone, these acts (concerning corporate reinstatements) would not be sufficient to disregard the corporate form, and the Energia Subsidiaries provided evidence that they have reinstated their corporate charter. *See*, *e.g.*, *Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 379 (7th Cir. 2008) (evidence of company's "failure to file tax returns since 1999" was "not enough to justify treating [it] as a mere shell"); *Liberty Mut. Ins. Co. v. M&O Springfield Co.*,

1997 U.S. Dist. LEXIS 19092 (N.D. Ill. 1997) (refusing to pierce veil where defendant failed to separate file tax returns for two years, but otherwise complied with corporate formalities, was adequately capitalized, and maintained separate bank accounts); *supra* at Findings of Fact Regarding Alter Ego Liability Nos. 86-87. However, the Subsidiaries' lack of corporate leadership to execute its corporate formalities is still pertinent here. *Standard Beauty*, 561 F.2d at 777.

27.     The evidentiary record provides other examples of the Energia Subsidiaries failing to undertake corporate formalities such as the functionality of officers and directors and the nonpayment of dividends. *Wilson v. Thorn Energy, LLC*, 787 F. Supp. 2d 286, 294 (S.D.N.Y. 2011) (applying Delaware's alter ego factors). Indeed, Dennis Shomko was on the board of ELUS for two years, and yet never attended a single board meeting. *See supra* at Findings of Fact Regarding Alter Ego Liability No. 96. Mr. Shomko also testified (in his deposition) that neither ELUS nor Energia Overseas paid him any dividends as a shareholder. *See supra* at Findings of Fact Regarding Alter Ego Liability No. 119.

28.     Energia and its affiliates also misrepresented key facts to both the Bankruptcy Court and to the U.S. Government when describing what the various Energia entities would do and how they would be funded following the confirmation of Sea Launch's Reorganization Plan. *See supra* at Findings of Fact Regarding Alter Ego Liability Nos. 51-52, 58-73, 98-107, 120-127. Specifically focusing on the $200 million revolver, Energia's advisors Dennis Shomko and Vyecheslav Sheyanov, both on the Board of Directors of both Energia Subsidiaries, conceded in writing that they " ███████████████████████████ ", and conspired to " ███████████████ ", including the Delaware Bankruptcy Court, through a false promise that Energia would fund this $200 million revolver.[34]   *See supra* at Findings of Fact Regarding Alter Ego Liability Nos. 124-129.

---

[34] This is also the fraudulent or reproachful misconduct, which Professor Cunningham mentioned, that could mislead creditors. *See* Tr. 980:8-981:2 (Cunningham) ("The Court: Mr. Cunningham,

29.     The Subsidiaries' books and records also support an alter ego finding here.  Professor Cunningham testified that in assessing alter ego, one should review corporate records looking for what he referred to as "prestidigitation."  Tr. 993:6-19 (Cunningham).  Here, the Energia Subsidiaries' general ledgers create more questions than answers.  As described above, the Subsidiaries' general ledgers show myriad interrelations with a host of affiliated entities.  ELUS paid numerous charges for Energia Overseas, with which its only connection is its ultimate parent Energia. *See supra* at Findings of Fact Regarding Alter Ego Liability Nos. 108-114.  Between 2011 and 2014, ELUS paid individuals like Brett Carman and Kjell Karlsen for various business expenses, but ELUS did not employ Messrs Carman and Karlsen during this time period.  *See supra* at Findings of Fact Regarding Alter Ego Liability No. 114 n. 28.  Rather, Sea Launch Services (wholly owned by Energia's advisors Shomko and Sheyanov) employed Messrs. Carman and Karlsen.  *See supra* at Findings of Fact Regarding Alter Ego Liability Nos. 143 n. 33.  Mr. Carman did not explain these transactions and why ELUS was paying him while he was a Sea Launch Services' employee.

30.     Moreover,  Mr. Carman only attempted to clean up these intermingled entities' finances a month after this lawsuit was filed, writing to his colleagues that "going forward" they would attempt to maintain their books and records as separate corporations.  *See supra* at Findings of Fact Regarding Alter Ego Liability No. 112.  Although he testified extensively about his ELUS duties, Mr. Carman did not explain why, as soon as this lawsuit was filed, ELUS suddenly became concerned about maintaining corporate separateness in its accounting records.

---

what do you mean by reproachful? . . . A: It means fraud, criminal misconduct, efforts to defraud creditors . . . as well as other conduct that would produce an injustice if left unremedied"); *cf*. Tr. 1025:11-20 (Cunningham) (stating that he was looking the "existence of any fraud, deception, inequitable conduct or unfair behavior on the part of Logistics, Overseas, RSC Energia, or others involved in their satellite launch business.").

31.     *Third*, Energia has siphoned assets from ELUS, including requiring ELUS to prioritize payments to ELRF; pay interest and fees for ELRF's loans; and pay invoices to ELRF.  *See supra* at Findings of Fact Nos. 98-107, 135-140. Energia set up contracts with these entities and other affiliates that placed Energia in complete control of how much it would be paid and the timing of such payments. Energia was the principal on its contracts with ELUS, using ELRF as its agent to negotiate and sign contracts with ELUS at the same time as ELRF was the agent of ELUS.  *Id.*  With Energia controlling these entities, the consequences of these interlocking arrangements evinces a single economic enterprise.  Less than a year after the entities began operating, Messrs. Karlsen and Carman knew that funds directed to the Subsidiaries' accounts would not be there long enough for the ink on the deposit slip to dry; that the funds would be "████████" up through "████████ ████████" to the parent company.  *See supra* at Findings of Fact Regarding Alter Ego Liability No. 140 n. 31.  This siphoning of cash reflects alter ego corporations. *Golden Acres*, 702 F. Supp. at 1106; *cf. In re The Heritage Organization, L.L.C.*, 413 B.R. 438, 517 n. 69 (Bankr. N.D. Tex. 2009) ("Siphoning suggests the improper taking of funds that the owner was not legally entitled to receive.").

32.     *Fourth*, ELUS and Energia Overseas both appear to be insolvent. Energia Overseas is a dormant company, and between its creation and the present, ELUS has allowed approximately $900 million to pass through it while retaining none of these corporate funds.  *See supra* at Findings of Fact Regarding Alter Ego Liability No. 65.  For its entire corporate life, ELUS has operated solely at the behest of Energia.  Even though $900 million has passed through ELUS over the past five years, ELUS has not been allowed to keep that money, and ELUS would be bankrupt in weeks without Energia's continual support.  This is evidence of siphoning funds which is relevant to an alter ego analysis.  *Blair*, 720 F. Supp. 2d at 473 ("purposely siphoned profits from the . . . Subsidiaries in favor of propping up

[the parent]—then plaintiffs have sufficiently alleged that the . . . defendants may have perpetrated an element of fraud or injustice in their use of the corporate form under both the federal alter ego standard (element of fraud or injustice) and the state alter ego standard . . . .").

33.     *Fifth*, the directors and officers familiar with Energia's and the Energia Subsidiaries' operations admitted in internal correspondence that Energia had created "███████████████████," failed to abide by contracts, had no control over their own funds, were forced to accept "highly irregular" transactions, and in general described the veil between these supposedly separate entities as a "███." *See supra* at Findings of Fact Regarding Alter Ego Liability Nos. 152-158.

34.     Overall, Energia constructed an elaborate corporate scheme where the Energia Subsidiaries (including ELRF and SLAG) served as instrumentalities in directing Sea Launch's operations.

35.     Considering the above factors, Plaintiffs have shown that Energia and the Energia Subsidiaries are alter egos engaged in a single economic enterprise. The "injustice" inquiry is next to consider.

36.     This element of injustice is satisfied here. In light of all of the circumstances presented, it would be manifestly unjust if Energia could:  break its promises to reimburse Plaintiffs for Sea Launch venture debts; buy Sea Launch while manipulating the bankruptcy process and making misrepresentations to the Bankruptcy Court, Department of Defense, Department of Justice, Department of Homeland Security, Boeing and other creditors that ELUS would be capitalized with a $200 million line of credit "vital" to the effectiveness of the Plan's implementation; create the Energia Subsidiaries and other companies to purchase and control reorganized Sea Launch; and siphon money from the Energia Subsidiaries to assure control.

1    37.    The alter ego doctrine is designed to prevent such abuses of the
2  corporate form.  *See, e.g., MIG Invs. LLC*, 852 F. Supp. 2d at 514-15 (creating new
3  subsidiaries in an effort to "shield themselves from personal liability" satisfied
4  "injustice" prong because allowing parent "to escape liability by hiding behind the
5  corporate veil would be unfair and unjust"); *Phillips Petroleum Secs. Litig.*, 738 F.
6  Supp. at 838-39 (alter ego can be found where entity was "merely an alter ego" that
7  was "created to insulate the parent corporation from possible securities fraud
8  liability"); *see generally* Fletcher Cyclopedia, § 41.34 ("A corporation's veil will be
9  pierced where the corporation's controlling shareholder formed or used the
10  corporation to defraud creditors by evading liability for preexisting obligations.").

11    38.    The Energia Subsidiaries bring forth a novel theory—reverse veil
12  piercing theory—in response to the foregoing.

13    **C.    Reverse Veil Piercing Theory**

14    39.    Rather than a traditional veil piercing theory, the Energia Subsidiaries
15  claim that Plaintiffs have asserted a reverse veil piercing theory which is a theory
16  not recognized under Delaware law.[35]

17    40.    The Court concurs with its previous determination—Plaintiffs' theory
18  is a "conventional application of the alter ego doctrine," Dkt. No. 273, p. 4—
19  because while this theory may appear to be reverse veil piercing on its face, this
20  theory is simply an extension of the traditional veil piercing theory.[36]

21

22  [35] The Court notes that Magistrate Judge Wistrich mentioned, in denying a motion for sanctions
23  sought by Plaintiffs, that "Plaintiffs' theory can fairly be described as 'reverse veil piercing'"
     because they "seek to hold the subsidiaries of RSC Energia responsible . . . for the misconduct of
24  their corporate parent, RSC Energia, rather than – as is usually the case – holding a corporate
     parent responsible for the misconduct of its subsidiaries."  Dkt. No. 826, p. 2.
25
26  [36] Per Judge Collins, the Court previously determined that Plaintiffs' claims were not "reverse veil
     piercing" and were cognizable under Delaware law.  *See* Dkt. No. 273 at p. 3 ("**Plaintiff's Alter**
27  **Ego Theory is Not Tantamount to Reverse Veil Piercing**") (emphasis in original); *id.* at p. 4
     ("This appears to be a conventional application of the alter ego doctrine.").
28

41.     Reverse veil piercing is a highly controversial and intensely debated corporate law doctrine because there is much confusion about the doctrine's application within a given jurisdiction.[37]  "The typical 'reverse pierce' case involves a corporate insider, or someone claiming through such individual, attempting to pierce the corporate veil from within so that the corporate entity and the individual will be considered one and the same." *See* Fletcher Cyclopedia, § 41.70 (discussing reverse veil piercing) (citations omitted); *S.E.C. v. Hickey*, 322 F.3d 1123 (9th Cir. 2003) (applying California law and stating "'[r]everse piercing' is a method of holding a corporation liable for the debts of a shareholder.) (citing Fletcher Cyclopedia, § 41.70).

42.     Generally, the theory comes in two forms—"outsider reverse veil piercing" and "insider reverse veil piercing."  *In re Howland*, 516 B.R. 163, 166 (Bankr. E.D. Ky. 2014).  The distinction between these reverse veil piercing forms is the position of the litigant seeking to disregard the corporate form.  "Outside reverse veil piercing" extends the traditional veil piercing doctrine to permit a third party creditor (attempting to satisfy a debt) to reach a corporation's assets to satisfy an individual shareholder's debts or to reach a subsidiary to bear its parent corporation's obligations.  *In re Howland*, 516 B.R. at 166; *Postal Instant Press, Inc. v. Kaswa Corp.*, 77 Cal. Rptr. 3d 96, 101-02 (Cal. App. 2008) (applying

---

[37] Case law reveals the variance between states in allowing and rejecting the reverse veil piercing theory.  *Postal Instant Press, Inc. v. Kaswa Corp.*, 162 Cal.App.4th 1510, 77 Cal.Rptr.3d 96 (Cal. App. 2008) ("outside reverse" piercing of the corporate veil is not permitted in California); *Lollis v. Turner*, 288 Ga. App. 419, 654 S.E.2d 229 (Ga. App. 2007) (Georgia does not recognize outsider reverse piercing); *In re Phillips*, 139 P.3d 639 (Colo. 2006) (Colorado permits outside reverse piercing when justice so requires); *Winston v. Leak*, 159 F. Supp. 2d 1012 (S.D. Ohio 2001) (Ohio law not recognizing reverse piercing of corporate veil); *LFC Mktg. Group, Inc. v. Loomis*, 116 Nev. 896, 8 P.3d 841 (Nev. 2000) (Nevada Supreme Court approving reverse veil piercing); *Am Fuel Corp. v. Utah Energy Dev. Co., Inc.*, 122 F.3d 130, 134 (2d Cir.1997) ("New York law recognizes 'reverse' piercing ... seek[ing] to hold a corporation accountable for actions of its shareholders." (citing *State v. Easton*, 169 Misc.2d 282, 647 N.Y.S.2d 904, 908–09 (N.Y. Sup. Ct. 1995))); *Cascade Energy and Metals Corp. v. Banks*, 896 F.2d 1557 (10th Cir. 1990) (Utah law not recognizing reverse piercing of corporate veil).

California law and noting that "'outside' reverse piercing of the corporate veil, by which the corporate veil is pierced to permit a third party creditor to reach corporate assets to satisfy claims against an individual shareholder"); *G-I Holdings, Inc. v. Those Parties Listed On Exhibit A* ("*In re G-I Holdings, Inc.*"), 313 B.R. 612, 655 n.36 (Bankr. D.N.J. 2004) (applying New Jersey law and stating "[r]everse corporate veil piercing occurs . . . when a plaintiff seeks to hold a subsidiary liable for the debts of its parent company."). Generally, "'[i]nside reverse veil piercing' involves a controlling insider who attempts to have the corporate entity disregarded to avail the insider of corporate claims against third parties . . . ." Fletcher Cyclopedia, § 41.70; *In re Howland*, 516 B.R. at 166.

43.     Courts are leery of the reverse veil piercing concept because, among other reasons, it affects innocent shareholders. As one commentator explains, the alter ego doctrine "cannot be applied to prejudice the rights of an innocent third party," because one of its "necessary element[s] . . . is that the fraud or inequity sought to be eliminated must be that of the party against whom the doctrine is invoked, and such party must have been an actor in the course of conduct constituting the abuse of corporate privilege[.]"[38] *Id.* at § 41.20; *see also*, *C.F. Trust, Inc. v. First Flight Ltd. P'ship*, 266 Va. 3, 12–13, 580 S.E.2d 806 (Va. 2003) ("[A] court considering reverse veil piercing must weigh the impact of such action upon innocent investors . . .").

44.     Although, "Delaware itself has never recognized any form of reverse piercing," *In re ALT Hotel, LLC*, 479 B.R. 781, 804 (N.D. Ill. 2012), being in a jurisdiction that has yet to recognize the reverse piercing doctrine is not dispositive

---

[38] As Professor Cunningham testified, reverse veil piercing is a "dangerous, novel, and almost radical theory" because it "has the potential to adversely affect the interests of all the innocent parties associated with th[e] subsidiary" whose veil is to be pierced in reverse, including the "interests of other creditors of that subsidiary," the "employees of that subsidiary," and the "retirees of that subsidiary," as well as "the interest of governmental agencies" and the "tax collecting authority." Tr. 971:19-972:22 (Cunningham).

1  because other courts have applied this doctrine under similar circumstances where

2  states have yet to expressly accept or reject the doctrine.  *Towe Antique Ford Found.*

3  *v. IRS*, 999 F.2d 1387, 1390 (9th Cir. 1993) (applying a reverse alter ego theory

4  under Montana law before "[t]he Montana Supreme Court has . . . had an occasion

5  to use a reverse piercing theory"); *Barba v. Seung Heun Lee*, No. CV 09–1115–

6  PHX–SRB, 2009 WL 8747368, at *8 (D. Ariz. 2009) (allowing the plaintiffs to

7  plead a reverse veil piercing theory "[a]lthough Arizona courts do not appear to

8  have explicitly applied the reverse corporate veil piercing doctrine"); *ASARCO LLC*

9  *v. Americas Mining Corp.*, 396 B.R. 278 (S.D. Tex. 2008) (applying Delaware law

10  under a reverse veil piercing theory despite Delaware law not yet recognizing the

11  doctrine).[39]

12      45.      Despite the different corporate interests implicated and the direction to

13  which the corporate pierce is pointed, the reason more courts apply reverse veil

14  piercing (absent a state supreme court decision recognizing the doctrine) is that the

15  remedy is a logical extension of traditional veil piercing, *i.e.* applying the traditional

16  veil piercing theory and applying the same elements but in reverse.  *See LFC Mktg.*

17  *Grp., Inc. v. Loomis*, 8 P.3d 841, 846 (Nev. 2000) ("Conceptually, we conclude that

18  reverse piercing is not inconsistent with traditional piercing in its goal of preventing

19  abuse of the corporate form."); *Select Creations, Inc. v. Paliafito America, Inc.*, 852

20  F.Supp. 740, 773 (E.D. Wis. 1994) ("Although the alter ego doctrine is typically

21  employed to pierce the corporate veil of a controlled entity to reach the assets of the

22  controlling party . . . the doctrine can also be applied in reverse to reach the assets of

23  a controlled entity."); *accord* Kurtis A. Kemper, *Acceptance and Application*

24  *of Reverse Veil Piercing*, 2 A.L.R. 6th 195 (2005) ("The same considerations are

25  

26  [39] As Professor Cunningham noted, "reverse-piercing" has not been rejected by any Delaware Court, and has been accepted as a valid theory by a number of jurisdictions.  *See* Tr. 1028:15-18

27  (Cunningham); *see also* 1 Fletcher Cyc. Corp. § 41.70 ("Many, but not all, jurisdictions recognize that the same considerations justifying piercing the corporate veil may justify piercing the veil in

28  'reverse.'") (citing cases).

1    usually at issue regardless of which direction a third party attempts to reach through

2    the veil." (citing *Securities Investor Protection Corp. v. Stratton Oakmont, Inc.*, 234

3    B.R. 293 (Bankr. S.D.N.Y. 1999))).

4          46.     This Court accepts Plaintiffs' claim as a traditional alter ego theory

5    because in applying their theory the underlying equitable goal remains unchanged—

6    holding corporations liable for being a mere "alter ego" entity or an

7    "instrumentality" for the controlling party or corporation.  Indeed, the traditional

8    alter ego model is widely accepted under Delaware law.  *See, e.g., Microsoft Corp.*

9    *v. Amphus, Inc.*, No. 8092-VCP, 2013 WL 5899003, at *6-7 (Del. Ch. Oct. 31,

10   2013) ("A subsidiary may be the alter ego or mere instrumentality of its parent when

11   the two 'operate[ ] as a single economic entity such that it would be inequitable for

12   this Court to uphold a legal distinction between them.'"); *Trs. of Vill. of Arden*, 2000

13   WL 130627 at *3 ("A court can pierce the corporate veil of an entity where there is

14   fraud or where a subsidiary is in fact a mere instrumentality or alter ego of its

15   owner.").

16         47.     During their closing argument, the Subsidiaries cited *In re ALT Hotel,*

17   *LLC*, 479 B.R. 781 (N.D. Ill. 2012) and encouraged the Court to consider this case

18   in its ruling.  *ALT Hotel* concerned a federal court (outside of Delaware) that was

19   faced with a reverse veil piercing claim and had to determine whether that claim was

20   permissible under Delaware law.  *Id.* at 801-802.  But, that court considered an

21   "insider veil piercing theory", *i.e.* a shareholder seeking to pierce its own veil to

22   assert its subsidiary's claims against a third party.  *Id.* at 801.  The opinion noted

23   that courts are "overwhelmingly hostile" to such claims, *id.* at 803, which are quite

24   unlike a third party claiming that a parent and subsidiary are a single economic

25   enterprise, as is the case here.  *ALT Hotel* found it would be "inappropriate" to allow

26   a "reverse piercing" claim, explaining that "the court cannot conclude that Delaware

27   would permit a reverse corporate veil piercing claim of the kind plaintiffs' have

28

1  alleged," and a contrary conclusion would "mov[e] Delaware law in a direction that

2  Delaware's own courts have not yet gone." *Id.* at 803.

3        48.     While *ALT Hotel* makes compelling points regarding "insider reverse

4  veil piercing," the rationale is inapplicable here because the facts before this Court

5  do not reflect "insider reverse veil piercing."  "Insider reverse veil piercing"

6  involves an insider of a corporation seeking to disregard corporate form of his own

7  corporation for his own benefit, *i.e.* stepping into the parent corporation's position

8  (as a creditor) to collect a deficiency obligation owed to the parent company.  *See In*

9  *re Howland*, 516 B.R. 163 (Bankr. E.D. Ky. 2014); *see also ALT Hotel, LLC v.*

10  *Diamondrock Allerton Owner, LLC*, 479 B.R. 781, 802 (Bankr. N.D. Ill. 2012).

11        49.     That is not the case here.  Plaintiffs seek to hold Energia and the

12  Energia Subsidiaries liable because they operate as alter ego corporations and that it

13  would be unjust to treat them separately.  *Cf. Greenspan v. LADT, LLC*, 191 Cal.

14  App. 4th 486, 513-14 (Cal. App. 2011) (a claim that two related entities are and

15  should be treated as a single economic entity is an alter ego claim fundamentally

16  different than "reverse piercing").  This theory is more analogous to a "outside

17  reverse piercing" theory.  *In re G-I Holdings, Inc.*, 313 B.R. at 655 n.36 ("Reverse

18  corporate veil piercing occurs . . . when a plaintiff seeks to hold a subsidiary liable

19  for the debts of its parent company."); *Jae Won Jeong v. Onoda Cement Co.*, No.

20  CV 99-11092 GHK, 2000 WL 33954824, at *12 (C.D. Cal. 2000) ("The doctrine of

21  reverse veil piercing has been used to hold a corporation liable either for the debts of

22  a shareholder or the debts of a subsidiary.") (citations omitted); *Securities Investor*

23  *Prot. Corp. v. Stratton Oakmont, Inc.*, 234 B.R. 293, 319-23 (Bankr. S.D.N.Y.

24  1995) (applying New York law to hold subsidiary liable for parent's debts under

25  reverse piercing doctrine).  But the Court is hesitant to wholly categorize Plaintiffs'

26  theory as outside reverse veil piercing because Plaintiffs' theory has little conceptual

27  difference between a traditional forward corporate piercing approach where a

28

creditor seeks to hold a parent liable for the subsidiary's corporate debt as opposed to an inverse approach where a creditor would seek to pierce the veil of a subsidiary based on a parent company's corporate debt. *C.F. Trust, Inc.*, 266 Va. at 11 ("there is no logical basis upon which to distinguish between a traditional veil piercing action and an outsider reverse piercing action"); *C.F. Trust, Inc. v. First Flight Ltd. P'ship*, 306 F.3d 126, 134 (4th Cir. 2002) ("Outsider reverse veil-piercing extends this traditional veil-piercing doctrine to permit a third-party creditor to 'pierce[ ] the veil' to satisfy the debts of an *individual* out of the corporation's assets.") (emphasis and alteration in original) (citation omitted).

50.     Moreover, various courts consider outside reverse veil piercing as a method to satisfy an individual shareholder debt. *Postal Instant Press, Inc.*, 77 Cal. Rptr. 3d at 101-02 ("'outside' reverse piercing of the corporate veil, by which the corporate veil is pierced to permit a third party creditor to reach corporate assets to satisfy claims against an individual shareholder"); *accord* Kathryn Hespe, *Preserving Entity Shielding: How Corporations Should Respond to Reverse Piercing of the Corporate Veil*, 14 J. Bus. & Sec. L. 69, 76 (2013) ("In an outside reverse veil piercing claim, a third party seeks to pierce the corporate veil to impose liability of the corporation in order to satisfy the personal debts of shareholders."). But, as explained above, Plaintiffs are not seeking to collect on individual shareholder debt, rather this is an attempt to collect on corporate debt.

51.     It is also worthy to note that an alter ego determination here would not affect any innocent shareholders. During their closing argument, Counsel for the Energia Subsidiaries pointed to a number of ELUS employees sitting in the courtroom audience to demonstrate that piercing the corporate veil here would result in potential harm to innocent employees. However, the harm to potential innocent persons is not a factor for the Court to weigh. Rather, it is the harm to innocent shareholders that should be given weight here. *See C.F. Trust, Inc. v. First Flight*

63

1  *Ltd. P'ship*, 266 Va. at 12–13 ("[A] court considering reverse veil piercing must

2  weigh the impact of such action upon innocent investors . . ."); *see also* Fletcher

3  Cyclopedia, § 41.70 ("In determining whether the corporate veil can be pierced to

4  satisfy the debt of an individual out of corporate assets, potential harm to innocent

5  shareholders or corporate creditors must be considered."). Here, Energia is the

6  dominant shareholder and there is no evidence to suggest that other innocent

7  shareholders (if any) will be affected. *See supra* Findings of Fact Regarding Alter

8  Ego Liability Nos. 4, 78, 79. While the Court is sympathetic to the ELUS

9  employees, the analysis pertains to individual shareholders and piercing the

10  corporate veil here would not affect individual shareholders here. Lastly, there is no

11  evidence of any effect on an ELUS creditor.

12      52.     In sum, this Court finds that Energia and the Energia Subsidiaries are a

13  single economic entity. Plaintiffs' alter ego theory is not tantamount to reverse veil

14  piercing theory, rather it is a traditional veil piercing theory. This type of corporate

15  disregard is acceptable in Delaware. To that end, this decision does not decide

16  whether Delaware law would accept or reject reverse veil piercing because

17  Plaintiffs' theory is a conventional use of the alter ego doctrine. Dkt. No. 273, p. 4.

18      53.     Accordingly, this Court finds that the Energia Subsidiaries are alter ego

19  corporations of Energia under the traditional alter ego theory.

20  **IV.   FINDINGS OF FACT REGARDING THE AFFIRMATIVE DEFENSE**

21         **OF "UNCLEAN HANDS"**

22      The Subsidiaries further maintain that Plaintiffs cannot prevail on their alter

23  ego theory because of the "unclean hands" doctrine which they contend is

24  established based on the following facts:

25      **A.   Boeing's Acquisition Of The Delta Line Of Rockets**

26      1.     Pursuant to the Sea Launch venture's governing contract, the Creation

27  Agreement, the Sea Launch Partners expressly agreed that they and their Affiliates

28

could participate in other ventures to launch satellites from land—only participation in other projects "for the launch of satellites from sea" was prohibited.  Tr. 814:2-815:2 (Karlsen) (reading Article 2.1 of the Creation Agreement, "[t]he Parties agree that . . . none of the Parties or their Affiliates, will discuss or enter into any agreement or contract . . . to: (a) participate in any other project for the launch of satellites *from sea* . . . ."  (emphasis added)).

2.      In 1996, approximately two years before Sea Launch's planned first launch, Boeing announced that it was merging with McDonnell-Douglas, and with that merger, it acquired the Delta family of rockets.  James Albaugh[40] 12/22/2014 Depo. ("Albaugh 12/22/2014 Depo."), 15:3-16:2.  That merger was finalized in July 1997.  *Id.* at 11:24-12:2.

3.      Through the merger with McDonnell-Douglas, Boeing acquired the Delta family of rocket launchers ("Delta"), which at the time included the Delta II and Delta III rockets, with a Delta IV rocket in the planning stage.  *Id.* at 15:6-17:14.

4.      There is no evidence that any Delta rocket has ever been launched "from sea" (or in any manner that would conflict with the Creation Agreement).

**B.      Joint Marketing of the Delta Program and Sea Launch**

5.      Boeing Launch Services ("BLS") jointly marketed Sea Launch and Delta for two years, November 2001 to November 2003.  *See* Final Pretrial Conference Order, Undisputed Fact No. 5, p. 5.

6.      In 2001, despite the potential conflicts of interests in collectively marketing Sea Launch and Delta (which compete for the same commercial launch missions), Boeing recommended that it was in Sea Launch's best interests to proceed with the BLS marketing proposal.  Tr. 781:20-782:9, 784:13-16 (Karlsen) (noting that possible conflicts of interests were posed during a board meeting before

---

[40] Before October 2012, James Albaugh was the executive vice president for Boeing and the president and CEO of Boeing Commercial Aircraft.  Albaugh 12/22/2014 Depo., 10:1-4.

the BLS marketing contract was approved); Vasiliev Depo. Vol. 2, 262:13-21 ("As we understood, Boeing identified its structure, Boeing Launch Services, and this entity was dealing with marketing of vehicles of both Delta family and Delta Zenit vehicles.  RSC Energia had repeatedly raised the matter of conflict of interest, and the response we received was that firewalls -- firewalls were necessary, some barriers were needed, and these firewalls exist, and Boeing didn't see any conflict of interest.").

7.     During a September 2001 board meeting, each Sea Launch partner agreed to use BLS to jointly market Sea Launch and Delta.  PX139-0006 (Minutes for September 8, 2001 Sea Launch Board Meeting); Tr. 805:3-5 (Karlsen) ("Q: The concept that BLS would market Sea Launch and Delta together was discussed at that [2001] meeting; right? A: It was.").  The goal of the arrangement was to sell more Sea Launch and Delta launch services.  Albaugh 12/22/2014 Depo., 154:2-11 (noting that the intent was to sell both Sea Launch and Delta launch services).

8.     Approximately nine months after the Sea Launch Partners approved the joint marketing arrangement, BLS and Sea Launch entered into a marketing services contract.  DX2085 (Joint Marketing Contract between BLS and Sea Launch); Tr. 806:8-19 (Karlsen).  Under the marketing services contract, BLS had no authority to negotiate contracts on behalf of Sea Launch.  *See* DX2085-0002, § 1.2 ("When a potential customer indicates an interest in entering into a contract, BLS will advise and support Sea Launch customer interface and the Sea Launch negotiation team.  BLS has no express or implied authority to negotiate or conclude contracts on behalf of Sea Launch."); Tr. 806:24-807:14 (Karlsen) (same).  Before proposing any Sea Launch offer, BLS was obligated to submit bid assessments to Sea Launch.  DX2085-0003, § 3.1 ("BLS shall submit a bid assessment to Sea Launch prior to Initiating proposal preparation of any Sea Launch offer for Launch services."); Tr. 807:15-808:2 (Karlsen) (same).  And BLS needed written approval

1  "from authorized Sea Launch management" before submitting any proposal to Sea

2  Launch for launch services.  DX2085-0003,§ 3.2[41]; Tr. 808:3-17 (Karlsen).

3        9.      BLS and Sea Launch agreed in their marketing services contract to

4  protect any proprietary information "from unauthorized disclosure and use in

5  accordance with [a] Proprietary Information Agreement between the parties

6  executed on December 3, 2001," the terms of which were incorporated into the

7  marketing services contract.  DX2085-0009, § 16.

8        10.     BLS had access to the confidential pricing information for both Sea

9  Launch and Delta, including where both programs were competing for the same bid.

10 Richard Williams[42] 12/16/14 Depo. ("Williams 12/16/14 Depo."), 64:19-25 ("Q:

11 And when BLS was getting to make a bid decision, the same people were making

12 bids on behalf of Delta and Sea Launch; correct? A: Roughly the same people, yes.

13 Q: And they knew exactly what prices each one was making; correct?  A: They

14 knew, yes."); *cf*. Tr. 889:18-25 (Williams) ("Can you tell the Court what kind of

15 pricing information was shared between Delta and Sea Launch?  A: Only the bid

16 assessment.  Q: Right. And what is the bid assessment?  A: It is an estimate of the

17 price to win based on all kinds of factors including prior launch history,

18 transportation costs, insurance, all kinds of factors."); Tr. 864:1-23 (Williams)

19 (sharing of Sea Launch proprietary information expressly contemplated through the

20 BLS marketing agreement); Tr. 859:12-861:25 (Williams) (same); *accord* DX2085-

21 0009, § 16 ("Each Party may disclose information to the other Party, some of which

22

23 [41] "After a bid decision has been made and at the request of Sea Launch, BLS will prepare Sea Launch proposals in conjunction with Sea Launch contracts, engineering and/or other appropriate

24 personnel and will submit a proposal approval request to Sea Launch management. Prior to submittal of a proposal by BLS a signed approval for the proposal for Sea Launch services must

25 be obtained from authorized Sea Launch management unless otherwise agreed to by Sea Launch."

26 [42] Richard Williams is a former Boeing employee, former Sea Launch Vice President for Business

27 Management (of Sea Launch's U.S. operations in Long Beach, California), and Sea Launch's former Vice President of Contracts and Procurement.  Dkt. No. 838, p. 8.

28

1  may be proprietary information of the disclosing Party, for purposes of executing

2  the Services provided by BLS under this Contract.").

3        11.    While being questioned on the bid-rigging issue, each witness testified

4  that they were unaware of any instance in which BLS shared Sea Launch's

5  confidential pricing information with Delta or otherwise misused Sea Launch's

6  confidential pricing information.  Tr. 890:9-23 (Williams) ("Q: did Boeing ever use

7  Sea Launch's projected bid prices to undercut Sea Launch? A: Not as far as I

8  know."); Robert Peckham[43] Depo. 12/08/2014 ("Peckham 12/08/2014 Depo."),

9  87:5-88:5 ("BLS had opinions about a lot of things.  But the decision for what was

10  going to happen for Sea Launch rested with Sea Launch . . . ."), 102:15-23 (same);

11  Albaugh 12/22/2014 Depo., 51:13-25 (confirming no confidential pricing

12  information was being exchanged), 176:10-18 ("[T]here was to be no sharing of

13  information between the Delta program and the Sea Launch program. I would guess

14  in -- at some level in BLS, somebody knew the pricing from both organizations,

15  yeah."), 194:20-195:16 ("I don't know what visibility was given to the people at

16  BLS. But I do know one thing. And that was, whatever BLS did, they were a filler

17  to keep the information from Sea Launch from leaking over to Delta and vise

18  versa.").

19        12.    BLS's pricing recommendations were ultimately recommendations,

20  which Sea Launch and Delta were free to accept or reject according to their own

21  judgment.  Peckham 12/08/2014 Depo., 87:5-88:5, 101:14-25, 105:2-5 (testifying

22  that Delta did not typically go with prices recommended by BLS).

23        13.    It is undisputed that Sea Launch retained final pricing authority over all

24  Sea Launch proposals during the time BLS marketed Sea Launch.  (Tr. 805:6-11,

25  806:20-23, 808:3-17 (Karlsen); Tr. 854:12-24, 859:2-19 (Williams); Peckham

26  12/08/2014 Depo., 87:5-88:5; DX2085-0003.  Sea Launch executives (which

27
28
---
[43] Robert Peckham was both a Boeing and a Sea Launch employee.  Peckham 12/08/2014 Depo., 10:1-10.

included then Sea Launch CFO Kjell Karlsen) approved all pricing decisions.  Tr. 808:18-21 (Karlsen); Peckham 12/08/2014 Depo., 231:8-11.

**C.**    **Government Regulations and Policies that Affected Sea Launch's Ability to Compete For Government Launches**

14.    The U.S. Government has declared that access to space through U.S. space transportation capabilities is essential to national security.  Tr. 1096:23-1097:1 (Logsdon[44]).

15.    From 1995 to 2009, there were multiple regulations and policies that made competing for U.S. Government launch services more difficult for companies such as Sea Launch.  Tr. 1046:19-25 (Logsdon) (agreeing that policy barriers "impede[d] Sea Launch's ability to get government contracts"); 1095:4-7 (Logsdon) (same); PX138 ("███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████").  These regulations and policies included: (1) the majority U.S. ownership requirement of the Commercial Space Act of 1998; (2) the requirement of National Space Transportation Policy that U.S. Government payloads be launched on launch vehicles manufactured in the United States; (3) the restrictions in the Iran Nonproliferation Act of 2000 barring payments to Russian entities in connection with the International Space Station; and (4) the "Buy American" requirements of Federal Acquisition Regulations.  Tr. 1095:4-25 (Logsdon) (agreeing that the Commercial Space Act of 1998 and the National Space Transportation policy were governmental barriers for Sea Launch); Tr. 816:14-819:17 (Karlsen) (discussing "Buy American" and the Iran Nonproliferation Act policies"); Peckham 12/08/2014 Depo., 211:12-212:5 (discussing the "Buy American" policy), 231:17-232:16 (noting that the reason Sea Launch had difficulty securing government contracting was because Sea Launch was "continually

---

[44] Dr. John Logsdon is the Energia Subsidiaries' aerospace technology expert who testified about government launch services contracts.  (Dkt. No. 803, p. 2.)

1  rebuffed by NASA for the Buy America Act"); Douglas Cooke[45] 05/14/15 Depo.

2  ("Cooke 5/14/15 Depo."), 233:9-235:5 (conversing about the Iran Nonproliferation

3  Act); DX2096-0060 (Sea Launch presentation highlighting "Buy American" and the

4  Iran Nonproliferation Act as "███████████████") (emphasis in original).

5       16.    Based on his experience working at NASA *see* DX2293, Mr. Cooke

6  testified that Sea Launch did not have a realistic possibility of overcoming these

7  legal and policy barriers.  Cooke 05/14/2015 Depo., 67:14-20.  The Subsidiaries'

8  own expert on space policy, Dr. John Logsdon, admitted that it is "somewhere

9  between speculation and a reasonable expectation that, if Boeing had put its full

10  support behind Sea Launch, that the government would have either qualified Sea

11  Launch as a U.S. vehicle or granted an exemption to make Sea Launch eligible for

12  government launches."  Tr. 1057:14-1058:5 (Logsdon).

13       17.    The regulations and policies are detailed below.

14          **1.    The U.S. Ownership Requirement Of The Commercial Space**

15              **Act Of 1998**

16       18.    The Commercial Space Act of 1998 required the U.S. Government to

17  acquire space transportation services from "United States commercial providers."

18  Tr. 1096:19-1097:5 (Logsdon); Pub. L. 105–303, title II, § 201, Oct. 28, 1998, 112

19  Stat. 2854.  Section 201(a) of the Act states:  "Except as otherwise provided in this

20  section, the Federal Government shall acquire space transportation services from

21  United States commercial providers whenever such services are required in the

22  course of its activities.  To the maximum extent practicable, the Federal Government

23  shall plan missions to accommodate the space transportation services capabilities of

24  United States commercial providers."  Pub. L. 105–303, title II, § 201(a), 112 Stat.

25  2854.

26  _____

27  [45] Douglas Cooke is a former NASA employee and Plaintiffs' expert on NASA launches.  *See*
28  DX2293.

70

19.   "United States commercial provider" means "a commercial provider, organized under the laws of the United States or of a State, which is . . . more than 50 percent owned by United States nationals…."  Tr. 1097:6-9 (Logsdon); Pub. L. 105–303, title II, § 2(8)(A), Oct. 28, 1998, 112 Stat. 2854; DX2096-0060.

20.   Sea Launch was not a "United States commercial provider" because United States nationals did not own more than 50% percent of Sea Launch.  Tr. 816:14-817:2 (Karlsen); Tr. 1097:6-13 (Logsdon).

21.   There is no evidence that any U.S. Government agency has ever granted any majority foreign-owned launch provider a waiver from the 50 percent U.S. ownership requirement of the 1998 Commercial Space Act solely on account of pricing or cost considerations.

## 2.   The U.S. Content Requirement Of National Space Transportation Policy

22.   U.S. National Space Transportation Policy required government payloads to be launched on "space launch vehicles manufactured in the United States."  White House Fact Sheet, National Space Transportation Policy, § V(1)(a) (Jan. 6, 2005), *available at* https://www.whitehouse.gov/sites/default/files/microsites/ostp/space-transportation-policy-2005.pdf ; White House Fact Sheet, National Space Transportation Policy, § VI(1) (Aug. 5, 1994), *available at* http://clinton3.nara.gov/WH/EOP/OSTP/other/launchstfs.html.  This policy bound all U.S. Government agencies, including NASA and the U.S. Air Force, at all times relevant to this dispute.  Tr. 1108:9-13 (Logsdon); DX2096-0060 ("                            ").

71

1        23.    Under the 1994 U.S. space transportation policy, Sea Launch would

2    have needed an exemption from the President of the United States or his

3    representative to launch U.S. Government payloads.  Tr. 1108:14-21 (Logsdon)

4    (confirming the existence of the exemption needed from the President under this

5    policy).

6        24.    After 2005, if a launch provider wanted to know if it was eligible for an

7    exception, it needed to contact the President's Office of Science and Technology

8    Policy ("OSTP").  Tr. 1119:5-14 (Logsdon).

9        25.    The Sea Launch Zenit 3-SL was comprised nearly entirely of foreign-

10   manufactured and designed hardware.  Tr. 817:19-818:6 (Karlsen) (agreeing that

11   outside of the payload fairing, Sea Launch rockets were manufactured in Russia and

12   Ukraine); Tr. 1109:5-10 (Logsdon) (the Zenit 3-SL "does not have 100 -- it does not

13   have 51 percent U.S. manufactured content . . . Some portions of it are

14   manufactured in the U.S."); 1110:10-20 (Logsdon) (agreeing that foreign entities

15   manufacture more than 50% percent of Zenit 3-SL); PX138-0001 ("█████

16   ████████████████████████████████████████████

17   ████████████████████████████████████████████

18   ████████████████████████████████████████████

19   ██████"); Tr. 1111:3-11 (Logsdon) (confirming the Zenit 3-SL's U.S. content

20   being less than 50%).

21       26.    The Delta's Atlas V rocket also contains some foreign content in its

22   engine.  Tr. 1114:13-15 (Logsdon) (confirming that outside of the RD-180 engine,

23   the Atlas V has almost no foreign components).  While the Atlas V has launched

24   U.S. Government payloads, using the Russian-made RD-180 engines in the Atlas V

25   has been a major policy issue and controversy for the U.S. Government.  Tr.

26   1114:16-19 (Logsdon) (verifying the policy issues with the U.S. government using

27   the RD-180 engines).  The U.S. Government only agreed to allow the RD-180's use

28

1  subject to a number of specific conditions.  Tr. 1115:2-15 (Logsdon) (discussing

2  several stipulations the U.S. government required in order to use the RD-180

3  engines).

4        27.     In comparing the Zenit 3 to the Atlas V, "it's inarguable that the Zenit 3

5  has more foreign content than the Atlas V."  Tr. 1114:10-12 (Logsdon).

6        28.     The Delta Antares also has foreign components.  The Antares is a two-

7  stage rocket Tr. 1111:16-17 (Logsdon), which means that the Antares rocket's first

8  stage is manufactured in the Ukraine and its second stage (along with the payload

9  fairing) is manufactured in the U.S.  Tr. 1111:16-25 (Logsdon).

10        29.     By contrast, the Zenit 3-SL is a three-stage rocket, and foreign entities

11  manufacture all three stages.  Tr. 1112:1-5 (Logsdon).

12               **3.**       **The Iran Non-Proliferation Act of 2000**

13        30.     The Iran Non-Proliferation Act (INA) forbade U.S. payment to Russian

14  entities involved in the International Space Station (ISS).  Tr. 818:7-17 (Karlsen);

15  DX2096-0060.  As Dr. Logsdon verified, in passing this law, the U.S. Government

16  sought to limit U.S. payment to Russian entities that were believed to be working

17  with Iran on nuclear proliferation.  Tr. 1115:16-1116:12 (Logsdon).

18        31.     The INA targeted Energia because Energia was a Russian entity

19  believed to be working with Iran on nuclear proliferation.  Tr. 1116:9-15 (Logsdon)

20  (confirming that Energia was believed to be working with Iran on nuclear

21  proliferation); *accord* Tr. 1095:20-22 (Logsdon) (agreeing that the INA was a

22  barrier for Sea Launch).

23        32.     With Energia being a Sea Launch partner, absent an act of Congress,

24  the INA barred Sea Launch from performing ISS-related missions.  Tr. 798:21-24

25  (Karlsen); Tr. 1116:24-1117:5 (Logsdon); PX138-0001 ("[A] Congressional waiver

26  to the Iran, North Korea, Syria Non-Proliferation Act (INKSNA) is believed to be

27  required for Sea Launch to participate in U.S. Government business. . . ."); PX138-

28

0002 ("Sea Launch requested an advisory opinion from the Office of Science & Technology Policy (OSTP) in the White House [] on the likelihood of receiving a Congressional waiver for lNKSNA.  While informal, it was not positive at that time."); DX2096-0060 (describing Sea Launch efforts to overcome INA).

33.     In the period preceding Sea Launch's bankruptcy, Congress only twice waived the INA—once in 2003 and once in 2008 which were occasions in which the U.S. Government had no other option to conduct the launches at issue.  Cooke 05/14/2015 Depo., 92:13-93:16 (testifying that the 2003 exemption was "a dire need within NASA" following the Columbia disaster and that the 2008 exemption "was a big deal" and "not an easy thing for NASA to go do"); Cooke 05/14/2015 Depo., 102:14-103:12 (waivers granted to permit Soyuz and Progress foreign launch vehicles to launch U.S. Government payloads were "done due to a dire need"); Cooke 05/14/2015 Depo., 241:9-242:13 ("I know there were [INA] waivers provided in order to fly Soyuz and Progress in 2003 after the Columbia accident, and in 2008 in anticipation of the space shuttle."); Cooke 05/14/2015 Depo., 244:8-245:16 ("dire need to keep things going" after Columbia accident led to waiver for Soyuz and Progress in 2003 and space shuttle retirement led to second waiver in 2008).

## 4.     The "Buy American" Rules Of Federal Acquisition Regulations

34.     The "Buy American" provisions of Federal Acquisition Regulations (FAR) "[r]estrict the purchase of supplies, that are not domestic end products, for use within the United States."  48 C.F.R. § 25.001(a)(1).

## D.     Sea Launch's Inability to Secure U.S. Government Launches

35.     Sea Launch technically qualified to perform several government launches.  Richard McKinney[46] 5/12/2015 Depo. ("McKinney 5/12/2015 Depo."),

---

[46] Plaintiffs' rebuttal expert, Richard McKinney, is a former Air Force colonel responsible for the EELV satellite launch program.  Dkt. No. 754, p. 3.

1   275:4-11 ("Q: Now, we've already talked about there were 21 missions that you

2   believed Sea Launch, in fact, was technically able to perform, correct? A: Yes.");

3   Tr. 776:8-17 (Karlsen) (same).

4          36.     Before filing bankruptcy in 2009, Sea Launch made numerous attempts

5   to obtain U.S. Government launches—all of which were unsuccessful.  PX35-0019

6   ("█████████████████████████████████████████████████████") (emphasis

7   in original); PX138-0001 ("███████████████████

8   █████████████████████████████████████████████████

9   ██████████████████████"); DX2095-0013

10  (discussing business strategies to secure NASA contracts); DX2096-0060

11  (requesting help from Sea Launch partners to enlist "██████████████████

12  ████████████████"); DX2098 ("████████████████████████████

13  ████████████") (emphasis in original); Peckham 12/08/2014 Depo., 231:17-232:16

14  ("Q: And did [Sea Launch] succeed in obtaining any U.S. Government business? A:

15  No."); Peckham 12/08/2014 Depo., 210:12-212:5 (discussing efforts to obtain

16  government business); Tr. 1086:19-1087:9 (Logsdon) (same).

17         37.     Sea Launch hosted or briefed numerous U.S. Government officials,

18  including representatives from the U.S. Air Force, the OSTP, the Joint Space Team

19  at the Pentagon, and the Missile Defense Agency, on Sea Launch's capabilities, and

20  prepared white papers used to advertise Sea Launch's capabilities for NASA

21  missions.  PX138-0001("Sea Launch has hosted or briefed hundreds of [U.S.

22  Government] representatives on our capabilities . . . ."); Tr. 1073:4-12 (Logsdon)

23  (hundreds of government officials visited Sea Launch, including Peter Teets, the

24  Undersecretary of the Air For Space).

25         38.     From 2000 to 2009, Sea Launch's price averaged between $65-70

26  million per launch as compared to Delta's price tag that exceeded $250 million.  Tr.

27  692:12-16 (Carman) (stating that over a ten-year period, Sea Launch's average price

28

1  was $65-70 million)[47]; Tr. 1052:23-1053:11 (Logsdon) ("The NASA inspector

2  general writing in 2011 talked about 264 million for an Atlas V."); *cf.* McKinney

3  5/12/2015 Depo., 249:5-252:25 (agreeing that in 2006, the U.S. Government spent

4  $1.8 billon on one launch within the EELV program; in 2007, they spent $2.2 billon

5  on three launches within the EELV program; in 2008, they spent $1.6 billion on five

6  launches within EELV program).

7      39.    In one effort, in October 2004, NASA sent a Request for Information

8  ("RFI") to Sea Launch, which BLS representative Jayne Schnaars brought to Sea

9  Launch's attention as "a great [opportunity] to get [Sea Launch] capabilities into

10  NASA."  DX2101 (9/15/2004 e-mail from BLS representative Jayne Schnaars

11  regarding NASA's RFI); PX477 (Sea Launch's response to NASA solicitation); Tr.

12  1087:17-25 (Logsdon) (verifying that Sea Launch responded to NASA's RFI).  With

13  some assistance from Boeing, Sea Launch provided NASA a comprehensive

14  summary of its capabilities.  *See* PX477 (Sea Launch's response to NASA

15  solicitation); *cf.* Tr. 1088:17-1089:21 (Logsdon) (admitting that Boeing submitted

16  information to NASA from Sea Launch in response to RFI for range of possible

17  NASA science missions).

18      40.    There were also coordinated meetings between Sea Launch and U.S.

19  Government officials to address the "Buy American" policy.  Peckham 12/08/2014

20  Depo., 202:3-11("We were working on creating an integrated strategy with Boeing

21  and, in particular, with the Washington, D.C. office, in meeting with various folks

22  from NASA to see if we could possibly overcome the Buy America Act

23  restriction.").  Boeing representatives helped Sea Launch strategize on positioning

24  for U.S. Government launches.  *See*, *e.g.*, DX2093 (Boeing representative Terry

25  Bohlen proposing ways to position Sea Launch for U.S. Government launches);

26

27  [47]  In a response to NASA Request for Information, Sea Launch quoted $78.0 million as the
    "Rough Order of Magnitude" for the price to launch a mission for NASA.  Tr. 1052:25-1053:3

28  (Logsdon); PX0477 (Sea Launch's response to NASA solicitation).

DX2101-0001 (Boeing representative Jayne Schnaars encouraging Sea Launch to respond to NASA RFI); DX2100-0002 (Boeing representative Mike Mott suggesting that Sea Launch and Boeing approach NASA (and maybe the Air Force) and recommending "next step" to help Sea Launch win NASA launches).

41.    The response from OSTP was not favorable to Sea Launch.  Tr. 1119:15-18 (Logsdon) (verifying that Sea Launch received a negative response from a OSTP staffer).  There is no other evidence that NASA responded favorably to any of the efforts stated above.

42.    Mr. Albaugh testified that despite the obstacles restricting Sea Launch's access to U.S. Government launches, he "was in there pitching [the U.S. Government] every chance [he] got for Sea Launch."  Albaugh 12/22/2014 Depo., 232:7-233:12.  Mr. Albaugh also addressed (with U.S. Government officials) the possibility of using Sea Launch to validate U.S. missile defense through launches off the coast of Korea or using Sea Launch for space station resupply.  Albaugh 12/22/2014 Depo., 169:7-170:11 (recalling that U.S. Government conversations about simulating a "launch from North Korea by taking the Sea Launch platform off the coast of Korea"); 170:16-23 (remembering U.S. Government discussion regarding Sea Launch's potential space station resupply); 233:7-12 (same regarding space station resupply).

43.    Despite the foregoing efforts, Sea Launch was unable to secure a U.S. Government launch contract.

        **1.**    **The Effect of Sea Launch's Inability to Secure U.S. Government Launch Contracts**

44.    Former Sea Launch executives testified that access to a limited number of such launches would have made a material difference in Sea Launch's financial condition.  Tr. 712:17-713:11 (Carman) ("Q: In your role as CFO of Sea Launch Company LLC, in your view what would have been the impact of seven launches or

$221 million of profit arising from government launches? . . . A: It would have had a tremendous positive impact [on Sea Launch's financial status]."). Mr. Karlsen testified that the additional $200 to $400 million in profit from government launches "would have made a huge difference" to Sea Launch financial stability. Tr. 774:2-13 (Karlsen). In addition to profits, Mr. Karlsen and Mr. Carman also testified that establishing the U.S. Government as a customer (even for one launch) would have a "domino effect" amongst Sea Launch's other commercial customers which would have "made a tremendous difference." Tr. 712:17-713:11 (Carman); *accord* Tr. 774:2-13 (Karlsen) ("A net profit in 200 to $400 million would have made a huge difference. It would have provided necessary funding to order lots of hardware. It would have given great customer confidence, which would have helped us in our quest for more commercial contracts.").

45.     In 2003, Boeing's Integrated Defense System ("IDS") division, which was responsible for Sea Launch, made a presentation to Boeing CFO Mike Sears that made clear that ████████████████████████████████████. DX2188-5. The presentation identified several "█████████████" regarding potential government contract opportunities for Sea Launch. DX2188-22 (emphasis in original); *cf.* Tr. 1060:7-9 (Logsdon) ("And in fact the document identified six by number, six launches -- government launches as candidates for Sea Launch.").

46.     Plaintiffs' rebuttal expert, Dr. Bradley Cornell, opined that even assuming Sea Launch secured government launch contracts, Sea Launch would not have survived. Tr. 610:21-616:14 (Cornell) (less than 1 in 10,000 chance of assumptions coming true); Tr. 612:2-5 (Cornell) (confirming that up to $400 million in additional profit would not have avoided Sea Launch's bankruptcy); Tr. 606:15-24 (Cornell) (same).

47.    Despite the foregoing, there is no conclusive evidence demonstrating that Sea Launch would have avoided bankruptcy if it were to secure government launch contracts.

**E.    Boeing's Anti-Trust Violations Related To The U.S. Evolved Expendable Launch Vehicle ("EELV") Satellite Launch Program**

48.    Through a June 2006 press release, the U.S. Government announced that Boeing would pay a $650 million civil penalty.  Dkt. No. 880, Ex. E, p. 1.[48] The penalty was assessed after investigating 1998 allegations against Boeing for procurement integrity violations involving Lockheed Martin's confidential pricing information and the EELV program.  Albaugh 12/22/2014 Depo., 54:23-55:8 (confirming that Boeing was assessed a fine after improperly using its competitor's information).   This procurement fraud fine was a "real embarrassment to [Boeing] and [ultimately] cost . . . [Boeing] billions and billions of dollars."  Albaugh 12/22/2014 Depo., 204:2-8.

49.    Mr. McKinney characterized Boeing's misconduct as a "big deal" and stated that Boeing "stole" Lockheed's confidential pricing information.  McKinney 5/12/2015 Depo., 229:24-231:13.

50.    There is no evidence that alleged procurement integrity violations in had any impact on Sea Launch's financial stability.

**V.    CONCLUSIONS OF LAW REGARDING THE AFFIRMATIVE DEFENSE OF UNCLEAN HANDS**

1.    The Subsidiaries have failed to prove their unclean hands defense.

2.    Because alter ego is an equitable remedy under Delaware law, Plaintiffs must "come[] into equity . . . with clean hands."  *Nakahara v. NS 1991 Am. Trust*, 739 A.2d 770, 791 (Del. Ch. 1998) (citation and quotation marks omitted).

---

[48] Pursuant to Federal Rule of Evidence 201, the Court takes judicial notice of the Department of Justice Press Release.  *See U.S. v. 14.02 Acres of Land More or Less in Fresno County*, 547 F.3d 943, 955 (9th Cir. 2008) (district courts "may take judicial notice of matters of public record").

3. Under both Delaware and federal law, the unclean hands affirmative defense is substantially the same in application. *Nakahara v. NS 1991 Am. Trust*, 718 A.2d 518, 523 (Del. Ch. 1998) (Unclean hands is a "rule of public policy" that "'protects the public and the court against misuse by one who, because of his conduct, has forfeited his right to have the court consider his claims, regardless of their merit.'") (citation omitted); *see also Precision Instrument Mfg. Co. v. Automotive Maint. Mach. Co.*, 324 U.S. 806, 814, (1945) (unclean hands doctrine "closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant.").

4. "The decisional authority is almost universal in its acceptance that courts of equity have extraordinarily broad discretion in application of the doctrine." *TransPerfect Global, Inc. v. Elting (In re Shawe & Elting LLC)*, 2015 Del. Ch. LEXIS 211, at *120-122 (Del. Ch. Aug. 13, 2015) (quoting *Nakahara*, 718 A.2d at 522).

5. This Court therefore "has broad leeway in exercising its equitable judgment under this maxim, and is 'not bound by formula or restrained by any limitation that tends to trammel the free and just exercise of discretion.'" *In re Barker Trust Agreement*, 2007 Del. Ch. LEXIS 87, at *46 (Del. Ch. 2007) (quoting *Nakahara*, 718 A.2d at 522).

6. In order to prevail on this defense, the Subsidiaries have to establish two necessary elements.

7. *First*, the Subsidiaries have to prove that Plaintiffs engaged in misconduct that is egregious, reprehensible, and so offensive as to shock the moral sensibilities of the Court. *See, e.g., Oracle Partners, L.P. v. Biolase, Inc.*, C.A. No. 9438-VCN, 2014 WL 2120348, at *18 (Del. Ch. 2014) *aff'd*, 97 A.3d 1029 (Del. 2014) ("The Court may invoke [unclean hands] when a party's particularly

egregious conduct offends the integrity of this Court."); *Portnoy v. Cryo-Cell Int'l, Inc.*, 940 A.2d 43, 80-81 (Del. Ch. 2008) ("[A] litigant who engages in reprehensible conduct in relation to the matter in controversy [] forfeits his right to have the court hear his claim, regardless of its merit.").

8.    *Second and most importantly*, the misconduct at issue *must have* an immediate and necessary relation to the claims seeking relief.  *E.g.*, *Sloan v. Segal*, 996 A.2d 794, at *6 (Del. 2010) ("The inequitable conduct must have an 'immediate and necessary' relation to the claims under which relief is sought.") (citation omitted); *Kousi v. Sugahara*, No. Civ. A. 11556, 1991 WL 248408, at *2 (Del. Ch. 1991) (same); *Henderson v. U.S.*, 135 S. Ct. 1780, 1783 n.1 (2015) ("immediate and necessary relation" required); *Cal-Agrex, Inc. v. Tassell*, 408 F. App'x 58, 61 (9th Cir. 2011) ("actions unrelated to the contract could not serve as a factual predicate for application of the unclean hands defense").  A court cannot "deny relief in equity . . . simply because the plaintiff may have engaged in inequitable conduct in the past," even if it has "no relation to anything involved in the suit[.]"  *Kousi*, 1991 WL 248408, at *5-6 (quoting *Eastern States Petroleum Co. v. Universal Oil Prod. Co.*, 8 A.2d 80, 82 (Del. 1939).

9.    For the sake of argument, the discussion below assumes that the Subsidiaries have satisfied the first prong, *i.e.* Plaintiffs engaged in misconduct[49]

---

[49] The Subsidiaries have three primary misconduct allegations against Boeing.  *First*, after Boeing acquired the Delta Program, the Subsidiaries allege that Plaintiffs improperly competed with the Sea Launch venture and breached its fiduciary duty to the other Sea Launch partners.  *In re Mobilactive Media, LLC*, C.A. No. 5725–VCP, 2013 WL 297950, at *20-23 (Del. Ch. Jan. 25, 2013) (acquiring competitor in same line of business); *Leff v. Gunter*, 33 Cal.3d 508, 515-8, 189 Cal.Rptr. 377, 381-4 (Cal. 1983) (competing bids for same project); *Interserve, Inc. v. Fusion Garage PTE. LTD.*, 2010 WL 3339520, at *8 (N.D. Cal. Aug. 24, 2010) (developing competing product).

*Second*, the Subsidiaries believe that Boeing was "bid-rigging" during BLS's joint marketing of the Delta Program and Sea Launch.  According to the Subsidiaries, Boeing was using Sea Launch's pricing data to manipulate competing bids of its Delta rocket launchers which implicates antitrust violations.  *See United States v. United States Gypsum Co.*, 438 U.S. 422, 441 n.16 (1978) ("Exchanges of current price information . . . have the greatest potential for generating

1  during the course of the Sea Launch venture.  Because even assuming Plaintiffs

2  engaged such misconduct, the Court finds that there is no "direct relation" between

3  the alleged misconduct and Plaintiffs' alter ego claim.

4       10.     To be clear, the following analysis assumes the first prong of the

5  unclean hands analysis—engaging in misconduct—is met, and what remains is

6  whether Boeing's unfair conduct has an immediate and necessary relation to

7  Plaintiffs' claims.

8       11.     The Court, however, *does not* make any findings of fact as to whether

9  any misconduct actually occurred, and only assumes such misconduct for the sake

10  of argument.

11      **A.**     **The Subsidiaries' Misconduct Allegations Do Not Bear A "Direct**

12                **Relation" To Plaintiffs' Alter Ego Claims**

13       12.     With respect to Plaintiffs' misconduct, it is not so much that Sea

14  Launch's longevity was directly harmed but whether such conduct affected the

15  equities between the instant litigants—Plaintiffs and the Subsidiaries—that controls

16  the analysis here.

17       13.     The unclean hands doctrine does not apply unless the misconduct at

18  issue bears a "direct and immediate" relation to the relief Plaintiff seeks.  *E.g.*,

19  *Republic Molding Corp. v. B.W. Photo Utils.*, 319 F.2d 347, 349 (9th Cir. 1963)

20  (Unclean hands does not constitute "misconduct in the abstract, unrelated to the

21  claim to which it is asserted as a defense."); *E. States Petroleum Co. v. Universal*

22  *Oil Prods. Co.*, 8 A.2d 80, 82 (Del. 1939) (Unclean hands applies "only where some

23  anticompetitive effects and . . . have consistently been held to violate the Sherman Act.");
24  *Morning Star Packing Co. v. SK Foods, L.P.*, 754 F. Supp. 2d 1230, 1235-36, n. 5 (E.D. Cal.
    2010) (claim for Sherman Act violation stated based on alleged "bid rigging and allocation of
25  customers," noting that bid-rigging can "result in a competitor being outbid on a contract they
    would have otherwise been awarded," and that "entity utilizing the bid information of its
26  competitors can ensure that its bid is the lowest submitted, while securing maximum profit").

27  *Third*, the Subsidiaries claim that Boeing actively prevented Sea Launch from accessing
28  government contracts.

unconscionable act of one coming for relief has immediate and necessary relation to the equity that he seeks in respect of the matter in litigation.") (quoting *Keystone Driller Co. v. Gen. Excavator Co.*, 290 U.S. 240, 245 (1933)); *Walter v. Walter*, 136 A.2d 202, 207 (Del. Ch. 1957) ("To bar relief, plaintiff's hands must be rendered unclean by reason of some conduct relating directly to the matter in controversy.").

14.     Applying these guidelines, the Energia Subsidiaries must draw a direct and immediate connection between the alleged conduct and the relief sought. Without a sufficient nexus, the Energia Subsidiaries cannot support an unclean hands defense.

15.     To the extent that the unclean hands defense rests upon Boeing's outside McDonnell-Douglas venture, BLS's marketing strategy, and Boeing allegedly blocking government contracts, these misdeeds are simply too vague and speculative to establish that the conduct constituting the unclean defense bears an *immediate and necessary* relation to the central claim here—whether the Energia Subsidiaries are alter ego corporations of Energia.

16.     Focusing on the McDonnell-Douglas venture and the BLS marketing strategy of Sea Launch and Delta, the Subsidiaries claim that Boeing's conduct implicates antitrust violations and self-dealing which in turn, contributed to Sea Launch's financial failings.  More specifically, before acquiring McDonnell-Douglas, the Subsidiaries claim that Boeing internally identified Delta as one of Sea Launch's key competitors and expressly recognized that the Delta rockets and Sea Launch's Zenit rocket could compete for the same launches.  Then as BLS proceeded to jointly market the Delta Program and Sea Launch, the Subsidiaries maintain that Boeing improperly diverted customers to the Delta Program and misappropriated confidential pricing information to favor the Delta program.

17.     These facts (even taking them as true for the sake of argument) have no direct relation to this litigation's alter ego issues.  Moreover, even if there were a

nexus between Boeing allegedly competing with Sea Launch, the Creation Agreement's exclusivity provision permits what the Energia Subsidiaries consider misconduct and the Sea Launch partners approved of this joint marketing strategy.

18. *First*, The Creation Agreement contained an exclusivity provision, Article 2.1, that allowed the Sea Launch partners to engage in outside ventures, as long as those ventures did not provide sea-based launch services. *See supra* at Findings of Fact Regarding the Affirmative Defense of Unclean Hands No. 1. There is no evidence that suggests that any Sea Launch partner breached this provision.[50] Nothing in the Creation Agreement precluded Boeing from venturing into a project that provides launch services from locations other than the sea. Thus, the Energia Subsidiaries' contention that Boeing committed antitrust violations while in acquiring the Delta Program misses the point because Article 2.1 permitted Boeing to pursue the McDonnell-Douglas merger. *Second*, despite BLS having access to Sea Launch's confidential pricing information, the Sea Launch partners agreed to use BLS to jointly market Sea Launch and Delta during a September 2001 board meeting. *See supra* at Findings of Fact Regarding the Affirmative Defense of Unclean Hands Nos. 9-10. Looking at these facts as a Court in equity, one would be hard-pressed to conclude that Boeing is blameworthy for an unsuccessful marketing plan that the other Sea Launch partners encouraged and eventually approved.

19. Most importantly, none of the antitrust and self-dealing allegations[51]

---

[50] There is evidence that demonstrates the Sea Launch partners using this provision to pursue outside ventures. Indeed, Boeing acquired the Delta program in accordance with the exclusivity provision, and when it became a Sea Launch partner, Energia was a minority owner in the Lockheed Khrunichev Energia International, Inc. ("LKEI") venture (which ultimately became known as International Launch Services ("ILS")). Vasiliev 01/19/2015 Depo., 32:3-10, 40:20-42:22, 44:3-11; Tr. 815:4-11 (Karlsen) ("I know that Energia was a subcontractor to ILS . . . . My understanding was that Energia was involved in a joint venture called LKE, which was Lockheed Martin, Khrunichev, and Energia."). Both of these businesses—the Delta Program and LKEI—were outside ventures that Boeing and Energia were allowed to pursue under the Creation Agreement.

[51] Rather, the events seem more appropriate for a tortious inference cause of action—a claim not

1  (even taken as true) appear to be the type of wrongdoing that has any relationship,

2  let alone one that is "immediate and necessary," to RSC Eneriga's subsequent

3  breach of the Creation Agreement (*see* Dkt. No. 750) and disregard of the corporate

4  form.  The Subsidiaries' allegations resemble the defendants' unsuccessful

5  arguments in *Petro Franchise Sys.*, 607 F. Supp. 2d 781 (W.D. Tex. 2009).  In

6  *Petro*, the defendants-franchisees pursued an unclean hands defense, arguing that

7  the plaintiffs-franchisor were not entitled to injunctive relief because by purchasing

8  a competing franchise and subsequently diminishing the defendants' franchise

9  value, the plaintiffs deprived the defendants of their contract benefits.  *Id.* at 785,

10  797-98.  The court concluded that the relationship between the alleged misconduct

11  and the plaintiffs' trademark infringement claim (against the defendants for failing

12  to pay franchise dues) was "not immediate, necessary, or direct; nor does it relate to

13  the controversy in question."  *Id.* at 797-98.  As with the instant case, Boeing bought

14  Delta and allegedly competed unfairly with Sea Launch, but for the aforementioned

15  reasons, this conduct is not sufficiently related to Energia's refusal to pay its

16  contractual debts to Boeing nor does this misconduct bear any relation to Plaintiffs'

17  alter ego claims.  *See Keystone*, 290 U.S. at 245 ("[Courts] apply the maxim

18

19  pleaded in the complaint.  *Cf.* Dkt. No. 1.  "[T]o establish a claim of tortious inference with
   prospective business relations under Delaware law, a litigant 'must establish (1) the existence of a

20  valid business relationship or expectancy [*i.e.* the joint marketing of Sea Launch and the Delta
   Program]; (2) knowledge of the relationship or expectancy on the part of the interferer [*i.e.* BLS's

21  knowledge]; (3) intentional interference which induces or causes a breach or termination of the
   relationship or expectancy [*i.e.* BLS misappropriating Sea Launch's proprietary information]; and

22  (4) resulting damages to the party whose relationship or expectancy has been disrupted [*i.e.* failing
   to secure launch contracts].'"  *Res. Ventures, Inc. v. Res. Mgmt. Intern., Inc.*, 42 F.Supp.2d 423,

23  439 (D. Del. 1999) (citing *CPM Industries, Inc. et al. v. Fayda Chemicals & Minerals, Inc. et al.*,
   No. 15996, 1997 WL 762650, at *7 (Del. Ch. Dec.1, 1997)).

24

25  However, whether Boeing tortiously interfered with Sea Launch's business relations is not
   pertinent here.  The issue here is whether the alleged misconduct has an *immediate and necessary*

26  relationship to Plaintiffs' alter ego claims.  *Blanchette v. Providence & Worcester Co.*, 428
   F.Supp. 347, 357 (D. Del. 1977) ("the alleged inequitable conduct must involve the subject of the

27  litigation . . . [and] have an immediate and necessary relationship to the equity which [the
   plaintiff] seeks to obtain in the matter in litigation").

28

requiring clean hands only where some unconscionable act of one coming for relief has *immediate and necessary* relation to the equity that he seeks in respect of the matter in litigation.").

20.     Moving to the Energia Subsidiaries' assertion that Boeing contributed to Sea Launch's inability to obtain U.S. Government contracts, the Subsidiaries claim that this misconduct jeopardized Sea Launch's ability to profit and contributed to Sea Launch's eventual insolvency.[52]  Despite the various regulatory hurdles in obtaining a government contract outlined above, *see supra* at Findings of Fact Regarding the Affirmative Defense of Unclean Hands Nos. 14-34, the Subsidiaries presented evidence at trial demonstrating it was not impossible for Sea Launch to qualify for a government contract, *see supra* at Findings of Fact Regarding the Affirmative Defense of Unclean Hands No. 35, which proves that Boeing's efforts (or lack thereof) had a substantial impact on Sea Launch's government contract prospects.

21.     The evidence at trial painted a picture different from what the Subsidiaries describe.  Sea Launch would have had difficulty securing a government contract because of the policies and restrictions on foreign-based space services, not due to Boeing's alleged misconduct.  *See supra* at Findings of Fact Regarding the Affirmative Defense of Unclean Hands Nos. 18-34 (the Commercial Space Act's requirement of majority U.S. ownership; the National Space Transportation Policy's requirement that U.S. Government payloads be launched on launch vehicles manufactured in the U.S.; (3) the Iran Non-Proliferation Act's restrictions barring

---

[52] If the Energia Subsidiaries' argument is that Boeing engaged in prior misconduct that contributed to Sea Launch's bankruptcy which gave rise to the same debts Boeing seeks to collect in this case, then the Court respectfully disagrees.  It is Energia's (and Yuzhnoye's) breach of contract that has brought forth this action and Energia's abuse of the corporate form in creating these U.S. subsidiaries.  If the debt obligations under the Creation Agreement or the Guaranty Agreements were fulfilled, then (more than likely) this is not a matter in controversy that requires the Court's resolution.

1  payments to Russian entities in connection with the International Space Station; and

2  (4) the "Buy American" requirements of Federal Acquisition Regulations).  The

3  Court recognizes that it was not impossible for Sea Launch to secure a government

4  contract, especially in light of Sea Launch's competitive launch prices.  *See supra* at

5  Findings of Fact Regarding the Affirmative Defense of Unclean Hands Nos. 35, 38.

6  Moreover, securing several government launch contracts surely would have helped

7  Sea Launch's profitability.  Mr. Carman's and Mr. Karlsen's testimony even

8  indicated that Sea Launch could have realized an excess of $200 million worth of

9  profits in securing one government launch per year, and Mr. Carman testified that

10 even one government launch would have had a positive impact on Sea Launch's

11 finances.  *See supra* at Findings of Fact Regarding the Affirmative Defense of

12 Unclean Hands Nos. 44-45.  While all this may be true, these facts *only* create doubt

13 as to whether Sea Launch would have entered into bankruptcy.  There was no

14 conclusive finding that assisting Sea Launch to secure government contracts could

15 have avoided bankruptcy.  *See supra* at Findings of Fact Regarding the Affirmative

16 Defense of Unclean Hands No. 47.  And taking these allegations as true still fails to

17 establish the unclean hands doctrine's essential element—direct relation to the

18 claims seeking relief.  *In re Numoda Corp. Shareholders Litig.*, No. CV 9163-VCN,

19 2015 WL 402265, at *15 n.147 (Del. Ch. Jan. 30, 2015) ("In evaluating an unclean

20 hands argument, this Court focuses on actions with 'immediate and necessary

21 relation to the equity that [the plaintiff] seeks in respect of the matter in litigation,'

22 not just general misdeeds.").

23        22.    This gap in the Subsidiaries' analysis is telling. These inherently

24 speculative (and ultimately immaterial) allegations are unresponsive to the legal

25 standard under Delaware law—whether the inequitable conduct has an immediate

26 and necessary relationship to the equity Plaintiffs seek.  The evidence presented at

27 trial makes it evident that any alleged inequitable conduct that occurred earlier in

28

Sea Launch's history has no direct relation to the later events in breaching the Creation Agreement and the formation of the Energia Subsidiaries as alter ego corporations. Because the Energia Subsidiaries have failed to show how Boeing's alleged misdeeds have an immediate and necessary relation to Plaintiffs' equitable claims, the Subsidiaries' unclean hands defense fails.

## VI.   FINDINGS OF FACT REGARDING THE BANKRUPTCY-RELATED AFFIRMATIVE DEFENSES

Lastly, the Subsidiaries contend that Plaintiffs cannot pursue their alter ego claims because of events during Sea Launch's bankruptcy reorganization.  The Subsidiaries assert that Plaintiffs' involvement in Sea Launch's reorganization bars their alter ego claims based on the following facts:

1.    On June 22, 2009, Sea Launch filed for Chapter 11 bankruptcy protection in the U.S. Bankruptcy Court for the District of Delaware.  *See* Final Pretrial Conference Order, Stipulated Facts No. 2, p. 4.

2.    In order for Sea Launch to emerge from bankruptcy, the parties to this lawsuit discussed and negotiated the terms of the Plan and Confirmation Order.  *See* Final Pretrial Conference Order, Stipulated Facts No. 3, p. 3.

3.    Counsel for the respective parties primarily drafted the Plan and Confirmation Order.  Tr. 503:7-22 (Picone) ("The lawyers took the lead on the drafting . . . .").

4.    Salans LLP (n/k/a Dentons LLP) represented Energia, Energia Overseas, and Energia Logistics.  *See* Final Pretrial Conference Order, Stipulated Facts No. 4, p. 4.

5.    Energia and its affiliates negotiated with Sea Launch a "commitment letter" through which Energia and its affiliates would provide funding to help Sea Launch emerge from bankruptcy.  *See* PX0981-0008-0020 ("Exit Financing Commitment Letter").  The draft commitment letter included a release of claims

1  against "S.P. Korolev Rocket and Space Corporation Company (RSC Energia),

2  Energia Overseas Limited Russia or Energia Logistics Limited Russia and any of

3  their affiliates arising out of any facts and circumstances of doing business with or

4  investing in [Sea Launch]."  *Id.* at PX0981-0012 (proposed Section 4.5.9).

5       6.    When presented with this letter, Plaintiffs made clear to the Energia

6  representatives and its affiliates that they would not agree to any reorganization plan

7  unless the proposed release provision—Section 4.5.9 of the commitment letter—

8  included specific amendments.  *See* DX2018-0007 ("Boeing indicated that it would

9  sign the exit financing resolution subject to de-linking of the DIP financing and

10  the Exit financing, and amending the release provisions in section 4.5.9 of the

11  Commitment letter in a manner acceptable to Boeing."); *cf.* Schey 10/30/2013

12  Depo., 243:24-244:12 ("Boeing was very clear in the meetings with members of

13  RSC Energia that we intended to fully pursue suits against Energia and any and all

14  subsidiaries -- any and all affiliates."); Tr. 90:8-91:23 (Simons) ("Q: Would Boeing

15  have approved the exit financing and the plan if it didn't explicitly preserve

16  Boeing's ability to bring claims against all of Energia's affiliates? A: Absolutely

17  not.").

18       7.    After discussion and negotiation, the Sea Launch partners agreed in a

19  fully-executed board resolution that:



PX0981-0002.

8.    Section 10.5 of the Plan provided that:

> ***Nothing in the Plan***, including, but not limited to, Section 10.2 and 10.3 of the Plan, ***Confirmation Order, or any other document in connection with such documents shall release or discharge the claims***, if any, ***of The Boeing Company, Boeing Commercial Space Company***, Kvaerner AS, Aker ASA, S.P. Korolev Rocket and Space Corporation Energia, KB Yuzhnoye, and PO Yuzhny Mashinostoritelny Zavod Production Association, against entities other than the Debtors . . . ."

*See* DX2019-0044 ("Exception to Releases") (emphasis added).

9.    Similarly, Paragraph 38 of the Confirmation Order provides that:

> "***Nothing in the Plan***, including, but not limited to, Sections 10.2 and 10.3 of the Plan, ***the Confirmation Order***, including, but not limited to, Finding Paragraph N, and Decretal Paragraphs 29-36, and 39-40, ***or any other document in connection with such documents shall release or discharge the claims***, if any, ***of The Boeing Company, Boeing Commercial Space Company***, Kvaemer Sea Launch Limited, Kvaemer Sea Launch U.S., Inc., Aker Maritime Finance AS, Kvaemer AS, Aker ASA, S.P. Korolev Rocket and Space Corporation Energia, KB Yuzhnoye, and PO Yuzhny Mashinostroitelny Zavod Production Association, against entities other than the Debtors; provided, however, that nothing contained in this paragraph or Section 10.5 of the Plan shall constitute an acknowledgement by any party of any right or fact with respect to any claims . . . ."

*See* Section 38 (emphasis added).

10.    Separate and apart from these provisions, the Confirmation Order explicitly provided that the Global Settlement and Release between Plaintiffs, Sea Launch, and the Official Committee of Unsecured Creditors was "integral to the Plan" and was "nonseverable from the Plan and mutually dependent." *See*

Confirmation Order, at 0058, ¶ 46.  That "integral" and "nonseverable" agreement also explicitly preserved Plaintiffs ability to bring any and all claims against all Energia affiliates.  In particular, it provided that:

> Boeing, BCSC, and Aker do not waive and expressly preserve their rights to pursue the other Sea Launch partners—S.P. Korolev Rocket & Space Company, Energia, KB Yuzhnoye, and PO Yuzhnoye Mashinostroitelny Zavod, *along with any of their affiliates*—for 40% of the third party debt and 40% of the partner loans.  Nothing in this Agreement, and nothing in any plan of reorganization filed by the Debtors or the OCUC, will affect Boeing, BCSC, or Aker's rights to pursue the other Sea Launch partners *or any affiliates* with respect to the third party debt and partner loans.

*See* DX2023-0005-06, ¶ 23 (emphasis added).

11.  Additionally, the Confirmation Order provides that "no ambiguity in this Confirmation Order shall be interpreted to prejudice the rights of RSC Energia, Energia Overseas and Energia Logistics Ltd. under the Plan."  Confirmation Order, at 0063, ¶ 23.

## VII.  CONCLUSIONS OF LAW REGARDING THE BANKRUPTCY RELATED AFFIRMATIVE DEFENSES

1.  The Subsidiaries raise three defenses: consent, res judicata/collateral estoppel, and preemption, each of which fail as a matter of fact and law.

### A.  Consent

2.  By consenting to the Plan, the Subsidiaries contend that Plaintiffs waived their ability to assert an alter ego claim.

3.  In Delaware, the equitable defense of consent (also known as acquiescence) can be applied to bar equitable relief where the plaintiff to proven to have: (1) full knowledge of a transaction; (2) accepts the benefits of the transaction or acknowledges its legitimacy, either by words or deeds; and (3) thereafter attacks

1  the same transaction.  *See Continental Ins. Co. v. Rutledge & Co., Inc.*, 750 A.2d

2  1219, 1240 (Del. Ch. 2000); *see also Clements v. Rogers*, 790 A.2d 1222, 1238 n.46

3  (Del. Ch. 2001) ("the doctrine of acquiescence has included a showing that the

4  plaintiff, by words or deed, has acknowledged the legitimacy of the defendants'

5  conduct" (citations omitted)).

6      4.      The Subsidiaries base their "consent" or "acquiescence" defense on a

7  court order that expressly preserved Plaintiffs' ability to pursue their alter ego

8  claims.  *See supra* at Findings of Fact Regarding Bankruptcy-Related Affirmative

9  Defenses Nos. 7-11.

10     5.      *First*, Plaintiffs were not aware of the material facts in how Energia

11 and the Energia Subsidiaries would operate post-reorganization.  Indeed, these

12 entities did not operate as represented to the parties, U.S. Government, and the

13 Bankruptcy Court.  *See, e.g., supra* at Findings of Fact Regarding Alter Ego

14 Liability Nos. 51, 58-73, 80-82, 92-95, 99-107, 121-123.

15     6.      *Second*, Plaintiffs expressly preserved their right to sue Energia and

16 other Energia affiliates in the very Confirmation Order that the Subsidiaries claim

17 constituted "consent."  *See supra* at Findings of Fact Regarding Bankruptcy-Related

18 Affirmative Defenses Nos. 7-12.

19     7.      *Third*, for the reasons stated above, Plaintiffs did not lead Energia or

20 the Energia Subsidiaries to believe that Plaintiffs had approved the currently

21 challenged acts and transactions.

22     8.      Consequently, the Subsidiaries have not established the affirmative

23 consent defense.

24     **B.    Collateral Estoppel / Res Judicata**

25     9.      The Energia Subsidiaries claim that the Confirmation Order precludes

26 Plaintiffs' alter ego claim under theories of collateral estoppel (issue preclusion) or

27 res judicata (claim preclusion).

28

10.    "Where a federal court has decided the earlier case, federal law controls the collateral estoppel analysis." *McQuillion v. Schwarzenegger*, 369 F.3d 1091, 1096 (9th Cir. 2004) (citation omitted).

11.    Under federal law, the elements of collateral estoppel—otherwise known as issue preclusion—are that (1) the issue at stake must be identical to the one alleged in the prior litigation; (2) the issue must have been actually litigated by the party against whom preclusion is asserted in the prior litigation; and (3) the determination of the issue in the prior litigation must have been a critical and necessary part of the judgment in the earlier action.  *See, e.g., McQuillion*, 369 F.3d at 1096; *Town of N. Bonneville v. Callaway*, 10 F.3d 1505, 1508 (9th Cir. 1993); *Schoenleber v. Harrah's Laughlin, Inc*., 423 F. Supp. 2d 1109, 1111-12 (D. Nev. 2006)

12.    The elements of res judicata (claim preclusion) under federal law are: (1) an identity of claims, (2) a final judgment on the merits, and (3) privity between parties.  *Turtle Island Restoration Network v. U.S. Dep't of State*, 673 F.3d 914, 917 (9th Cir. 2012).  When these res judicata elements are satisfied, "a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were *or could have been raised* in that action."  *Allen v. McCurry*, 449 U.S. 90, 94 (1980) (citation omitted) (italics added); *see also Shaw v. State of California*, 788 F.2d 600, 605 (9th Cir. 1986) (res judicata applies "even if the particular theories of recovery or defenses raised in the second proceeding were not actually litigated in the first action").

13.    Here, Plaintiffs' alter ego claim seeks recovery for their claims that were specifically preserved during the bankruptcy proceedings.

14.    The Subsidiaries have not produced any evidence that demonstrates that Plaintiffs actually litigated an identical issue—seeking reimbursement under the Creation Agreement—prior to this lawsuit.  Moreover, no evidence has been

presented that a final determination or a final judgment has been previously issued with respect to Plaintiffs' alter ego liability theory or their breach of contract claims.

15.     As mentioned, Paragraph 38 of the Confirmation Order and Section 10.5 of the Plan make it clear that the Plaintiffs' claims are still viable irrespective of Sea Launch's Chapter 11 reorganization.  *See supra* at Findings of Fact Regarding Bankruptcy-Related Affirmative Defenses No. 9 (Section 38 states that "[n]othing in the Plan including but not limited to . . . *shall release or discharge the claims*, if any, of The Boeing Company, Boeing Commercial Space Company . . . .") (emphasis added); *see also* Findings of Fact Regarding Bankruptcy-Related Affirmative Defenses No. 8 ("Section 10.5 of the Plan states "[n]othing in the Plan . . . *shall release or discharge* the claims, if any, of The Boeing Company, Boeing Commercial Space Company . . . .") (emphasis added).)

16.     Plaintiffs are now exercising this right—the right to recovery for the claims (including alter ego claim) arising under the Creation Agreement—preserved under the Plan, and based on the facts, this is the first time Plaintiffs have pursued these claims.

17.     Because the recovery sought in this lawsuit is not identical to anything previously litigated or decided (*see* Dkt. No. 74, p. 7), the collateral estoppel and res judicata affirmative defenses are inapplicable and therefore fail.

**C.    <u>Preemption</u>**

18.     Lastly, the Energia Subsidiaries contend that Section 1144 of the Bankruptcy Code preempts Plaintiffs' alter ego claims.

19.     Section 1144 permits a party to seek revocation of a confirmation order on grounds of fraud, provided that it does so within 180 days of entry of a confirmation order.  *See* 11 U.S.C. § 1144.

20.      Both of those documents explicitly preserve Plaintiffs' ability to bring their alter ego claims, and Plaintiffs are not seeking to revoke the Confirmation

1   Order.  *See supra* at Findings of Fact Regarding Bankruptcy-Related Affirmative

2   Defenses Nos. 8-9; *see also* Dkt. No. 74 at 6-7 ("[T]he Confirmation Order has no

3   impact on the claims raised by Plaintiffs against the Energia Subsidiaries.").  Nor

4   are Plaintiffs asserting that the Energia Subsidiaries violated any applicable law,

5   rule, or regulation governing (a) solicitation of the Plan or (b) the offer, issuance,

6   sale, or purchase of securities.  11 U.S.C. §1125(e).  Rather, Plaintiffs seek to pursue

7   a right explicitly preserved within the Confirmation Order.  *See supra* at Findings of

8   Fact Regarding Bankruptcy-Related Affirmative Defenses Nos. 8-9.  Ultimately,

9   Section 1125 has no bearing, let alone preclusive effect, on any of Plaintiffs' claims

10   here.  *See* Dkt. No. 74, p. 7 (rejecting the Subsidiaries' preemption argument for this

11   reason).

12       21.    Thus, the Energia Subsidiaries have failed to produce sufficient

13   evidence to establish their affirmative preemption defense.

14   **VIII.  <u>DECISION SUMMARY AND CONCLUSION</u>**

15       On one end, this case concerns a relatively simple set of circumstances—

16   creditors, Plaintiffs, seeking to collect on debtors', Energia and Yuzhnoye,

17   reimbursement obligations.  The facts of this debt collection and its corresponding

18   breach of contract claims are equally straightforward.  Plaintiffs first extended credit

19   to Sea Launch through several loan guaranties which the Sea Launch partners—

20   Energia, Yuzhnoye, and Kvarner—secured in the event Sea Launch defaulted on

21   that credit.  Eventually, Sea Launch filed for Chapter 11 in June 2009 and defaulted

22   on its secured loans, resulting in the Sea Launch partners' debt obligations

23   becoming payable upon demand.  Appropriately, Plaintiffs invoiced the Sea Launch

24   partners demanding they satisfy their debts.  In September 2009, Kvaerner executed

25   a promissory note to Boeing satisfying its debt owed under the loan guarantees,

26   leaving Energia and Yuzhnoye as the remaining Sea Launch partners left to

27   reimburse Plaintiffs.  Those debts have yet to be paid, and for failing to satisfy these

28

1  contractual terms, Plaintiffs initiated this lawsuit against Energia and Yuzhnoye to

2  collect on these debt obligations.  The breach of contract claims were ultimately

3  resolved in Plaintiffs' favor.  Dkt. No. 750.

4      On the other end, this case involves an equitable theory that cannot be easily

5  simplified.  The circumstances mentioned above also introduced Plaintiffs' alter ego

6  theory against the Energia Subsidiaries because Plaintiffs claimed that the

7  Subsidiaries were not in fact legally recognized entities but instead functioned as

8  one legal entity with their dominant shareholder, Energia.  After a bench trial that

9  consisted of nearly two weeks of testimony and the presentation of several hundred

10  exhibits, this Court, sitting here in equity, could no longer ignore the façade of

11  separateness between Energia and the Energia Subsidiaries.  Evidence with regard to

12  the Energia Subsidiaries' insolvency (despite the supposed $200 million revolving

13  line of credit outlined in the Confirmation Order), nonpayment of dividends to its

14  shareholders, corporate records displaying various payments to related Energia

15  entities and employees of those Energia entities, overlapping officers and directors

16  between them and Energia, non-observation of corporate formalities, lack of control

17  over their corporate funds, and reproachful conduct in misleading creditors and the

18  Delaware Bankruptcy Court (evinced in the December 2010 and March 2011 email

19  chains) made clear that Energia uses the Subsidiaries as a mere instrumentality to

20  conduct and control Sea Launch's U.S. activates.  *See, e.g., supra* at Findings of

21  Fact Regarding Alter Ego Liability Nos. 83-95, 98-107, 113, 119, 121-129, 132-146,

22  152-158; *cf. Wilson v. Thorn Energy, LLC*, 787 F. Supp. 2d 286, 294 (S.D.N.Y.

23  2011) (discussing Delaware's alter ego factors).  One of the objectives of a court in

24  equity is to protect a creditor's (such as Plaintiffs) interest and the integrity of the

25  bankruptcy process from these aforementioned misrepresentations regarding

26  shareholder involvement.  Therefore, because Energia and the Subsidiaries

27  intermingle in a manner contrary to basic Delaware corporate law principals and use

28

their corporate form as a shield for defrauding the Delaware Bankruptcy Court, their corporate form shall be disregarded. *Blair*, 720 F. Supp. 2d at 471-73 (applying Delaware's alter ego factors which include "[parent company] misdirect[ing] funds, exercis[ing] crippling control, and purposefully siphon[ing] profits from the [] [s]ubsidiaries"); *Marnavi S.p.A*, 900 F. Supp. 2d at 392 (the corporate entity will be disregarded if the plaintiff "show[s] some fraud, injustice, or inequity in the use of the corporate form.").

The Subsidiaries maintain several positions and assert four affirmative defenses that ultimately fall short in challenging this alter ego finding. The Subsidiaries' primary argument is that Plaintiffs' alter ego theory reflects reverse veil piercing, a doctrine not yet recognized in Delaware. While this contention is not completely without merit, it convolutes the traditional alter ego theory being applied here. Plaintiffs are not corporate insiders seeking to disregard the corporate form to benefit from a corporation's claims, *i.e.* "insider reverse veil piercing," nor are Plaintiffs piercing the corporate veil to satisfy an individual shareholder's personal debt, *i.e.* "outsider reverse veil piercing." Fletcher Cyclopedia, § 41.70; *In re Howland*, 516 B.R. at 166. Rather, Plaintiffs are seeking to hold Energia and the Energia Subsidiaries as a single economic enterprise and claiming that the retention of this corporate form would produce inequitable consequences. *Microsoft Corp.*, 2013 WL 5899003 at *6-7 ("A subsidiary may be the alter ego or mere instrumentality of its parent when the two 'operate[ ] as a single economic entity such that it would be inequitable for this Court to uphold a legal distinction between them.'"). Now, an argument can be made that Plaintiffs are third party creditors seeking to pierce the Subsidiaries' veil to satisfy Energia's shareholder debt which may signify "outsider reverse veil piercing." *See Goya Foods, Inc. v. Unanue*, 233 F.3d 38, 43 (1st Cir. 2000) ("'reverse piercing' (which makes the corporation liable for the debts of its owner or parent) . . . .") (citation omitted); *see also In re G-I*

*Holdings, Inc.*, 313 B.R. at 655 n.36 (under New Jersey law, "[r]everse corporate veil piercing occurs . . . when a plaintiff seeks to hold a subsidiary liable for the debts of its parent company."). But this form of veil piercing is an extension of the traditional veil piercing doctrine. *C.F. Trust, Inc.*, 306 F.3d at 134 ("Outsider reverse veil piercing extends this traditional veil piercing doctrine to permit a third-party creditor to 'pierce[] the veil' to satisfy the debts of an *individual* out of the corporation's assets.") (emphasis and alteration in original) (citation omitted). At its core, "there is no logical basis upon which to distinguish between a traditional veil piercing action and an outsider reverse piercing action," *C.F. Trust, Inc.*, 266 Va. at 11, and with Delaware recognizing Plaintiffs' traditional alter ego theory, the Subsidiaries' reverse veil piercing argument is ultimately rejected. *Microsoft Corp.*, 2013 WL 5899003 at *6-7.

The Subsidiaries' remaining defenses suffer from similar flaws. Focusing on their unclean hands defense, the Energia Subsidiaries fail to demonstrate an essential element—the immediate and necessary relation between the Plaintiffs' alleged misdeeds and Plaintiffs' alter ego theory. *Sloan*, 996 A.2d at *6 (Del. 2010) ("The inequitable conduct must have an 'immediate and necessary' relation to the claims under which relief is sought.") (citation omitted). Without providing a direct nexus to the instant matter, the Energia Subsidiaries' unclean hands affirmative defense cannot be asserted. With respect to the bankruptcy-related defenses, the gist of these three defenses—consent, collateral estoppel or res judicata, and preemption—is that Plaintiffs cannot bring forth these alter ego claims in light of Plaintiffs' participation and benefit from the Sea Launch's bankruptcy reorganization. However, these defenses contradict the Confirmation Order which provides, *inter alia*, that nothing in the Plan would discharge or release Plaintiffs' claims against Energia and Energia's affiliates, *i.e.*, the Subsidiaries. *See supra* at Findings of Fact Regarding Bankruptcy-Related Affirmative Defenses Nos. 7-12. These bankruptcy

1  related affirmative defenses ring hollow, and ultimately fail, when weighed against

2  the express terms (within the Confirmation Order) that preserve Plaintiffs' claims

3  against Energia and Energia affiliates, ELUS and Energia Overseas.

4     Lastly, the Subsidiaries' contend that Plaintiffs failed to exhaust their

5  available legal remedies in enforcing their breach of contract judgment on Energia

6  before invoking their equitable alter ego theory.  Dkt. No. 888, pp. 95-97 (citing

7  *Sonne v. Sacks*, 314 A.2d 194, 197 (Del. 1973); *Interim Healthcare, Inc. v. Spherion*

8  *Corp.*, No. Civ.A. 18977 NC, 2003 WL 22902879, at *7 n. 27 (Del. Ch. 2003)

9  ("[t]his Court can not exercise its equity jurisdiction on any claim where an

10  adequate remedy at law is available" (citing *Theis v. Board of Educ.*, No. C.A.

11  17270-NC, 2000 WL 341061, at *2 (Del. Ch. 2000))).  The Subsidiaries appear to

12  misunderstand this equitable ruling.  Before invoking the alter ego doctrine, there

13  must first be an independent basis to hold a corporation liable.  *Trustees of the*

14  *National Elevator Industry Pension v. Andrew Lutyk*, 332 F.3d 188, 192 (3rd Cir.

15  2003) (citation omitted) (noting that piercing the veil is not an independent cause of

16  action or a mechanism for imposing legal liability).  Here, summary judgment has

17  already been entered against Energia and Yuzhnoye, Dkt. Nos. 750, 960, for

18  Plaintiffs' breach of contract claims, and this present equitable ruling stands apart

19  from that legal determination because Plaintiffs' veil piercing theory is remedial in

20  nature "for [it] only expand[s] the potential [available] sources of recovery." *Kern*

21  *v. Gleason*, 840 S.W.2d 730, 736 (Tex. App. 1992) (citation omitted).  In other

22  words, the doctrine of veil piercing can be addressed as an available source of

23  recovery before ultimately imposing liability for the underlying judgment.  If

24  Energia's judgment remains unsatisfied after its execution, this alter ego ruling

25  serves as an existing liability that be enforced on the Energia Subsidiaries.  The

26  Court therefore rejects the Subsidiaries' final argument.

27

28

99

1    In sum, after considering the enumerated alter ego factors, the Parties' various

2    arguments and affirmative defenses, and the evidence presented at trial going to the

3    issues of whether the Energia Subsidiaries and Energia are a single economic

4    enterprise, the Court finds that Plaintiffs have met their burden of proving that the

5    Energia Subsidiaries are alter ego corporations of Energia and the Energia

6    Subsidiaries have failed to establish an affirmative defense to defeat this alter ego

7    finding.

8    Accordingly, if Energia fails to satisfy the Court's previous Summary

9    Judgment, Dkt. Nos. 750, 960, the Energia Subsidiaries are liable (as judgment

10   debtors) to the same extent as Energia for such judgment.

11   Plaintiffs shall submit a proposed judgment for this decision **no later than**

12   **June 27, 2016**.  The Energia Subsidiaries shall file any objections to Plaintiffs'

13   proposed judgment **no later than July 11, 2016**.

14   Lastly, the Court has reviewed the Parties' deposition designations.  Dkt. No.

15   868.  The Parties are to pick up these submissions (and any other lodged trial

16   materials) within ten (10) days of this decision's issuance.  Otherwise, the Court

17   shall dispose of such materials.

18   **IT IS SO ORDERED**.

19
     Dated:  May 13, 2016                    _____

20                                           HONORABLE ANDRÉ BIROTTE JR.

21                                           UNITED STATES DISTRICT COURT JUDGE

22

23

24

25

26

27

28